**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ERIN GURSSLIN,<br><br>Plaintiff, | **COMPLAINT** |
| -against- | **CASE NO.:** |
| THE CITY OF ROCHESTER, a municipal entity, POLICE OFFICER JEREMY NELLIST, POLICE OFFICER JOSHUA KELLY, COMMANDER FABIAN RIVERA, LIEUTENANT AARON SPRINGER,<br><br>Defendants. | |

"Properly trained, a man can be dog's best friend."

-- Corey Ford

## I.   PRELIMINARY STATEMENT

Plaintiff ERIN GURSSLIN, by her attorneys, ROTH & ROTH, LLP, complaining of the defendants, respectfully allege as follows:

1.      Plaintiff brings this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of her civil rights.

2.      On September 6, 2018, at approximately 6:00 a.m., Rochester Police Department ("RPD") Officers JEREMY NELLIST and/or JOSHUA KELLY shot and killed Nina, Ms. Gursslin's sixty-pound, four-year-old white mixed-breed dog while they were trespassing in her back yard at 1774 St. Paul Street, Rochester, New York.



*Nina, age four.*

3.      On the morning of the incident, the RPD's Special Weapons and Tactics ("SWAT") team was planning to execute a "no-knock" (a/k/a a "night-time") search warrant at 1771 St. Paul Street, which is located approximately four properties north of Ms. Gursslin's house.

4.      Upon information and belief, Commander FABIAN RIVERA and/or Lieutenant AARON SPRINGER devised the "Pre-Warrant Execution Plan" and ordered NELLIST and KELLY to enter Ms. Gursslin's back yard without a warrant, consent or exigent circumstances.

5.      RIVERA and/or SPRINGER assigned NELLIST and KELLY to provide "protective over watch" for the officers executing the search warrant at 1771 St. Paul Street. They chose Ms. Gursslin's back yard because it was completely fenced-in, and by looking over the six-foot tall wooden fence at the north of her property, the officers had had an unobstructed view of the back door at 1771 St. Paul Street. This allowed NELLIST and/or SPRINGER to aim their sniper rifles over Ms. Gursslin's six-foot fence at the backdoor of 1771 St. Paul Street where the SWAT team was executing the no-knock warrant.

6.      At no point did any RPD officer contact Ms. Gursslin to ask permission to enter her property or to warn her that SWAT officers would be present in her backyard. At no time was there any emergency requiring that any RPD officer enter Ms. Gursslin's property without a warrant, her consent, or warning her.

7.     On September 6, 2018, at approximately 5:50 a.m., Ms. Gursslin arrived home from a road trip and parked in her driveway. When she arrived home, there was a marked RPD vehicle parked on the street directly in front of her house.

8.     Ms. Gursslin brought her bags inside, then exited with Nina on a leash to bring her to the backyard to relieve herself.

9.     Before Ms. Gursslin entered her back yard with Nina, she approached the uniformed RPD officer parked in front of her house and asked him if everything was okay. The officer assured her that she had nothing to worry about and permitted her to walk into her back yard with Nina.

10.     At no point did the uniformed RPD officer warn Ms. Gursslin that there were RPD officers in her backyard.

11.     After Ms. Gursslin entered her fenced-in back, she unleashed Nina—completely unaware that NELLIST and/or KELLY were in her back yard.

12.     NELLIST and/or KELLY immediately fired multiple shots, striking Nina once in the back, killing her. Ms. Gursslin was standing just feet away when the shots were fired, and easily could have been shot herself.

13.     Completely distraught and overcome with grief, Ms. Gursslin got down on the ground and held Nina while she bled to death in her arms.

14.     Ms. Gursslin suffered and continues to suffer extreme emotional and psychological distress from the incident.

15.     According to the City officials, approximately 45,000 dogs reside in the City's approximately 86,000 households. Thus, it was reasonably foreseeable that

the NELLIST and KELLY would encounter a dog when they unlawfully entered Ms. Gursslin's back yard.

16.     Defendants knew or should have known that there was a one-in-two chance that NELLIST and KELLY would encounter a dog before they trespassed into Ms. Gursslin's backyard. They trespassed anyway. It is foreseeable that such reckless behavior can lead to killing innocent dogs like what happened here. Nina's shooting death was a reasonably foreseeable consequence of the unlawful entry.

17.     Police officers rightly remind the public that they are required to make split-second decisions in very difficult situations. These split-second decisions cannot in every case be made reliably so as to avoid harm to innocents. But these imperfect life-or-death decisions demonstrate that entry by an officer, on alert, with weapon drawn, can foreseeably result in shooting deaths, as happened here.

18.     Based on public information, RPD officers shoot and kill dogs at a shocking rate. From 2004 to 2009, RPD officers shot killed almost *one dog every two months*—they fired their guns 217 times at 87 dogs, killing 35. Additionally, between 2013 and 2018, RPD officers shot and killed *almost one dog per month*— they killed about 50 dogs, including Nina.

19.     The City has also disregarded various free training and model policies published by leading national law enforcement organizations, which establish the industry standards for safely interacting with domestic canines during routine police activities.

20.    Nina was killed because the City failed to train its officers not to trespass on residential properties, because the City failed to train its officers how to safely interact with dogs, and because the City has disregarded the industry standards established by leading national law enforcement organizations for safely interacting with domestic canines during routine police activities.

21.    Instead, the City appears to have trained its officers to trespass on residents' properties as a matter of course, without announcing their presence, and then to shoot and kill any dog they may encounter while trespassing on the innocent person's property.

22.    These are unreasonable and unsafe policies, that result in the killing of innocent people and dogs. In this case, it killed Nina. It could have killed Ms. Gursslin. The City should take responsibility for the bullets fired by NELLIST and/or KELLY.

23.    Ms. Gursslin brought this lawsuit to challenge the City's unlawful policies, and to seek justice for herself and for Nina.

## II.    Venue and Jurisdiction

24.    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(a)(3) and (a)(4) and the aforementioned statutory and constitutional provisions.

25.    Venue is proper for because the events occurred in this district.

## III. JURY DEMAND

26.    The Plaintiff respectfully demands a trial by jury of all issues in this matter.

## VI. PARTIES

27.    Plaintiff, ERIN GURSSLIN, is a citizen of the United States and a resident of the County of Monroe, State of New York.

28.    Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the RPD.

29.    Defendants Rochester Police Department ("RPD") POLICE OFFICER ("P.O.") JEREMY NELLIST, P.O. JOSHUA KELLY, COMMANDER FABIAN RIVERA, and LIEUTENANT AARON SPRINGER (collectively, "Defendant RPD OFFICERS," individually, "Defendant RPD OFFICER"), are and were at all times relevant herein, officers, employees and agents of the Defendant CITY and the RPD.

30.    The Defendant RPD Officers are being sued in their individual and official capacities.

31.    At all times relevant herein, the Defendant RPD Officers were members of the RPD's Special Weapons and Tactics ("SWAT") team.

32.     At all times herein, upon information and belief, NELLIST and
KELLY were assigned to the SWAT's Sniper Team.

33.     At all times herein, SPRINGER was the commanding officer of the
RPD's Special Weapons and Tactics ("SWAT") team. As such, he was responsible for
training all members of the SWAT team, including NELLIST and KELLY, and was
in command of the operations on the night of the incident that caused Nina to be
shot and killed. As Commanding officer, SPRINGER is a municipal policymaker
with respect to the RPD's SWAT team policies and training.

34.     At all times herein, RIVERA was the commanding officer of the RPD's
Special Operations Division ("SOD"), which oversees the SWAT team. As such, he
was SPRINGER's supervisor and had responsibility to oversee the operations of the
SWAT team. As such, RIVERA is a municipal policymaker with respect to the
RPD's SWAT team policies and training.

35.     SPRINGER and RIVERA were the officers responsible for ensuring
that, on and before the date of the incident, the SWAT team, including NELLIST
and KELLY, were properly trained on all issues relating to SWAT operations,
including entering onto private property, the use of firearms and in dealing with
domestic animals.

36.     At all times relevant herein, the individual Defendant RPD
OFFICERS were acting under color of state law in the course and scope of their
duties and functions as agents, servants, employees and officers of the Defendant
CITY OF ROCHESTER, and otherwise performed and engaged in conduct

incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the RPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the RPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the RPD.

37.     The individual Defendant RPD OFFICERS' acts hereafter complained of were carried out intentionally, recklessly, with malice, and in gross disregard of Plaintiff's rights.

38.     At all relevant times, the individual defendants were engaged in joint ventures, assisting each other in performing the various actions described herein and lending their physical presence in support and the authority of their offices to one another.

## V.  STATEMENT OF FACTS

39.     On September 6, 2018, Ms. Gursslin lived at 1747 St. Paul Street, Rochester, New York, with Nina, her four-year-old sixty-pound white mixed breed dog.

40.     At all times herein Ms. Gursslin owned the property at 1747 St. Paul Street, Rochester, New York.

## A.  RPD's SWAT operation at 1771 St. Paul Street.

41.     Upon information and belief , on September 6, 2018 at approximately 5:45 a.m., the RPD's SWAT team was preparing to execute a "no-knock" a.k.a "night-time" search warrant at 1771 St. Paul Street—which is located

approximately three properties north of Ms. Gursslin's home and separated by one house and a large vacant lot.

42.    Upon information and belief, pursuant to General Order 415, prior to the SWAT activities on the morning of the incident, SPRINGER and RIVERA, along with the swat team, developed a "Pre-Warrant Execution Plan" related to execution of the no-knock warrant at 1771 St. Paul Street.

43.    Upon information and belief, pursuant to General Order 415, in the "Pre-Warrant Execution Plan", SPRINGER and RIVERA specified the assignments of all SWAT team personnel, including NELLIST and KELLY, who were assigned to unlawfully enter Ms. Gursslin's yard to provide "protective overwatch" for the Entry Team officers who were going to execute the warrant at 1771 St. Paul Street.

44.    Upon information and belief, pursuant to General Order 415, SPRINGER and RIVERA held a "pre-execution briefing" with members of the SWAT team, including NELLIST and KELLY, prior to the incident. At this briefing, SPRINGER and RIVERA discussed the assignments of each officer, including NELLIST and KELLY; and any likely occurrences, such as encountering residents and dogs during the operation.

45.    Upon information and belief, a uniformed RPD officer must be present at the scene of all SWAT activities.

46.    Upon information and belief, the uniformed police officer who was present at the SWAT activities on September 6, 2018 in the vicinity of 1771 St. Paul Street was present at the "pre-execution briefing".

47.     Upon information and belief, the uniformed police officer was informed that NELLIST and KELLY would be present in Ms. Gursslin's back yard during the SWAT team's execution of the search warrant at 117 St. Paul Street.

48.     Upon information and belief, SPRINGER and RIVERA instructed NELLIST and KELLY to enter Ms. Gursslin's yard to provide "protective over watch" for the SWAT Entry Team that was executing the search warrant at 1771 St. Paul Street, as Ms. Gursslin's back yard provided an unobstructed view of the rear of 1771 St. Paul Street, and so they could fire gunshots if necessary.

**B.   NELLIST and KELLY unlawfully entered Ms. Gursslin's backyard at 1774 St. Paul Street without any plan for how to safely interact with any dogs they may encounter while trespassing in her yard.**

49.     Upon information and belief, on September 6, 2018 at approximately 5:40 a.m., NELLIST and KELLY climbed over the fence at the north of Ms. Gursslin's fenced-in back yard without a warrant, without her consent, and without probable cause *and* exigent circumstances.

50.     Prior to climbing over the fence, NELLIST and KELLY did not announce that they were entering Ms. Gursslin's back yard, or otherwise alert Ms. Gursslin to the fact that they were entering her yard.

51.     Upon information and belief, prior to climbing over the fence, there was no emergency requiring NELLIST and KELLY to enter Ms. Gursslin's back yard.

52.     NELLIST and KELLY created a danger to Ms. Gursslin and Nina by trespassing into her back yard without announcing their presence.

53.     Prior to entering Ms. Gursslin's property, NELLIST and KELLY knew or should have known there was a greater than one-in-two chance that a dog resided at Plaintiff's house.

54.     Prior to instructing NELLIST and KELLY to enter Ms. Gursslin's property, SPRINGER and RIVERA knew or should have known there was a greater than one-in-two chance that a dog resided at Plaintiff's house.

55.     Upon information and belief,  in planning the SWAT activity, SPRINGER, RIVERA, NELLIST and KELLY took no steps to learn if a dog lived at Ms. Gursslin's residence and devised no plan for what to do if a dog was encountered by NELLIST and/or KELLY when they unlawfully entered Ms. Gursslin's property.

56.     Upon information and belief, prior to entering Ms. Gursslin's property, NELLIST and KELLY had no plan for what to do if they encountered a dog on her property, other than to shoot and kill the dog.

57.     Upon information and belief, prior to instructing NELLIST and KELLY to enter Ms. Gursslin's property, SPRINGER and RIVERA failed to devise a plan for what to do if NELLIST and KELLY encountered a dog on her property, other than to shoot and kill the dog.

58.     Upon information and belief, despite NELLIST and KELLY being involved in the planning and discussions regarding the SWAT activity in the area of Ms. Gursslin's residence and the execution of the search warrant at 1771 St. Paul

Street, neither NELLIST nor KELLY requested a plan for the safe handling of any dog encountered when they entered Ms. Gursslin's yard.

59.     Upon information and belief, the Defendants' only plan during the SWAT activity in the area of Ms. Gursslin's residence and the execution of the search warrant at 1771 St. Paul Street was to wing it and/or kill any dog that they encountered.

## C.  The RPD fails to warn Ms. Gursslin that SWAT officers are present in her backyard or stop Ms. Gursslin from entering her backyard with Nina.

60.     On September 6, 2018 at approximately 5:50 a.m., Ms. Gursslin returned home from a road trip, and drove her car into her driveway and parked.

61.     When she parked, Ms. Gursslin noticed a marked RPD vehicle parked in the street directly in front of her house.

62.     While she was on her road trip, her downstairs neighbor and tenant watched Nina.

63.     Ms. Gursslin picked up Nina from her downstairs neighbor and exited the front door of the house with Nina on a leash.

64.     Ms. Gursslin approached the uniformed RPD officer parked in front of her house, with Nina on the leash, and asked the officer if she needed to be concerned.

65.     The RPD officer assured Ms. Gursslin that she had nothing to worry about, despite knowing, upon information and belief, that NELLIST and KELLY were present in Ms. Gursslin's back yard.

66.     The uniformed RPD officer observed her walk down the driveway towards her back yard and failed to inform Ms. Gursslin that NELLIST and KELLY were present in her yard.

67.     Upon information and belief, the uniformed RPD officer also failed to warn NELLIST and KELLY that Ms. Gursslin and Nina were walking into the backyard.

68.     Upon information and belief, the uniformed RPD officer failed to inform SPRINGER and RIVERA that Ms. Gursslin and Nina were walking into the backyard.

69.     Upon information and belief, SPRINGER and RIVERA failed to instruct the RPD officer stationed on the street to warn NELLIST and KELLY if any persons and/or dogs were entering the backyard.

70.     Upon information and belief, the uniformed RPD officer parked in front of Ms. Gursslin's house also failed to contact RIVERA and/or SPRINGER to ask for instructions when Ms. Gursslin parked in her driveway, and when she exited her house and began walking towards the back yard.

**D.  NELLIST and/or KELLY shot and killed Nina directly in front of Ms. Gursslin immediately after she and Nina entered the backyard.**

71.     Ms. Gursslin then entered her fenced-in backyard with Nina on her leash.

72.     When Ms. Gursslin entered her back yard with Nina, a motion-sensor light on the side of her house was activated and the light turned on.

- 14 -

73.     Upon information and belief, the motion-sensor light alerted NELLIST and KELLY to Ms. Gursslin and Nina's presence in the yard.

74.     Despite the motion sensor light alerting NELLIST and KELLY, they failed to call out to Ms. Gursslin or otherwise warn her of their presence in her yard.

75.     Not knowing that NELLIST and KELLY were present in her yard, Ms. Gursslin unleashed Nina so she could relieve herself.

76.     Immediately after Nina was unleashed, NELLIST and/or KELLY fired two or more gunshots at Nina.

77.     Nina was struck once in the back. She died from her injuries.

78.     When NELLIST and/or KELLY fired their guns, Ms. Gursslin was present in the enclosed backyard just feet from Nina, and she easily could have been shot as well.

79.     Ms. Gursslin feared she could also be shot.

80.     NELLIST and/or KELLY firing their guns put Ms. Gursslin at unreasonable risk of danger.

81.     Ms. Gursslin screamed out in horror when NELLIST and/or KELLY shot Nina, and then held her, distraught, while she bled to death.

82.     Before NELLIST and/or KELLY shot and killed her, Nina did not growl or exhibit any signs that any dog owner, properly trained police officer, or reasonable person exercising common sense could interpret as threatening.

83.     Upon information and belief, having not been trained on canine behavior or how to safely interact with canines, NELLIST and KELLY became unreasonably fearful of Nina as she approached them.

84.     NELLIST and KELLY's _subjective_ fear, however, was not _objectively_ reasonable, as Nina had not exhibited aggressive behavior towards them.

85.     NELLIST and KELLY were clad in full SWAT uniforms and body armor. The below picture was taken in Ms. Gursslin's back yard after the incident, and, upon information and belief, depicts either NELLIST or KELLY:



86.     Because NELLIST and KELLY were wearing full body armor, even if Nina attacked them, they most likely would not have been injured.

87.     Nina was beloved by Ms. Gursslin and was known to their friends, family and neighbors as a loving companion and a friendly dog that would never hurt anyone.

88.     Ms. Gursslin lost a great deal when Nina was shot and killed for no reason—directly in front of her. Nina had been a member of Ms. Gursslin's family for approximately two years. During that time, Ms. Gursslin invested significant money in Nina's care and maintenance. In addition to the emotional loss of being deprived of a member of her family, Ms. Gursslin lost the amount she invested in Nina over these years, which equals or exceeds $10,000. In addition, Ms. Gursslin lost the anticipated future companionship, love and value of ownership of Nina for her normal lifespan and sustained pain and suffering from observing her shooting.

**E.  The City, through the RPD, SPRINGER, and RIVERA, provided inadequate and/or incorrect training regarding SWAT activities, the legal requirements to enter residential property, canine behavior and how to interact with dogs.**

89.     NELLIST and KELLY were inadequately trained in SWAT activities, which caused Nina's death.

90.     NELLIST and KELLY had insufficient training, or incorrect training, in the legal requirements to enter onto residential property, which caused Nina's death.

91.     The City, SPRINGER and RIVERA trained NELLIST and KELLY that they were permitted to enter residential property without a warrant, consent, or probable cause *and* exigent circumstances.

92.     The City, SPRINGER and RIVERA knew or should have known that dogs were often encountered during law enforcement activity, and particularly during SWAT activity.

93.     NELLIST and KELLY had insufficient training, or incorrect training, in dealing with domestic animals and the use of firearms, which caused Nina's death.

94.     The City and RPD never implemented a policy regarding the safe handling of dogs encountered during law enforcement activities.

95.     The City, SPRINGER and RIVERA never implemented a policy regarding the safe handling of dogs encountered during SWAT activities.

96.     The City, SPRINGER and RIVERA trained NELLIST and KELLY that if they encountered a dog during the performance of their police duties, they were permitted to shoot and kill the dog, even if the dog did not pose an objectively reasonable threat to the officers or others.

97.     The City and RPD never implemented a policy regarding not trespassing on residential properties during law enforcement activities.

98.     The City, SPRINGER and RIVERA never implemented a policy regarding not trespassing on residential properties during SWAT activities.

99.     The City, SPRINGER and RIVERA never implemented a policy regarding safely interacting with dogs encountered while trespassing on residential properties.

100.    Defendants should have reasonably expected that when NELLIST and KELLY jumped the fence and entered the fenced-in back yard to Ms. Gursslin's property, a dog would likely approach them, as more than one-in-two households in Rochester have dogs.

101.    The actual and proximate cause of NELLIST and KELLY shooting and killing Nina was their unlawful entry and trespass onto Ms. Gursslin's property.

102.    Nina's shooting death was a foreseeable consequence of the unlawful entry.

103.    The City appears to have trained its officers that if they subjectively feel fear, however minor the cause of that fear may be, they are entitled to kill anyone or anything who makes them have that subjective feeling.

104.    RPD officers have testified under oath that if they perceive a dog as a threat to themselves or a third person, even if that perception is unreasonable, they are trained to shoot and kill the dog.

105.    The City has not trained its officers that they have a duty to question whether there is a rational basis for their fear before using deadly force.

106.    This is a bad policy, that kills innocent people and dogs. In this case, it killed Nina. It could have killed Ms. Gursslin. The City should take responsibility for the bullets fired by NELLIST and/or KELLY.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### MUNICIPAL LIABILITY UNDER *MONELL*
### UNDER 42 U.S.C. § 1983
### (Against the City)

107.    Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

108.    Plaintiff's constitutional injuries resulted from several interrelated unconstitutional municipal policies and the City is liable to her pursuant to *Monell* v. *Department of Social Services of New York*, 436 U.S. at 658, 694 (1978).

109.    The City and RPD are aware that police officers, and particularly SWAT officers, routinely enter residential property without a warrant, consent or the probable cause *and* exigent circumstances required to legally do so.

110.    The City knew that its officers routinely are required to make decisions regarding whether they are permitted by law to enter and/or search a citizen's private land/property.

111.    The City knew that its officers routinely climbed fences and entered the fenced-in yards of private properties without a lawful basis to do so.

112.    The City's Search and Seizure Policy, General Order 415, provides the City's policy with respect to the search of people, vehicles, dwellings, and buildings, but is silent with respect to the search of the curtilage around a dwelling and/or other privately-owned land.

113.    The City and RPD are aware that police officers, and particularly SWAT officers, shoot and kill dogs at an alarming rate—especially when they are trespassing on residential property.

114.    From 2004 to 2009, RPD officers shot and killed almost *one dog every two months*—they fired their guns 217 times at 87 dogs, killing 35.

115.    From 2013 and 2018, RPD officers shot and killed *almost one dog per month*—they shot and killed about 50 dogs, including Nina.

116.    The City's "shoot-first" policy is unreasonable, because according to the industry standards, long standing documentation and records of injuries from dogs in the United States, dog bites that cause "serious bodily injury" are extremely rare, and fatalities are even rarer.

117.    The SWAT team's "shoot first" policy is even more unreasonable, because SWAT officers wear full body armor, making it even more unlikely that a dog bite could cause "serious bodily injury."

118.    There exist recognized and professionally accepted best practices and industry standards for police encounters with canines, which have been established by several leading national law enforcement organizations. These industry standards have been recognized nationally since at least 2011.

119.    For example, well prior to the date of the incident, the U.S. Department of Justice, through its Community Oriented Policing Services (COPS) Learning Portal, in conjunction with the Center for Public Safety and Justice (CPSJ) Institute of Government and Public Affairs at the University of Illinois,

provided (and continues to provide) free evidence-based training videos and manuals to law enforcement officials and the general public regarding how to safely interact with dogs while engaging in law enforcement activities. *See, e.g.*, Bathurst, Cleary, Delise, VanKavage, & Rushing (2011). The Problem of Dog-Related Incidents and Encounters. Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services. ISBN: 978-1-935676-31-7. This guidebook is intended as a resource for law enforcement officers to help them improve incidents involving dogs and to build the knowledge, skills, and awareness necessary to succeed in these encounters. The publication offers an in-depth look into developing effective strategies in assessing a dog's environment, options for distracting and escaping from a dog; defensive options; dog investigations; and effective gathering of evidence and report writing in cases involving dogs. See:

http://www.nationalcanineresearchcouncil.com/sites/default/files/The-Problem-of-Dog-Related-Incidents-and-Encounters-2011.pdf. The guidebook includes a 5-part video series, Police & Dog Encounters: Tactical Strategies and Effective Tools to Keep Our Communities Safe and Humane. Produced by Safe Humane and the National Canine Research Council, Distributed by COPS. See: https://learn.copstrainingportal.org/.

120.     Another free resource is: "Dog Behavior for Law Enforcement" which was created to address the specific needs of law enforcement when encountering dogs in the course of their duties. The course was developed by spcaLA's Captain of Animal Cruelty Investigations, Cesar Perea. spcaLA's "Dog Behavior for Law

Enforcement" is a course certified by the California Commission on Peace Officers Standards and Training (POST) concerning law enforcement and canines, which is fully evidence-based. The course is also approved by the State Humane Association of California (SHAC). "This course is designed for Officers to properly evaluate dog behavior and modify their own actions and appearance in accordance with a dog's perspective to maintain their safety, the safety of the public, and the well-being of the family pet involved." Information about the training can be accessed at: https://spcala.com/programs-services/professional-training-courses/. Below are links to training flyers and press releases:

   a. https://spcala.com/press-release/spcala-presents-dog-behavior-for-law-enforcement-seminar-to-local-state-and-national-law-enforcement-personnel/

   b. https://www.sogtraining.org/files/EBF/DogBehaviorLawEnforcement_Flyer2016%20(2).pdf

121.    Another free resource is: Law Enforcement Dog Encounters Training (LEDET). A partnership between the National Law Enforcement Center on Animal Abuse (NLECAA), its parent organization, the National Sheriff's Association and VirTra, Inc., resulting in a training program for law enforcement that includes structured coursework on engaging and deescalating dog encounters, along with simulation training. *See*: https://www.sheriffs.org/ledet and for resources visit: https://www.sheriffs.org/dog_encounters.

122.    Another free resource is: Law Enforcement Encounters with Canines
Concepts and Issues Paper. From the International Association of Chiefs of Police
Law Enforcement Policy Center, a paper accompaniment to the IACP's Model Policy
on Law Enforcement Encounters with Canines. The Concepts and Issues paper
provides essential background material supporting documentation for agencies to
guide them in the implementation of the model policy. Also, see Officer Safety
Corner: Dogs and the Police Response: A Guide for Safe, Successful, and Humane
Encounters. See: http://www.policechiefmagazine.org/officer-safety-corner-dogs-and-
the-police-response-a-guide-for-safe-successful-and-humane-encounters/.

123.    The City and RPD chose not to avail themselves of this free training
and model policies or to impart this training and these policies to their police
officers.

124.    Further, two law enforcement leadership associations, the National
Sheriffs Association (NSA), and the International Association of Chiefs of Police
(IACP) have begun to recognize the concerns and complexities associated with dog
encounters and dog shootings. As part of its National Law Enforcement Center on
Animal Abuse (NLECCA), the NSA now also seeks "to train and educate officers on
how to handle officer-dog encounters more safely." The IACP developed a "concepts
and issues paper" on law enforcement encounters with canines (IACP Policy Center,
2015a) that is comprehensive, detailed, and informative, with important
information on dog behaviors such as the fact that "barking alone is not an indicator
that an attack is likely" (IACP, 2015a, p. 5), and suggested measures that can

reduce deadly force with dogs such as carrying dog treats or requesting that dogs be secured. Further, IACP has also issued a model policy on law enforcement interactions with canines (IACP, 2015b). However, the RPD has failed to adopted this policy.

125.    Moreover, the National Police Foundation has published free literature and training materials on reducing dog shootings, including a publication entitled, "An Evidence-Bates Approach to Reducing Dog Shootings in Routine Police Encounters: Regulations, Policies, Practices and Training Implications". The RPD has failed to implement any of the training or policies recommended by the NPF.

126.    Furthermore, a review of the trade publication, Police: The Law Enforcement Magazine reveals a number of articles on the subject of dog encounters and shootings by police informing officers about the issues and associated concerns from an officer perspective.

127.    Moreover, the City and the RPD failed to avail themselves of training resources offered by other States:

> a. **Illinois**: A two- to four- hour course on Animal Abuse and Cruelty; Canine Behavior and Police Response pursuant to statute P.A. 098-0311 50 ILCS 705/10.14. Topics include: components of animal abuse and cruelty, impact of animal abuse, cruelty, and police response, basic dog behavior, defining the threat, and officer response.

b. **<u>Michigan</u>**: Canine encounter training focused on the following: when to shoot an animal or pet and managing canine aggressions. The training recognizes that some dogs may pose a serious threat and deadly force is allowed but taking a few extra moments to fully assess an encounter can possibly prevent an attack or shooting.

c. **<u>Nevada</u>**: In response to a statute that requires peace officers "who are likely to encounter companion animals" to attend companion animal encounters training, Nevada utilizes The Problem of Dog-Related Incidents and Encounters COPS guidebook. The training is delivered online and includes training videos and a test.

d. **<u>Ohio</u>**: The Ohio Peace Officer Training Commission offers a two-hour course for officers on understanding common companion animal behaviors. Topics include: assessing the situation, communicating with dogs, police and dog body language, use of force considerations.

e. **<u>Texas</u>**: The Texas Commission on Law Enforcement offers a four-hour Canine Encounters Course (course #4065) which is a legislatively mandated course to be completed by the second year for new officers and as part of intermediate and advanced proficiency certifications for existing officers. The course

includes lecture, group discussion, scenario training and equipment demonstration.

    f.  **Oregon**: Includes a few slides on dogs in the community for Basic Parole and Probation Field Considerations training only.

    g.  **Tennessee**: The Tennessee Law Enforcement Training Academy offers a two-hour course on dealing with dangerous dogs and countering canine attacks. Course focus is on identifying basic animal behavioral characteristics; situations and environments in which an animal is more likely to be or become aggressive; and learning the techniques to counter and survive a canine attack.

128.    The standard in the law enforcement industry is evidenced by US DOJ free training, and the NSA, IAPC, NPF and various state's training and publications for law enforcement and the public regarding canine behavior and how to safely interact with canines without unnecessarily injuring them.

129.    Despite the increasing attention on dog shootings by police, the RPD has failed to adopt policies or training in accordance with industry standards, despite the potential for liability, continued public scrutiny, and damage to police-community relationships when pet dogs are shot in questionable circumstances.

130.    According to industry standards, long standing documentation and records of injuries from dogs in the United States, dog bites that cause "serious bodily injury" are extremely rare, and fatalities even rarer.

131. According to the industry standards, the perception that a single dog presents a life-threatening danger to a healthy adult male who is wearing full SWAT uniform and body armor is objectively unreasonable, and it has been well-documented to be a false perception.

132. Upon information and belief, the City and the RPD do not provide any training to officers on how to properly and lawfully interact with dogs they encounter at residential properties.

133. The City's failure to train its officers on how to safely interact with dogs is unreasonable because dogs reside in more than 50% of households in Rochester.

134. The City estimates that there are approximately 45,000 dogs residing in households in the City. *See* Sarah Traddeo and Brian Sharp, *Dog Census helps track population, safety*, DEMOCRAT & CHRONICLE (Feb. 21, 2017).

135. According to Census data, there are approximately 86,000 households in the City. *See* https://www.census.gov/quickfacts/fact/table/rochestercitynewyork/HSD410217#HSD410217.

136. Thus, the City and RPD knew or should have known that any time a police officer enters a residential property, there is greater than 50% chance the officer will encounter a dog.

137. That is why the City warns residents to take the following precautions "when visiting an unfamiliar house or dwelling" to avoid dog bites:

      a.  Announce arrival or call ahead if possible

      b.  Look for signs of a dog (e.g., bowl, toys, etc)

      c.  Jiggle fence, shake keys, whistle

      d.  If a dog is present, ensure it is secured before entering home

      e.  Inquire about dog before entering home

*See* City of Rochester, Dog Bite Prevention, available at:

https://www.cityofrochester.gov/article.aspx?id=8589946022.

138.   Apparently, the City does not provide the same instructions to RPD officers, but instead simply instructs them to shoot the dog if they are subjectively fearful.

139.   The City apparently does not provide any training whatsoever to its police officers on how to safely interact with dogs.

140.   In 2013, the Second Circuit Court of Appeals admonished law enforcement agencies in Monroe County to provide better training to their officers, stating: "Deputy Carroll, in particular, has apparently killed two other dogs in the course of executing no-knock search warrants, which indicates that officers in the County encounter these situations more frequently than they would probably prefer and that planning and training—while not always constitutionally required—may be advisable to avoid future tragedies and future litigation." *Carroll* v. *County of Monroe*, 712 F.3d 649 (2d Cir. 2013).

141.   The City's decision not to heed this warning has indeed led to approximately 50 dog-shooting incidents by RPD officers from 2013 and 2018, including Nina's tragic shooting death and the instant litigation.

142.   The City knew or should have known that officers routinely encountered domesticated canines on patrol and during SWAT activities without necessary and appropriate policies and training that meets the standard in the industry.

143.   The regularity of such encounters while operating below the industry standard made the potential for constitutional violations to occur plainly obvious to the City.

144.   The City did not adopt appropriate policies to govern how officers could safely interact with domesticated canines without unnecessarily injuring the animals.

145.   The City knew or should have known its officers were not properly trained regarding how to safely interact with domesticated canines without unnecessarily injuring the animals.

146.   The City knew (or should have known) that the US DOJ publishes free training for law enforcement and the public regarding canine behavior and how to safely interact with canines without unnecessarily injuring them.

147.   The City, however, did not provide this free and readily available training to its officers or even make them aware of its existence.

148.   The City knew or should have known  that its officers routinely misidentified friendly canines as threats, as happened in this matter.

149.   The City knew or should have known that it had not provided police officers with a non-lethal plan regarding how to interact with domesticated canines while on patrol without unnecessarily injuring the animals.

150.   The City knew or should have known that it had not provided police officers with non-lethal options regarding how to safely interact with domesticated canines while on patrol without unnecessarily injuring the animals.

151.   As a direct result of the City's deficient policy and training, City officers have routinely used excessive force, including deadly force, when encountering non-threatening dogs; as happened in this matter.

152.   In the alternative, as a direct result of the City's deficient policy, when City officers encountered aggressive dogs, they routinely used excessive force, often immediately resorting to the use of deadly force, instead of lesser objectively reasonable force; as happened in this matter.

153.   Based on the pattern of past excessive force incidents involving canines, the City was on notice that absent additional and/or different policies and training, City officers would routinely use excessive and/or deadly force against non-threatening canines or aggressive canines when not objectively reasonable.

154.   For example, on October 19, 2018, RPD Officer Javier Algarin unlawfully entered Charles Dempsey's fenced-in back yard by jumping the fence, without a warrant, consent or exigent circumstances. Algarin also did not knock or

announce his presence. After jumping the fence, he encountered a four-year-old black Labrador Retriever. Algarin had the time and opportunity to avoid using lethal force, but instead, he shot Tesla twice, killing her. But for Algarin's trespass, he would not have shot and killed Tesla. But for Algarin's failure to knock and announce, he would not have killed Tesla.

155.    On June 10, 2018, Officers Brian Cala and Jen Trenton unlawfully entered the fenced-in yard at 236 Belknap Street, Rochester, New York, without a warrant, consent or exigent circumstances. The officers failed to knock and announce their presence. Upon entering the yard, they encountered a friendly dog named Sampson. The officers had the time and opportunity to avoid using lethal force, but instead, Cala shot Sampson in the head, killing him. But for the officer's trespass, they would not have shot and killed Sampson. But for the officer's failure to knock and announce, they would not have killed Sampson.

156.    On September 16, 2016, Officer Tito Batson entered the backyard of 39 Lenox Street, Rochester, New York without a warrant, exigent circumstances, or consent. While trespassing in the yard, Baston encountered a dog from approximately 30 feet away, and fired a total of seven shots from his department-issued firearm, while a resident of the property was on the back porch in the yard. Luckily, neither the dog nor the person was shot, but the Officer's trespass and reckless conduct created an unreasonable risk that the person or dog could have been shot and killed.

157.   On July 21, 2018, Officer James Breen, while executing a warrant at 14 Bauer Street, Rochester, New York fired two shots at a dog, striking it once. Officer Breen had the time and opportunity to use pepper spray or other non-lethal force but chose instead to shoot the dog with his department-issued Glock semi-automatic handgun.

158.   On June 20, 2018, Officer Derek Sterling shot a dog while responding to a 911 call in the vicinity of 105 Ambrose Street, Rochester, New York. Sterling first saw the dog from approximately 50 feet away and had the time and opportunity to avoid using any force against the dog and could have used non-lethal force. Instead, Sterling chose not to retreat to safety or use non-lethal force and fired two rounds from his department-issued Glock semi-automatic handgun, striking the dog at least once.

159.   On April 22, 2018, Officer Justin Whitmore shot a dog while responding to a 911 call in the vicinity of 339 First Street, Rochester, New York. Whitmore had the time and opportunity to avoid using any force against the dog and could have used non-lethal force. Instead, Whitmore chose to shoot the dog with his department-issued Glock semi-automatic handgun, striking the dog in the head.

160.   On March 9, 2018, Officer Connor Edwards responded to a report of an abandoned dog at 222 Spencer Street, Rochester, New York, a vacant property. The only reason the officers were at the property is because of the report of an abandoned dog. Nevertheless, the officers apparently devised no plan for what to do when they encountered the dog, other than to shoot it. Upon entering and searching

the property, Edwards encountered the dog and fired three rounds of buckshot with his department-issued shotgun at the dog[1], hitting the dog with one round. Edwards could have easily avoided using lethal force by devising a plan of what to do when they encountered the dog, but the officers chose to enter the property with no plan other than to simply shoot the dog. Moreover, Edwards had the time and opportunity to avoid using any force against the dog and could have used non-lethal force.

161.    On January 18, 2018, Investigator Burgoon and Sergeant Lee shot a dog while executing a search warrant at 856 North Plymouth Avenue, Rochester, New York. Investigator Burgoon shot the dog once with a shotgun, and Sergeant Lee shot the dog once with his handgun. Prior to executing the warrant, the officers did not develop a plan for how to safely handle any dog they might encounter upon entering the property, despite knowing there was a one-in-two chance that they would encounter a dog.

162.    According to publicly available information, between 2013 and 2018, there were at least 40 other incidents where RPD officers discharged their firearms at dogs in various scenarios in the line of duty. Numerous times these incidents involved officers responding to calls regarding dogs, but the officers devised no plan for interacting with the dog other than shooting it. At least 10 of those incidents

---

[11] Notably, the intentional killing of a dog, with no justifiable purpose, is a felony crime. McKinney's Agriculture and Markets Law § 353-a. Thus, the exact conduct by Connors—intentionally killing a stray dog—if done by a non-police officer, would be chargeable as felony animal cruelty.

involved officers who entered a property to execute a warrant and apparently lacked any plan for how to safely deal with any dog they encountered during the execution of the warrant.

163.    Despite it being plainly obvious to the City that additional and/or different policies and training was necessary to protect civil rights, the City did not adopt or implement the additional and/or different policies and training.

164.    Furthermore, the City did not adopt, implement, or enforce, an effective internal affairs or disciplinary procedure/program to promote and require lawful conduct from its police officers, ensure accountability to citizens, and protect the rights of citizens.

165.    The City's policy of having a deficient internal affairs/disciplinary procedure/program, was also a moving force behind the Defendant RPD Officers' unlawful conduct because they learned that City officers were permitted to use excessive force against canines and that would not suffer any negative employment or criminal consequence as a result of same.

166.    Despite committing a trespass, using unlawful force, and intentionally submitting a false and/or misleading report to a law enforcement agency, the City has not criminally charged NELLIST or KELLY or disciplined them in any way.

167.    Despite the fact that RPD officers committed a trespass, used unlawful force, and intentionally submitted false and/or misleading official reports to a law enforcement agency, the City did not retrain NELLIST or KELLY.

168.    At all relevant times, SPRINGER as the commanding officer of the RPD's SWAT team, was a policymaker on behalf of the City and RPD.

169.    SPRINGER explicitly trained his SWAT team officers, including NELLIST and KELLY to trespass on residential property during the execution of search warrants and other SWAT activities.

170.    SPRINGER knew or should have known that more than half of residential properties in Rochester have dogs, but SPRINGER did not require the SWAT team to devise plans for how to safely deal with any dogs encountered during SWAT activities.

171.    Here, SPRINGER's failure to devise a plan to safely deal with any dog that might be encountered when he instructed NELLIST and KELLY to trespass in Ms. Gursslin's yard was the moving force behind Nina's shooting death.

172.    RIVERA is the SDO commander and was present at the scene of the SWAT activities taking place in the vicinity of Ms. Gursslin's home. RIVERA was SPRINGER's superior. RIVERA also failed to require that the SWAT team devise a plan for safely interacting with any dogs that might be encountered on the night of the incident, including any dogs encountered by NELLIST and KELLY when they were instructed to trespass in Ms. Gursslin's yard. RIVERA's failure to oversee SPRINGER and the SWAT team was the moving force behind Nina's shooting death.

173.    The City maintains an official policy of permitting its officers to trespass on residential properties in the course of their law enforcement duties, in violation of residents' Fourth Amendment right against unreasonable searches.

174.    In fact, the City, through the RPD, apparently trained its officers that they are permitted to enter residential properties without a warrant, consent, or the probable cause **_and_** exigent circumstances required to lawfully do so.

175.    The City and RPD have ratified this unconstitutional policy by failing to discipline officers for trespassing on residential property—even when damage is caused to a resident's person, pet or property as a result of the unlawful entry.

176.    For example, on March 3, 2019, numerous RPD officers unlawfully entered the apartment of Mr. Edward Goolsby Jr. located at 1 Pleasant Street, Apt. 612, Rochester, New York, in response to a complaint regarding a dog. Mr. Goolsby filed a complaint with the Professional Standards Section, PSS # 2019-0201, which determined that the RPD officers unlawfully entered Mr. Goolsby's apartment. Nevertheless, upon information and belief, none of the officers who unlawfully entered Mr. Goolsby's apartment were reprimanded or disciplined in any meaningful way, and the RPD did not retrain its officers on the legal requirements to enter residential property.

177.    The City, through the RPD, maintains an official policy that RPD officers may shoot and kill any dog they encounter in the course of their law enforcement duties, even if it is not objectively reasonable for the officer to believe

the dog poses a threat of physical harm to the officer or others—in violation of resident's Fourth Amendment rights against unreasonable seizures.

178.    Even if it did not rise to the level of an "official policy", the City tolerated or adopted an unofficial custom of permitting its officers, and particularly its SWAT officers, to shoot and kill any dog they encounter in the course of their law enforcement duties, even if it is not objectively reasonable for the officer to believe the dog poses a threat of physical harm to the officer or others—in violation of resident's Fourth Amendment rights against unreasonable seizures.

179.    The City and RPD have also exhibited deliberate indifference to the longstanding and pervasive practice of RPD officers, and particularly SWAT officers, violating residents' Fourth Amendment right against unreasonable seizures by shooting dogs in the course of their law enforcement duties by its failure to implement remedial training or discipline any of the offending officers.

180.    These are bad policies that kill innocent people and dogs. In this case, it killed Nina. It could have killed Ms. Gursslin. The City should take responsibility for the bullets fired by NELLIST and/or KELLY.

181.    The actions of NELLIST and/or KELLY violated Ms. Gursslin's rights under the Constitution.

182.    As a result of Defendants' impermissible conduct, Plaintiff was injured and harmed.

183.    The Plaintiff is are entitled to compensatory and punitive damages in an amount to be determined at trial, together with attorney's fees and costs.

## SECOND CLAIM FOR RELIEF
## UNREASONABLE SEARCH OF CURTILAGE
## UNDER 42 U.S.C. § 1983

184.     Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

185.     The Fourth Amendment provides, in relevant part, that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

186.     When NELLIST and KELLY jumped the privacy fence and entered the Plaintiff's fenced-in backyard, they did not have consent, a warrant, or the probable cause *and* exigent circumstances required to lawfully do so.

187.     There was no life/death exigency that required NELLIST and KELLY to immediately enter Plaintiff's locked backyard.

188.     NELLIST and KELLY did not knock and announce their presence before entering Plaintiff's backyard, or otherwise warn Plaintiff that they were in her yard.

189.     Had Defendants announced their presence, Ms. Gursslin would not brought Nina into the back yard to relieve herself.

190.     NELLIST and KELLY were instructed to unlawfully enter Ms. Gursslin's back yard by SPRINGER and/or RIVERA, who were their superiors and commanding officers.

191.   No objectively reasonable police officer would have believed it was lawful to jump a privacy fence and enter a private person's backyard without consent, a warrant, or probable cause *and* exigent circumstances.

192.   By jumping the fence into Plaintiff's back yard and approaching within feet of Plaintiff's home, NELLIST and KELLY entered the home's curtilage.

193.   NELLIST and KELLY's entry into the curtilage without a warrant constituted an unreasonable search in violation of Plaintiff's rights as guaranteed by the Fourth Amendment to the United States Constitution.

194.   This violation of Plaintiff's constitutional rights caused the loss of Nina and the other harms identified herein.

195.   As a result, the Plaintiff suffered physical and emotional injuries, monetary losses, and loss of the present and future value of her property, as well as other damages to be set forth and proved at trial.

196.   The Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, together with attorney's fees and costs.

**THIRD CLAIM FOR RELIEF**
**UNLAWFUL SEIZURE OF PERSONAL PROPERTY**
**FOURTH AND FOURTEENTH AMENDMENTS**
**UNDER 42 U.S.C. § 1983**

197.   Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

198.   The Fourth Amendment provides, in relevant part, that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"

199.    "Effects," as referenced in the Fourth Amendment, includes, personal property. *See United States* v. *Place*, 462 U.S. 696, 701 (1983).

200.    A Fourth Amendment "seizure" of personal property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States* v. *Jacobsen*, 466 U.S. 109, 113 (1984).

201.    The destruction of personal property has been determined to be a meaningful interference with an individual's possessory interest in that property. *See id.* at 124–25.

202.    As such, the Second Circuit has held that "the unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment." *Carroll* v. *Cty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013).

203.    Nina was allegedly regarded as property under the law, even though the Plaintiff considered her to be a member of her family.

204.    Therefore, to determine if Nina's warrantless seizure was objectively reasonable, we "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States* v. *Place*, 462 U.S. 696, 703 (1983).

205.    NELLIST and/or KELLY shot and killed Nina while they were present in Plaintiff's backyard without a warrant, consent, or the probable cause and exigent circumstances required to legally do so.

206.    The violent shooting and killing of Nina, a friendly family pet dog, just feet from the Plaintiff, while NELLIST and KELLY were trespassing in Plaintiff's yard,  is a significant intrusion on Ms. Gursslin's Fourth Amendment interests.

207.    The unlawful entry and failure to knock and announce created the circumstances giving rise to the subsequent shooting of Nina.

208.    Nina was not growling or otherwise acting aggressively towards NELLIST and KELLY when they shot and killed her.

209.    No reasonable SWAT team officers in NELLIST and KELLY situation would have believed they were in imminent danger of serious physical injury at the time they shot and killed Nina.

210.    Under the totality of the circumstances, NELLIST and KELLY acted unreasonably when they shot and killed Nina.

211.    Defendants are not entitled to qualified immunity, as it was clearly established in 2018 that it was unlawful for them to trespass in Plaintiff's back yard and shoot Plaintiff's dog.

212.    Defendants violated General Order 415, "Searches/Seizures: By Dynamic Entries, Search Warrant, Arrest Warrant, Without Warrant," which required them to, at the least, seek Plaintiff's consent to enter her property.

213.    Defendants deprived Plaintiff of Nina by killing her, in violation of her Fourth Amendment rights.

214.   As a result, the Plaintiff suffered physical and emotional injuries, monetary losses, and loss of the present and future value of her property, as well as other damages to be set forth and proved at trial.

215.   Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, together with attorney's fees and costs.

**FOURTH CLAIM FOR RELIEF**
**UNLAWFUL SEIZURE OF PLAINTIFF**
**FOURTH AND FOURTEENTH AMENDMENTS**
**UNDER 42 U.S.C. § 1983**
**(Against NELLIST and KELLY)**

216.   Plaintiff re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

217.   The Defendants, individually and collectively, were acting under color of state law when they performed the acts complained of herein.

218.   The point of the Fourth Amendment's prohibition against trespass into property was in part to prevent damage done by the trespassers. The Fourth Amendment was ratified not just to protect privacy interests, but also out of a concern that governmental trespass to property could lead to subsequent physical harms.

219.   NELLIST and KELLY seized Ms. Gursslin by shooting Nina directly in front of her, as she was standing just feet away.

220.   As a result, the Plaintiff suffered physical and emotional injuries, monetary losses, and loss of the present and future value of their property, as well as other damages to be set forth and proved at trial.

221.   The Plaintiff is entitled to compensatory and punitive damages in an amount to be determined at trial, together with attorney's fees and costs.

**WHEREFORE and in light of the foregoing**, Plaintiffs respectfully requests that the Court assume jurisdiction and:

[a] Award appropriate compensatory and punitive damages.
[b] Empanel a jury.
[c] Award attorney's fees and costs.
[d] Award such other and further relief as the Court deems to be in the interest of justice.

Dated: New York, New York  Respectfully Submitted,
   July 15, 2020

         ROTH & ROTH, LLP


By:   _____~//s//~_____
   Elliot D. Shields
   Roth & Roth, LLP
   Counsel for Plaintiff
   192 Lexington Avenue, Suite 802
   New York, New York 10016
   Phone:  (212) 425 1020
   Fax:   (212) 532 3801
   Email eshields@rothandrothlaw.com