**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

ERIN GURSSLIN,

                                    Plaintiff,          **20-cv-6508 (EAW)(MJP)**

                    -against-

THE CITY OF ROCHESTER, a municipal
entity, POLICE OFFICER JEREMY
NELLIST, POLICE OFFICER JOSHUA
KELLY, COMMANDER FABIAN
RIVERA, LIEUTENANT AARON
SPRINGER,

                                    Defendants.

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO
PRECLUDE JAMES CROSBY, Ph.D**

Elliot Dolby Shields
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016

<u>**Table of Contents**</u>

Table of Contents …………………………………..…….….……………………..…….. i

Table of Authorities …………………………………..…….….……………………iii

PRELIMINARY STATEMENT……………………..…..…………..…..…..…....……………1

STANDARD OF REVIEW ……………………………………..………..…………………1

ARGUMENT ……………………………..……...…………………………….....……2

I.    THE COURT SHOULD NOT PRECLUDE DR. CROSBY'S TESTIMONY REGARDING THE FOURTH AMENDMENT, WARRANTS, AND SEARCHES ……………………… 2

  A.  Dr. Crosby is Qualified to Testify on Fourth Amendment Applications ……………..2

  B.  Crosby's Testimony Will Aid the Jury in Understanding Fourth Amendment Issues…………………………………………………………………….. 3

   1. *Crosby's opinion will aid the jury in generally understanding the Fourth Amendment Issues in this case*…………………………………………………3

   2. *Crosby's opinion regarding when officers may discharge their firearms is both legally correct and appropriate in this case, and should not be excluded*………………………………………………………..………4

   3. *The City's argument that "unauthorized entry" and "unauthorized search" are distinct Fourth Amendment considerations is legally incorrect*…………………6

   4. *In this case there is no question that the fenced-in backyard was the curtilage to Ms. Gursslin's property*………………………………………………..………7

  C.  Crosby's Fourth Amendment Conclusions are Based on Extensive Review of Deposition Testimony and Other Information……………………………………...…7

  D.  Crosby provided a complete report and defendants attempt to mischaracterize his testimony must be rejected…………………………………………………………..10

  E.   Dr. Crosby's conclusions of violations of good and accepted police practices and professional standards of care are based on reliable principles and methods………11

 II.   DEFENDANTS' ARGUMENT THAT THE COURT SHOULD PRECLUDE DR. CROSBY'S PROFFERED EXPERT TESTIMONY REGARDING "SWAT" IS A *RED*

*HERRING*………………………………………………………………………………….15

A. Defendants' argument that Dr. Crosby is not qualified to serve as an expert in SWAT tactics is a *Red Herring*………………………………………………………………….…... 15

B. Dr. Crosby's swat-related opinions are based on facts and data from the record…………16

   1.  Dr. Crosby's Analysis of "Situational Awareness"…………………………………16

   2.  Lack of Investigation into the Presence of a Dog……………………………………18

   3.  Inconsistent Testimonies Regarding Notification of the SWAT Operation…………18

III. THE COURT SHOULD NOT PRECLUDE THE PROFFERED EXPERT TESTIMONY REGARDING DOG BEHAVIOR AND DOG ENCOUNTERS………………………..…………19

A. Dr. Crosby's testimony will aid the jury.……………………………………………………19

B. Dr. Crosby's testimony will aid the jury, not replace it.…………………………………21

C. "Good and Accepted Police Practices" and Professional Standards of Care Are Essential Topics for Expert Testimony, and Defendants' Arguments to the Contrary Are Without Merit………………………………………………………………………………….…... 21

D. Dr. Crosby Reliably Applies His Principles to the Facts of This Case……………..……22

IV.  DR.  CROSBY'S  TESTIMONY  ON  FIREARMS  IS  RELEVANT  AND NECESSARY…………………………………………………………………………………23

V. THE COURT SHOULD NOT PRECLUDE THE PROFFERED EXPERT TESTIMONY REGARDING *MONELL* LIABILITY……………………………………………………..……23

A. Dr. Crosby Is Qualified to Opine on the Facts Relevant to Municipal Liability…………23

B. Dr. Crosby's Testimony Assists the Jury, Rather than Replaces It………………………24

C. Dr. Crosby's Conclusions Are Based on Sufficient Data and Facts………………………24

D. Dr. Crosby's Opinions on Violations of Good and Accepted Police Practices Are Based on Reliable Principles and Methods……………………………………………………………24

E. Dr. Crosby Applies His Principles and Methods to the Facts of This Case………………25

CONCLUSION ……………………………………………………………………….. 25

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amorgianos V. National R.R. Passenger Corp.*,
    303 F.3d 256, 267 (2d Cir. 2002),…………………………….…....................2, 4

*Azurdia v. City of New York*,
    2019 WL 1406647 (E.D.N.Y. March 28, 2019)…………………………..…………6

*Branson v. Price*,
    2015 WL 5608120 (D. Colo. Sept.24, 2015)…...…….…….…….…...……..…….1, 3, 19

*Brocuglio v. Proulx*,
    67 F. App'x 58, 61 (2d Cir. 2003) …………………………………….………..7

*Cowan ex rel. Estate of Cooper v. Breen*,
    352 F3d 756, 762 (2d Cir 2003)……………………………….…......................5

*Florida v. Jardines*,
    569 U.S. 1, 11 (2013) ……………………………………………………….…….6

*Graham v. Connor*,
    490 U.S. 396 (1989)…………………………………………….…......................5

*Jimenez v. City of Chicago*,
    732 F.3d 710, 721 (7th Cir. 2013)…………………………….……...…………..13

*Katz v. United States*,
    389 U.S. 347, 360 (1967)…………………………………………….……..6

*Nimely v. City of New York*,
    414 F.3d 381 (2d Cir.2005)……………………………………….…....................2, 3

*Restivo v. Hessemann*,
    846 F3d 547, 580 (2d Cir 2017) ……………………………………..…..……*passim*

*Smith v. City of Buffalo*
    2020 WL 8083655 *4 (W.D.N.Y. Sept. 29, 2020)…………………………………19

*Tardif v. City of New York*
    344 F. Supp. 3d 579, 598-99 (S.D.N.Y. 2018)......................................................16

*Tennessee v. Garner*,
    471 U.S. 1, 11 (1985) …………………………………….….......................5

*United States v. Maxi*,
   886 F.3d 1318, 1327 (11th Cir. 2018)................................. …………………..………….6-7

*U.S. v. Napout*,
   963 F.3d 163, 187 (2d Cir. 2020)………………………………………..…............2

*Vale v. United States,*
   673 F. App'x 114, 116 (2d Cir. 2016)………………………………………………2

**Rules**

Federal Rule of Civil Procedure 26(a)(2)(B)(ii)                              12, 13

Federal Rule of Civil Procedure 30(b)(6)                                          5

Rule 702 of the Federal Rules of Evidence                                      1-2

## **PRELIMINARY STATEMENT**

Plaintiff, Erin Gursslin ("Ms. Gursslin"), respectfully submits this memorandum in opposition to Defendants' motion to preclude Plaintiff's expert, James Crosby, Ph.D.

Defendants argue that Dr. Crosby lacks the requisite qualifications and that his testimony would not assist the trier of fact. However, Dr. Crosby's extensive experience and expertise in law enforcement, canine behavior, and use of force make him eminently qualified to opine on the matters at issue in this case. His testimony is relevant, reliable, and will be invaluable to the jury in understanding the complex issues surrounding police procedures, canine encounters, and municipal liability. His testimony is both relevant and reliable under Federal Rule of Evidence 702 and should be admitted.

In *Branson v. Price*, No. 13-CV-03090-REB-NYW, 2015 WL 5608120 (D. Colo. Sept. 24, 2015), the court faced a similar motion to exclude Crosby's testimony. The court in *Branson* denied the motion, holding that Crosby's testimony was both reliable and relevant, and that his expertise in canine behavior and use of force would assist the jury in understanding the officer's actions. This decision further underscores the admissibility of Crosby's testimony in this case.

For these reasons and the reasons explained below, Defendants' motion should be denied.

## **STANDARD OF REVIEW**

Under Rule 702 of the Federal Rules of Evidence, expert testimony is admissible if the expert is qualified by knowledge, skill, experience, training, or education and the testimony will assist the trier of fact, is based on sufficient facts or data, is the product of reliable principles and methods, and is reliably applied to the facts of the case. Fed. R. Evid. 702. Notably, while Rule 702 was amended effective December 1, 2023, the Advisory Committee specifically noted that,

"[n]othing in the amendment imposes any new, specific procedures." Fed. R. Evid. 702, Advisory Committee Notes, 2023 Amendments.

The Second Circuit has consistently upheld a liberal standard of admissibility under Rule 702, requiring courts to first assess whether a proposed expert is qualified, and then to evaluate the reliability and relevance of the testimony. *See, e.g., Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016) (summary order) ("As a threshold matter, trial courts must consider whether the witness is qualified ... before reaching an analysis of the testimony itself.").This gatekeeping function ensures that expert testimony is both relevant and reliable but leaves the testing of such testimony to the adversarial process, including cross-examination and the presentation of contrary evidence. See *Vale v. United States*, 673 F. App'x 114, 116 (2d Cir. 2016); *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005); *U.S. v. Napout*, 963 F.3d 163, 187 (2d Cir. 2020).

Rule 702 is a rule of inclusion rather than exclusion, with the rejection of expert testimony being the exception rather than the rule. As emphasized in *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002), the proper means of addressing potentially shaky evidence is through cross-examination and presentation of opposing evidence, not exclusion.

## ARGUMENT

I.  **THE COURT SHOULD NOT PRECLUDE DR. CROSBY'S TESTIMONY REGARDING THE FOURTH AMENDMENT, WARRANTS, AND SEARCHES.**

A. **Dr. Crosby is Qualified to Testify on Fourth Amendment Applications**

Jim Crosby's 22 years of experience as a police officer, rising to the rank of lieutenant, provide him with extensive practical knowledge and experience in the application of the Fourth Amendment in the field. (Ex. 1, Crosby Report) Throughout his career, Crosby regularly applied Fourth Amendment principles in real-world policing situations, including the execution of search warrants, arrests, and the use of force—issues that are central to this case.

2

Crosby's expertise in canine behavior and law enforcement practices has been recognized in numerous cases across the country, including *Branson v. Price*, where his testimony was admitted over similar objections. The court in *Branson* found that Crosby's unique combination of expertise in law enforcement and canine behavior made his testimony particularly valuable in assessing the reasonableness of the officer's use of force. This precedent strongly supports the admissibility of Crosby's testimony in this case.

B. **Crosby's Testimony Will Aid the Jury in Understanding Fourth Amendment Issues**

> **1.  *Crosby's opinion will aid the jury in generally understanding the Fourth Amendment issues in this case.***

Crosby's testimony is not intended to instruct the jury on the legal standards of the Fourth Amendment, which is the court's role. Instead, his testimony will assist the jury in understanding how those legal standards are applied in practical, on-the-ground situations faced by police officers. His insights into police practices, policies, and training will help the jury evaluate whether the actions of the officers in this case were consistent with constitutional standards.

Experts like Crosby are often called upon to provide testimony on police practices and their relationship to constitutional standards, even when they are not legal scholars. The court in *Branson v. Price*, 2015 WL 5608120 (D. Colo. Sept. 24, 2015), acknowledged the importance of such testimony, noting that Crosby's experience in law enforcement and his specialized knowledge in canine behavior provided valuable context for the jury. The court recognized that while Crosby is not a legal expert, his testimony was crucial in helping the jury understand the practical implications of Fourth Amendment law as it applied to the officers' actions.

The Second Circuit has also recognized the value of expert testimony on police practices and the Fourth Amendment in cases such as *Nimely v. City of New York*, 414 F.3d 381 (2d Cir. 2005). In *Nimely*, the court held that expert testimony can be helpful to the jury in understanding

3

complex issues that are not within the common knowledge of the average juror. Dr. Crosby's testimony on the Fourth Amendment will provide the jury with valuable insights into police procedures, the concept of curtilage, and the requirements for lawful entry onto private property.

Crosby's testimony will help the jury bridge the gap between abstract legal principles and the realities of police work. For instance, in this case, Crosby can explain how officers are trained to assess situations rapidly and make decisions under stress, which directly relates to the reasonableness of their actions under the Fourth Amendment. His experience with police training and operations makes him uniquely qualified to provide this context.

Moreover, Crosby's extensive background in developing and teaching law enforcement training programs, including those approved by the Department of Justice, further qualifies him to speak on the practices and policies that govern police conduct during searches and seizures. This expertise is directly relevant to the issues at hand and will assist the jury in determining whether the officers' actions were consistent with the Fourth Amendment.

Any alleged inconsistencies in Dr. Crosby's deposition testimony can be addressed through cross-examination at trial. As the Second Circuit has held in *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002), minor flaws in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible. The jury can weigh the evidence and assess the credibility of Dr. Crosby.

### 2. Crosby's opinion regarding when officers may discharge their firearms is both legally correct and appropriate in this case, and should not be excluded.

Defendants claim that Dr. Crosby erroneously maintains that officers may only discharge their firearms when they or others are "threatened with death or severe injury," arguing that officers are allowed to defend themselves from any level of imminent threat to safety. However, Dr.

Crosby's opinion is a correct statement of the law and reflects the best practices applied by police departments across the country, including the City of Buffalo.

The Fourth Amendment requires that the use of force by law enforcement officers must be reasonable under the totality of the circumstances. *See Graham v. Connor*, 490 U.S. at 396 ("With respect to a claim of excessive force", in violation of the Fourth Amendment, the standard is the "reasonableness [of the particular force used] at the moment[.]") In the context of firearm use, it is generally accepted that lethal force is only appropriate when there is an imminent threat of death or serious bodily harm. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Cowan ex rel. Estate of Cooper v Breen*, 352 F3d 756, 762 (2d Cir 2003) ("In this case, resolution of whether a constitutional violation occurred centers on whether at the moment Breen decided to fire at the Camaro, he reasonably believed that the approaching vehicle put his life or person in danger.").

This standard is not only a legal principle but is also reflected in the training and policies of many police departments. For example, Lieutenant Peter Nigrelli testified as a Rule 30(b)(6) witness on behalf of the Buffalo Police Department (BPD) and explained that it is unreasonable for an officer to use a firearm against a dog if there is any possibility that a stray bullet could strike a person (Ex. 2, Nigrelli Depo. Tr. 33:14-34:11). Specifically, officers can use their firearms to ward off an attack, but they must ensure that no bystanders or other individuals are in the line of fire, as shooting in such circumstances would be a violation of department policy. (Id. at 34:3-19) The policy emphasizes the importance of minimizing danger to both officers and the public, and officers are expected to choose the safest option available for dog encounters. The department's training also reflects this standard, reinforcing that lethal force should be a last resort and should only be used in extreme situations where serious injury or death is imminent. This standard aligns

with the principle that lethal force should only be used in the most extreme circumstances, a view that is consistent with Dr. Crosby's testimony.

Lieutenant Nigrelli testified that in the exact circumstances under which Defendants Kelly and Nellist fired their weapons in this case was a violation of the BPD's Policy. (Id. at 34:20-35:4).

Moreover, the court in *Azurdia v. City of New York*, No. 18-cv-04189, 2019 WL 1406647 (E.D.N.Y. March 28, 2019), cited by the Defendants, does not contradict Crosby's position. The *Azurdia* decision recognizes that the level of force must be proportionate to the threat faced by the officer, which is consistent with Dr. Crosby's report and testimony.

Therefore, Dr. Crosby's opinion is not only a correct statement of the law but is also supported by the established practices of police departments like Buffalo, which emphasize the need for restraint and the careful application of lethal force in dog encounters.

### 3. The City's argument that "unauthorized entry" and "unauthorized search" are distinct Fourth Amendment considerations is legally incorrect.

Defendants incorrectly assert that Dr. Crosby's understanding of Fourth Amendment principles is flawed because he allegedly conflates unauthorized entry with an impermissible search. However, it is well-established that the Fourth Amendment protects individuals from both unauthorized entries and impermissible searches. The law recognizes that a violation of the Fourth Amendment can occur either by infringing on a person's reasonable expectation of privacy, as articulated in *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring), or by a physical intrusion into a constitutionally protected area, such as the curtilage of a home, where an individual has a property entitlement, as held in *Florida v. Jardines*, 569 U.S. 1, 11 (2013).

In *Jardines*, the Supreme Court clarified that any police intrusion onto the curtilage of a property that exceeds the customary license extended to the general public constitutes a violation of the Fourth Amendment. This principle was reaffirmed in *United States v. Maxi*, 886 F.3d 1318,

1327 (11th Cir. 2018), which held that when law enforcement officers exceed the bounds of what a private individual is allowed to do, such as entering a driveway, crossing a backyard, or jumping over a fence, they have violated the Fourth Amendment. Thus, Defendants' argument is meritless.

### 4. In this case there is no question that the fenced-in backyard was the curtilage to Ms. Gursslin's property.

When Nellist and Kelly entered the fenced-in backyard, there was nothing to indicate that the yard was anything other than the curtilage to her home. The yard was entirely fenced-in and had a gate across the driveway. Thus, defendants' argument that Crosby allegedly does not understand what constitutes curtilage to the home is both irrelevant and meritless. *Brocuglio* v. *Proulx*, 67 F. App'x 58, 61 (2d Cir. 2003) (clearly established as of 2003 that a fenced-in backyard is "curtilage" entitled to Fourth Amendment protection).

### C. Crosby's Fourth Amendment Conclusions are Based on Extensive Review of Deposition Testimony and Other Information

Defendants' argument that Dr. Crosby did not review adequate evidence to support his opinion that the RPD fails to adequately train its officers on exigency and curtilage is meritless. Dr. Crosby reviewed all the RPD's policies and training materials, and more importantly, he reviewed the deposition testimony of approximately 20 RPD officers–including high level supervisors involved in this incident. None of the officers could remember any specific training, and most of them did not understand the definition of "exigency" or what constitutes "curtilage".

The deposition testimony of multiple RPD officers reveals a prevalent and disturbing lack of understanding regarding the legal requirements for entry onto curtilage. Defendant Aaron Springer—a Lieutenant and the SWAT team commander—testified that he did not realize the Fourth Amendment prohibited officers from walking across the curtilage of a property without a warrant, consent, or exigent circumstances; only after this lawsuit was filed did Springer recognize

the Fourth Amendment protections for curtilage (Exhibit 3, at 168:7-169:11, 170:15-18, 176:3-10). Similarly, Defendant Fabian Rivera—a Commander who oversaw the Special Operations Division, and the SWAT team—admitted that he did not know at the time of the incident that the Fourth Amendment protected the curtilage of residential properties (Id. at 173:11-19).

Additionally, the deposition testimony of Defendants Jeremy Nellist and Joshua Kelly—the officers who entered Ms. Gursslin's property and shot and killed Nina in front of her—highlights that they were not properly trained on the legal requirements to enter curtilage. Officer Nellist testified that he believed the curtilage of someone's home did not enjoy the same Fourth Amendment protections as the home itself, and that he was trained to believe that officers did not need a warrant, consent, or exigent circumstances to enter a fenced-in backyard if they were simply passing through (Ex 4, Nellist Depo. Tr. 38:24-39:23, 43:2-24). Specifically, Nellist explained that during his training and operational experience with the RPD, he was led to understand that as long as officers were not "searching" the property, merely walking through a backyard for the purposes of conducting police operations did not require a warrant or consent. This belief was consistent with what he described as standard practice within the RPD, despite acknowledging that the curtilage is generally considered an extension of the home and thus enjoys the same Fourth Amendment protections (Id. 111:10-112:20, 115:3-116:25).

Sergeant Joshua Paul Kelly admitted during his deposition that he and Officer Nellist planned to infiltrate their final operating position by walking down Ms. Gursslin's driveway and through her backyard without obtaining a warrant or consent (Ex 5, Kelly Depo. Tr. 93:4-94:10). Kelly testified that this practice was "not atypical" for his duties as a SWAT sniper, indicating a systemic misunderstanding of the legal requirements for entering curtilage (Ex 5, Kelly Depo. Tr. 94:12-94:20). He also confirmed that there was no exigency or probable cause to believe that a

crime was occurring on Ms. Gursslin's property, yet the decision to enter the curtilage without a warrant was made because it was considered the "easiest and best route" to reach their FOP (Ex 5, Kelly Depo. Tr. 106:16-108:4, 110:10-111:15).

Moreover, both officers testified that the choice of the route through Ms. Gursslin's backyard, including the decision to not seek a warrant or consent, was consistent with RPD policy and their SWAT training (Ex 4, Nellist Depo. Tr. 118:2-119:7; Ex 5, Kelly Depo. Tr. 112:7-113:4). Both emphasized that the RPD's policy did not require a separate warrant or consent when crossing through neighboring properties to reach an operational position, even though this understanding directly contradicts the established Fourth Amendment protections afforded to curtilage.

The testimonies of both Nellist and Kelly demonstrate a troubling pattern within the RPD of insufficient training on Fourth Amendment rights, particularly concerning the protections afforded to curtilage. This inadequate training led directly to the unconstitutional entry onto Ms. Gursslin's property, further supporting the Monell claim that the RPD failed to properly train its officers on these critical legal principles.

These testimonies highlight a significant gap in the training provided by the RPD, which failed to properly educate its officers on the constitutional requirements for entering curtilage and the appropriate use of exigent circumstances. This gap in training was acknowledged by the RPD itself. In 2019, after the incident involving Mr. Dempsey and Ms. Gursslin, the RPD issued a written training bulletin specifically addressing warrantless searches on the curtilage of residential properties. (Ex. 6, 2019 Training Bulletin "Warrantless Searches of Curtilage"). This bulletin was an acknowledgment of the need for clear guidance and training on the constitutional limitations of such actions. The City's Rule 30(b)(6) witness, Lieutenant Cuilla, and Officer Horowitz testified that the bulletin was intended to clarify the requirements for conducting searches on residential

curtilage, emphasizing the need for a warrant, consent, or exigent circumstances (Ex 7, Cuilla Depo. Tr. 22:25-23:24; Ex 8, Horowitz Depo. Tr. 63:4-17).

Moreover, the RPD's prior training materials also show that these constitutional principles were not adequately emphasized. The 1997 training bulletin titled "Warrantless Entries – With/Without Exigent Circumstances" provides some guidance on warrantless entries but fails to adequately address the specific protections afforded to curtilage under the Fourth Amendment (Ex. 9). The 2019 training bulletin reinforced the importance of these protections but was issued after the incidents where RPD officers trespassed on the curtilage of Ms. Gursslin and Mr. Dempsey's properties and shot and killed their dogs in front of them, further demonstrating the RPD's failure to adequately train its officers prior to that point (Ex. 6).

Importantly, Dr. Crosby also reviewed the RPD's SWAT Standard Operating Procedures (SOP) manual, which was drafted by Defendant Springer. (Ex 10, SWAT SOP; Ex 3, Springer Depo. 32:9-16). The SOP does not require SWAT Snipers to consider the legal basis for entering the curtilage of a non-target property, or instruct officers to obtain a warrant or consent before crossing curtilage, nor did it provide any guidance on the Fourth Amendment protections afforded to curtilage (Exhibit 10 at Order #700, p. 13-15). This omission further supports Dr. Crosby's conclusion that the RPD failed to adequately train its officers on the legal standards governing exigency and curtilage.

Dr. Crosby reviewed all materials mentioned above, which clearly demonstrate that the RPD's training on these issues was insufficient. Thus, his conclusion that the RPD failed to adequately train its officers on exigency and curtilage is well-supported by the evidence.

D. **Crosby provided a complete report and defendants attempt to mischaracterize his testimony must be rejected.**

Defendants' argument that Dr. Crosby failed to provide a complete report because he allegedly did not list all the materials he relied on is a mischaracterization of his testimony and entirely inaccurate. During his deposition, Dr. Crosby clarified that he had access to a Dropbox folder containing all the discovery materials from multiple related cases provided by counsel, ensuring he had comprehensive access to all relevant documents (Ex 11, Crosby Depo. Tr. 26:18-27:7). Dr. Crosby emphasized that the list of materials he reviewed was "a fluid and evolving thing" due to the ongoing nature of the litigation. This does not indicate a failure to comply with Federal Rule of Civil Procedure 26(a)(2)(B)(ii) but rather reflects his diligence in considering all pertinent information as it became available.

Moreover, Dr. Crosby's report explicitly lists the discovery materials he reviewed from nine related cases where RPD officers shot the plaintiffs' dogs.[1] These materials are comprehensively listed in Appendix A to Dr. Crosby's report, which spans six pages and provides a detailed account of all documents he reviewed. This thorough documentation ensures transparency and compliance with Rule 26(a)(2)(B)(ii). Dr. Crosby's opinions are therefore based on a robust and well-documented body of evidence, making the Defendants' claim that he failed to include all relevant materials baseless. The Court should therefore reject this argument.

E. **Dr. Crosby's conclusions of violations of good and accepted police practices and professional standards of care are based on reliable principles and methods.**

---

[1] Crosby report p. 3-4: (1) *Dempsey v. City Of Rochester, et al., 19-cv-6780 (EAW)(MWP)*; (2) *Gursslin v. City of Rochester, 20-cv-6508 (EAW)(MJP)*; (3) *Anniszkiewicz v. City of Rochester, 20-cv-6629 (FPG)(MWP)*; (4) *Cox v. City of Rochester, 22-cv-6207 (FPG)(MJP)*; (5) *McGill v. City of Rochester, 22-cv-6523 (EAW)(MWP)*; (6) *Barnes v. City of Rochester, 22-cv-6524 (EAW)(MWP)*; (7) *Preston v. City of Rochester, 20-cv-6636 (FPG)(MJP)*; (8) *Strong v. City of Rochester, 22-cv-6428 (FPG)(MJP)*; and (9) *Cabisca v. City of Rochester, 22-cv-6471 (EAW)(MWP)*

Defendants argue that Dr. Crosby's conclusions about violations of good and accepted police practices and professional standards of care are not the product of reliable principles and methods. This argument is erroneous and misguided for several reasons.

First, the purpose of best practices and standards of care in law enforcement is to ensure that officers are properly trained to avoid violating individuals' constitutional rights. "When an expert offers an opinion relevant to applying a legal standard such as probable cause [or reasonableness], the expert's role is limited to describing sound professional standards and identifying departures from them," which is precisely what Crosby did in this case. *Restivo v Hessemann*, 846 F3d 547, 580 (2d Cir 2017)(quoting *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) (internal quotation marks omitted).

As articulated by Dr. Crosby, these standards are informed by his extensive experience, established national guidelines, and comprehensive training programs. Dr. Crosby, who is recognized as the foremost expert in law enforcement training concerning canine encounters, has developed and implemented training programs that are considered best practices nationwide. Notably, he developed the "Law Enforcement Dog Encounters Training," a comprehensive course on safe interactions between police officers and domestic dogs. (Ex 12, LEDET PowerPoint) This program is supported by the National Sheriffs' Association and the National Law Enforcement Center on Animal Abuse and has been approved by the Department of Justice's Office of Community Oriented Policing Services (COPS) (Ex 1, Crosby Report, p. 41). His training programs have been adopted by major cities such as Miami-Dade, Florida, where he recently retrained the police department in 2023 through a "train-the-trainer" session that reached over 6,000 officers (Ex 11, Crosby Depo. Tr. 35:1-7). Dr. Crosby's expertise is also recognized internationally, as he has provided training in countries like Canada, Italy and Australia, and by

the federal government, having provided training to the U.S. Marshall's Office, the United States Attorney's Office, and Homeland Security. (Ex 1, Crosby Report, p. 36).

Second, it is essential to recognize the relevance and necessity of Dr. Crosby's expert opinion in evaluating two critical aspects of this case: (1) whether the actions of Officers Nellist and Kelly fell below minimally accepted police practices, and (2) whether the Rochester Police Department's (RPD) training program, specifically the program provided by Officer Reno DiDomenico, was so inadequate as to fall below minimally accepted standards of police training.

Dr. Crosby's expert opinion is particularly important in assessing whether the officers' actions in this case adhered to the baseline standards of police conduct. As the Second Circuit affirmed in *Restivo v. Hessemann*, it is proper for an expert to testify about "minimally accepted police practices" to provide the jury with a baseline to evaluate whether the conduct in question deviated from professional standards. The court in *Restivo* held that such testimony is relevant as it helps the jury determine whether a defendant's actions were merely negligent or so severe as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights. In *Restivo*, the expert did not testify to legal standards but instead described what minimally accepted police practices required and whether the defendant's conduct departed from those standards. This type of expert testimony is directly applicable here, as Dr. Crosby is offering a similar analysis regarding the officers' actions and the adequacy of their training. *Restivo v. Hessemann*, 846 F.3d 547, 580 (2d Cir. 2017).

Dr. Crosby's report also provides a detailed analysis of the RPD's training deficiencies, particularly in the course provided by Officer Reno DiDomenico. According to DiDomenico's own testimony, the training consisted of a brief two-hour session primarily focused on handling aggressive dogs rather than how to avoid using lethal force against dogs. (Ex. 13). DiDomenico

described the course as an "awareness course," emphasizing that it was not intended to make officers experts in dog behavior but rather to provide basic survival tactics in the field (Ex 13, DiDomenico Depo. Tr. 34:1-36:4). This limited scope falls far short of the comprehensive training needed to prepare officers adequately to handle canine encounters without resorting to lethal force.

Dr. Crosby's assessment of the deficiencies in the RPD's training regarding encounters with dogs is based on his extensive experience and knowledge of best practices in law enforcement, as well as data from comparable police departments. In Buffalo, the police department faced a similar issue with the shooting of pet dogs. In response, they implemented a department-wide training on best practices for law enforcement encounters with dogs in 2014. This training, which was a simple day-long session showing five short training videos developed by the Department of Justice (DOJ), resulted in a significant and immediate reduction in the number of dogs shot by police. (Exs. 15-19) The number of dogs shot dropped by 62%, from 26 in 2013 to just 10 in 2017 (Ex 1, p. 13). Buffalo implemented this training four years before the shooting of Nina, which underscores the failure of the RPD to adopt similar, readily available, and effective training.

Furthermore, the Buffalo Rule 30(b)(6) witness, Lieutenant Peter Nigrelli of the Buffalo Police Department, testified that the department-wide implementation of this training in 2014 was mandatory for all officers, and led to a dramatic reduction in the number of dogs shot by the Buffalo police, particularly during SWAT operations (Ex 2, Nigrelli Depo. Tr. 22:1-23:2). This testimony reinforces the effectiveness of the DOJ training and the critical need for the RPD to adopt similar standards. Dr. Crosby's expert opinion is that the RPD's failure to implement this type of training falls below minimally accepted police practices and directly contributed to the unconstitutional conduct in this case.

14

Dr. Crosby's expert testimony is crucial in helping the jury understand whether the RPD's training program fell below minimally accepted standards and whether this inadequacy contributed to the constitutional violation in this case when Officers Nellist and Kelly shot and killed Nina in front of Ms. Gursslin. It is the role of the jury, guided by Dr. Crosby's expert opinion, to determine whether the training provided was so deficient that it led to the violation of Ms. Gursslin's constitutional rights.

## II. DEFENDANTS' ARGUMENT THAT THE COURT SHOULD PRECLUDE DR. CROSBY'S PROFFERED EXPERT TESTIMONY REGARDING "SWAT" IS A *RED HERRING*

### A. Defendants' argument that Dr. Crosby is not qualified to serve as an expert in SWAT tactics is a *Red Herring*.

Defendants argue that Dr. Crosby should be precluded from testifying on SWAT tactics and operations because he lacks direct experience as a SWAT team member. However, this argument is a *Red Herring*. Dr. Crosby is not offering an opinion on specialized SWAT tactics or procedures; rather, his testimony focuses on a straightforward issue: why Officers Nellist and Kelly chose to trespass through Ms. Gursslin's yard after the conclusion of the SWAT operation when they could have simply exited through the vacant lot. This decision to trespass is not a specialized SWAT procedure requiring unique expertise, but a basic issue of police conduct that Dr. Crosby is well-qualified to address.

The officers were no longer engaged in any technically specialized "SWAT duties" at the time they entered Ms. Gursslin's property. They had completed their operation and were merely walking back to their vehicles. The decision to cross private property without a warrant or consent, particularly when a less intrusive route was available, is a matter of routine police conduct—an area where Dr. Crosby has extensive experience. As a former Sergeant and Lieutenant, Dr. Crosby was responsible for overseeing warrant executions and ensuring that his officers respected private

property rights during police operations. His testimony on this matter is directly relevant and will assist the jury in determining whether the officers' actions were reasonable and necessary, or simply a matter of convenience.

Moreover, the Second Circuit has held that an expert's lack of specialization does not automatically disqualify them from testifying. In *Tardif v. City of New York*, 344 F. Supp. 3d 579, 598-99 (S.D.N.Y. 2018), the court stated that if an expert has qualifications in a general field closely related to the subject matter in question, their testimony should not be excluded solely because they lack expertise in the specialized area.

Here, Dr. Crosby's training and experience in overseeing warrant executions and ensuring compliance with Fourth Amendment protections are more than sufficient to offer expert testimony on the police tactic at issue. His insights into the officers' lack of situational awareness, failure to plan for contingencies, and unnecessary trespass onto private property will assist the jury in determining whether the officers' actions were reasonable under the circumstances.

In summary, Defendants' attempt to frame Dr. Crosby's testimony as an opinion on specialized SWAT operations is misleading. The core issue here is a basic question of police practices and canine behavior, areas where Dr. Crosby is eminently qualified to provide expert testimony.

**B. Dr. Crosby's swat-related opinions are based on facts and data from the record.**

Defendants argue that some of Dr. Crosby's SWAT-related opinions are not based on any facts or data. This assertion is incorrect. Dr. Crosby's conclusions were grounded in a detailed analysis of the available evidence, including deposition testimony and other evidence.

**1. Dr. Crosby's Analysis of "Situational Awareness"**

16

Dr. Crosby's assessment of situational awareness was firmly grounded in the testimony provided by Erin Gursslin, as well as the depositions of Officers Jeremy Nellist and Joshua Kelly. Ms. Gursslin testified that her driveway was equipped with a motion sensor light that activated whenever there was movement near the side door of her house. On the night of the incident, she recalled that this light came on when she walked her dog, Nina, to the back of the yard, which illuminated the area (Ex 14, Gursslin Depo. Tr. 70:2-12). This directly contradicts the defendants' claim that the officers were unaware of their surroundings or the presence of a dog. The lighting conditions described by Ms. Gursslin are critical to Dr. Crosby's opinion that the officers failed to exhibit proper situational awareness.

Moreover, Ms. Gursslin's testimony indicates that while her car was not present in the driveway when Officers Nellist and Kelly initially "infiltrated" to their Final Operating Position (FOP) by walking up her driveway and through her backyard, the car was present when they "exfiltrated" from the FOP by jumping the fence back into her backyard (Ex 14, Gursslin Depo. Tr. 42:13-43:4). This change in circumstances should have prompted the officers to pause and reassess the situation. Had they done so, they would have observed several critical indicators: the motion-activated floodlight had turned on, lights were on inside the house, and there was now an additional car in the driveway.

The officers' failure to notice and react to these changes further supports Dr. Crosby's conclusion that they did not exercise the proper situational awareness required for such an operation. Their oversight in not pausing to assess the presence of a vehicle, the activated floodlight, and the illuminated house is a key factor that Dr. Crosby relied on to determine that the officers acted without adequate awareness of their surroundings, ultimately leading to the tragic shooting of Ms. Gursslin's dog, Nina.

17

Defendants' attempt to rely on Dr. Crosby's deposition testimony, where he did not recall specific details of Ms. Gursslin's testimony, is misleading and improper. As discussed in Point Point I. C., supra, Dr. Crosby's report was extensively informed. His inability to recall every detail during his deposition does not undermine the fact that his expert opinions are based on the evidence he reviewed, including Ms. Gursslin's testimony about the lighting, the location of her car, and the presence of her dog. The lighting conditions and the presence of a parked car are key factors that contradict the defendants' narrative and support Dr. Crosby's conclusion that the officers did not exercise proper situational awareness.

The fact that the officers failed to notice the car, the floodlight, and the house lights when exfiltrating from the FOP significantly undermines the defendants' claims of proper situational awareness. Dr. Crosby's expert opinions, grounded in these facts, are crucial for the jury to consider in evaluating the officers' conduct during the operation.

### 2. Lack of Investigation into the Presence of a Dog

Dr. Crosby's conclusion that Officers Nellist and Kelly failed to adequately investigate the presence of a dog on the property is supported by their own deposition testimonies. Officer Nellist admitted that he did not check city records to see if a dog was registered at the address, did not wait to see if someone was walking a dog, and did not notice dog waste in the yard during the scouting phase (Ex. 4 Nellist Depo. Tr. 128:12-129:3). Similarly, Officer Kelly testified that he did not take any actions to determine if a dog lived on the property and did not observe any signs of a dog living there during their scouting operation (Ex 5 Kelly Depo. Tr. 94:16-95:2). These admissions support Dr. Crosby's opinion that the officers did not take the necessary steps to ensure they were aware of all potential hazards, including the presence of a dog.

### 3. Inconsistent Testimonies Regarding Notification of the SWAT Operation

18

Further supporting Dr. Crosby's conclusions are the inconsistent testimonies regarding whether Ms. Gursslin was informed about the SWAT operation. Ms. Gursslin testified that she and her boyfriend spoke with a police officer outside their home before the operation began. The officer told them they had nothing to worry about, and when Ms. Gursslin asked if there was a car crash, the officer vaguely responded, "something like that" (Ex 14 Gursslin Depo. Tr. 45:19-23). Ms. Gursslin also documented this interaction in a diary entry, which she referenced during her deposition (Id. at 55:3-25). This testimony contradicts the officers' claims that no such conversation occurred and directly supports Dr. Crosby's opinion that the officers failed to adequately inform the plaintiff about the ongoing operation.

## III.   THE COURT SHOULD NOT PRECLUDE THE PROFFERED EXPERT TESTIMONY REGARDING DOG BEHAVIOR AND DOG ENCOUNTERS.

### A.  Dr. Crosby's testimony will aid the jury.

Defendants argue that expert testimony on dog behavior and police encounters with dogs is unnecessary because it falls within the common knowledge of the average juror. However, Courts across the country, including the court in *Branson v. Price*, have repeatedly held that these are precisely the types of topics where expert testimony is helpful. In *Branson*, the court allowed Dr. Crosby's testimony on dog behavior and police practices, recognizing that such specialized knowledge goes beyond what the average juror would know and is therefore admissible under Rule 702 (Branson v. Price, 2015 WL 5608120, at *4-5 (D. Colo. Sept. 24, 2015)).

Similarly, in *Smith v. City of Buffalo*, the court found Dr. Crosby's expert report admissible, noting that the reasons for challenging his testimony went to the weight of the evidence, not its admissibility. *Smith v. City of Buffalo*, 2020 WL 8083655, at *4 (W.D.N.Y. Sept. 29, 2020). Dr. Crosby's extensive training as detailed in Point I. E., supra, makes him uniquely qualified to opine

on the reasonableness of the officers' actions in this case, which will assist the jury in understanding the complexities involved.

Defendants argue that the jury is capable of evaluating Sgt. Kelly's use of his bag as a barrier and whether the officers should have employed alternative control measures or less lethal responses without the need for expert testimony from Dr. Crosby. Dr. Crosby's detailed analysis demonstrates that these are not matters of "common sense," as defendants suggest.

In his report, Dr. Crosby specifically explains that the proper method for using a bag as a barrier against a dog involves holding it as a shield, which could have been effectively utilized in this case to prevent the shooting of Nina. Instead, Sgt. Kelly threw the bag on the ground, an action that Dr. Crosby identifies as improper and ineffective in controlling or deterring an aggressive dog (Ex 1 Crosby Report, pp. 19-21). This distinction between holding a bag as a shield and simply dropping it on the ground may seem minor to a layperson, but is a critical difference that can have significant implications in such situations.

Furthermore, Dr. Crosby details how police officers are trained to assess and react to potential threats posed by dogs, and that these tactics go beyond mere "common sense." For example, the decision to announce one's arrival prior to entering a fenced area, or accurately determining whether a dog poses an imminent threat, involves specific knowledge and training that the average juror may not possess (Ex 1 Crosby Report, pp. 16-18). The defendants' reliance on the testimony of police officers who claim these tactics are "common sense" ignores that even experienced officers can make critical mistakes without proper training.

Dr. Crosby's expert testimony is necessary to provide the jury with the specialized knowledge required to understand why certain actions taken by the officers were inadequate and how proper techniques could have prevented the tragic outcome. His detailed explanation of the

proper use of alternative control measures and less lethal responses directly challenges the defendants' claim that these issues are within the common understanding of a layperson.

### B. Dr. Crosby's testimony will aid the jury, not replace it.

Defendants argue that in Opinion 13, Dr. Crosby seeks to replace the jury, not aid it. However, this argument fundamentally misunderstands the role of expert testimony in cases such as this one. As already argued above, Dr. Crosby's role is not to supplant the jury's decision-making but to provide the jury with the necessary context and understanding of proper standards of care in law enforcement, particularly in situations involving police encounters with dogs.

As detailed in Point I. E., supra, in *Restivo v. Hessemann*, 846 F.3d 547, 580 (2d Cir. 2017), the Second Circuit emphasized that expert testimony describing sound professional standards and identifying departures from them is relevant because it provides the jury with a "baseline" to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights.

Dr. Crosby's testimony is designed to fulfill precisely this function. His expertise helps the jury understand what the appropriate standards of care are for police officers in situations involving dogs, and how the actions of the officers in this case deviated from those standards. Far from replacing the jury, Dr. Crosby's testimony equips the jury with the necessary tools to make informed decisions about the reasonableness of the officers' conduct.

### C. "Good and Accepted Police Practices" and Professional Standards of Care Are Essential Topics for Expert Testimony, and Defendants' Arguments to the Contrary Are Without Merit.

Defendants argue that Dr. Crosby should not be allowed to testify about "good and accepted police practices" and professional standards of care, claiming that such testimony is improper.

However, this argument ignores the well-established role of expert testimony in providing the jury with a clear understanding of the professional standards that govern police conduct. As discussed above, Dr. Crosby's role is to describe the proper standards of care and identify how the actions of the RPD and its officers deviated from those standards.

As detailed in Point I. E., supra, Dr. Crosby is uniquely qualified to testify about what the minimum standards are for police practices across the country. His testimony will help the jury understand how the RPD's training and policies fell below these national standards and contributed to the constitutional violations in this case.

In *Restivo v. Hessemann*, 846 F.3d 547, 580 (2d Cir. 2017), the Second Circuit emphasized the importance of expert testimony in cases involving police conduct (See Point I. E., supra). Dr. Crosby's testimony is not only proper but essential for the jury to fully grasp the significance of the deviations from accepted standards of care here.

Defendants' attempt to dismiss Dr. Crosby's testimony as improper is without merit. His expertise in police practices and standards of care is crucial to helping the jury understand the failures in the RPD's training and policies and how these failures led to the tragedy in this case.

### D.  Dr. Crosby Reliably Applies His Principles to the Facts of This Case

Defendants argue that Dr. Crosby does not reliably apply his principles to the facts of this case. However, as detailed in Point III.A., supra, Dr. Crosby provided a clear and reliable analysis of what the officers should have done during their encounter with Nina. Specifically, he detailed that the officers should have held the bag as a shield to protect themselves, rather than dropping it on the ground, which was an incorrect and ineffective tactic. This analysis demonstrates that Dr. Crosby applied established principles of police practices to the specific facts of this case in a manner that is both logical and grounded in his extensive experience and expertise.

Dr. Crosby's expert testimony is crucial for the jury to understand the proper standards of care and how the officers' actions deviated from these standards, leading to the unnecessary use of lethal force. His application of principles to the facts of this case is both reliable and essential for the jury's evaluation of the officers' conduct.

## IV.   DR. CROSBY'S TESTIMONY ON FIREARMS IS RELEVANT AND NECESSARY

Defendants argue that Dr. Crosby should be precluded from testifying about the use of firearms, claiming that his application of principles to the facts is unreliable. However, this argument is unfounded. As established by Erin Gursslin's deposition testimony, she was directly behind Nina, within several feet, when the officers discharged their firearms (Ex 14, Gursslin Depo. Tr. 70:2-12). This fact is crucial to understanding the recklessness of the officers' actions and the danger posed to Ms. Gursslin.

Moreover, Lieutenant Peter Nigrelli testified that discharging a firearm when a person is in the same yard as the target would violate the Buffalo Police Department's policy (Ex 2, Nigrelli Depo. Tr. 34:7-35:2). Dr. Crosby's expert testimony is necessary to explain the gravity of the officers' decision to fire their weapons under such circumstances, which directly relates to whether their actions were in line with accepted police practices and professional standards of care.

## V.   THE COURT SHOULD NOT PRECLUDE THE PROFFERED EXPERT TESTIMONY REGARDING *MONELL* LIABILITY.

### A.   Dr. Crosby Is Qualified to Opine on the Facts Relevant to Municipal Liability

Defendants argue that Dr. Crosby is not, and does not purport to be, an expert on municipal liability issues. However, this argument mischaracterizes the role of an expert witness in this context. Dr. Crosby's expertise is in law enforcement practices and the proper standards of care that should be applied by police departments. While it is true that the legal principles of *Monell* liability were explained to Dr. Crosby by counsel, this is standard practice in preparing experts for

23

their testimony. Dr. Crosby did not opine on the law itself but rather applied the relevant legal principles to the facts of this case, detailing how the RPD's training and policies fell below the national standards he is qualified to describe. His role is not to interpret the law but to provide the factual foundation necessary for the jury to determine whether *Monell* liability exists based on the evidence. This is entirely proper and does not warrant preclusion.

### B.  Dr. Crosby's Testimony Assists the Jury, Rather than Replaces It

Defendants contend that Dr. Crosby's opinions on municipal liability attempt to replace the jury's role rather than aid it. However, as discussed in Point III.B., supra, Dr. Crosby's testimony is designed to inform the jury of the proper standards of care in law enforcement and how the RPD's practices deviated from these standards. As mentioned in Point I. E., supra, in *Restivo v. Hessemann*, 846 F.3d 547, 580 (2d Cir. 2017), the Second Circuit upheld the admissibility of expert testimony that described sound professional standards and identified departures from them, emphasizing that this type of expert testimony aids the jury in understanding whether the defendant's conduct was consistent with these standards. Dr. Crosby's testimony is precisely the type of expert analysis that helps the jury make informed decisions about whether the RPD's actions constitute deliberate indifference, rather than usurping the jury's role.

### C.  Dr. Crosby's Conclusions Are Based on Sufficient Data and Facts

Defendants argue that Dr. Crosby's conclusions are not based on sufficient data or facts, particularly regarding the RPD's training practices. This claim is unfounded. As detailed in Point III.A., supra, Dr. Crosby thoroughly reviewed all available discovery materials to form his opinions. He specifically highlighted how other departments, such as the Buffalo Police Department, implemented DOJ-approved training programs that led to a significant reduction in

dog shootings. Dr. Crosby's analysis of the RPD's inadequate training and supervision is grounded in the evidence and demonstrates how the department's failures led to the violations in this case.

### D. Dr. Crosby's Opinions on Violations of Good and Accepted Police Practices Are Based on Reliable Principles and Methods

Defendants reiterate their argument that Dr. Crosby's opinions on good and accepted police practices are not based on reliable principles and methods. However, as argued in Point III.C., supra, Dr. Crosby's opinions are grounded in widely recognized national standards and practices. He has developed and implemented training programs that have been adopted across the country, and his testimony draws on these experiences to assess the RPD's deficiencies. The methodologies he used to form his conclusions are reliable, reproducible, and directly relevant to the issues of municipal liability in this case.

### E. Dr. Crosby Applies His Principles and Methods to the Facts of This Case

Finally, Defendants assert that Dr. Crosby does not apply his principles and methods to the facts of this case. This assertion is incorrect. Dr. Crosby systematically analyzed the RPD's training programs, or lack thereof, and compared them to established best practices in the field. His conclusions regarding the RPD's failure to provide adequate training on dog encounters and Fourth Amendment issues are directly tied to the facts of this case and are essential for the jury to understand the context of the constitutional violations alleged.

### **CONCLUSION**

For the foregoing reasons, Defendants' motion to preclude Dr. Crosby should be denied.

Dated: August 12, 2024          Roth & Roth, LLP
      New York, New York

                                              ~//s//~
                                    Elliot Dolby Shields
                                    192 Lexington Avenue, Suite 802
                                    New York, New York 10016
                                    Phone: (212) 425 1020
                                    E-mail: eshields@RothandRothLaw.com