**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

ERIN GURSSLIN,

Plaintiff,

-against-

THE CITY OF ROCHESTER, a municipal entity, POLICE OFFICER JEREMY NELLIST, POLICE OFFICER JOSHUA KELLY, COMMANDER FABIAN RIVERA, LIEUTENANT AARON SPRINGER,

Defendants.

**20-cv-6508 (EAW)(MJP)**

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Elliot Dolby Shields
Roth & Roth, LLP
192 Lexington Avenue, Suite 802
New York, New York 10016

## **Table of Contents**

Table of Contents ………………………………..……………..…………………………….. i

Table of Authorities …………………………..….…………………………………iii

PRELIMINARY STATEMENT………………...………………............………..……..…....…1

STATEMENT OF FACTS ……………………………………….……..……………… 1

RELEVANT LAW……………………………...……..……..…………………………... 1

ARGUMENT……………………………………………………………...………………2

I.   THE UNDISPUTED EVIDENCE DEMONSTRATES THAT PLAINTIFF WAS SEIZED BY
NELLIST AND KELLY BECAUSE SHE WAS THREE FEET BEHIND NINA WHEN THEY
SHOT HER……………………………………… ………………………… 2

   A.  Plaintiff pled the elements of a seizure……………………………… ………….. 2

   B. The facts demonstrate that Plaintiff was seized under a theory of transferred intent
   ……………………………………………………………………………….. 2

II. SUMMARY JUDGMENT MUST BE DENIED ON PLAINTIFF'S SEIZURE OF PROPERTY
CLAIM………………………………………………………………………3

   A. Defendants failed to assert lack of standing as an affirmative defense in their Answer;
   regardless, the affidavit of Donna Beyea establishes that Erin Gursslin was Nina's
   "owner" and that she has standing to bring this claim………………………………3

      1.  Donna Beyea's affidavit conclusively establishes that Ms. Gursslin was Nina's
      legal owner and has standing to bring the instant suit …………………………4

      2.  Ms. Gursslin's level of care for Nina establishes standing under the Agricultural
      and Markets law, which clearly defines "owner" more broadly than Pennsylvania
      law……….…………………………………………………………………4

   B. There is no need for the Court to abstain from deciding whether Ms. Gursslin has
   possessory interest in Nina to confer standing………………………………………6

   C. The Fourth Amendment Seizure of Nina is a question for the jury…………………7

      1.  The law on Fourth Amendment seizures clearly shows Defendant's motion must be
      denied…………………………………………………………………………7

      2.  The fact disputes and credibility questions can only be made by a jury…………9

i

3.  Dr. James Crosby's expert, and the deposition testimony of the Rule 30(b)(6) witness for the City of Buffalo, Lieutenant Peter Nigrelli, also demonstrates there are fact issues that can only be resolved by a jury………………………………10

III.  NELLIST AND KELLY ARE NOT ENTITLED TO QUALIFIED IMMUNITY FOR SHOOTING NINA IN FRONT OF MS. GURSSLIN WHILE TRESPASSING IN HER BACK YARD………………………………………………………………………16

IV.  SPRINGER AND RIVERA DIRECTLY PARTICIPATED IN THE VIOLATIONS OF MS. GURSSLIN'S CONSTITUTIONAL RIGHTS…………………………………………12

A. Authorizing and Direction of the Trespass………………………………………... 12

B. Failure to Properly Plan and Supervise the Operation………………………...…13

C. Direct Participation in the Seizure………………………………………………15

V.  THE MONELL CLAIM REGARDING DOG SHOOTINGS MUST PROCEED TO THE JURY………………………………………………………………………………15

A. *Monell* liability may be found even if the officers are granted qualified immunity……15

B. A jury must decide if the City has an unwritten policy or custom of unconstitutionally permitting officers to shoot dogs………………………………………………16

C. A jury must decide if the City was deliberately indifferent to the RPD shooting residents' dogs……………………………………………………………………………… 18

1. Whether the City failed to properly train its officers is a jury question……..…….. 18

i. *Dr. Crosby's expert report demonstrates the City's training was grossly insufficient* …………………………………………………………………………19

2. Whether the city failed to properly supervise and discipline its officers for shooting dogs a jury question………………………………………………………………22

a. This theory was adequately pled………………………………………22

b. There is sufficient evidence to go to the jury……………………………22

CONCLUSION …………………………………………………………………….. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adickes v. S.H. Kress & Co.,*
  398 U.S. 144, 167–168 (1970)………………………………………………………16

*Altman v. City of High Point, N.C.,*
  330 F.3d 194, 206 (4th Cir. 2003)........…………......................................................7

*Amnesty Am. V. Town of W. Hartford,*
  361 F.3d 113, 123 (2d Cir. 2004)…………………………………….…................7

*Askins v. Doe,*
  727 F. 3d 248, 253-54 (2d Cir. 2013)……………………………………………16

*Azurdia v. City of New York,*
  2019 WL 1406647 at *8 (E.D.N.Y. 2019); ……………….…...............................7

*Barrett v. Orange County Human Right Comm'n,*
  194 F.3d 341, 350 (2d Cir. 1999)……………………………………………16

*Birch v. Town of New Milford*
  3:20-CV-1790 (VAB), 2023 WL 4684720, at *26(D Conn July 21, 2023), appeal
  dismissed, 23-1153, 2024 WL 3083385 (2d Cir June 21, 2024)…………………13, 15

*Brown v. Muhlenberg Township,*
  269 F.3d 205 (3d Cir. 2001)…………………………….…………………..6, 7

*California v. Hodari D.,*
  499 U.S. 621 (1991)…………………………………………….…...........................2

*Carroll v. County of Monroe,*
  712 F.3d 649, 651 (2d Cir. 2013)............................. …………………….………….7

*Celotex Corp. v. Catrett,*
  477 U.S. 317, 322 (1986)…………………………………….….................... 1

*Chappell v. Horsham Twp. Police Dept.,*
  No. 16-cv-02650, 2018 WL 6075096 (E.D. Pa. Nov. 20, 2018)……………………. 6

*City of Canton v. Harris,*

489 U.S. 378, 388 (1989)…………………………………………………………………17, 19

*Connick v. Thompson,*
    563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)………………………………19

*Fiacco v. City of Rensselaer,*
    783 F.2d 319, 331 (2d Cir. 1986)…………………………………………………………17

*Hayes v. New York City Dep't of Corr.,*
    84 F.3d 614, 619 (2d Cir. 1996)……………………………………………….…………2

*Hodge v. City of New York,*
    No. 19-CV-2474 (CM), 2019 WL 1455170, at *2 (S.D.N.Y. Apr. 1, 2019).....................3

*Jackson v. Mastrangelo,*
    6:17-CV-06448 EAW, 2019 WL 4686456, at *4, 405 F.Supp.3d 488 (W.D.N.Y. Sept. 26, 2019)…………………………………………………………………………………………11

*Johnson v. City of Shelby, Miss.,*
    135 S.Ct. 346, 347 (2014)…………………………………………………………………22

*Jones v. City of New York,*
    2016 WL 1322443 at *8 (S.D.N.Y. 2016)………………………………………………19

*Matteson v. Hall,*
    No. 2019 WL 2192502 at *7 (W.D.N.Y. May 21, 2019) ………………………………7

*Meli v. City of Burlington,*
    585 F. Supp. 3d 615, 643-45 (D. Vt 2022)………………………………………………17

*Okin v. Vill. of Cornwall-On-Hudson Police Dep't,*
    577 F.3d 415, 441 (2d Cir. 2009)…………………………………………………………17

*Pangburn v. Culbertson,*
    200 F.3d 65, 71–72 (2d Cir. 1999)…………………………………………………16, 17

*Pembaur v. City of Cincinnati,*
    475 U.S. 469, 483–84 (1986)……………………………………………………………16

*Phillips v. Girdich,*
    408 F.3d 124, 130 (2d Cir. 2005)…………………………………………………………22

*San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose,*
    402 F.3d 962, 975–76 (9th Cir. 2005)……………………………………….…............7

*Saucier v. Katz,*

533 U.S. 194, 210 (2001)…………………………………………………………………12

*SCR Joint Venture L.P. v. Warshawsky*,
599 F.3d 133, 137 (2d Cir. 2009)……………………………………….……… 1

*Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*,
391 F.3d 77, 83 (2d Cir. 2004)……………..…..……..……….…..……………2

*Segal v. City of New York*
459 F.3d 207, 219 (2d Cir. 2006)…………………………………………………16

*Sorlucco v. New York City Police Dep't*,
971 F.2d 864, 870 (2d Cir. 1992)……………………………………………16, 17

*Spencer v. Sullivan County*,
18-cv-365, 2019 WL 4514011, at *7 n.5 (W.D.N.Y. Sept. 19, 2019)…………………12

*Strong v. Perrone*,
2020 WL 1445877 at *2 (W.D.N.Y. Mar. 25, 2020) …………………….…..….………7

*Terebesi v. Torreso*,
764 F.3d 217, 234 (2d Cir. 2014)……………………………………………12, 13, 15

*Viilo v. Eyre*,
547 F.3d 707, 712 (7th Cir. 2008)……………………………………………………7

*Walker v. City of New York*,
974 F.2d 293, 297-98 (2d Cir. 1992)…………………………………………………17

*Whren v. United States*,
517 U.S. 806 (1996) …………………………………………….…………..…..2

**Statutes**

N.Y. AGRIC. & MKTS. § 350…………………………………………………………5, 6

**Rules**

Federal Rule of Civil Procedure 26(a)(2)(B)(ii)                    12, 13

Rule 702 of the Federal Rules of Evidence                    2, 3

## PRELIMINARY STATEMENT

The Defendants' motion for partial summary judgment should be denied in its entirety. The Plaintiff has presented substantial evidence creating genuine issues of material fact that can only be resolved by a jury. The credibility of the witnesses and the reasonableness of the officers' actions are central to this case and are not suitable for determination at the summary judgment stage.

The municipal liability claims against the City of Rochester are also supported by substantial evidence, including internal documents, deposition testimony, and the expert report of Dr. James Crosby. The evidence raises serious questions about the City's policies, training, and supervision regarding dog encounters, suggesting a pattern of deliberate indifference to the constitutional rights of residents and their pets. The Plaintiff's claims warrant a full and fair trial before a jury.

## STATEMENT OF FACTS

Plaintiff respectfully refers the Court to her Rule 56.1 Statement of Undisputed Facts for a more detailed recitation of the evidence that she maintains warrants denial of the City's motion.

## RELEVANT LAW

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009). "The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to a material fact, the court is required

to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." S*ec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc*., 391 F.3d 77, 83 (2d Cir. 2004). "In applying this standard, the court should not weigh evidence or assess the credibility of witnesses. These determinations are within the sole province of the jury." *Hayes v. New York City Dep't of Corr*., 84 F.3d 614, 619 (2d Cir. 1996).

## <u>ARGUMENT</u>

I.  **THE UNDISPUTED EVIDENCE DEMONSTRATES THAT PLAINTIFF WAS SEIZED BY NELLIST AND KELLY BECAUSE SHE WAS THREE FEET BEHIND NINA WHEN THEY SHOT HER.**

**A.  Plaintiff pled the elements of a seizure.**

Ms. Gursslin sufficiently pled that she was seized when the officers shot and killed Nina "just feet from Nina", that she was almost shot, and that she feared that she could have been shot. ECF 1 ¶¶ 78-79.

**B.  The facts demonstrate that Plaintiff was seized under a theory of transferred intent.**

Erin Gursslin was seized within the meaning of the Fourth Amendment when Officers Nellist and Kelly shot Nina while she was standing just three feet behind her. Gursslin's deposition testimony, which is undisputed by the Defendants, clearly establishes that she was following closely behind Nina when the shooting occurred. Under the doctrine of transferred intent, this proximity and the direct involvement of the officers' use of force against Nina effectively resulted in a seizure of Gursslin herself.

A seizure occurs when there is either physical force or submission to a show of authority. The U.S. Supreme Court in *California v. Hodari D.*, 499 U.S. 621 (1991), held that a seizure requires "either physical force ... or, where that is absent, submission to the assertion of authority." Similarly, in *Whren v. United States*, 517 U.S. 806 (1996), the Court stated that the "[t]emporary

detention of individuals … by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of the Fourth Amendment."

In this case, when Officers Nellist and Kelly intentionally discharged their firearms at Nina while Ms. Gursslin was just feet behind her, they also unintentionally directed their actions towards Ms. Gursslin. This scenario falls under the theory of transferred intent, which is well-established in both criminal and tort law. According to Black's Law Dictionary, transferred intent applies when "if one person intends to harm a second person but instead unintentionally harms a third, the first person's criminal or tortious intent toward the second applies to the third as well." This principle has been recognized in the context of Fourth Amendment claims, as noted in *Hodge v. City of New York*, No. 19-CV-2474 (CM), 2019 WL 1455170, at *2 (S.D.N.Y. Apr. 1, 2019), where a plaintiff stated a claim for excessive force if injured by officers who used force against another individual.

Drawing all reasonable inferences in Ms. Gursslin's favor, her proximity to Nina and the officers' use of force directly in front of her establishes that she was seized under the Fourth Amendment. This claim should proceed to the jury.

## II.   SUMMARY JUDGMENT MUST BE DENIED ON PLAINTIFF'S SEIZURE OF PROPERTY CLAIM.

### A.   Defendants failed to assert lack of standing as an affirmative defense in their Answer; regardless, the affidavit of Donna Beyea establishes that Erin Gursslin was Nina's "owner" and that she has standing to bring this claim.

For the first time on summary judgment, Defendants argue that Ms. Gursslin lacks standing to bring a Fourth Amendment seizure claim because she did not have a sufficient possessory interest in Nina, as she was allegedly a foster dog. This argument fails for several reasons.

First, Ms. Gursslin's standing is conclusively established by the affidavit of Donna Beyea, Board of Directors of Greece Residents Assisting Stray Pets ("GRASP"). Second, Ms. Gursslin's extensive care for Nina over more than two years, as well as her close relationship with the dog,

firmly establishes her possessory interest, providing her with the necessary standing to bring this claim. Third, the New York Agricultural and Markets Law and case law detailed below clearly demonstrate that Ms. Gursslin has standing.

      **1.  Donna Beyea's affidavit conclusively establishes that Ms. Gursslin was Nina's legal owner and has standing to bring the instant suit.**

As noted in the Declaration of Donna Beyea, Ms. Gursslin was responsible for Nina's daily care, including feeding, grooming, and providing a safe environment, just as if Nina were her own dog (Ex 1, Beyea Decl. ¶ 4). Erin's possessory interest in Nina was substantial and continuous, and she exercised exclusive control over Nina's care and well-being (Beyea Decl. ¶ 10). While GRASP retained certain administrative obligations, such as providing financial assistance for veterinary care, Ms. Gursslin's role as Nina's primary caregiver was far more significant. GRASP ceased posting Nina for adoption in April 2018, effectively making Ms. Gursslin Nina's permanent caregiver (Beyea Decl. ¶ 6) Erin had the right of first refusal if any person expressed interest in adopting Nina, but during the two-year period Nina was in Ms. Gursslin's care, no one did (Beyea Decl. ¶ 8). This arrangement firmly establishes Erin's possessory interest in Nina, sufficient to confer standing to bring the Fourth Amendment Seizure claim.

      **2.  Ms. Gursslin's level of care for Nina establishes standing under the Agricultural and Markets law, which clearly defines "owner" more broadly than Pennsylvania law.**

Ms. Gursslin provided daily care for Nina from the summer of 2016 until the fall of 2018. During this period, Nina lived with Ms. Gursslin, and she was responsible for all aspects of Nina's care, including providing shelter, food, and companionship. Ms. Gursslin testified that Nina was an inside dog who slept in her bed and had her own dog bed by the window in her living room. Ms. Gursslin also confirmed that she did not keep any of Nina's belongings outside, further emphasizing that Nina was fully integrated into her home and life (Plaintiff Dep., p. 18, lines 1-

15). Ms. Gursslin provided food for Nina, although she occasionally received supplies from GRASP volunteers. While GRASP reimbursed some expenses, Ms. Gursslin covered other costs, such as toys and additional supplies (Gursslin Dep, p. 20, lines 1-12; p. 23, lines 4-12).

This level of care and responsibility clearly satisfies the definition of "custody and control" under New York's Agriculture and Markets Law. Specifically, N.Y. AGRIC. & MKTS. § 350 defines an "owner" as "any person who owns *or has custody or control of a dog*." *Id*. (emphasis added). Ms. Gursslin's testimony confirms that she had both custody and control of Nina, thereby meeting the legal standard for a possessory interest. Furthermore, N.Y. AGRIC. & MKTS. § 353-a, which addresses "dangerous dogs," defines an "owner" as "any person keeping or harboring a dog." *Id*. Ms. Gursslin's long-term care and harboring of Nina within her home unequivocally establishes her as Nina's owner under these statutory definitions.

Defendants argue that the definition of "owner" under Pennsylvania law, as applied in *Brown v. Muhlenberg Township* and *Chappell v. Horsham Twp. Police Dept.*, is broader than that under New York law, thereby implying that Erin Gursslin's relationship with Nina does not confer the necessary possessory interest. This argument is fundamentally flawed and fails to recognize the inclusive and expansive nature of New York's statutory framework regarding pet ownership.

Under New York Agriculture and Markets Law, an "owner" is defined broadly to include "any person who owns or has custody or control of a dog" (N.Y. AGRIC. & MKTS. § 350). This definition encompasses not only formal legal ownership but also individuals who have custody or control over a dog. Ms. Gursslin's daily care for Nina, including feeding, sheltering, and providing companionship for over two years, clearly establishes her as someone who had custody and control of Nina, thereby meeting New York's broad definition of an owner.

Moreover, New York law extends this concept of ownership to individuals who "keep or harbor" a dog (N.Y. AGRIC. & MKTS. § 353-a). This further solidifies that Ms. Gursslin, who harbored and cared for Nina in her home, qualifies as an owner under New York law. This broad statutory language reflects New York's recognition of the rights of individuals who may not hold formal title to a pet but who, through their actions and care, have a significant possessory interest.

In contrast, Pennsylvania law, as discussed in *Brown v. Muhlenberg Township*, 269 F.3d 205 (3d Cir. 2001), defines "owner" as including "every person having a right of property in such dog, and every person who keeps or harbors such dog or has it in his care" (3 Pa. Stat. Ann. § 459-102). The emphasis on "right of property" suggests a more formalized notion of ownership, which is more restrictive compared to New York's emphasis on "custody and control".

Additionally, in *Chappell v. Horsham Twp. Police Dept.*, No. 16-cv-02650, 2018 WL 6075096 (E.D. Pa. Nov. 20, 2018), the court applied this definition to a case involving a fostered dog, ultimately recognizing the boyfriend of the person who contracted to foster the dog as having an ownership interest. Thus, this case clearly supports Ms. Gursslin's ownership interest in Nina.

The statutory definitions in New York reflect a more protective stance toward individuals who assume responsibility for animals. New York law's recognition of the rights of those who have custody and control over a dog underscores that a person like Ms. Gursslin, who fostered Nina and provided for her every need, should be considered an owner with the corresponding rights to seek redress for the harm caused to her dog.

### B. There is no need for the Court to abstain from deciding whether Ms. Gursslin has a sufficient possessory interest in Nina to confer standing.

Defendants suggest that the Court abstain from deciding the state law issue of ownership, but there is no need for abstention in this case. The affidavit of Donna Beyea clearly demonstrates that Erin Gursslin was considered Nina's owner under New York law. (Beyea Decl. ¶¶ 4-10).

**C.**     **The Fourth Amendment Seizure of Nina is a question for the jury.**

    **1.  The law on Fourth Amendment seizures clearly shows Defendants' motion must be denied.**

The Second Circuit has made clear that granting summary judgment on a Fourth Amendment seizure claim is not appropriate unless no reasonable fact finder could conclude that the officer's conduct was objectively unreasonable. See *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

"[T]he unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment." *Carroll* v. *County of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013). "[W]hen a dog is seized—and especially, as here, where it is killed, not merely injured or detained—the intrusion on the owner weighs heavily in favor of finding the seizure unreasonable." *Strong* v. *Perrone*, 2020 WL 1445877, at *2 (W.D.N.Y. Mar. 25, 2020) *quoting Matteson* v. *Hall*, No. 2019 WL 2192502, at *7 (W.D.N.Y. May 21, 2019).

Courts consider multiple factors in analyzing whether a seizure of a dog is reasonable under the totality of the circumstances, which include, but are not limited to:

1. Whether the dog's seizure occurred on the owner's property. *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 210–11 (3d Cir. 2001); *Strong*, 2020 WL 1445877, at *2.
2. The breed of the dog. *Altman* v. *City of High Point, N.C.*, 330 F.3d 194, 206 (4th Cir. 2003); *Azurdia* v. *City of New York*, 2019 WL 1406647, at *8 (E.D.N.Y. 2019);
3. Whether there was time to devise a plan to control of the dog before the seizure. *See Carroll v. Cnty of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013); *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975–76 (9th Cir. 2005).
4. Whether non-lethal means were available to control the dog. *See Carroll*, 712 F.3d at 652.
5. Whether the dog posed a danger to the officer or the public. *See Brown*, 269 F.3d at 210–11; *Viilo* v. *Eyre*, 547 F.3d 707, 712 (7th Cir. 2008).

Importantly, here, the Court must also consider the fact that Nellist and Kelly had no lawful basis to be present in Ms. Gursslin's back yard, and so their mere presence in her yard—the

curtilage to her property—constituted a Fourth Amendment violation.

When these factors and the totality of the circumstances are considered in this case, it is clear that summary judgment must be denied. A reasonable jury could easily find that it was unreasonable for Nellist and Kelly to shoot and kill Nina when:

1. **They Were Trespassing in Ms. Gursslin's Backyard When They Shot and Killed Nina**: The officers entered the curtilage to Ms. Gursslin's property (her backyard) without lawful authority where they encountered Nina. The officers lacked any legal justification for their presence on the property at the time of the shooting, which contributed to the unreasonable nature of their actions (Crosby Report, p. 22).

2. **Even Though Nina Was a Pit Bull, She Had a Deformity in Her Legs**: Despite being a Pit Bull, Nina had a deformity in her legs that impaired her mobility, making it unreasonable for the officers to perceive her as an immediate threat. Ms. Gursslin testified that Nina's physical limitations were apparent and would have been noticeable to anyone observing her (Deposition Transcript, p. 51:4-6). Dr. Crosby's report further supports that Nina's physical condition would have reduced any potential threat she posed (Crosby Report, pp. 19-20).

3. **There Was Time to Devise a Plan to Control Nina, and No Emergency Required Immediate Action:** There was no emergency requiring the officers to immediately enter Ms. Gursslin's backyard. If the officers had taken their time before jumping the fence, they would have noticed numerous signs indicating that someone had come home, such as the additional car in the driveway, the lights on in the house, and the floodlight on the side of the house. These signs should have alerted the officers to the need to create a plan for encountering a person or a dog. Instead, they failed to observe these indicators and recklessly jumped the fence without a plan, leading to the unnecessary shooting of Nina (Crosby Report, pp. 21-22; Deposition Transcript, p. 49:1-5).

4. **Non-lethal Means Were Available**: Non-lethal means, such as using the rifle bags as shields, were available to the officers but were not utilized. Dr. Crosby points out that employing these non-lethal options would have been consistent with accepted police practices and could have prevented the shooting (Crosby Report, pp. 19-21).

5. **Nina Did Not Pose an Objective Threat to the Officers or Anyone Else**: The evidence indicates that Nina did not pose an objective threat to the officers or anyone else at the time of the shooting. Ms. Gursslin testified that Nina was not barking, growling, or charging at the officers but was simply moving around the yard (Deposition Transcript, p. 49:4-51:3). Dr. Crosby's analysis supports the conclusion that Nina's behavior did not warrant the use of deadly force (Crosby Report, 19-22).

6. **The Officers Lacked Any Lawful Basis for Their Presence in Ms. Gursslin's Yard**: The officers had no lawful reason to be in Ms. Gursslin's backyard, which further undermines the justification for their use of deadly force. Dr. Crosby notes that their unauthorized entry into the property and subsequent actions were not supported by any legal authority, making their conduct objectively unreasonable (Crosby Report, p. 22).

7. **The Officers Failed to Conduct an Adequate "Scout" Prior to the Incident**: The officers failed to conduct an adequate reconnaissance or "scout" of the property before entering, which would have revealed that a dog lived at the residence. Dr. Crosby points out that if the officers had properly scouted the area, they would have noticed signs indicating a dog's presence, such as the dog poop in the backyard, and could have prepared accordingly (Crosby Report, pp. 21-22).

Thus, it is clear that applying these controlling legal principles to the facts of this case, there are fact questions and credibility determination that can only be made by a jury, and so Defendants' summary judgment motion must be denied.

## 2.   The fact disputes and credibility questions can only be made by a jury.

The record in this case is replete with factual disputes that preclude summary judgment. Ms. Gursslin's deposition testimony directly contradicts the Defendants' narrative. Ms. Gursslin walked Nina into the back yard, on a leash. Before doing so, she had spoken with a uniformed officer in front of her home, who told her she had nothing to worry about.

After Ms. Gursslin let Nina off the leash in the backyard, she noticed Nina behaving abnormally. Nina first headed toward a woodpile near the wooden privacy fence on the north side of the yard, and then moved toward the northwest corner (Ex 2, at 49:4-51:3). Concerned by this unusual behavior, Ms. Gursslin followed closely behind Nina, calling her name (Id. at 51:4-6). As Ms. Gursslin reached the back northwest corner of the yard, she was standing approximately three feet behind Nina when suddenly, she heard a loud bang and saw a bright flash of light (Id. at 51:4-13). Both Officers Nellist and Kelly discharged their department-issued firearms at Nina, with Kelly firing twice and striking her at least once (Exhibit 4 at 108:16-23; Exhibit 8 at 135:24-136:8). Realizing that Nina had been shot, Ms. Gursslin rushed to her, picking her up as Nina struggled to breathe, choking on her own blood. Ms. Gursslin held Nina in her arms, staring into her eyes as she died (Exhibit 2 at 51:23-52:16).

Ms. Gursslin's account raises serious questions about the credibility of Nellist and Kelly's account that can only be reconciled by a jury. The officers apparently did not notice that lights were on in the house; that an additional car was parked in the driveway; that the flood light had been activated in the driveway; claim that they did not hear Ms. Gursslin calling out to Nina in the back yard; and claim they did not see Ms. Gursslin, despite her following approximately three feet behind Nina. These credibility questions can only be determined by a jury.

### 3. Dr. James Crosby's expert, and the deposition testimony of the Rule 30(b)(6) witness for the City of Buffalo, Leiutenant Peter Nigrelli, also demonstrates there are fact issues that can only be resolved by a jury.

The expert report of Dr. James Crosby, a recognized authority in canine behavior and law enforcement practices, thoroughly undermines the Defendants' assertion of reasonableness. Dr. Crosby opines that Officers Nellist and Kelly acted unreasonably and in violation of accepted police practices when they used lethal force against Nina. He criticizes the officers for failing to plan appropriately for a potential encounter with a dog, despite knowing that many homes in Rochester have dogs. This lack of foresight directly contributed to the unnecessary shooting of Nina. Additionally, the officers failed to employ non-lethal alternatives, such as using their rifle bags as barriers, which could have de-escalated the situation without resorting to deadly force (Ex 3, Crosby Report, pp. 19-21).

Dr. Crosby further emphasizes that the officers' immediate decision to use deadly force, without attempting verbal commands or other de-escalation techniques, was driven by fear and surprise rather than a reasonable assessment of an imminent threat. This response deviates from what a well-trained officer would have done under similar circumstances and highlights the unreasonableness of their actions (Ex 3, Crosby Report, pp. 21-22). The officers' actions also

violated established police practices by not maintaining situational awareness and failing to utilize available barriers to protect themselves and others, (Ex 3, Crosby Report, pp. 17-19).

Moreover, the testimony of Peter Nigrelli, the 30(b)(6) witness for the City of Buffalo, reinforces Dr. Crosby's conclusions. Lieutenant Nigrelli testified that discharging a firearm when a person is near the target, as Ms. Gursslin was to Nina, would violate the Buffalo Police Department's policy. This testimony indicates a significant departure from accepted standards of police conduct, further supporting the argument that the actions of Officers Nellist and Kelly were unreasonable (Ex 41, Nigrelli Deposition, p. 34, lines 7-19).

Additionally, Dr. Crosby's report notes that the officers fired their weapons in a residential backyard without considering the potential collateral risks. Ms. Gursslin was standing just feet behind Nina, and other individuals were present in the home. The officers' disregard for these risks underscores the recklessness and unreasonableness of their actions (Ex 3, pp. 22-23).

Given the fact-specific nature of Fourth Amendment seizure inquiries and the substantial evidence challenging the reasonableness of the officers' actions, Defendants' motion for summary judgment should be denied.

III.   **NELLIST AND KELLY ARE NOT ENTITLED TO QUALIFIED IMMUNITY FOR SHOOTING NINA IN FRONT OF MS. GURSSLIN WHILE TRESPASSING IN HER BACK YARD.**

Defendants' argument that the Court must determine, as a matter of law, that the actions of Nellist and Kelly were "objectively reasonable" is completely meritless. For the reasons explained in Point II. C., *supra*, their request for summary judgment based on qualified immunity must be denied. *Jackson v. Mastrangelo*, 6:17-CV-06448 EAW, 2019 WL 4686456, at *4, 405 F.Supp.3d 488 (W.D.N.Y. Sept. 26, 2019) ("[I]n the context of excessive force, the Fourth Amendment reasonableness inquiry tends to converge with the qualified immunity reasonableness inquiry.")

(quoting *Spencer v. Sullivan County*, 18-cv-365, 2019 WL 4514011, at *7 n.5 (W.D.N.Y. Sept. 19, 2019)); see *Saucier v. Katz*, 533 U.S. 194, 210 (2001) (Ginsburg, J., concurring in the judgment) (stating that "paradigmatically, the determination of police misconduct in excessive force cases and the availability of qualified immunity both hinge on the same question: Taking into account the particular circumstances confronting the defendant officer, could a reasonable officer, identically situated, have believed the force employed was lawful?").

## IV. SPRINGER AND RIVERA DIRECTLY PARTICIPATED IN THE VIOLATIONS OF MS. GURSSLIN'S CONSTITUTIONAL RIGHTS.

The Second Circuit has consistently held that a supervisor may be held liable as a "direct participant" in a constitutional violation if he "authorizes, orders, or helps others to do the unlawful acts, even if he ... does not commit the acts personally" (*Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014)). In this case, there is substantial evidence to establish that Deputy Chief Aaron Springer and Commander Fabian Rivera were direct participants in the unconstitutional actions taken against Erin Gursslin and her dog, Nina.

### A. Authorization and Direction of the Trespass

Springer and Rivera, in their supervisory roles, authorized and directed the actions of Officers Nellist and Kelly, who infiltrated and exfiltrated from their final operating positions by trespassing on Ms. Gursslin's property. Rivera, as the on-site commander, testified that he was responsible for overseeing the operation and ensuring that all officers followed protocol. Despite this responsibility, neither he nor Springer took the necessary steps to ensure that the operation was conducted lawfully and safely, particularly regarding the unauthorized entry into Ms. Gursslin's backyard (Ex 6, Rivera Deposition, pp. 7-9; Ex 3 Crosby Report, p. 22).

In *Terebesi v. Torreso*, the Second Circuit found that supervisory officials could be held liable when they authorized or directed actions that led to constitutional violations, even if they

did not personally carry out the actions. In this case, similar to *Terebesi*, Springer and Rivera's authorization of the operation, without ensuring lawful conduct or proper precautions, makes them direct participants in the unlawful trespass (Crosby Report, p. 22).

### B. Failure to Properly Plan and Supervise the Operation

The failure of Springer and Rivera to properly plan and supervise the operation is particularly significant in establishing their direct participation in the constitutional violations. In *Birch v. Town of New Milford*, the court held that a supervisor's liability could be established if they failed to properly plan and supervise an operation that led to constitutional violations. 3:20-CV-1790 (VAB), 2023 WL 4684720, at *26(D Conn July 21, 2023), *appeal dismissed*, 23-1153, 2024 WL 3083385 (2d Cir June 21, 2024). The court emphasized that when supervisors are responsible for the oversight of an operation, they have a duty to ensure that all reasonable precautions are taken to avoid constitutional harm.

Rivera and Springer's actions (or inactions) directly mirror the supervisory failures discussed in *Birch*. Despite knowing that they were operating in a residential area with a high likelihood of encountering pets, they did not implement any specific plan to address the potential presence of a dog or take steps to mitigate the risks associated with entering private property. This lack of planning directly contributed to the unnecessary and unconstitutional use of lethal force against Nina (Rivera Deposition, pp. 18-20; Crosby Report, pp. 19-21).

The *Birch* case also highlights the importance of a supervisor's role in reviewing and acting upon critical information before key operational decisions. In *Birch*, State Police Sergeant Acker was found potentially liable for failing to act on evidence suggesting improper police procedures before a critical interview, which could have prevented constitutional violations. Acker's failure to

review and address the problematic conduct of his subordinate before proceeding with the interview was a key factor in the court's decision to deny summary judgment.

Similarly, in the present case, Rivera and Springer failed to ensure that Nellist and Kelly conducted a proper scout of Ms. Gursslin's property, which would have revealed that a dog, Nina, resided there. Had they ensured that a thorough reconnaissance was conducted, the officers would have discovered Nina's presence and been prompted to develop a plan to safely handle any encounters with a dog or person on the property (Ex 3, Crosby Report, pp. 21-22; Ex 2, Gursslin Deposition, pp. 49:1-5).

The failure to conduct an adequate scout before deciding to infiltrate and exfiltrate through Ms. Gursslin's property was a critical oversight. If Nellist and Kelly had performed the necessary reconnaissance, they would have known about Nina and could have taken appropriate precautions. As Peter Nigrelli testified, proper scouting procedures involve thorough reconnaissance to identify the presence of any dogs or other potential risks on the property before executing a warrant. Nigrelli emphasized that such scouting is essential for the safety of both officers and residents and is standard procedure in similar operations (Ex 41, Nigrelli Deposition, pp. 31:1-17).

The failure of Springer and Rivera to oversee this crucial pre-warrant execution process, including ensuring that a proper scout was conducted, constitutes direct participation in the unlawful entry and subsequent seizure. Their lack of oversight and planning led directly to the violation of Ms. Gursslin's constitutional rights, as their subordinates entered her property without lawful basis and used deadly force against Nina. This failure is sufficient to deny summary judgment on the unlawful entry and seizure claims, as a reasonable jury could find that Springer and Rivera's inaction was a direct cause of the constitutional violations.

This failure to act on available information and properly plan the operation led directly to the violations of Ms. Gursslin's and Nina's constitutional rights. Just as in *Birch*, where the supervisor's failure to address known risks before a critical interview contributed to the violation, Springer and Rivera's failure to address the known risks before entering Ms. Gursslin's property makes them direct participants in the unconstitutional actions that followed.

### C.  Direct Participation in the Seizure

The trespass into Ms. Gursslin's yard and the subsequent shooting of Nina must be considered within the totality of the circumstances when evaluating the Fourth Amendment seizure claims. Springer and Rivera's authorization and direction of the operation, without ensuring proper precautions or lawful entry, directly contributed to the unlawful seizure of Nina. Additionally, since Ms. Gursslin was present in the yard, just three feet behind Nina, she too was seized under a theory of transferred intent when the officers fired their weapons (Ex. 2 pp. 51:4-13).

As established in *Terebesi*, officers who authorize or direct the use of force must comply with the Fourth Amendment, and supervisors can be held liable if their actions lead to unreasonable seizures. The same reasoning applies here, where the actions of Springer and Rivera in authorizing and overseeing the operation resulted in the unlawful seizures of both Ms. Gursslin and Nina (Ex 3, Crosby Report, pp. 22-23).

Given these facts and the substantial evidence challenging the reasonableness of the officers' actions, it is clear that this case involves significant factual disputes that must be resolved by a jury. Therefore, Defendants' motion for summary judgment should be denied.

## V.   THE MONELL CLAIM REGARDING DOG SHOOTINGS MUST PROCEED TO THE JURY.

### A.   *Monell* liability may be found even if the officers are granted qualified immunity.

Contrary to Defendants' claim in their memorandum (Dkt. 114-1 p. 17-18), it is well-settled in this Circuit that *Monell* liability may be found even in the absence of individual liability. Therefore, even in the unlikely event that Nellist, Kelly, Springer and Rivera are found not liable for violating Plaintiff's rights because they are granted qualified immunity, municipal liability can still be imposed. *See Askins* v. *Doe*, 727 F. 3d 248, 253–54 (2d Cir. 2013); *see also Barrett* v. *Orange County Human Rights Comm'n,* 194 F.3d 341, 350 (2d Cir. 1999).

Notably, the only case cited by Defendants for the erroneous proposition that *Monell* liability may not be found in the absence of individual liability is a district court decision from 2006 that predates the Second Circuit's 2013 holding in *Askins* v. *Doe*. *See* Dkt. 32-1 p. 9 (*citing, Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir. 2006).

**B.    A jury must decide if the City has an unwritten policy or custom of unconstitutionally permitting officers to shoot dogs.**

Ms. Gursslin has presented evidence that would allow the Court to conclude that Rochester had an official policy or custom encouraging or permitting its police officers to shoot dogs in violation of federal law. An official policy is one in which "a deliberate choice to follow a course of action is made ... by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986). However, the policy need not be part of an "explicitly adopted rule or regulation." *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir.1992). The inclusion of "custom" along with "policy" recognizes that the practices of government officials can, "[a]lthough not authorized by written law[,] ... be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co*., 398 U.S. 144, 167–68 (1970)); see generally *Pangburn v. Culbertson*, 200 F.3d 65, 71–72 (2d Cir.1999) (discussing evidence plaintiffs might present to show such an unwritten policy exists).

Accordingly, § 1983 liability can attach to a municipality for a practice, as opposed to an official policy, authorized by an official with policy-making responsibility. *Pangburn*, 200 F.3d at 71–72. It can also attach to a practice established by subordinate employees, if there is constructive acquiescence by senior policy-making officials. *Sorlucco*, 971 F.2d at 870. In addition, failure to properly train police officers can create a custom or policy for purposes of § 1983 liability, if such failure is tantamount "to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); accord *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir.1992).

The Second Circuit has upheld *Monell* claims where plaintiffs provided other evidence, such as statistical data and personal experiences, to demonstrate a pattern of unconstitutional conduct (*Fiacco v. City of Rensselaer*, 783 F.2d 319, 331 (2d Cir. 1986); *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 441 (2d Cir. 2009)). As noted in *Meli v. City of Burlington*, expert testimony is not required to show deficiencies in municipal policies or practices when there is sufficient evidence for a jury to infer the existence of a custom or practice (*Meli v. City of Burlington*, 585 F. Supp. 3d 615, 643-45 (D. Vt. 2022)).

In the present case, Ms. Gursslin has presented compelling evidence that the RPD had a custom or practice of permitting officers to shoot dogs with alarming frequency and without sufficient justification. Between 2004 and 2009, RPD officers shot at 87 dogs, killing 35. (Ex. 9, Democrat and David Andreatta, Shooting dogs on city streets, RPD fired 217 times at 87 often vicious dogs in last 5 years, Democrat & Chronicle (July 14, 2009)). Between 2013 and 2018, they killed approximately 50 dogs, averaging nearly one dog per month. (Ex 10, Firearm Discharge Reports). Nevertheless, no officer has ever been disciplined for shooting a dog, and the City has

never implemented any new training as a result of a dog being shot. These statistics alone suggest a pattern so pervasive and persistent that it constitutes a municipal custom.

Importantly, the City's policy instructs RPD officers to shoot dogs even when non-lethal tools are available, such as TASERS. TASER International (now Axon) provides training materials and other information to all departments that use TASERS. (See Exhibits 12-13, Taser User Manuals). Since 2003, TASER has informed all departments that, based on an analysis of 37 incident reports involving animals (mostly dogs), there was a 92% success rate. (Ex 11, TASER Animal Certification). The instructional PowerPoint even includes a real video of an officer effectively using a TASER to subdue a dog. (Ex 13 – 2019 PowerPoint with embedded video at page 149, provided to the Court on a thumb drive). Nevertheless, the City explicitly instructs its TASER-certified officers to ignore this training and to instead shoot dogs. (Ex 14, 154:20-155:5)

Additionally, Dr. James Crosby's expert report provides further support for the existence of this custom. Dr. Crosby highlights the lack of proper training and the failure of the RPD to implement policies that would prevent unnecessary shootings of dogs. His analysis indicates that the frequent use of lethal force against dogs was not an isolated incident but rather part of a broader pattern of conduct that was approved by the department (*Crosby Report*, pp. 13, 18)

 C. **A jury must decide if the City was deliberately indifferent to the RPD shooting residents' dogs.**

  1. **Whether the City failed to properly train its officers is a jury question.**

There is substantial evidence to support Plaintiff's claim that the City is liable under a deliberate indifference, failure to train theory of municipal liability. Courts in the Second Circuit have articulated the elements of deliberate indifference for such a claim as follows:

> (1) a policymaker knows to a moral certainty that [his] employees will confront a given situation; (2) the plaintiff must show that the situation either presents the employee with a difficult choice of the

> sort that training or supervision will make less difficult or that there
> is a history of employees mishandling the situation; and (3) the
> wrong choice by the city employee will frequently cause the
> deprivation of a citizen's constitutional rights.

*Jones v. City of New York*, 2016 WL 1322443 at *8 (S.D.N.Y. 2016)).

Deliberate indifference may therefore be found where "city policy makers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011). Notice is generally established by alleging a pattern of similar violations; however, "in a narrow range of circumstances, a pattern of similar violations might not be necessary to show deliberate indifference," *id*. at 63, 131 S.Ct. 1350 (internal quotation marks omitted), such as where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 388, 390 (1989).

### i. *Dr. Crosby's expert report demonstrates the City's training was grossly insufficient.*

The City argues that it provided proper training to its officers through a 2014 in-service session developed by Reno DiDomenico, a former Monroe County Sheriff's Deputy. However, the expert report of James Crosby, Ph.D., demonstrates that this training was grossly inadequate both in duration and content. According to DiDomenico's own testimony, the training was a brief 1.5 to 2-hour session, which is insufficient to properly educate officers on the complexities of canine behavior and how to handle encounters with dogs without resorting to lethal force. (DiDomenico Dep 33:25, 34:1-3, 54:14-15, 140:9-141:21) The training lacked hands-on practice or interactive components necessary for officers to internalize the techniques being taught. Instead,

it provided only a basic overview, which was inadequate for ensuring that officers could effectively apply these techniques in real-life situations (Ex 3, pp. 14-15).

Moreover, DiDomenico, who developed and delivered the training, lacks the necessary expertise in dog behavior, a critical component for creating an effective program. Dr. Crosby emphasizes that DiDomenico is not a certified dog trainer or animal behaviorist, and his background does not equip him to develop a comprehensive training program on this subject. The limited involvement of animal behavior expert Robert Lockwood did not extend to the core training provided to the officers. This reliance on inadequately qualified individuals underscores the insufficiency of the training provided by the City (Ex 3 Crosby Report, p. 16).

Dr. Crosby also criticizes the City for not utilizing readily available, comprehensive training resources that could have significantly improved officer preparedness. Specifically, the U.S. Department of Justice's Community Oriented Policing Services (COPS) program offers detailed materials and videos on how to handle dog encounters (Exs. 18-23) yet the City chose not to incorporate these resources into their training program. Crosby notes that these resources are available at no cost and are specifically designed to prevent unnecessary harm to dogs during police encounters (Ex 3, Crosby Report, pp. 18-19).

In addition to the deficiencies in the content and structure of the training, Dr. Crosby reviewed deposition testimonies from approximately 20 RPD officers, revealing a striking lack of recollection regarding the details of the training they received on dog encounters (See R. 56.1 Counter. ¶¶ 58-59). Many officers could not remember specifics about the non-lethal options supposedly covered in the training. (Id.) For instance, while some officers recalled discussions about using a baton, they could not confirm whether they were trained on the use of OC spray or

other non-lethal methods. (Id.) This lack of retention suggests that the training was not sufficiently impactful or comprehensive to be effective (Ex 3, Crosby Report, pp. 22-23).

The inadequacy of the training is further evidenced by the alarming number of dog shootings by RPD officers. Between 2014 and 2022, RPD officers shot and killed at least 66 pet dogs. This pattern indicates that the training provided was not only insufficient but also failed to instill the necessary skills and knowledge to prevent these tragic incidents. Dr. Crosby compares this with other police departments, such as Buffalo, which, after implementing proper training, saw a significant reduction in dog shootings. For example, after Buffalo implemented a department-wide training in 2014, the number of dogs shot by police dropped by 62%, from 26 in 2013 to just 10 in 2017 (Ex 3, Crosby Report, pp. 25-26).

In 2014, the Buffalo Police Department took a proactive step in addressing the issue of dog shootings by providing all of its officers with the free COPS training developed by the U.S. Department of Justice's Community Oriented Policing Services (COPS) program. This training was delivered during a mandatory, day-long, in-service session and included a series of videos specifically designed to educate officers on how to handle encounters with dogs safely and effectively. The training materials emphasized the importance of understanding canine behavior and applying non-lethal methods to manage situations involving dogs.

The implementation of this training had a significant and immediate impact. The number of dogs shot by Buffalo police officers dropped dramatically. Specifically, the number of dog shootings decreased by 62%, from 26 incidents in 2013 to just 10 in 2017 (Crosby Report, pp. 25-26). This reduction is a clear indication of the training's effectiveness in reducing unnecessary harm to dogs during police operations.

Lieutenant Peter Nigrelli of the Buffalo Police Department testified that the training was indeed mandatory for all officers and that it played a critical role in changing how officers approached encounters with dogs. (See Ex 41). He noted that since the implementation of the training in 2014, the Buffalo Police Department saw a marked decrease in the number of dogs shot by officers, particularly during SWAT operations. He attributed this positive change directly to the comprehensive nature of the COPS training, which provided officers with the necessary tools and knowledge to handle dog encounters more safely (Ex 41 22:1-23:2). This testimony underscores the effectiveness of the DOJ training and highlights the RPD's failure to adopt similar, readily available, and proven methods to prevent unnecessary shootings of dogs.

### 2. Whether the City failed to properly supervise and discipline its officers for shooting dogs a jury question.

#### a. This theory was adequately pled.

The theory was clearly adequately pled in the complaint. *See*, *Johnson v. City of Shelby, Miss.,* 135 S. Ct. 346, 347 (2014) (although § 1983 not pled, defendants were advised of the factual basis of the claim, and plaintiffs were "required to do no more"; amendment must be allowed to assert § 1983). If the factual allegations support a valid claim, the court must treat the complaint as raising that claim, even if the plaintiff has not cited the right legal theory. *Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir. 2005).

#### b. There is sufficient evidence to go to the jury.

No RPD officer has ever been disciplined or required to undergo additional training for shooting a dog. (Ex 14, Cuilla Depo. 102:23-25, 103:3-6). This is despite the long history of troubling dog shootings by RPD officers. The evidence reveals a systemic failure by the RPD to supervise or discipline its officers in incidents involving the shooting of dogs. This lack of

accountability has contributed to a culture where officers feel free to use lethal force against dogs without fear of repercussions.

The only person required to review an incident where an officer fires a gun at a dog is the officer's immediate supervisor, normally a sergeant. (Ex 14, Cuilla Depo. 195:23-196:5). The Professional Standards Section (the RPD's internal affairs), is not required to review incidents where firearms are discharged at dogs. (Cuilla Depo. 196:6-8; Cuilla Depo. 212:23-25, 213:2-6).

The RPD has not changed any of its training on canine encounters in response to prior incidents where officers have shot dogs (Cuilla Depo. 195:1-5). The City also has not made any recommendations for changes in its policies or training regarding the use of force against dogs after reviewing BWC of dog shootings (Cuilla Depo. 194:22-195:5, 206:18-207:1). The City does track the number of dogs shot by its officers, but it does not conduct any statistical analysis of this data or generate reports on it, unless specifically requested to do so (Cuilla Depo. 200:12-15, 204:7-10, 205:6-9).

Commander Fabian Rivera testified that during his tenure at the RPD, no officers were disciplined or required to undergo retraining as a result of shooting a dog. He mentioned that although four or five officers had shot at dogs, none were disciplined, though some were ridiculed for missing their shots. Specifically, Chief Rivera referenced an incident involving Officers Mike Johnson and Korey McNees, who were ridiculed for missing shots at a small dog, but they did not face any disciplinary actions (Ex 6 p. 150, lines 16-25; p. 151, lines 1-25). Rivera also confirmed that there was no record of disciplinary actions taken against officers Nellist and Kelly in this case. (Ex 6, p. 151, lines 8-25).

Similarly, Aaron Springer testified that, to his knowledge, no officer within the RPD has ever been disciplined or required to undergo retraining specifically as a result of shooting a dog.

He confirmed that he was not aware of any instances where officers received additional training following such an incident. When questioned about specific cases, such as the incident involving Officers McNees and Johnson, Springer indicated that there were no requirements for further training for the officers involved (Ex 7, p. 152, lines 17-25; p. 153, lines 1-25)

This is particularly concerning, as numerous officers have shot multiple dogs. For example, former RPD Sgt. Daniel Zimmerman testified that he shot approximately 25 dogs during his time as an officer with the RPD. (Ex 32) He stated that these shootings occurred between 1988 and 2009, particularly during his time in the narcotics division before 2010. Zimmerman mentioned that after the last time he shot a dog, there was no retraining or disciplinary action taken against him. Furthermore, he noted that the RPD did not provide any training regarding interactions with dogs during police duty during his tenure (Id. 204:13-205:25).

On August 11, 2019, Officer Kenneth Pinkney shot a dog on Cedarwood Terrace. As detailed by Pinckney at his deposition, he shot the dog while it was standing on the grassy area between the sidewalk and the curb (Ex 34 102:11-13). The dog had previously retreated to its yard but then turned and barked at Pinckney and another officer while in an "assertive, dominant position" (Id. 105:16-20). The dog had not advanced towards the officers or left the curb before Pinckney fired his shotgun (Id. 104:21-105:8; see also Ex 35, Pinckney BWC) Pinckney clearly violated RPD policy, as the dog was not advancing or attacking in any way. Yet Pinckney was not disciplined or required to undergo any additional training as a result of the incident.

Dr. Crosby emphasizes that effective supervision and discipline are critical components of maintaining good and accepted police practices. The absence of these elements in the RPD's response to dog shootings indicates a systemic failure of accountability within the department.

This failure is particularly egregious given the availability of comprehensive training resources that could have been implemented to prevent such incidents. (Ex 3, Crosby rpt. 11-16).

This lack of supervision and discipline underscores the City's failure to supervise its officers and reflects a deliberate indifference to the constitutional rights of residents and their pets.

The City's claim that it has adequately supervised and disciplined its officers is not supported by the evidence. Instead, the City's inaction in the face of repeated dog shootings demonstrates a clear failure to hold officers accountable, thereby perpetuating a pattern of unconstitutional behavior. This lack of accountability directly contradicts the City's assertion and highlights the need for significant reforms within the RPD to address these systemic issues.

## **CONCLUSION**

For all of the reasons stated herein, Plaintiff respectfully submits the Court should deny the City's motion for partial summary judgment in its entirety.

Dated: August 12, 2024          Roth & Roth, LLP
       New York, New York

                                ~//s//~
                        _____
                        Elliot Dolby Shields
                        192 Lexington Avenue, Suite 802
                        New York, New York 10016
                        Phone: (212) 425 1020
                        E-mail: eshields@RothandRothLaw.com