**Revised**
**Exhibit C**

CONFIDENTIAL

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ERIN GURSSLIN,

      Plaintiff,

          Civil Action No. 20-cv-6508

v.

THE CITY OF ROCHESTER, a municipal entity, POLICE
OFFICER JEREMY NELLIST, POLICE OFFICER JOSHUA
KELLY, COMMANDER FABIAN RIVERA, LIEUTENANT AARON
SPRINGER,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Remote Deposition Upon Oral Examination:

      Sergeant Joshua Paul Kelly

Date:          February 22, 2023

Time:          10:00 a.m.

Reported By:  Jayme C. Wintish

           Alliance Court Reporting, Inc.

           109 South Union Street, Suite 400

           Rochester, New York 14607



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

**Confidential**

2

A P P E A R A N C E S

Appearing Remotely on Behalf of Plaintiff:

Elliot D. Shields, Esq.

    Roth & Roth LLP

    192 Lexington Avenue, Suite 802

    New York, New York  10016

    eshields@rothandrothlaw.com


Appearing Remotely on Behalf of Defendants:

Peachie L. Jones, Esq.

    City of Rochester Law Department

    City Hall, Room 400A

    30 Church Street

    Rochester, New York  14614

    peachie.jones@cityofrochester.gov


Also Present Remotely:

Dave Parrotta, Videographer

    Alliance Court Reporting, Inc.

    109 South Union Street, Suite 400

    Rochester, New York 14607


                    *       *       *



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

4

P R O C E E D I N G S

for their certified transcript charge, including any expedite or other related production charges;

AND IT IS FURTHER STIPULATED, that the Notary Public, JAYME C. WINTISH, may administer the oath to the witness.

*     *     *

THE COURT REPORTER:  Will counsel please stipulate to me remotely swearing in the witness located in New York State; that counsel will not object to the admissibility of the transcript based on proceeding in this way and that the witness has verified that he is, in fact, Sergeant Joshua Paul Kelly?

MS. JONES:  Yes.  Defendants will.

MR. SHIELDS:  Plaintiff stipulates.

THE VIDEOGRAPHER:  We are on the record at 10:04 a.m.  Today is Wednesday, February 22nd, 2023. I am David Parrotta for Alliance Court Reporting located at 109 South Union Street, Suite 400, in Rochester, New York.  We are at the offices of Alliance Court Reporting.

We are about to begin the video-recorded deposition of Joshua P. Kelly in the matter of Erin Gursslin, Plaintiff, versus the City of Rochester, a



SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

municipal entity, Police Officer Jeremy Nellist, Police Officer Joshua Kelly, Commander Fabian Rivera, Lieutenant Aaron Springer, the Defendants.

In attendance is the court reporter, Jayme Wintish, of Alliance Court Reporting.

At this time, will counsel please identify themselves for the record, after which our court reporter can swear in the witness?  We may proceed.

MR. SHIELDS:  Elliot Shields, Roth & Roth LLP, for the plaintiff, Erin Gursslin.

MS. JONES:  Peachie Jones for the City of Rochester for all defendants.

SERGEANT JOSHUA PAUL KELLY,

called herein as a witness, first being sworn,

testified as follows:

EXAMINATION BY MR. SHIELDS:

Q.  Good morning, Sergeant.  My name is Elliot Shields.  I represent a woman whose dog, Nina, you shot and killed in front of her in her backyard.  And I'm going to ask you some questions today.

First, I'm just going to go over some ground rules for the deposition.

Will you tell me if you don't understand my question?



Confidential

85

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

MS. JONES:  Please follow up in writing.

Q.  And do you recall what year that switch was made from using two channels to using one channel?

A.  No, sir.  I don't.

Q.  Okay.  Do you recall if it was you or Nellist who sent that communication over the radio that you were infiltrating to your operating position?

A.  No, sir.  I don't.

Q.  Is that the correct term, "infiltrating" to your operating position?

A.  Yeah.  I understand what you're getting at.

Q.  Okay.  So eventually you left from Whittier Park and you walked down Ms. Gursslin's driveway; correct?

MS. JONES:  Objection.

A.  Yes, sir.

Q.  Okay.  And Nellist was with you at that time?

A.  Yes, sir.

Q.  And you said the chain-link gate was open?

A.  Yes, sir.

Q.  Okay.  And you proceeded down her driveway into her backyard; correct?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

86

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

MS. JONES:  Objection.

A.   That is correct.

Q.   And how many cars were in the driveway at that time?

A.   I don't recall.

Q.   Okay.  Do you remember seeing cars in the driveway?

A.   Honestly, I don't remember either way.

Q.   When you went down the driveway, the motion sensor floodlight came on on the side of the house; is that correct?

MS. JONES:  Objection.

A.   I don't remember.

Q.   Okay.  What would you have done if it's dark outside and suddenly a motion sensor light turned on?

A.   We're generally going to pause and possibly observe to see what happens.

Q.   Is the motion sensor light something that you observed during your scouting?

A.   I don't remember.

Q.   What, if anything, did you observe when you entered her backyard?

A.   That night?



Confidential

87

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

Q.   Correct.

A.   Or I'm sorry.  That morning.  Nothing that was out of the ordinary different from the scout.

Q.   Okay.  And what did you do when you entered her backyard?

A.   We paused to make sure that nothing was different, listening to see if we hear anybody outside, or animals outside, looking to see if we see any movement or anything.

Q.   Okay.  What did you do next?

A.   We moved to the back -- I guess it would be the northwest corner of her property.

Q.   Okay.  And then what did you do?

A.   We proceeded to climb over the fence.

Q.   Okay.  What kind of fence was that?

A.   From what I can remember, it was chain-link fence in the back corner.  And I want to say I'm remembering it being somewhat broken to where it was a little bit more difficult to get over.  And I think on the other side was a tall, stockade-ish style fence, I guess, on the west portion.

Q.   Okay.  And what was on the other side of the fence?

A.   That we were -- I guess, let me clarify,



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

you're wanting to know the route we were taking, what was on the other side?

Q.   Like what was the terrain when you jumped over the fence?

A.   I know that there wasn't much room.  I believe there's a possible building on the other side, maybe a detached garage or shed that butts up close to the property line.

Q.   Were there little barbs on the top of the fence?

A.   I can't remember.

Q.   Was there a slope on the other side of the fence?  Did the ground slope downward?

A.   Not that I can recall offhand.

MR. SHIELDS:  Okay.  So I am going to put up an exhibit.  These are going to be the pictures produced by the city.  I'm just going to mark them all as one exhibit.  It's Bates Number City of Rochester 33 to City of Rochester 43.  Give me one second, and I will ask a couple questions here.

A.   Yes, sir.

(The following exhibit was marked for identification:  Number EXH 1.)

MR. SHIELDS:  Okay.  So this will be



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

107

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

Q.   Okay.   Okay.   What did you do when you reached your final operating position?

MS. JONES:   Objection.

Go ahead.

A.   We set up and from what I can remember we radioed in our position to command, which would be the commander.

Q.   Okay.   And that would have been Springer?

A.   Yes.

Q.   Okay.   Do you remember if Fabian Rivera was also present at this operation?

A.   I don't remember seeing him until the -- afterwards, I guess.   But it could be he was there.   I just don't remember.

Q.   Okay.   If he was the commander of the special operations division, would he have been at the pre-execution briefing?

A.   Sometimes.

Q.   So do you have any specific recollection if he was at the pre-execution briefing for this case?

A.   I don't remember whether he was there or not.

Q.   Okay.   So you got to your final operating position, you radioed in your location, and you set up



Confidential

125

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

A.    Not necessarily.  There -- people gather on neighboring porches.  And there are sometimes large crowds that gather right at the police line, which would be in view of us attempting to leave.

Q.    Okay.  So instead of going directly out to St. Paul Street for secrecy reasons, instead you went and you trespassed back through my client's backyard?

MS. JONES:  Objection.

A.    For safety purposes, we went back through the way we came.

Q.    And again, you didn't have a warrant, consent, or exigent circumstances that permitted you to reenter my client's yard; correct?

MS. JONES:  Objection.

But go ahead.

A.    No, sir.

Q.    Do you remember the path that you took when you left your final operating position to get back into my client's yard?

A.    I believe we went the same exact route that we came in.

Q.    Do you remember if you had to go up a hill?

A.    I don't remember as far as terrain



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

129

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

noticed a light?

A.   At the -- in your client's yard, but back at that corner directly with my back up against the corner of the fence still.

Q.   Okay.  So how long after you entered the yard did you notice the light?

A.   Probably less than -- I'd say anytime between 15 seconds to 30 seconds, maybe, or sometime in there.  It happened fairly quickly.

Q.   Okay.  And what was Ms. Gursslin saying to Nina as they entered the backyard?

A.   I don't recall.

Q.   Okay.  You heard Ms. Gursslin's voice talking to Nina?

MS. JONES:  Objection.

A.   I don't recall hearing her voice to start with.

Q.   Do you remember seeing Ms. Gursslin take her dog off the leash?

A.   No, sir.

Q.   And when Nina started coming towards the back of the house, Ms. Gursslin was directly behind her; correct?

MS. JONES:  Objection.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

**Confidential**

130

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

A.  Again, I couldn't see where your client was.

Q.  Okay.  So let's take a step back.

You enter the yard.  Maybe 15 seconds later you noticed the light come on.  Tell me everything that happens after that.

A.  A light comes on.  I remember hearing a -- what sounded like a door opening, and then a growl of a dog, and what sounded like a dog -- which I can only describe as a dog running on the ground until it came into my view.

Q.  Okay.  And at any point, did you see Ms. Gursslin following right behind the dog?

A.  No, sir.

Q.  Okay.  At any point did you hear Ms. Gursslin saying anything to her dog?

A.  Not that I can recall.

Q.  When you are operating as a SWAT sniper, do you use the earmuff radio covers sort of like the entry team, if you know what I'm talking about?

MS. JONES:  Objection.

A.  No, sir.  We do not.

Q.  Okay.  So there was nothing that would have obstructed your hearing.



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

133

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

general area of the corner of that white plastic picket fence near the gray cinder block.  And it would be outside the fenced area.  So closer to the -- on the west side of that fence.

Does that make sense?

Q.   Okay.  So the gray cinder block is on the bottom of the screen between the white picket fence and the red car?

A.   No.  No.  I'm talking about the cinder block -- I'm trying to figure out how to describe this without you being here and pointing.  There's a cinder block building in the back.  It looks like there's some windows boarded up on it.

Q.   Okay.  So you mean the structure to the north side of the property that looks like a garage or something else?

A.   Yes, sir.

Q.   Okay.  So do you mean the first time you saw the dog it was to the west of this white picket fence, and so kind of in the northwest corner where the white picket fence would connect to this structure that is either a garage or something else?

MS. JONES:  Objection.

A.   Yes.  I'd say that's a good description on



Confidential

134

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

the other side of the fence.  So if that fence is meant to contain something, I'd say it was on the outside of it.

Q.  Okay.  And before you saw Nina, the dog, were you aware that she was present in the backyard?

A.  I heard a growling and what sounded like a dog moving quickly.  And it sounded like it was getting -- it was towards my direction.  So I -- I assumed that it was a dog of some type.

Q.  Okay.  Was she growling or barking?

A.  I heard a growl and then barking as running -- or what I can only assume was running.

Q.  And what did you do when you became aware of Nina, the dog, in the backyard?

A.  I noticed that my avenues of escape were severely cut down, and the dog started coming towards me along that cinder block wall.  At that time, I threw my bag down in front of myself and -- in between me and the dog to create some type of barrier.

Q.  Okay.  Did you see Ms. Gursslin at that point?

A.  No, sir.

Q.  Did you notice that she was also in the backyard beyond the white picket plastic fence with



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

135

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

you?

MS. JONES:  Objection.

A.  No, sir.

Q.  Okay.  What did Nellist do?

A.  So I would be closer to the cinder block. And so again, this is tougher to explain than to show you.  I guess if my left shoulder was close to the cinder block with my back up against that corner of the two fences facing towards the house, Nellist would have been to my right.

Q.  Okay.  So Nellist would have been closer to the white van?

A.  I wouldn't say he was close to the white van, but he was closer than I was.

Q.  Okay.  So he was to your right if you're facing towards the house.

And so that would have been the direction where the white van is in this picture marked as City of Rochester 34; correct?

MS. JONES:  Objection.

A.  Correct.  We were shoulder to shoulder in that back corner.

Q.  Okay.  All right.  What happened next?

A.  Like I said, the dog made what I -- what



**Confidential**

136

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

appeared to me as a charging motion.  I threw my bag down in order to create a barrier.  The dog stopped and from what I can recall, it seemed to circle around, I guess, towards the van, to use a reference point.  At that point, the dog appeared to charge again towards our location.  And that's when I fired two rounds.

Q.  Okay.  You fired two rounds.

And did Nellist also fire his gun?

A.  Yes.

Q.  Okay.  And do you know how many rounds Nellist fired?

A.  One, I believe.

Q.  Okay.  Did all of the rounds strike the dog?

A.  I can't say for sure.

Q.  Okay.  What happened next?

A.  Once the dog was hit, it appeared to back up and fall to the ground.  We radioed to the team, I believe, our location.  And I'm trying to think if there was anything else.  We were met by team members out back.

Q.  Okay.  What happened before the team members got there?



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

**Confidential**

137

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

A.  We identified ourselves as police officers to your client.

Q.  Okay.  What did my client do?

A.  I don't recall.  I know she was yelling and screaming.

Q.  Okay.  And crying?

MS. JONES:  Objection.

Go ahead.

A.  I'm not sure.  I honestly didn't have a clear view of your client afterwards.

Q.  Okay.  Did you observe my client hold Nina as she bled to death in her arms?

MS. JONES:  Objection.

A.  I don't recall.

Q.  Okay.  Did you remain in the yard for some period of time after the shooting?

A.  We remained in position until members of the entry team or other members of the team made it to our location.

Q.  After those other members came into my client's backyard, did you leave?

A.  Yes.  We were told -- or ordered to head back to our vehicle.

Q.  Okay.  And between the time when you shot



Confidential

138

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

the dog and went to your vehicle, who did you speak with in the backyard?

A. I believe it was Lieutenant Diehl and possibly Lieutenant Springer. And there might have been another member of the team that was back there at the time as well. I just don't remember specific faces.

Q. Okay. Did you speak to my client at all?

A. The only thing, I believe, I said, I identified myself as a police officer.

Q. Okay. Did you speak with anyone else that wasn't a police officer?

MS. JONES: Objection.

A. Not that I recall.

Q. Okay. And how long between the shooting and when you left the yard?

A. I'd say a couple minutes roughly.

Q. Okay. Anything else you remember about being in the backyard before you exited the backyard?

A. No, sir.

Q. Okay. Did you read the complaint in this case?

A. No, I did not.

Q. Like when you were served with a copy of



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

192

SERGEANT JOSHUA PAUL KELLY - BY MS. JONES

Q.  Earlier you said that traveling through Ms. Gursslin's yard was the easy and best way to get into position?

A.  Yes, ma'am.

Q.  What did you mean by the best way to get into position?

A.  We determined that there was no other route that would allow us to complete our mission.

Q.  Why wasn't there any other route that wouldn't jeopardize the mission?

A.  Other avenues would have created a large observation of our covert action.  And this provided the best way for us to get into position as unnoticed as possible.

Q.  And what did you mean by was the easiest way to get into position?

A.  It didn't provide as many avenues of concern as far as drawing of attention from the target location or making other residents, such as the amount of residents that are in that apartment building, aware of our presence.

Q.  What types of warrants have you dealt with as a police officer?

A.  Two that I can think of.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

197

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

MS. JONES:  Objection.

A.  Yes, sir.

Q.  Okay.  So you chose to trespass in my client's yard because it was the easiest way to get to your final operating position; correct?

MS. JONES:  Objection.

A.  Like I said earlier, it was the easier and fastest approach.

Q.  Okay.  And you chose to exfiltrate through her yard again because it was the easiest way to exfiltrate; correct?

MS. JONES:  Objection.

A.  Again, it was the easiest and fastest way. And we come out where we went in unless we encounter something.

Q.  Okay.  So you knew that you were going to -- you knew that you didn't have a lawful basis to enter her yard, but you chose to do it anyways because it was the easiest thing to do?

MS. JONES:  Objection.

A.  I'd say that under emergency circumstances for this warrant I felt like we had a right to be there.

Q.  Okay.  And earlier you agreed with me and



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920