**Revised
Exhibit D**

CONFIDENTIAL

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
ERIN GURSSLIN,

        Plaintiff,

                    Civil Action No. 20-cv-6508
v.

THE CITY OF ROCHESTER, a municipal entity, POLICE
OFFICER JEREMY NELLIST, POLICE OFFICER JOSHUA
KELLY, COMMANDER FABIAN RIVERA, LIEUTENANT AARON
SPRINGER,

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -


Video-recorded Deposition Upon Oral Examination of:

        Officer Jeremy Nellist


Location:      Alliance Court Reporting, Inc.
              109 South Union Street, Suite 400
              Rochester, New York  14607


Date:          February 24, 2023


Time:          10:00 a.m.


Reported By:   KIMBERLY A. BONSIGNORE

              Alliance Court Reporting, Inc.

              109 South Union Street, Suite 400

              Rochester, New York  14607



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

2

A P P E A R A N C E S

Appearing Remotely on Behalf of Plaintiff:

Elliot D. Shields, Esq.
    Roth & Roth LLP
    192 Lexington Avenue, Suite 802
    New York, New York  10016
    eshields@rothandrothlaw.com


Appearing on Behalf of Defendant:

Peachie L. Jones, Esq.
    City of Rochester Law Department
    City Hall, Room 400A
    30 Church Street
    Rochester, New York  14614
    peachie.jones@cityofrochester.gov


Also Present:

Peter H. Colucci, Videographer
    Alliance Court Reporting, Inc.
    109 South Union Street, Suite 400
    Rochester, New York  14607



                    *      *      *



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

4

P R O C E E D I N G S

for their certified transcript charge, including any expedite or other related production charges in accordance with Rochester Rules;

AND IT IS FURTHER STIPULATED, that the Notary Public, KIMBERLY A. BONSIGNORE, may administer the oath to the witness.

\* \* \*

THE VIDEOGRAPHER:  Good morning.  We are on the record at 10:13 a.m.  Today is Friday, February 24, 2023.

My name is Peter Colucci of Alliance Court Reporting, located at 109 South Union Street, Suite 400, in Rochester, New York.  We are at the offices of Alliance Court Reporting.

We are about to begin the video-recorded deposition of Jeremy Nellist in the matter of Erin Gursslin versus the City of Rochester et al.

Would the attorneys please announce their appearances for the record?

MR. SHIELDS:  For the Plaintiff Erin Gursslin, Elliot Shields, Roth & Roth LLP.

MS. JONES:  And Peachie Jones for -- with the City of Rochester, for all defendants.

THE VIDEOGRAPHER:  The court reporter



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

5

OFFICER JEREMY NELLIST - BY MR. SHIELDS

today is Kim Bonsignore of Alliance Court Reporting.

The witness may be sworn in.

OFFICER JEREMY NELLIST,

called herein as a witness, first being sworn,

testified as follows:

EXAMINATION BY MR. SHIELDS:

Q.   Good morning, Officer Nellist.  My name is Elliot Shields.  I represent a woman named Erin Gursslin, whose dog, Nina, was shot and killed in her yard, and I'm going to ask you some questions today.

First I'm just going to go over the ground rules for the deposition.  Will you tell me if you don't understand my question?

A.   Yes.

Q.   And will you tell me if you find my question confusing?

A.   Yes.

Q.   Will you tell me if I have assumed an incorrect fact in my question?

A.   Yes.

Q.   And will you tell me if you don't know the answer to my question?

A.   Yes.

Q.   And will you need me to remind you of the



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

66

OFFICER JEREMY NELLIST - BY MR. SHIELDS

many people reside at the property?

MS. JONES:  Objection.

A.  No.

Q.  Okay.  Tell me everything you did when you entered Ms. Gursslin's property while you were scouting.

A.  I checked the fence.  I was looking for signs of any type of dogs that would be in the backyard -- food dishes, dog houses, or leads tied to anything, actually a dog barking at me as I did the scout -- and I saw none of that.

Q.  Okay.  Tell me everything you did to determine whether a dog resided at the property.

MS. JONES:  Objection.

A.  I checked the fence.  I rattled the fence. I didn't hear a dog bark.  I walk into the backyard. I did not see any type of dog feces.  I didn't see any dog bowls.  I didn't see a doghouse.  I didn't see a lead tied to anything.

Q.  Okay.  Did you ask anyone in the neighborhood?

A.  No.

Q.  Okay.  Did you knock on the door or ring the doorbell to ask?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

67

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A.   No.

Q.   Did you peer through any windows of the house to see if there were dogs inside?

A.   No.

Q.   Did you peer through the house to see if there were -- anything, like a leash, hanging by the front door?

A.   No.

Q.   Okay.  Did you look inside any of the cars in the backyard for a sign of a dog?

A.   No.

Q.   Okay.  How much poop was on the ground in the backyard?

MS. JONES:  Objection.

A.   I didn't notice any.

Q.   Okay.  Did you look?

A.   As I was walking through, yes.

Q.   Okay.  Is it something that you were specifically looking for when you entered the backyard?

MS. JONES:  Objection.

A.   I didn't scan the entire yard.  I looked in the area that I walked through, and I didn't notice any.



OFFICER JEREMY NELLIST - BY MR. SHIELDS

MS. JONES:  Objection.

A.  I can't testify to what he testified to. I did not notice a light, no.

Q.  Okay.  So at no point you noticed a light come on?

A.  Correct.

Q.  After you reentered the backyard, what did you hear Ms. Gursslin saying to Nina?

MS. JONES:  Objection.

A.  I didn't hear anything.

Q.  Okay.  What happened after you entered the backyard?

A.  We got charged by a dog.

Q.  Okay.  When's the first time that you noticed the dog?

A.  As it was about 5 or 6 feet from us.

Q.  Okay.  Did you also notice Ms. Gursslin right behind the dog?

A.  No.

Q.  Okay.  If Ms. Gursslin was right behind the dog and talking to it, is that something that you think you would have noticed?

MS. JONES:  Objection.

A.  I did not notice her anywhere in the yard.


ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

105

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q.  Okay.  When's the first time that you noticed Ms. Gursslin?

A.  After we shot the dog.

Q.  Okay.  If Ms. Gursslin testified that she was following the dog and talking to it right up to the time when you shot the dog, and that she was standing about 3 feet behind the dog when you shot it, do you think she was mistaken?

MS. JONES:  Objection.

A.  Yes.

Q.  Okay.  If she was 3 feet behind the dog, do you think you would have noticed her?

MS. JONES:  Objection.

A.  Yes.

Q.  Okay.  And you testified that it was dark outside?

A.  It was dark, yes.

Q.  And you testified that you didn't see any light come on?

MS. JONES:  Objection.

A.  Correct.

Q.  And you testified that you didn't see any poop on the ground because it was dark outside?

MS. JONES:  Objection.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A.   Correct.

Q.   And you testified -- well, let me withdraw that.

So you jump the fence, and you see the dog running at you, and then you shoot the dog.  Is that what happened?

A.   No.

MS. JONES:  Objection.

Q.   Okay.  So what happened?

A.   So Josh jumped over the fence first.  He was in the yard, I passed him all the gear, and then I jumped over the fence.  And then we picked up our gear and began to walk out.

And as we got to the point of the yard, that's when the dog charged at us.  So we were in the yard briefly before the dog ever came at us.

Q.   Okay.  So how long were you in the yard before you noticed the dog?

A.   About 30 seconds.

Q.   Okay.  And in that 30 seconds, you never noticed the light come on?

A.   No.

Q.   And in that 30 seconds, you never heard Ms. Gursslin talking to Nina?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

107

OFFICER JEREMY NELLIST - BY MR. SHIELDS

MS. JONES:  Objection.

A.  No.

Q.  Okay.  Where was Nina located in the yard when you first noticed her?

A.  She was about 4 to 5 feet from us, running directly at us.

Q.  Okay.  So in that 4 to 5 feet, you were able to pull out your gun and shoot?

A.  No.

Q.  Okay.  So what happened?

A.  So initially the dog charged at Josh, who was in front of me because we were in a single-file line.  Josh used his rifle bag and put it in front of him as a barrier between him and the dog.

The dog could not get through the rifle bag.  Josh actually used it, from what I could see, as a shield, moving it around to -- as a barrier between him and the dog.

The dog then went around to our right and came in through some shrubbery that we were up against that was between us and the dog.

Q.  I mean, what were you doing when Josh had the bag and was using it as a shield?

A.  I was actually just -- I don't remember



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

108

OFFICER JEREMY NELLIST - BY MR. SHIELDS

exactly what I did because it happened so fast.  I think I kind of grabbed my bag too.  I had gear in my hand.

Q.  Okay.  And what did you -- what did you do?

MS. JONES:  Objection.

A.  I just kind of stood there.

Q.  Okay.  Did you see Ms. Gursslin while you were standing there?

A.  No.

Q.  Okay.  Did you hear Ms. Gursslin while you were standing there?

MS. JONES:  Objection.

A.  No.

Q.  Then what happened next?

A.  The dog left where Josh was, came in at a different location.  I saw Josh draw his handgun, and I drew mine at the same time.  And he shot first, and then I shot roughly a quarter of a second behind him, as the dog was coming at us through the shrubbery.  And then I started identifying ourselves as police officers.

Q.  Okay.  Why did you start identifying yourselves as police officers?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A. So that if there was anyone else in the yard, they knew police was back there.

Q. Okay. So did you start identifying yourself after you saw Ms. Gursslin?

MS. JONES: Objection.

A. I started identifying ourselves after the shots were fired.

Q. Okay. And you saw Ms. Gursslin immediately after the shots were fired?

A. Yes.

Q. Okay. Where was Ms. Gursslin?

A. Coming through the yard.

Q. Okay. She was close to you?

MS. JONES: Objection.

A. She was approaching us, yes.

Q. She was behind that little white picket fence that divided the backyard?

MS. JONES: Objection.

A. I don't remember exactly where she was.

Q. Okay. She wasn't, like, by the side door; right?

MS. JONES: Objection.

A. I don't recall exactly where she was, no.

Q. Okay. Did you have any idea where the dog



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

OFFICER JEREMY NELLIST - BY MR. SHIELDS

came from?

A.  From the area that it was running from, it looked like it came from the area of the house.

Q.  Josh testified that he thought the dog came from a back door because he noticed the light come on.  Was that your thought?

MS. JONES:  Objection.

A.  All I know is that it came from the yard, running in the direction from the house.  I have no idea where the dog came from.

Q.  Okay.  How far away from you is the dog when you drew your weapon?

MS. JONES:  Objection.

A.  3 feet.

Q.  Okay.  So in that 3 feet, you were able to draw your weapon and shoot before the dog made contact with you?

MS. JONES:  Objection.

A.  Yes.

Q.  Okay.  Before you shot, did you think that there might be a person in the yard also?

A.  No.

Q.  Okay.  You thought the dog just came out by itself?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

OFFICER JEREMY NELLIST - BY MR. SHIELDS

MS. JONES:  Objection.

A.  I don't know where the dog came from.

Q.  Okay.  And what did Ms. Gursslin do after you shot the dog?

A.  She started yelling.

Q.  Was she upset?

MS. JONES:  Objection.

A.  Yes.

Q.  Was she crying?

MS. JONES:  Objection.

A.  Yes.

Q.  And did you see her get down on the ground and hold Nina as she bled to death?

MS. JONES:  Objection.

A.  I don't recall.

Q.  When you shot Nina, were you afraid?

A.  Yes.

MS. JONES:  Objection.

Q.  When you shot Nina, were you reacting based on your fear?

A.  Yes.

Q.  And everything that happened was consistent with your training?

A.  Yes.



Confidential

135

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q. When you say "how to catch a dog," do you mean the catch pole or something else?

A. Catch pole.

Q. Okay. So you get catch pole training on the SWAT team; correct?

A. Yes.

Q. Do -- outside of the SWAT team, do regular patrol officers get trained on the use of catch pole?

A. I'm not aware of it, no.

Q. Okay. That's something you've only been trained on as part of the SWAT team?

A. Yes.

Q. Okay. And aside from the use of the catch pole, do you receive any additional training on how to catch a dog?

A. Other than without a catch pole -- I mean, if a dog is -- there's multiple locations that we go into that the dogs are friendly. And we just -- if there is a leash, we can secure them outside or we can secure them inside a room that has been cleared inside the location. Catch poles are only really used for aggressive dogs.

Q. Okay. And in your experience, the catch poles are generally an effective tool to use with



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

OFFICER JEREMY NELLIST - BY MR. SHIELDS

aggressive dogs?

MS. JONES:  Objection.

A.  Yes.

Q.  Do you think that the rest of RPD patrol officers should be trained on the use of a catch pole?

MS. JONES:  Objection.

A.  I don't believe they have access to them.

Q.  Do you think that the rest of the RPD should have access to catch poles?

MS. JONES:  Objection.

A.  Yes.

MR. SHIELDS:  All right.  I want to just put up another document, which is the catch pole training PowerPoint that was produced in this case, and the first page is Bates-numbered COR 178 and that will be Exhibit 9 for this deposition.

(The following exhibit was marked for identification:  Number EXH 9.)

Q.  Officer Nellist, do you see a dark page entitled "Catch Pole"?

A.  Yes.

Q.  And do you recognize this -- the first page of this document?

A.  No.



Confidential

161

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q.  Have you ever been disciplined for using force against the person?

A.  No.

Q.  Have you ever been a defendant in a lawsuit other than this lawsuit?

A.  No.

Q.  Does the RPD require officers to use de-escalation techniques in situations with aggressive people?

A.  Yes.

Q.  Does the RPD require officers to use similar de-escalation techniques in situations with aggressive dogs?

A.  If there is time to react to a dog, then you use some of the techniques that I've already discussed.  The baton, maybe pepper spray, if there's time.

Q.  Did you ever learn how to use, for example, body language with a dog that you perceive as aggressive to de-escalate with the dog?

A.  Yes.  I've learned, like, speak loudly at the dog, tell him to stay.  That's about it.

Q.  Okay.  And when did you learn those techniques?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920