**Revised
Exhibit S**

CONFIDENTIAL

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
ERIN GURSSLIN,

        Plaintiff,

               Civil Action No. 20-cv-6508
v.

THE CITY OF ROCHESTER, a municipal entity, POLICE
OFFICER JEREMY NELLIST, POLICE OFFICER JOSHUA
KELLY, COMMANDER FABIAN RIVERA, LIEUTENANT AARON
SPRINGER,

        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Video-Recorded Deposition in the Above-Titled Matter:

            Deputy Chief Aaron Springer

Location:       Alliance Court Reporting, Inc.
               109 South Union Street, Suite 400
               Rochester, New York 14607

Date:          February 28, 2023

Time:          10:00 a.m.

Reported By:   CHRISTINE VIGNA

               Alliance Court Reporting, Inc.

               109 South Union Street, Suite 400

               Rochester, New York 14607



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

2

A P P E A R A N C E S

Appearing Remotely on Behalf of Plaintiff:

Elliot D. Shields, Esq.

    Roth & Roth LLP

    192 Lexington Avenue, Suite 802

    New York, New York 10016

    eshields@rothandrothlaw.com

Appearing on Behalf of Defendants:

Peachie L. Jones, Esq.

    City of Rochester Law Department

    City Hall, Room 400A

    30 Church Street

    Rochester, New York 14614

    peachie.jones@cityofrochester.gov

Also Present:

Kenneth Williamson, Videographer

    Alliance Court Reporting, Inc.

    109 South Union Street, Suite 400

    Rochester, New York  14607

                *      *      *



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

4

P R O C E E D I N G S

for their certified transcript charge, including any expedite or other related production charges;

AND IT IS FURTHER STIPULATED, that the Notary Public, CHRISTINE VIGNA, may administer the oath to the witness.

*      *      *

THE VIDEOGRAPHER:  We are on the record. The time is 10:08 on Tuesday, February 28, 2023.  My name is Ken Williamson for Alliance Court Reporting located at 109 South Union Street, Rochester, New York.  Today we are located at the offices of Alliance Court Reporting.  We are about to begin the video-recorded deposition of Deputy Chief Aaron Springer in the matter of Erin Gursslin versus the City of Rochester, a municipal entity, Police Officer Jeremy Nellist, Police Officer Joshua Kelly, Commander Fabian -- Fabian Rivera and Lieutenant Aaron Springer, Defendants.  Today's matter is being video-recorded on behalf of the Plaintiffs.

Counsel, please state your appearances for the record and please begin with the noticing attorney.

MR. SHIELDS:  Elliot Shields, Roth & Roth, LLP for the Plaintiff, Erin Gursslin.



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

**5**

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

MS. JONES:  Peachie Jones with the City of Rochester for all Defendants.

MR. SHIELDS:  And as a note, this is a hybrid deposition.

And at this time, our court reporter, Christine Vigna, of Alliance Court Reporting will swear in our witness.

DEPUTY CHIEF AARON SPRINGER,

called herein as a witness, first being sworn,

testified as follows:

EXAMINATION BY MR. SHIELDS:

Q.  Good morning, Deputy Chief Springer.

A.  Good morning.

Q.  My name is Elliot Shields.  I represent a woman whose dog Nina was shot and killed in front of her in her backyard and I'm going to ask you some questions today.

A.  Okay.

Q.  First, have you ever had your deposition taken before?

A.  I have not.

Q.  Okay.  So I'm going just to go over some ground rules for the deposition.  Will you tell me if you don't understand my question?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

20

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

training coordinator, assistant commander and the commander.

Q.   Okay.  Can you give me the dates for all of those different positions?

A.   I -- I think it -- it would be difficult for me to recall as I transferred different positions. I was -- I know for certain that I was moved to the assistant commander position and had some ancillary responsibilities as the training coordinator when I was promoted to lieutenant in and around 2009.  But I -- I know with certainty that I was appointed as the commander of the team in December of 2012.

Q.   So you were commander of the team from December of 2012 until your retirement in January of 2020?

A.   That's correct.

Q.   Okay.  And I just want to back up and make sure I got all the different positions that you held before that.

So first you said entry and then breach. And then what was after breach?

A.   Assistant team leader.

Q.   And for which team was that?

A.   That would have been an entry team.



Confidential

30

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

A.  Certainly, again, I -- I hope I'm -- I'm not -- I'm not being argumentative.  But because there were -- were times where there were additional people of the same rank on the team, that being lieutenant, we had the same rank, I was positionally responsible for the team by virtue of the appointment of the chief even though our ranks may have been similar.  So I -- I -- the highest rank isn't necessarily representative of how the organizational structure worked.

Q.  Okay.  So would a better term just be that in the SWAT chain of command, as the SWAT commander, you had overall authority and -- and you were the final decision-maker for the SWAT team?

A.  Yes.

(The following exhibits were marked for identification:  Numbers EXH 2A and 2B.)

Q.  Okay.  All right.  And then if we -- I have a couple of questions.  I'm going to mark two exhibits, one 2A and one 2B.  So 2A is going to be the General Order 630 dated April 20, 2015.  And 2B is going to be General Order 630 dated September 18, 2018.

And so my first question is, Chief, the



Confidential

51

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

consultation with the -- the rest of the team when we were putting this -- this procedure together.

And again, there's also the historical context of what had been done prior to sort of the implementation of this SOP that was never really codified or written down with -- with the exception of some reference that would have been in a general order predating the 2015 draft that you had there.

Q. Okay. So I'm just scrolling to get to the next thing. But as you said that, I have a question. Which is, prior to this SOP, was there a pre-existing SOP for the SWAT team?

A. There was not. We relied specifically on just the general order that would have predated the 2015 draft.

Q. Okay. So you drafted the first draft of the SOP that came into existence for the RPD SWAT team?

A. Right. You know, again, like nitpicking, but to provide context or detail, in consultation with other members of the team, yup.

Q. Okay. So I went down to page 40 of the 160-page document that we marked as Exhibit 1. And this is still under SWAT organization, order number



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

52

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

300, page 4.  And down here under J and K, I highlighted them.  And it says that -- well, I'm sorry.  Let me go up.

It says duties and responsibilities under subsection C and then 1, SWAT commander.  And it says "The SWAT commander is responsible for the following, administrative duties."  And it says "A, command of RPD SWAT."  And then I just wanted to fast-forward down here to J and K.  And it says "Develop, coordinate, approve and administer SWAT training through the SWAT training coordinator."  And then K, "Continually evaluate and make improvements to SWAT weapons, equipment and techniques, tactics and procedures."

So I guess my question is, Chief, basically it was your duty, according to the SOP, to -- what it says in J -- develop, coordinate, approve and administer the SWAT training through the SWAT training coordinator; is that right?

A.  That's correct.

MS. JONES:  Objection.

Q.  And I mean, what does that mean in, you know, everyday English to you?

A.  So what that means to me in everyday



DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

English is to -- is to work with the SWAT training coordinator and the team leaders to develop an annual training plan toward the end of the preceding year of that training cycle or calendar.

The training coordinator would have been responsible for reviewing training and operational after action reviews to identify training needs, to build out an annual training calendar that met all of our mission essential task list items based on our -- our -- our core mission, you know, hostage, rescue, barricaded armed subjects, high-risk warrant service. And then ensure that all components of training needs were met to include our biannual SWAT qualification testing. And then from -- from a large level.

And then on a monthly basis to, you know, approve, oversee and participating in monthly SWAT training. And then it would be finally, to review the training after action report and ensure that it was recorded for -- you know, in accordance with our -- our ability to record that document as a -- as a -- as a reference for future need.

Q. And since this is listed under your administrative duties, again, you were the final person to have the final say, overall SWAT training;



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

54

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

is that fair to say?

MS. JONES:  Objection.

A.  That would be -- that would be fair to say that I had the final say, yes.

Q.  Okay.  So you would have been the final policy maker for the SWAT training for the RPD SWAT team?

MS. JONES:  Objection.

A.  So I -- I don't think it would be fair to say that I would be responsible for -- for the policy. I -- I think that -- that there's implications there that are -- that are outside of my scope a little bit.

So MPTC provides policy requirements, the chief of police, the research and evaluation section. New York State MPTC and DCJS, they -- they -- they outline policy requirements.

It was my job to sort of ensure that the team was -- was meeting those -- those needs or -- or what was outlined in the policy that was prescribed to us.

Q.  Okay.  So if not -- so you didn't per se develop the policies that were developed by MPTC, but you made sure to implement those policies that were prescribed by MPTC?



Confidential

55

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

A.   I think that would be fair to say.

Q.   Okay.  And so that would have been like the practice of the RPD, you -- you implemented all practices of the RP -- RPD in terms of these required policies, putting them -- putting the policies into practice?  That's what I'm trying to say.

MS. JONES:  Objection.

A.   So I think -- I think that's fair, but I -- I would just appreciate a little more narrow focus.

So during SWAT training if -- if we differentiate or look at the RPD practice and policy compared to RPD SWAT practice and policy, there was a lot of policy and training that was administered through the department that was not reflective in SWAT training.  And -- and I think that based on, you know, the limited amount of time that we had to train and what things that we had to focus on, I had to defer to other avenues for the SWAT team members -- again, because it's a collateral-duty team and they all had assignments throughout the Rochester Police Department -- to receive Rochester Police Department non-SWAT-specific training through other avenues or means.  I -- I was responsible and focused on the SWAT



Confidential

56

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

aspect.

Q.   Got it.

And the SWAT team received a large amount of additional training that normal patrol officers did not have to receive, correct?

MS. JONES:   Objection.

A.   I think -- I think generally SWAT received more training, but there was quite a bit of elective training that takes place throughout the department based on individual officer's interest or areas of -- areas of assignment.  So SWAT wasn't unique in providing additional training.

For example, the scuba squad trained extra days of the month probably reflective of the number of additional hours that SWAT trained.  That would be similar to the bomb squad.  If -- if -- if not, they may potentially receive slightly more because they're sponsored by the FBI and have to meet FBI bomb squad requirements.

So I -- I don't know if in general terms it would be fair to say that we received more.  We just received more narrowly focused training consistently with regards to SWAT.

Q.   And you were in charge of implementing all



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

57

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

of that additional training, correct, for SWAT?

MS. JONES: Objection.

A. Ultimately, as we had sort of described, you know, I had a SWAT training coordinator that -- that really dealt with the minutiae of it. But, you know, at the end of the day, I was responsible for all of the training that was administered or not administered based on, you know, other conflicts that may have come up.

Q. And as it says in K, part of your duties were to continually evaluate and make improvements to SWAT weapons, equipments and techniques and tactics and procedures. Can you tell me how you would do that?

A. Sure. So one of the ways that I may evaluate any one of those things was through comparing what our mission requirements were locally or based on, you know, federal NIMS requirements for what type or tier SWAT team we were in addition to what the MPTC accreditation requirements were for weapons, equipment and techniques, tactics and procedures.

I would look to after action reports from operations and from training to make any recommendations on equipment or -- or tactics.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

58

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

I did my best to attend outside training to try to learn industry-best practice of what was happening, you know, either regionally or nationally based on, you know, subject-matter expertise from a -- from a SWAT command perspective to see if we were -- if we were training and -- and being led appropriately based on again like the -- the best you could say for industry-best practice. And then just constantly evaluating what was taking place on the team during operations from a -- from a first-person observation perspective and during training to see if things need to be updated.

So, you know, really that was -- that was the thing that I feel like was most important to me. Constantly evaluating to ensure that based on the -- the resources and -- and what we had available to us, we were doing the best that we could to meet our mission requirements.

Q.   So you said a couple of things. One, you'd review the after action reports. That's one of things you said, correct?

A.   That's correct.

Q.   And what types of things would you do in response to an after action report to improve training



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

59

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

or tactics?

A.   Typically delegate -- delegate out.
If -- so if it was -- if it was an issue of like
a -- like a -- a tactic that -- or a tool or a piece
of equipment, then I would find a team leader or a
team member to be responsible for reviewing
what -- what the current -- the current use of the
equipment was.

So just as an example, finding out what
way that equipment could be used more appropriately
or -- or to replace it, developing training and then
implementing that and then -- and then, you know,
defining a period of assessment to ensure that the
assumptions that were made in the replacement or the
update were -- were appropriate and were meeting the
needs that we had envisioned.  That's -- that's
an example of sort of the process that we would use.

Q.   What if there was an after action report
that identified a problem, maybe an ongoing problem?
Maybe you reviewed several after action reports and
you saw an ongoing problem with tactics, would you
respond by, for example, implementing some sort of new
training or policy?

MS. JONES:  Objection.


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

60

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

A.   If -- if I -- if I believed that there was a problem with the application of, for instance, tactic, then yes.  I would implement a -- a change of direction through that, whether that would be reflected in, you know, training, lesson plan or policy, would be specific to that problem that was identified.

Q.   Did that ever happen when you were the commander of the SWAT team?

A.   Continuously I -- I would -- I would -- I would -- I would like to think that I was constantly assessing and making changes to update our -- our -- the application of SWAT to better meet our mission requirements.  So if you don't mind, I'll just provide an example.

Entry techniques, tactics and procedures, the way a team goes from point A outside a house to point B which is the location and the occupants are secure.  Traditionally in -- in search warrant service, that was done using dynamic entry, techniques, tactics and procedures where the team moved through the house relatively quickly in anticipation of identifying and controlling the occupants of the location.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

146

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

A.   Correct.

Q.   That meeting is called a debriefing; is that right?

MS. JONES:   Objection.

A.   It's typically referred to as an after action review, a debrief, a hot wash.  We all -- all the members of the team get together in one room and they discuss -- and we discuss the operation.

Q.   Okay.  Do you remember doing that after this operation?

A.   I don't have a specific recollection other than to say with a high degree of certainty that it was done because that's what we do on every single operation.

Q.   Okay.  Do you remember speaking with Nellist and Kelly about the dog being shot during the operation?

A.   During the operation, I -- I responded briefly to the area where the dog was shot. We -- we -- I believe that when the incident took place, that we had found ourselves proximate to a criminal assault or a shooting.

The information with regards to the -- the dog being shot was not immediately relayed on the



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

147

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

radio.  And -- and I -- I believed at the time when the gunshots were heard and there was a woman screaming, that we had somehow found ourselves in the middle of a -- of a -- of a criminal assault which prompted available team members who weren't specifically focused on a task in the operation to respond to the area in an effort to, you know, identify if there was a victim, identify and apprehend a -- a suspect, especially because of the gunshots.

Again, my immediate -- my immediate thoughts were that this was a -- this was -- that -- that we had somehow found ourselves in the middle of a criminal act.

Q.  So that -- that sounds pretty chaotic? No?

MS. JONES:  Objection.

A.  I mean, when -- when -- when you're -- you're trying to ascertain critical information in a short period of time, there can be some communication or some information friction.

But to be completely candid, relative to other incidents that I've been involved with, you know, very, very quickly after getting proximate to the incident location, it was very clear what



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

188

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

MS. JONES:  Objection.

A.  I -- I would say no.  Because it's not illegal in that fact pattern that you defined to possess a gun inside a home.  Guns are -- guns are very often legally owned by homeowners and residents and people.  So that -- that -- that in and of itself would not give me the authority to enter that house.

Q.  Is there a different standard that applies to enter the front door to the home as there is to enter the curtilage to someone's property?

A.  Well, I think it's the reasonableness of the governmental intrusion.  So, you know, if I were arguing this case, based on those two fact patterns, I feel that someone inside a house has a -- has a greater expectation of -- of privacy than that same person does in their backyard.

Q.  So the Fourth Amendment applies differently to entering the home than entering the curtilage to the property?  That's what your testimony was?

MS. JONES:  Objection.

A.  I feel in my opinion that the Fourth Amendment applies differently to every circumstance based on individual fact pattern because in -- in my



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

209

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

Q.   Okay.  Can you describe all the training regarding interactions with dogs during SWAT operations that were required when you were the SWAT commander?

A.   The -- the training that I can recall that we implemented in and around 2017 was the use of catchpoles to have available to us during SWAT operations.  So specifically, I directed one of the subordinate leaders to draft a PowerPoint presentation on the use of catchpoles, to acquire catchpoles and to have catchpoles immediately accessible or proximately accessible during all SWAT operations.

Q.   Okay.  And can you tell me everything you did as the SWAT commander to ensure that members of the SWAT team did everything possible to avoid shooting dogs?

MS. JONES:  Objection.

A.   I didn't, no.  We didn't -- we didn't have an SOP or a rule that -- that required us to do everything possible before shooting a dog.  We -- we didn't have a -- a -- a -- the -- the process or the policy or accepted practice wasn't -- wasn't to shoot every dog, but we weren't required or didn't have a policy that said you have to make efforts not to shoot



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

212

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS
scenarios with dogs in the use of a catchpole similar to what Lieutenant Nigrelli from Buffalo testified to?

A.   No.

Q.   Have you ever spoken with anyone from the Buffalo SWAT team about how they were able to reduce the number of dogs shot during SWAT operations?

A.   No.  I -- I -- I didn't believe based on our application of force on dogs that it rose to the level that required a lot of consideration for decreasing.  So I -- I don't know the numbers that Buffalo shot dogs that required them to look into this type of training.

But if -- if -- if my recollection is accurate, based on the number of SWAT operations that I participated in as the commander compared to the number of dogs that were shot, it wasn't a high enough number that -- that -- because we didn't shoot dogs very often, that it was a -- something that we needed to focus our efforts on.

Q.   In your time with the SWAT team, how many dogs do you remember being shot during SWAT operations?

A.   I remember two specific instances when -- three specific instances where -- where dogs


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

213

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

were shot during SWAT operations, two of which while I was the commander of the team.

Q.  All right.  So you said three total and two while you were commander?

A.  That's correct.

Q.  And one of those two would be this lawsuit with Erin Gursslin?

A.  Oh, I'm sorry.  Four then.  Four total. Not including -- three not including this particular case.

Q.  Okay.  Have you ever shot a dog?

A.  Yes, I have.

Q.  Okay.  Tell me everything you remember -- well, let me withdraw that.

Have you shot only one dog or more than one dog?

MS. JONES:  Objection.

A.  More than one dog.

Q.  How many dogs have you shot?

A.  I don't recall specifically.  I -- I -- I can say with certainty that I've only shot one dog during the execution of a SWAT operation and, you know, a few dogs while I was the member of the special investigations section doing narcotic search warrants.



Confidential

215

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

Safe and Humane"?

A.  I'm not aware of that publication, no.

Q.  Okay.  And if I told you that that publication by the DOJ is free and includes five roll call training videos that have been widely used in police departments across the country, is that something that you might consider implementing in the Greece Police Department?

A.  I would be interested in reviewing it for content and application.  Again, it would also be specifically important to understand if -- if there was a true need based on, you know, analyzing data and a look back of how many dogs were shot.  Certainly wouldn't want to take time to implement training that wasn't an -- an answer to a problem.

Q.  Okay.  Do you think that it's a problem that you shot between four and eight dogs in your career?

A.  Well, I mean I think that that question --

MS. JONES:  Objection.

A.  -- can be answered in several different ways.  It's -- it's -- you know, from -- from a justification perspective, I -- I don't think there were -- there were issues or problems.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

218

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

That's -- that's a -- a fairly accurate description of what took place.

Q. How far were you from the dog at the time that you shot?

A. About 2 to 3 feet. The -- the -- I was either number 1 or number 2 as part of the entry team. The rest of the team was coming in behind me. There was really no space for me to move forward or to move backward.

And it was -- you know, because of the confines of the location, the inability for me to move anywhere, there wasn't really many other, what I thought, suitable options at the time to protect me from the imminent, you know, threat of that particular dog.

Q. Did the SWAT team have catchpoles at that time?

A. No.

Q. When did the SWAT team get catchpoles?

A. The SWAT team implemented our -- our catchpole process wherein we provided training for the catchpoles and that we built the lesson plan presentation and then we made catchpoles accessible on every operation under my command and direction in and



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

219

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS around 2017-ish.

Q.   Okay.  So you said they're available for every operation under your command.  But earlier you said that if there's no specific information about dogs at the property that you wouldn't make a plan for how to safely interact with dogs on the property, correct?

MS. JONES:  Objection.

A.   Yeah.  We -- we wouldn't -- we wouldn't build into the plan a specific response to a dog unless we had information that there was a dog there.  So the -- the -- in those circumstance, a member of the team would be assigned to carry the catchpole with them to -- to the front door.

Absent that information, the catchpole would be in the trucks which were proximate to the entry point of the target location allowing us to retrieve them quickly if necessary.

Q.   Okay.  Are you aware that in or around 2014 in Buffalo, the Buffalo PD implemented the free DOJ training I referenced earlier and virtually eliminated dog shootings for the City of Buffalo?  Were you aware of that?

A.   No.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

224

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

practical solution if they encountered a dog after entering the home?

A.  I think that based on my recollection of -- of statistics insomuch as the application of deadly physical force on dogs and the scarcity in which we had to shoot dogs, that -- that that was a practical application.

I -- I don't recall very many occasions when we did shoot dogs because our -- our method of entry, our method of breach was a -- was -- was more often times than not effective that it precluded the need for an immediate access to catchpole if a dog was identified that was not planned for.

So while I haven't had access to the statistics in quite some time having retired from the police department, I -- I -- I can say confidently that we just didn't shoot a lot of dogs during SWAT operations that would mandate a tremendous amount of consideration for changing our -- our approach to it.

So we found that we had a tremendous amount of success in our methodical movement as opposed to the dynamic entries and methods of breach, diversions like NFDs, you know, finding a dog later on in a house and just shutting the door and then calling



Confidential

239

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

Q.  Okay.  And so now back to the document I wanted to mark as Exhibit 9.  This is an incident report, CR number 2015-00144836.  It involved an incident at 583 Dewey Avenue on June 10, 2015.

And, Chief, do you see that incident report on your screen?

A.  Yes, I do.

Q.  Okay.  And did you review this document in preparation for your deposition today?

A.  Yes, I did.

Q.  Okay.  And can you tell me everything you remember about this incident?

A.  You know, I don't -- I don't remember a lot other than specifically when Officer Alexander shot the dog.  I was -- I was proximate to the point of entry at -- at the corner of the house and -- and was able to at least hear when the gunshots were fired.

I don't think that we had any specific information that there were dogs at this location when we planned.  I don't -- I don't remember a lot about the lead-up to this, just specifically this is an incident that I -- I remember even without having had an opportunity to review the -- the incident report.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

240

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

Q. Okay. So what happened after the dog was shot?

A. The -- the -- the rest of the location was clear and secured. And then it was turned over to the -- the host unit or the requesting unit.

Q. What was done before the warrant was executed to prepare in an attempt to avoid shooting any dogs that might be encountered during the warrant execution?

A. I -- I don't recall. I didn't have a chance to review the operation order for this, so I can't say with any level of certainty if it was a hasty, if it was a deliberate plan, if there was a comprehensive operation order, scouting process done like we referred to or if this was done under an exigency. I -- I -- I don't know.

(The following exhibit was marked for identification: Number EXH 10.)

Q. Okay. And so I want to put up the operation order, so that will be Exhibit 10 for this deposition.

And so if we go to the top, Chief, do you see it says "SWAT Operation Order High-Risk Search Warrant, 583 Dewey Avenue, 6/10/2015"? So this is the



Confidential

241

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

operation order that corresponds to the exhibit that we marked as Exhibit 9, the incident report; is that right?

A.   That's correct.

Q.   Okay.  And for the record, the first page Bates number is COR GUR 1292.  And so on the second page where it says COR GUR 1293, it says "Situation" and mostly redacted.  But at the bottom of the page "Possibly four to five dogs inside the location."

So does that refresh your recollection, Chief, about whether this was a planned incident and whether there was information about dogs at the location?

A.   Yes, it does.

Q.   Okay.

A.   With regards to the -- to the planning, it does not refresh my recollection on the planning process leading up to it other than what's -- what's displayed on the unredacted operation order.

Q.   Would there be additional information in this document that would refresh your recollection about the planning?

A.   Presumably, having an opportunity to review the unredacted version, may allow some


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

242

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

recollection.

(Document request - unredacted version of Exhibit 10)

MR. SHIELDS:  Okay.  And, Ms. Jones, again, we're going to call for production of this document in its unredacted form in its entirety because there's no way for us to determine looking at these completely redacted pages what, if any, planning was done aside from this page which is entitled "Execution" and Bates-numbered COR GUR 1301.  And I'll follow up in writing.

Q.  And, Chief, here on this page, "Execution," it does indicate that some officer, at least one officer, was assigned the catchpole, correct?

A.  That's correct.

Q.  Aside from that, at the time that this warrant was executed, would there have been any additional planning in a situation like this where there was information that there were potentially four to five dogs inside the location?

A.  I'm not sure.  I -- I would -- I would prefer to have an opportunity to review the unredacted version to make a determination if there were any



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

243

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

other considerations, but I don't have any independent recollection.

Q.   Okay.  In a situation like this where there were four to five dogs potentially inside of the location, would it be something that the SWAT team would ever do to assign more than one catchpole to members of the team who were making entry into the location?

MS. JONES:  Objection.

A.   I don't -- I don't recall a time when we -- when we were made aware that there multiple dogs in a location and we assigned multiple catchpoles. But that -- that's not saying that it's not possible. I just don't recall.

Q.   Okay.  So you have no independent recollection of any situation when more than one member of the SWAT team was assigned a catchpole for entry during a search warrant?

A.   Yeah.

MS. JONES:  Objection.

A.   That's correct.  I -- I do recall at least on one occasion -- although, I can't remember the specific address to draw your attention to -- that there were multiple dogs reported and we -- we brought



Confidential

244

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

an assigned animal control representative with us so that when we made contacts with the dogs, we could -- we could take advantage of that -- of that person's expertise.

Q.  Okay.  And what happened during that incident?

A.  I don't recall if we ever needed them, if -- if -- if there were any issues with the dog.

Like I said, this particular incident stands out because it -- it was an aberration from -- from what -- what normally happens.  Even when there's reports of multiple dogs there, we just don't shoot dogs often enough.

So -- so this particular one I remember when the door was breached, Eric Alexander was the number 1 man.  There was -- that -- that -- that dog was -- was pretty much within that immediate area coming directly toward him, really negating a lot of other options.  I would say that in my opinion, even if the officer with the catchpole was standing right there, that based on the behavior of the dog and -- and my memory, that the catchpole wouldn't -- wouldn't have -- have allowed us the ability to control that dog based on the imminent



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

245

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

threat to -- to the officer.

Q.   When an officer is assigned a catchpole, what place in the stack is that officer located?

MS. JONES:  Objection.

A.   I don't -- I don't think there's a specific number.  Generally, not one through four.

Q.   Okay.  And if I told you that in the Buffalo Police Department SWAT team that person is generally in the stack between number 1 and 4 and that they successfully have used the catchpole multiple times on dogs, would that potentially change where you think the person with the catchpole should go?

MS. JONES:  Objection.

A.   No.  Not independently.  I -- you know, if I were still the SWAT team commander, I would want to explore that in -- in much greater detail than just -- you know, than just that specific information.

Q.   I guess my question is, if you enter a house, a dog is going to potentially run right up to the first person that comes in, so it doesn't seem like having the person with the catchpole is going to do much good if they're sitting in the back of the stack, right?

MS. JONES:  Objection.



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

246

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

A.   Yeah.  No.  I agree.  And I think that the -- the -- the -- the -- the -- the threat that you're attempting to address with the first four people are armed subjects inside a house.

So I -- I -- I am not necessarily at this particular point barring additional information inclined to say that giving up the ability for the first four officers to control that space with any armed subjects directly inside the location is worth giving up an armed officer for -- for a less lethal dog control tool.  That's -- that's -- that's a secondary consideration after armed subjects inside a location.

(The following exhibit was marked for identification:  Number EXH 11.)

Q.   Okay.  All right.  I want to put up the next exhibit which is going to be Exhibit 11 for this deposition.  And it's an incident report, CR number 201600005694.  And the Bates number is Dempsey 1972 on the first page.

So my question, Chief, is, if you look at this first page, it says "Search Warrant, Weapons Discharge," correct?

A.   That's correct.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

247

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

Q. From just looking at this first page, can you tell whether or not this was a SWAT operation or something else?

MS. JONES: Objection.

A. I can tell that's not a SWAT operation.

Q. Okay. Because it says GRANET was executing a no-knock narcotics search warrant?

A. Yes. And additionally, Investigator Ferro was never a member of the SWAT team.

Q. Got it.

Do you know what GRANET means?

A. Yes, I do.

Q. Okay. What is it?

A. That's a -- it's an acronym for the Greater Rochester Area Narcotics Enforcement Team. They're a subunit assigned to the special investigations section.

Q. Got it.

Okay. Do you have any idea if catchpoles are available to members of the RPD other than members of the SWAT team?

A. I -- I do not know.

(The following exhibit was marked for identification: Number EXH 12.)



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

248

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

Q.   Okay.  Because here there was a warrant executed but there's no indication that there was a catchpole present that could have been used.  So that's where my question comes from.

Okay.  Okay.  I'm going to put up what is going to be marked as Exhibit 12.  This is an incident report, CR number 2017-00064121.  And the date of the incident was March 21, 2017, and the incident location was 104 Delmar Street.

Did I read that correctly, Chief?

A.   Yes, sir.

Q.   Okay.  And again, my question here is, looking at this narrative page, the third page of this report, is this also an incident that was not a SWAT incident?

A.   Yes.  That's correct.

Q.   Okay.  And what indicates that to you if you just look at this narrative section?  If it was a SWAT incident, it would have said SWAT?

MS. JONES:  Objection.

A.   There's two specific points of information that -- that call that out as not being a SWAT-related incident, the first of which is the firearm involved. The SWAT team only uses Remington 870 pump-action



Confidential

249

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

12-gauge shotguns as breaching shotguns not -- not as deadly physical force or as primary weapons.

The second of which is the officer involved was Investigator Dave Swain.  Investigator Swain was only on the SWAT team for a short period of time and in 2017 was not a member of SWAT.

Q.  And why did Investigator Swain leave the SWAT team?

MS. JONES:  Objection.

A.  I don't know.

(The following exhibit was marked for identification:  Number EXH 13.)

Q.  Okay.  And the next one -- let me just make sure I write down the last one.  So the last one at 104 Delmar was Exhibit 12.

So we'll move on to the next one which will be Exhibit 13.  And that is an incident, CR number 2019-0012 -- I'm sorry -- 00112182, an incident that occurred on May 23, 2019, at 234 Fernwood Avenue. And the Bates number of the first page is Dempsey 2186.

And, Chief, do you have a recollection of this incident?

A.  I do not.



Confidential

250

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

Q.  Okay.  So can you just read the narrative section here on the second page and tell me when you've had a chance to review that?

A.  Yes, sir.

Q.  Okay.  Did that refresh your recollection of this incident?

A.  No.  I was --

MS. JONES:  Objection.

A.  -- not -- I was not involved in this incident.

Q.  Okay.  It says members of the entry team were Investigators Hickey, Post, Steiner, Leckinger, Springer.  Is that a different Springer?

A.  Yes.  I'm not an investigator.  I was a lieutenant at the time.  That's Investigator Springer who was assigned to SIS, not me.

(The following exhibit was marked for identification:  Number EXH 14.)

Q.  Got it.  So that's not you.  Okay.  Thank you for the clarification.

Okay.  It may be the same answer on this last incident report, which we'll just go ahead and mark as Exhibit 14, which is an incident, CR number 2019-00178495 that occurred on July 31, 2019, at 49



Confidential

251

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

Roycroft Drive; is that right, Chief?

A. Yes, sir.

Q. Okay. And for the record, the Bates number is Dempsey 2200 on the first page of this report.

And again, this was an SIS incident. And it says that -- again, it -- it lists Springer, Investigator Springer. So that wouldn't be you, Chief?

A. That's correct. That's not me. I don't have any recollection of this particular incident and -- and was not involved.

MR. SHIELDS: Okay. All right. So I'm going to take those down for now.

MS. JONES: I'm sorry, Elliot. I missed the Bates number on Exhibit 12.

MR. SHIELDS: 12. Okay. Let's see. So that was --

MS. JONES: CR -- from 2017.

MR. SHIELDS: That one. That one. Okay. The first page was Dempsey 2020.

MS. JONES: Thank you.

MR. SHIELDS: And it goes through Dempsey 2022.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

264

ACKNOWLEDGMENT

I, Deputy Chief Aaron Springer, declare, swear and aver that I have read my testimony contained herein and that my answers are true and correct, with any exceptions noted on the errata sheets, under penalty of perjury.

_____
Deputy Chief Aaron Springer

I certify that this transcript was signed in my presence by Deputy Chief Aaron Springer on the 20 day of April, 2023.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office of Notary Public on this 20 day of April, 2023.

_____
Notary Public

10/10/25
_____
My Commission Expires:



PEACHIE L. JONES
NOTARY PUBLIC, STATE OF NEW YORK
REG. NO. 02JO6365436
QUALIFIED IN Monroe COUNTY
COMMISSION EXPIRES 10/10/25

ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

**Confidential**

265 A

E R R A T A   S H E E T

Witness: Deputy Chief Aaron Springer
Deposition Date:   February 28, 2023

| Pg # | Line # | Change | Clarification |
|------|--------|--------|---------------|
| 7 | 21 | Add "Only once as a law enforcement officer." | I understood this question to refer to instances of being sued as a police officer. |
| 8 | 24 | Change "solve" to "resolved." | |
| 47 | 21 | Change "attune" to "attitude and atmosphere." | |
| 48 | 11 | Change "and" to "in." | |
| 53 | 16 | Insert "the training coordinator would be responsible" after "basis." | To clarify that I was still referring to the Training Coordinator in that paragraph. |
| 61 | 7 | Replace the period with a comma. | These lines (L7-20) are an ~~explanatory phrase, not~~ standalone sentences. |
| 61 | 8 | Replace the period with a ~~comma and change the W (from a capital)~~ to lowercase. | |
| 68 | 16 | Add an S to then end of "circumstance." | Subject-verb agreement. |
| 74 | 16 | Delete the word "poorly." | |
| 82 | 20 | Add "I reviewed then and then forwarded to the SDO Commander and DCO -- the Deputy Chief of Operations -- for approval." | To prevent any misundertsanding regarding the review and approval process. |
| 99 | 6 | Replace "identified" with "present inside." | Making this sentence clearer. |
| 99 | 7-8 | Delete "--inside during the operation as opposed to." | |
| 135 | 19 | Delete the word "not." | To correct transcription error. |
| 143 | 17 | Change "would" to "wouldn't." | To correct transcription error. |
| 176 | 9 | Change "fair" to "likely." | To clarify my position and understanding regarding entering residential yards. |
| 176 | 10 | Change to "I would for sure consider a warrant if I were traversing a yard." | |



**Confidential**

265 B

E R R A T A   S H E E T

Witness: Deputy Chief Aaron Springer
Deposition Date:  February 28, 2023

| Pg # | Line # | Change | Clarification |
|------|--------|--------|---------------|
| 185 | 22 | Change "cooperating" to "corroborating." | I believe the stenographer misheard. |
| 199 | 24 | Change "was" to "wasn't." | I intended to say it was not required. |
| 200 | 12 | Insert a comma after "yard." | I made multiple changes to this paragraph (Lines 11-20), in order |
| 200 | 13 | Insert a comma after "fence" and a period after "curtilage." | to make it clear that we understood  and treated curtilage |
| 200 | 13 | Replace "as opposed to" with "We would not have, even if." | differently than yards. |
| 200 | 14 | Change "believing" to "believed." | |
| 200 | 18 | Add a period after the first "that" and delete the second "that." | |
| 200 | 18 | Capitalize "this." | |
| 201 | 10 | Change the period to a comma, then insert "even with" and make the  letter A lowercase. | |
| 201 | 11 | Insert "but" after the comma. | |
| 246 | 7 | Insert commas after "point" and "information." | |
| 253 | 2 | Change the question mark to a period. | |



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920