CONFIDENTIAL

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

ERIN GURSSLIN,

        Plaintiff,

                Civil Action No. 20-cv-6508

v.

THE CITY OF ROCHESTER, A MUNICIPAL ENTITY, POLICE
OFFICER JEREMY NELLIST, POLICE OFFICER JOSHUA
KELLY, COMMANDER FABIAN RIVERA, LIEUTENANT AARON
SPRINGER,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Video-recorded Deposition Upon Oral Examination of:

        Chief Fabian Rivera

| | |
|---|---|
| Location: | Alliance Court Reporting, Inc. |
| | 109 South Union Street, Suite 400 |
| | Rochester, New York 14607 |
| Date: | March 15, 2023 |
| Time: | 11:00 a.m. |
| Reported By: | MICHELLE MUNDT ROCHA and |
| | MARY ELIZABETH PHILLIPS |
| | Alliance Court Reporting, Inc. |
| | 109 South Union Street, Suite 400 |
| | Rochester, New York 14607 |



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

2

                    A P P E A R A N C E S

Appearing Remotely on Behalf of Plaintiff:

Elliot D. Shields, Esq.

    Roth & Roth LLP

    192 Lexington Avenue, Suite 802

    New York, New York  10016

    eshields@rothandrothlaw.com


Appearing on Behalf of Defendants:

Peachie L. Jones, Esq.

    City of Rochester Law Department

    City Hall, Room 400A

    30 Church Street

    Rochester, New York  14614-1224

    peachie.jones@cityofrochester.gov


Also Present:

Kenneth Williamson, Videographer

    Alliance Court Reporting, Inc.

    109 South Union Street, Suite 400

    Rochester, New York  14607


                    *      *      *



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

A.  Not a promotion, sir, just I was asked to move over to patrol in 2019 to 2020.

Q.  Okay.  So that was basically a lateral move?

A.  Yes, sir.

Q.  So there was nothing between those two positions?  It was commander of SOD and then commander of patrol?

A.  Yes, sir.  That's correct.

Q.  And when did you join the RPD's SWAT team?

A.  2003, sir.

Q.  And can you tell me all the positions you held with the SWAT team from 2003 until -- well, let me withdraw that.

How long did you serve on the RPD SWAT team for?

A.  14 years, sir.  So 2003 to 2017.

Q.  And between 2003 and 2017 can you give me an overview of all the different roles you served on the RPD's SWAT team?

A.  Yes, sir.  I initially was an entry member from 2003 to 2006.  The gap is 2004 to 2005 I was overseas.  Returned '05, '06.  I came back as an entry team member.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

17

CHIEF FABIAN RIVERA - BY MR. SHIELDS

In '06 I moved over to the snipers.  From 2006 to 2009 I was a sniper.  2009 I became sniper team leader.  In 2014, I believe, or 2015 I became the assistant commander of SWAT.

So the positions I've held were entry, sniper, sniper team leader and assistant team leader -- or team commander.  I'm sorry.  And that's what I retired as, assistant to Chief Springer.

Q.  When you -- did you just say that's when you retired as assistant to Chief Springer?

A.  Yes, sir.  In 2017.  I was his number two.

Q.  Got it.  And when you say "retired," is that because you were promoted to commander of SOD?

A.  Yes, sir.

Q.  Got it.  Can you tell me what all your duties were as the sniper team leader?

A.  Sir, from developing training schedules, supervising training schedules or training evolutions, to logistics, ordering of equipment from ammunition to weaponry to optics.  Basic supervision of sniper operations.  That's really the context of sniper team leader.  Again, training, supervision of operations, and admin and logistics.

Q.  And you did that for about five or six



CHIEF FABIAN RIVERA - BY MR. SHIELDS

section platoon commander?

A.   Usually, sir, I think at that time lieutenants and above can apply.

Q.   And it says in the handwritten section "Lieutenant Rivera needs to get off probation before he can assume any T/CPT role."

So my question there is just T/CPT, is that captain?  Or what does that refer to?

A.   Temporary captain, sir.

Q.   Temporary captain, okay.  Is that temporary captain of the SWAT team, or is that talking about something else?

A.   Sir, that would have been temporary captain of a patrol section.  At that time it would be Genesee Section where I was assigned.

Q.   Got it.  And eventually about a year after this form was filled out, you were promoted to captain; correct?  Or commander?

MS. JONES:  Objection.

Q.   I'm sorry.  Let me withdraw that.

So about a year after this evaluation was filled out, in January 2018 you were promoted to the commander of the Special Operations Division; correct?

MS. JONES:  Objection.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

57

CHIEF FABIAN RIVERA - BY MR. SHIELDS

A.  I was promoted to commander and assigned to command Special Operations Division.

Q.  Got it.  So my terminology was a little bit wrong.

You were promoted to commander and assigned to Special Operations?

A.  Correct.

MS. JONES:  Objection.

Q.  And when you were promoted to commander, you were a member of the command staff; correct?

MS. JONES:  Objection.

A.  I was.

Q.  And as a member of the command staff, did you attend the meetings that you referenced in this Career Development Worksheet?

A.  At a higher level, yes, sir.

Q.  And as a member of the command staff, did you make decisions about deployment of resources?

A.  I did.

Q.  And as a member of the command staff, you made policy decisions for the RPD?

MS. JONES:  Objection.

A.  Ultimate decision on policy was made by the Chief of Police.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

**58**

CHIEF FABIAN RIVERA - BY MR. SHIELDS

Q. But as a member of the command staff, you assisted in making policies for the RPD?

MS. JONES: Objection.

A. We would make recommendations. But, again, the ultimate, you know, decision on making policy was the Chief's.

Q. So, for example, if there was a policy specific to the Special Operations Division, would that be something that you would -- that you would discuss with the other members of the command staff and then recommend to the Chief?

MS. JONES: Objection.

A. Yes. I would discuss with -- at the time my boss would have been the Deputy Chief of Operations. And then ultimately that discussion would go up to the Chief of Police.

Q. So between you and the Chief, there's only one person at that time?

A. Yes. My lineage to the Chief was the Deputy Chief of Operations.

Q. So in terms of devising a final policy, it would be you, the rest of the command -- let me withdraw that.

In terms of if you wanted to, let's say,



**Confidential**

**59**

CHIEF FABIAN RIVERA - BY MR. SHIELDS

implement a new policy for the entire Special Operations Division, you would discuss it with command staff, put it up the chain to the Deputy Chief and then the Chief; is that right?

A.  That's correct.

Q.  And as SOD commander, you oversaw the SWAT team; correct?

MS. JONES:  Objection.

A.  I did.

Q.  And as SOD commander, the SWAT commander reported directly to you?

MS. JONES:  Objection.

A.  He did.

Q.  And as SOD commander, you made policy decisions for the SWAT team; is that right?

MS. JONES:  Objection.

A.  Those policy changes would, again, come through me.  I would have to introduce those to the Deputy Chief of Operations, and, again, the Chief of Police would have final say.

Q.  Got it.  So Springer testified that he would come up with, for example, new policies, and then you would review them and either approve or deny them.



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

69

CHIEF FABIAN RIVERA - BY MR. SHIELDS

Commander, which was reviewed by the Deputy Chief of Operations.

Q.   As the sniper team leader, after an incident where the sniper team was deployed, was there paperwork that you had to fill out?

A.   Yes.   There was a -- we participate in an After Action, and then there's After Action Reports that are completed by sniper teams.   Again, an evolution of professionalism within the team.

In 20 -- in 2003 our After Actions were deficient.   As we started getting a little bit more professional as a team, a whole team, a SWAT team or ETF, we put more information into our After Actions.   And there is a report prepared.

That report is reviewed by the sniper -- I mean, I'm sorry, the SWAT commander.   That After Action is sent to me -- or was sent to me -- as the Special Operations Commander.   I would review it, and then I would pass it on to the Deputy Chief of Operations for final approval or final review.

Q.   So my specific question is was there a specific separate form for the sniper team called a sniper After Action Report, or was that simply a portion of one document called an After Action Report?



Confidential

**70**

CHIEF FABIAN RIVERA - BY MR. SHIELDS

A.  That's --

MS. JONES:  Objection.

A.  That is one portion.

Q.  So there's only one After Action Report that's completed after any SWAT incident and includes a subsection for the sniper team?

MS. JONES:  Objection.

A.  It does.

Q.  And that subsection would be completed by the sniper team leader?

A.  Yes.

Q.  All right.  I want to put up the next exhibit, which are your training certificates.  And I just want to scroll through them and ask a few questions about certain trainings.

MR. SHIELDS:  And, Peachie, again, this is a document that we got in FOIL, so it doesn't have Bates numbers on it.  But it's an 88-page document.

(The following exhibit was identified for the record:  Number EXH 2.)

Q.  And, Chief, do you see that on your screen, the first page is titled "Division of Criminal Justice Services."

A.  I do, sir.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

126

CHIEF FABIAN RIVERA - BY MR. SHIELDS

A.   I don't -- I'm not aware of.  They could have, but I'm just not aware.  I was an officer myself.

Q.   And the SWAT team has to follow all of the regular general orders that the rest of the department has to follow; correct?

A.   Yes.

MS. JONES:  Objection.

Q.   And then in addition, the SWAT team is also governed by the SWAT SOP?

A.   Yes.

Q.   And the chain of command is laid out in the SWAT SOP?

A.   Team structure, yes.

Q.   And just for us, I want to put the SWAT SOP up.  And that will be Exhibit 3.  And I just have a couple questions.

(The following exhibit was identified for the record:  Number EXH 3.)

Q.   Now, Chief Springer testified that this draft of the SOP went into effect in around 2015 and that he drafted it.

Does that sound accurate to you?

MS. JONES:  Objection.



Confidential

127

CHIEF FABIAN RIVERA - BY MR. SHIELDS

A.  Sounds accurate.

Q.  Did you play any role in drafting the SOP at all?

A.  I believe I covered the sniper side of it.

Q.  So in the 2015 SOP that we're looking at, you drafted the portions that dealt with SWAT sniper team?

A.  I believe so.

Q.  And is that because you were the sniper team leader at the time?

MS. JONES:  Objection.

A.  I think I was just the senior member.  I think I was his assistant but had the breadth of knowledge to assist in developing that portion.

Q.  And after you became SOD commander, did you order any changes to the SWAT SOP?

MS. JONES:  Objection.

A.  I don't recall.  Only reason I answer that way is from 2015, of course, to 2019 had to have been some advances in technology and tactics and such.  So at this time, you know, I can't really tell you yes or no.  Just don't remember if I did or not.

Q.  So you were the SOD commander from January 2018 until sometime in 2019; is that right?



CHIEF FABIAN RIVERA - BY MR. SHIELDS

A.   That's correct.

Q.   And you were the SWAT SOD commander at the time of this incident; correct?

A.   Yes.

(The following exhibits were identified for the record:  Numbers EXH 4A and 4B.)

Q.   All right.  I might come back to that. But for now I want to put up Exhibit 4, which is the General Order 630.  And I'm going to do the same thing that I did with Springer.

This version is going to be marked as 4A, and it's effective April 20, 2015.  And then 4B is September 18, 2018.

So this incident happened on September 6, 2018, so version 4A would have been the applicable one; right, Chief?

A.   Yes.

Q.   So if we go to page 11 of Exhibit 4A, under -- so this would be under Command and Operational Response, Roman numeral IV.  If you go down to F, it says (as read):  The responsibility for the planning, deployment and tactical method of operation of SWAT at an incident will rest with the SWAT commander, under the direction of the incident



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

commander.  All entry and movement within the inner perimeter will be under the control and direction of the SWAT commander.

So -- I'm sorry.  Well, I guess I'll just ask a question on that.  In this incident do you remember if you were the incident commander?

A.  No, sir, I was not the incident commander. I was present, just, you know, kind of, you know, present in support of the SWAT team.  Just being out, you know, leadership, walking around, just being present.

This SWAT operation was under the command of the SWAT commander, but I was present.

(The following exhibit was identified for the record:  Number EXH 5.)

Q.  So I'm going to put up Exhibit 5, which I'll get back to and ask more questions on, but Exhibit 5 is the After Action Report for the incident.

Do you recognize this as the After Action Report for this incident, Chief?

A.  I do.

Q.  And it lists you as the incident commander?

A.  You got me there.  Yes, sir.



CHIEF FABIAN RIVERA - BY MR. SHIELDS

Q.   Not trying to trick you.

A.   No, no.  It's just -- again, I would attend some of these operations just to, you know, boots-on-ground-type leadership.  But being a hundred percent, being present does make me, at the end of the day, responsible.  So yes.

Q.   And so going down to I on page 11 and then onto page 12, it says (as read):  The SWAT commanding officer or his designee will complete the After Action Reports as required by General Order 601.  The AAR will be done per current SWAT SOPs.  The SWAT commanding officer will forward the report to the SOD commander for review and approval.  Once approved, the SOD commander will forward a copy of the report to the DCO, who will review it and forward it to the Chief of Police.  The SWAT commander will maintain copies of all AARs.

Did I read that correctly, Chief?

A.   Yes, sir.

Q.   And is that what happened in this case?

A.   Yes.  So the AAR is prepared, it's sent to me, I review it.  I forward it to the Deputy Chief of Operations, who does a review; and then his action is to, if any, to review it with the Police Chief for



Confidential

131

CHIEF FABIAN RIVERA - BY MR. SHIELDS

final approval.

Q.   So this report went through the normal approval process up through the chain of command?

A.   Yes.

Q.   And so Springer testified that after this incident, he assigned the AAR to be drafted, he reviewed it and approved it, and then he sent it to you for your review and approval.

Do you agree that that's what happened?

MS. JONES:   Objection.

A.   Yes.

Q.   And then do you remember sending it up the chain of command to the DCO?

A.   I do.

Q.   Did you ever have any discussion with the DCO or the Chief about this incident?

A.    If I'm not mistaken, I think the discussion with the DCO was, you know, the circumstances surrounding the actual engagement or dispatch of the dog in the backyard and, you know, the -- you know, certain questions concerning sniper operations, the ingress or egress out of a sniper position, why that yard and such.  And, you know, we had a discussion on it.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

And then he forwarded it and discussed it with the Chief.

Q.  So you had a specific conversation with the DCO.  And who was the DCO at that time?

A.  That should be now Chief of Police in Irondequoit Scotty Peters.  Scott Peters.

Q.  So you spoke with DCO Peters, he asked you specific questions about why ingress and egress through my client's property, and tell me everything that you remember about that conversation.

A.  Really kind of the circumstances surrounding coming -- Nellist coming over the fence or -- one of the snipers came over the fence and handed over the fence the equipment.  Other sniper climbs over.

At the same time as they're turning to proceed out of the -- kind of the backyard, owner's letting their pet out to -- for a morning relief.  And this -- again, this is how I'm relaying it to the Deputy Chief of Operations Scotty Peters, DCO Peters.

Said they tried to throw an obstruction in front of the dog, the dog circumvents it, and they had to use -- they had to discharge their weapons to prevent the dog attack.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

133

CHIEF FABIAN RIVERA - BY MR. SHIELDS

He asked, you know, why that yard, why the ingress/egress, and I told him about their pre-scout. You know, they were coming out of the position after the execution of a high-risk warrant at the adjacent house. You know, they had chosen that egress ease to leave the area undetected. Did not work out that way.

We also discussed, you know, the timeliness of the dog coroner. It arrived on scene while I was still on scene.

And that's really -- and we talked a little about the house target, the target itself. I believe they did get narcotics. I believe there was guns -- a gun next door. We talked about, you know, that piece.

But that was the extent of the conversation was basically they weren't aware that there was a dog -- or presence of a dog in that yard. That's why they selected it to be the egress. They get confronted as they jumped over the fence, unfortunately had to dispatch the family dog and circumstances of, you know, the search itself, why we were there. And then that was the extent, I believe, of the conversation.

Q. And after the incident, before the After


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

Action Report is drafted, there's a briefing -- a debriefing session; correct?

A.   Yes.

Q.   Was the incident discussed at the debriefing?

A.   Yes.

Q.   Tell me everything you remember about that conversation.

MS. JONES:  Objection.

A.   I believe, you know, Jeremy and Josh were talking us through the circumstances.  I think one of the questions I did ask was why that ingress/egress. They said, you know, there's no signs of animals. That was a direct egress out of their sniper position. It allowed them to walk out without being detected.

And due to the fact that we were in a high-risk area with a number of other target locations possibly in the vicinity, they selected kind of a direct route to exit.

Again, they talked us through the incident itself.  That's just their portion.  They -- during the After Action, we talked from leaving, you know, the tac unit to actions on target, actions after target, which is unfortunately what happened here.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

135

CHIEF FABIAN RIVERA - BY MR. SHIELDS

And that's the extent, kind of, the conversations.

Again, there's tactical considerations that occurred within the target location, and then they talked us through their incident.

Q.  All right.  So you spoke with them, you got what they knew, then the After Action Report was drafted, and you reviewed it; correct?

A.  Correct.

Q.  And in speaking with Nellist and Kelly and reviewing the After Action Report, you found that their actions were consistent with RPD policy and training?

MS. JONES:  Objection.

A.  Yes.

Q.  And what's the purpose of the After Action Report?

A.  Lessons learned.

Q.  Okay.

A.  Usually an After Action is one of those what went well, what went wrong, what can we improve on.  And this is just kind of a meatier After Action Report.  It has a little bit more substance.  You know, it has actions taken, were they effective, were they not effective, why weren't they effective; and



CHIEF FABIAN RIVERA - BY MR. SHIELDS

there's needed either equipment or training or policy that has to be addressed.

Q.   And here you found that there was no equipment, training or policies that needed to be addressed as a result of Nellist and Kelly shooting the dog; correct?

MS. JONES:  Objection.

A.   No.  You know, based on the incident itself, it was hard to say they were -- you know, when they said their pre-scout had no indicators that there was a dog and then the noise they make, you know, climbing over the fence with no dog action, no dog activity, no dog barking, unfortunately once they finished climbing the fence and passed over the equipment, the owner was letting the dog out for its morning relief.  And then the circumstances just bled into this incident.

Q.   And down here in the section on the page marked Bates number City of Rochester 110, in terms of the lessons learned, that would be under the Recommendations section; correct?

A.   Correct.

Q.   So here it says (as read):  While ex-filling, the team encountered an aggressive dog two



CHIEF FABIAN RIVERA - BY MR. SHIELDS

yards south of the target location.  Due to the aggressive actions of the loose dog and no egress from the fenced-in yard, they had to put the dog down, which caused the owner to become irate.  During future ops, ensure members have their police badges and coms readily available and accessible.

So basically the lessons learned here were to have their police badges and communications ready, available and accessible?

MS. JONES:  Objection.

A.  Yes.  They were in civilian attire, if I'm not mistaken.  So having the proper identification readily available to identify themselves as police, again, this could have caused, you know, interaction between the owner and the officers.  Not knowing they were police, that could have been a hazard, as you like to refer to.

And when the shots rang out, we thought it was either -- again, the operation is done inside the target location; everyone's in custody.  They're coming out of a position.  Either they're encountered, there's a counter-ambush and they're encountered by an assailant, we stumble upon another crime -- possibility -- or we don't know what's going on.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

Because, again, there's SWAT officers, there's tac unit officers all in this general vicinity.  Shots ring out.  Those are all the multitude of things that went through our minds.  A counter-ambush, we stumbled upon another crime, or they had exchanged fire with someone.  So that's why the coms were an important piece.

Q.  And getting back to the After Action Report going up the chain of command, so were you ever made aware of the conversation that happened between the DCO and the Chief?  And that would have been Chief Ciminelli; correct?

MS. JONES:  Objection.

A.  That would have been Chief Ciminelli.

Q.  So it would have been Chief Ciminelli. Are you aware of any of the conversation that DCO Peters and Chief Ciminelli had about this incident?

A.  No.

Q.  But you're aware that it happened?

MS. JONES:  Objection.

A.  No.

Q.  But the Chief eventually signed off on this After Action Report?

A.  He would have seen it, yes.



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

Q.  And by -- if he saw the After Action Report and it didn't have any changes or -- that would have meant that he approved of the After Action Report?

A.  Yes.

Q.  That was a bad question.  Let me ask that a different way.  Even though you answered and said yes.

My question is really as far as you know, the Chief didn't impose any discipline on Nellist or Kelly as a result of this incident; correct?

MS. JONES:  Objection.

A.  None.

Q.  And as far as you know, the Chief didn't make any edits to this After Action Report; correct?

MS. JONES:  Objection.

A.  None.

Q.  So he reviewed and approved this After Action Report; correct?

MS. JONES:  Objection.

A.  Yes.

Q.  And did you ever speak with the Chief about this incident?

A.  No.



Confidential

140

CHIEF FABIAN RIVERA - BY MR. SHIELDS

Q.    I just have one other question.  Down here at the bottom it looks like on this version at least only Lieutenant Springer signed this version.

Do you know if that's just because this is the version that we received or if there should be a different version with your signature and the DCO's signature?

MS. JONES:  Objection.

A.    Yes, there should be one on file with both signatures.

MR. SHIELDS:  And, Peachie, just to the extent that it hasn't been provided or already demanded, we would demand a copy of the After Action Report that contains the SOD commander's signature, Chief Rivera, and the DCO Peters' signature.

(Document request -- After Action Report that contains the SOD commander's signature and DCO Peters' signature)

Q.    And, Chief, when you would forward a copy of this After Action Report to the DCO, would you email it to him or something else?

MS. JONES:  Objection.

A.    Those are hard copies.  I would receive hard copies from Lieutenant Springer via



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

interdepartmental mail.  I sign, and then I walk over to the DCO and put it in his tray or present it to him.

Q.    And this copy looks like it has an electronic signature from Lieutenant Springer.

Would Lieutenant Springer send you an electronic copy, or would he provide you with a hard copy?

A.    Both.

MS. JONES:    Objection.

Q.    Both?    Okay.    So do you remember if Lieutenant Springer emailed you a copy of this document?

A.    I would believe he did.  Again, we did both, a hard copy and electronic.  But I had access to their drive also.  So, you know, there was times that I could easily review an After Action based on an email saying "Hey, Boss, the After Action's complete; it's in the drive."

So I don't think they were emailed.  I think they were mailed hard copy, and I would review based on -- and they were in electronic form in the folder, the SWAT drive we call it.

MR. SHIELDS:    Got it.


ALLIANCE
COURT REPORTING, INC.

*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

142

CHIEF FABIAN RIVERA - BY MR. SHIELDS

So, Ms. Jones, to the extent -- well, they have been demanded.  All communications related to this incident were previously demanded, but there were no emails that were produced related to sending the After Action Report up the chain of command.  So we'd call again for production of any emails related to the After Action Reports.

(Document request -- Any emails related to After Action Reports)

MS. JONES:  Just follow up in writing.

MR. SHIELDS:  Okay.  And just to be clear that you know, the demand on the record, according to the case law, is sufficient.  But I will follow up in writing also.

MS. JONES:  Yeah, we disagree with that.

MR. SHIELDS:  Okay.  Well, we can agree to disagree.

Q.  And, Chief, as SOD commander, was it also your responsibility to review and approve all SWAT operation plans?

A.  Yes.

Q.  Okay.

A.  But not final approval.

Q.  I'm sorry?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

143

CHIEF FABIAN RIVERA - BY MR. SHIELDS

A.   I wasn't the final approving authority. That was still the Deputy Chief of Operations.

Q.   So it would be a similar process of putting it up the chain of command?

A.   Yes, sir.

Q.   So in this instance -- well, let me withdraw that for now.

Anybody -- did anybody other than the DCO have to approve the SWAT operation plans after you had reviewed and approved it?

MS. JONES:   Objection.

A.   I believe the Chief of Police took a look at all ops.  Chief Ciminelli was, as you know, an attorney by law and was very into the weeds when it came to tactical operations as far as the planning and risk mitigation.

(The following exhibit was identified for the record:   Number EXH 6.)

Q.   All right.  I had pre-marked my exhibits, so I just want to put up Exhibit 6 real quick, which is the incident report for this incident.

Chief, is that what you see on your screen right now, an incident report date September 6, 2018?

A.   I do.



Confidential

144

CHIEF FABIAN RIVERA - BY MR. SHIELDS

Q.  At 1747 St. Paul Street?

A.  Yes.

Q.  And for the record, the Bates number of the first page of this three-page document is City of Rochester 1.

So if we go down to the third page here, at the very bottom it says "Commander Rivera and Lieutenant Springer on scene."  So my question is you testified that you were present at the scene of this incident.  But my question is where -- where would you have been located while the SWAT operation was being carried out?

A.  Most times, you know, in these early morning execution of search warrants I would drive behind in my own POV.  Sometimes I would join Chief Springer -- Lieutenant Springer in his vehicle, depending on room.

I think this incident I followed.  I park a couple of houses outside of the target location, and once the target location is deemed safe, I approach.

And I believe at this time I was on the street when the shots did ring out.  If I'm not mistaken, I already had conducted a walk-through with Lieutenant Springer.  He just walk -- he does a



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

walk-through of the target location.  I joined him. We were outside of the target location.  I believe assailants were being loaded onto vehicles to be transported back to the PSB, and the incident occurred at your client's house.

Once they finally determined what happened, I did walk back there, did see the -- see Josh Kelly and Jeremy Nellist, the owner, wife and husband.  At that time I did not speak with them.  I think Sergeant Diehl did speak with them and Lieutenant Springer.

I left kind of the proximity of the driveway back to the street and eventually headed back to the tac office for the After Action.

Q.  So you were outside over towards the target location when you heard the shots fired at my client's house; is that right?

A.  That's correct.

Q.  And then you went and you entered her backyard, and you saw Nellist and Kelly in the yard along with my client and -- it was her boyfriend, not her husband, but you saw a woman and a man, who were the owners of the dog?

A.  Yes.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

MS. JONES:  Objection.

Q.  And what were Nellist and Kelly doing when you entered the backyard?

A.  I think by that time they were talking to Sergeant Diehl, who was -- I think he was the assistant commander at that time during this operation.  So he was talking to at that time Lieutenant Diehl.

Jeremy Nellist is one of my recruits.  I was his class counselor.  Just checked up on him to see how he was doing.  Just a visual check.

Josh Kelly, again one of my guys, a quick visual check.  They didn't want to get into the circumstances of the incident until we got back.  And I just exited the location, backed out the driveway and onto the street.

Q.  And did you speak with Nellist and Kelly at all?

A.  No.

Q.  You just did a visual inspection to make sure that they were okay?

MS. JONES:  Objection.

A.  Just a quick check on them.  But not -- I did not debrief them or ask them any questions.



147

CHIEF FABIAN RIVERA - BY MR. SHIELDS

Q.  Did you speak with anybody else in the yard?

MS. JONES:  Objection.

A.  No.

Q.  What was my client doing when you entered the yard?

A.  Not sure if she was still talking to Lieutenant Diehl.

Q.  Did you hear at any point my client scream?

A.  Yes.  But --

Q.  And did you hear her cry?

A.  Yes.

Q.  Did you see her holding her dog as it died in her arms?

MS. JONES:  Objection.

A.  I did not.

Q.  Did you see blood on her when she was talking to Lieutenant Diehl?

MS. JONES:  Objection.

A.  I did not.

Q.  What else did you see in the yard?

A.  There was one vehicle in the back, a wood fence.  Dark.  Their door leading from, I believe, the



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

148

CHIEF FABIAN RIVERA - BY MR. SHIELDS

kitchen coming out was open.  And I have to say there was a dog house in the back.  I think that's all I remember.

Q.  And do you remember how long you were in the yard for?

A.  Briefly.  No more than five minutes.

Q.  And at no time did you speak with my client or her boyfriend?

A.  No.

MS. JONES:  Objection.

Q.  And this incident involved the execution of a high-risk search warrant; correct?

MS. JONES:  Objection.

A.  Correct.

Q.  And a high-risk search warrant is a deliberately planned operation; correct?

MS. JONES:  Objection.

A.  This one was, yes.

Q.  So that would fall under General Order 200?

A.  That's personnel, I believe.  Or conduct.

(The following exhibit was identified for the record:  Number EXH 7.)

Q.  I'm going to put up Exhibit 7.  General



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

**149**

CHIEF FABIAN RIVERA - BY MR. SHIELDS

Order 200, Operational Planning and After Action Reporting?

A.    There's me.  Yep.

Q.    Not trying to trick you.

A.    No.  It's just -- again, when you are out of, you know, RPD for so many -- it's just -- and you're in a different world as the Chief of Macedon. It's different.  So it's -- you're bringing back good and -- good memories.

Q.    So I want to go to page 7.

MS. JONES:  Sorry.  Did we mark this as an exhibit?  Is this number --

MR. SHIELDS:  7.

MS. JONES:  -- 7?

Q.    So deliberate planning procedures -- well, let's go up.  I'm sorry.  We'll go to III, Policy. And so under III-A it says (as read):  Human life is of immeasurable value.  The RPD will take all reasonable measures to protect and preserve human life.  This includes safety of police officers, victims, persons and suspects during the planning and execution of high-risk operations.

So would that mean that basically you got to -- well, let me withdraw that.



CHIEF FABIAN RIVERA - BY MR. SHIELDS

And then if you go down to B, it says (as read):  Operational planning and risk management is imperative to the success of the operation.

So my question is basically as part of the planning of the operation, you're required to undertake a risk management assessment; correct?

MS. JONES:  Objection.

A.  Yes.

Q.  And that risk management assessment would include planning for known risks; correct?

MS. JONES:  Objection.

A.  Yes.

Q.  And would it also include planning for unknown risks?

A.  Yes.

Q.  And are there any rules that you implemented for the SWAT team as SOD commander to account for unknown risks prior to the execution of a high-risk search warrant?

A.  No.

Q.  I want to go down to -- let's see.  I want to go down to 9, page 9.  So it says Operational Planning Process.  Under 2(n) one thing that it says to account for is any dogs that might be present; is



CHIEF FABIAN RIVERA - BY MR. SHIELDS

that right?

A.  Yes.

Q.  Now, would that fall under both a known risk and an unknown risk?

A.  At the target location, yes.

Q.  How about at other locations?

A.  If I'm not mistaken, if you go to the checklist that determines if a high-risk warrant search should be executed by the SWAT team, I think it refers to vicious dogs at the target location.  I do not think it says anything of peripheral, which this one was.

Q.  So you're saying that according to RPD policy, the only dogs that have to be planned for during the operation -- or during the execution of a high-risk search warrant are dogs that are present at the target location; is that what you're saying?

MS. JONES:  Objection.

A.  Yes.  And it's vicious or multiple dogs present.  And I think it's always referred to, you know, at the target location and unfortunately not the peripheral.

Q.  During your time on the SWAT team, did you ever make any plans for dogs on peripheral locations?



Confidential

152

CHIEF FABIAN RIVERA - BY MR. SHIELDS

A.   Most of the time that I was an active sniper, you know, while conducting my own scouts and my own reconnaissance of areas, you know, basic observations and, you know, being able to depend on your assignment, know -- you know, a lot of these locations, know if a dog is present in the peripheral.

But as far as planning, you know, I would personally ensure that I try to avoid all, you know, backyards with signs or with, you know, active dogs. Didn't matter the size.

Again, we're trying to enter, ingress, egress, exit, out of target locations or out of sniper operations without being detected.  That's not only for the security of the officers or snipers, but it's also for the security of the main element that's conducting the operation.

So as far as planning on an individual level, yes.  As planning as far as policy, again, it only indicates, you know, target location.

Q.   So on the policy level for the RPD, there's no requirement to plan for any dogs that might be encountered on any properties that the SWAT snipers plan to traverse while egressing -- while ingress or egress to and from the final operating position; is



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

that right?

MS. JONES:  Objection.

A.  That is correct.  Unfortunately, you can't policy common sense.  If there is a yard with a Beware of Dog sign, I don't pick that yard.

Unfortunately, as you saw the After Action was they chose this because they believed there were no signs -- they didn't see no signs of dogs.

You know, based on my experience and my time as an active sniper, you know, the number of sniper operations that I've conducted as an individual sniper, you know, I would go into areas and do my scouting and know where dogs were or dogs weren't. Because, again, dogs do alert bad guys and good guys that there's someone in their backyard.

So that's one of the things that -- moving into a sniper position undetected and moving out of that position undetected is our best practice.

(The following exhibit was identified for the record:  Number EXH 8.)

Q.  I'm going to ask you some more questions on that in a little bit.  For now I want to put up Exhibit 8, which was a SWAT operation order.

MS. JONES:  Elliot, it's 3 o'clock.


ALLIANCE
COURT REPORTING, INC.

Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

154

CHIEF FABIAN RIVERA - BY MR. SHIELDS

Isn't it 3 o'clock?

(There was a discussion off the record.)

THE VIDEOGRAPHER:  The time is 3:06 p.m. We are off the record.

(The following exhibits were marked for identification:  Numbers EXH 1 through 8.)

(The proceeding recessed at 3:06 p.m.

(The proceedings reconvened at 3:15 p.m.; Court Reporter Michelle Mundt Rocha has has been replaced by Court Reporter Mary Elizabeth Phillips.)

THE VIDEOGRAPHER:  We are on the record. The time is 3:15 p.m. on March 15th, 2023.  Our witness is Fabian Rivera.  Our court reporter is Betsy Phillips.  We are located at 109 South Union Street, Rochester, New York at the offices of Alliance Court Reporting.  Please continue.

MR. SHIELDS:  And just for the record, we took a break from 3:06 to 3:15 to switch court reporters from Michelle to Betsy Phillips because Michelle had to leave.  And the parties all stipulated that there won't be any objections to the record having been created by two different court reporters.

Is that accurate, Ms. Jones?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

155

CHIEF FABIAN RIVERA - BY MR. SHIELDS

MS. JONES:  Yeah, that's correct.  The defendants agreed to the new stenographer.

MR. SHIELDS:  Okay.  Thank you.

CONTINUING EXAMINATION BY MR. SHIELDS:

Q.  Okay, Chief.  Same questions as before after we took a break.  Are there any questions that you'd like to change your answers to after having the opportunity to take a break?

A.  No.

Q.  Anything that you'd like to clarify at all?

A.  No.

Q.  Okay.  All right.  So just before we broke, I had put up the SWAT Operation Order as Exhibit 8, the SWAT Operation Order from this incident on September 6th, 2018.  Chief, do you see that document on your screen right now?

A.  I do.

Q.  Okay.  And do you recognize this document?

A.  Yes.

Q.  Okay.  It's a document that you've seen before?

A.  Yes.

Q.  But it's not a document that you reviewed



ALLIANCE
COURT REPORTING, INC.

*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

156

CHIEF FABIAN RIVERA - BY MR. SHIELDS

in preparation for your deposition today?

MS. JONES:  Objection.

A.  No.

Q.  When's the last time that you reviewed this document?

A.  9/16 of '18.

Q.  Okay.  And Officer Nellist testified that he did his scouting sometime in the week prior to the execution of this SWAT Operation Order on 9/6/2018. Would that be the normal time frame when the scouting would be conducted for a high-risk search warrant?

MS. JONES:  Objection.

A.  Depends on the number and frequency of warrants.  At that time in 2018, there was an uptick in operations.  I know currently, you know, the SWAT Team is deploying drones to hit a house tomorrow, for an example, speaking to just the frequency.

So at that time usually a week prior we had knowledge that the Narcotics Squad, Special Investigations Section wanted to conduct this warrant. So it's dependent.  Again, we can't say time frame because it's solely dependent on the customer.

Our customers sometimes at the time were Major Crimes, our Homicide Unit, our Special



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

Investigations Section, Narcotics Unit.  And at times it could also have been our PSI unit, which is our Patrol Section Investigations depending on the risk, again, going through the checklist, determining if the target was a target that SWAT should execute the search warrant.

So scouts can be within 24 hours of hitting the target up to that example.  Again, they can vary.

Q.  Okay.  In this instance this SWAT Operation Order was devised in advance prior to the execution; correct?

A.  Correct.

Q.  Okay.  And going back to Exhibit 7 on page 16, it says under B, Operation Order, subsection 3 under Commander, it says "The Patrol Division/SDO commander will review RPD 1234, an Operation Order, and approve and submit through the chain of command to the DCO or return to the authoring supervisor for additional work"; correct?

A.  Correct.

MS. JONES:  Objection.

Q.  Now, here did you -- do you remember if you returned it to the authoring supervisor for



Confidential

158

CHIEF FABIAN RIVERA - BY MR. SHIELDS

additional work or not?

A.  I did not.

Q.  Okay.  So you reviewed it, you approved it, and then you sent it to DCO Peters?

A.  Correct.

Q.  Okay.  So part of the -- part of the plan here was -- well, let me withdraw that.

Did you have any comments or changes at all to the SWAT Operation Order?

A.  I did not.

Q.  Okay.  And there was a lot of time and thought that went into developing the SWAT Operation Order; correct?

MS. JONES:  Objection.

A.  Correct.

Q.  And the snipers, as we discussed, testified that they did scouting prior to development of their plan here?

MS. JONES:  Objection.

A.  That's correct.

Q.  And they planned to cross through Ms. Gursslin's fenced-in backyard; is that right?

MS. JONES:  Objection.

A.  Correct.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

159

CHIEF FABIAN RIVERA - BY MR. SHIELDS

Q.   And, in fact, Nellist testified that prior to execution when he was scouting, he, in fact, went into my client's yard sometime during the week before the incident as part of his scouting.  Is that -- would that be normal during scouting for a SWAT sniper to enter through the curtilage to someone's residential property like that?

MS. JONES:  Objection.

A.   Yes.

Q.   Okay.  Is that something that you did when you were a SWAT sniper?

MS. JONES:  Objection.

A.   Yes.

Q.   Okay.  So there's nothing that was out of the ordinary or violated any RPD policies or procedures to simply walk into my client's backyard?

MS. JONES:  Objection.

A.   No.

Q.   Okay.  And so you approved their plan to infiltrate and ex-filtrate to and from their final operating position by going through my client's yard?

A.   I approved the total plan.  The specifics, again, are left up to the individual snipers.  But my signature is at the bottom, so yes.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

160

CHIEF FABIAN RIVERA - BY MR. SHIELDS

Q. Okay. So you approved the plan for the SWAT snipers to infiltrate and ex-filtrate to and from their final operating position by going through my client's backyard; correct?

MS. JONES: Objection.

A. Yes.

Q. Okay. And going back to the Exhibit 7 here. When you forwarded the SWAT Operation Order to the DCO, did you have any conversations with DCO Peters about the SWAT operation plan?

A. No.

Q. Did he have any written edits or changes or anything?

A. No.

Q. Okay. So -- and that's after DCO Peters reviewed and approved the SWAT Operation Order. It was not required to be reviewed and approved by the chief; is that right?

MS. JONES: Objection.

A. Most is he gives the chief a heads-up as we discussed. At that time if I'm not mistaken, Chief Ciminelli gave the yay or nay on SWAT operations. I would say yes.

Q. Okay. So your testimony is that in this



Confidential

161

CHIEF FABIAN RIVERA - BY MR. SHIELDS

instance, Chief Ciminelli would have reviewed and approved the SWAT operation plan or the SWAT Operation Order in this case; correct?

MS. JONES:  Objection.

A.   Correct, or made at least aware of it. Again, you know, the conversation between the deputy chief of operations and the chief of police, I would not have been privy to that.

Q.   Okay.  Did Chief Ciminelli ever give feedback or offer any changes to any SWAT operation orders around that time?

MS. JONES:  Objection.

A.   I'm sorry.  I'm just trying to remember a situation where he might have asked about certain tactics or certain timing, the validity of the search warrant, the risk.  Again, none for this one.  I'm trying to think of an example.  Most of the changes came from or denials were from the deputy chief of operations Scotty Peters.  And again, those were either big picture, why are we conducting a search warrant at a certain time?  Why are we conducting a search warrant?  Is there risk?  Should it be high-risk?  Can we do further investigation?  Again, mostly at the DCO level.



CHIEF FABIAN RIVERA - BY MR. SHIELDS

Just additional information:  Deputy Chief of Operations Peters was the SWAT commander for a juncture.  He was on SWAT also.

Q.  So here there was no question from the DCO or the chief about why the sniper team planned to cross through my client's fenced-in backyard to get to and exit from their final operating position; correct?

MS. JONES:  Objection.

A.  That's correct.

Q.  Okay.  So they approved -- they reviewed and approved the plan for Nellist and Kelly to cross through my client's yard to get to and from the final operating position; correct?

MS. JONES:  Objection.

A.  They approved the final SWAT plan, which that is included.  But again, that's just a portion of the plan they approved.

Q.  So they approved of the entirety of the plan, which included the plan -- withdraw that.  So let me start over my question.

My question is, the DCO Peters and Chief Ciminelli reviewed and approved the entirety of the plan.  And contained within that plan was the SWAT snipers' plan to get to and exit from the final


ALLIANCE
COURT REPORTING, INC.

Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

operating position by crossing through my client's yard; correct?

MS. JONES:  Objection.

A.  Correct.

Q.  I'm going to take that down for now.

All right.  So at no time either before the execution of the warrant or after the after-action review did anyone in the RPD chain of command find that any of the actions of Nellist or Kelly were in violation of RPD rules and policies; correct?

MS. JONES:  Objection.

A.  No.

Q.  Okay.  And after the incident it was reviewed by you -- well, let me withdraw that.

After the incident the After-Action Report was reviewed by Springer, you, DCO Peters and Chief Ciminelli.  And each one of you approved it and ratified it and didn't find that their actions were in violation of any RPD rules or policies; correct?

MS. JONES:  Objection.

A.  Correct.

Q.  Okay.  And so you testified earlier that your longest-serving -- the position that you served longest in on the SWAT Team was as sniper leader;



CHIEF FABIAN RIVERA - BY MR. SHIELDS

correct?

MS. JONES:  Objection.

A.  Yes.

Q.  Sniper team leader?  You were sniper team leader for five to six years; is that correct?

MS. JONES:  Objection.

A.  Yes.

Q.  Okay.  And during that time was it a common practice for snipers to walk through the curtilage to a property to get to their final operating position?

MS. JONES:  Objection.

A.  Yes.

Q.  Okay.  So what happened in this case, it wasn't uncommon; correct?

MS. JONES:  Objection.

A.  It was not uncommon, no.

Q.  And Nellist and Kelly and Springer all testified that prior to walking through the curtilage to a property, SWAT snipers never get consent from the property owner; correct?

MS. JONES:  Objection.

A.  That's correct.  And the reason why is that -- if I can give a reason is that --



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

Q. All right. So I would prefer if I ask the follow-up questions, but my follow-up question was going to be why.

A. Okay. I'm sorry. A lot of locations that we do target have neighboring friends. So, you know, as we move in and move out of final operating positions, sniper hides, we try to do that discreetly to ensure the safety and security of the snipers.

Again, by giving or asking for consent ahead of time, it could alert -- even the most good person can't keep a secret. So confidentiality and secrecy during our high-risk warrant services are essential to the safety of, you know, not only the snipers but the entire team and the entire operation and also the community.

Have there been instances where I've requested consent into our location to residential homes? You knock, ask for consent to come in and use an attic, a room in the location. Again, we're not there -- they're not the targets of the investigation. They're not suspects. They're consenting homeowners that have allowed us into their property.

Most of those instances for SWAT were barricaded gunmen where they knew we were there,


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

the bad guy.  But as far as moving into positions for high-risk warrant service where the bad guy doesn't know we're coming, we like to keep it that way.  So moving in as discreetly as possible is for the safety of the sniper and the SWAT Team as a whole.

Q.  Okay.  And what other considerations are you required to take other than officer safety?

MS. JONES:  Objection.

A.  As far as moving through without consent into a position or in general?

Q.  Correct.  When you're deciding to walk across the curtilage to residential property without consent or a warrant, what other considerations are you required to take?

MS. JONES:  Objection.

A.  Well, again, you know, there's curtilage and there's exceptions.  There's exigency.  You know, there's -- best way I can say it is that there are exceptions to the search warrant or to consider exigency, them not being the target of the investigation itself.

The safety and security, if we look at priority of life, we go -- and depending on what type of operation we're working on, if it's a normal



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

167

CHIEF FABIAN RIVERA - BY MR. SHIELDS

high-risk operation it goes community, officer, bad guy. If it's hostage rescue, it goes SWAT officer -- well, it goes community and we're at the bottom. We're always at the bottom for hostage rescue. So it depends, you know.

How can you elaborate on your question that might, you know, be a little bit more helpful to me to answer that?

Q. So I think that you said in your two examples that you just gave that safety of the community is the top priority; correct?

MS. JONES: Objection.

A. Correct. In the priority of life and how we try to operate, yes, community is first.

Q. Okay.

A. Officer --

Q. So when you're considering walking through the curtilage to someone's property, in addition to officer safety, you also have to consider the safety of the public; correct?

MS. JONES: Objection.

A. Correct.

Q. And the homeowner or the residents of that property would be included in the consideration of



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

safety to the public; correct?

MS. JONES:  Objection.

A.  Correct.

Q.  And the Fourth Amendment rights of the homeowner or resident are important also; correct?

MS. JONES:  Objection.

A.  Yes, they are.

Q.  And the Fourth Amendment protects the right to property; right?

MS. JONES:  Objection.

A.  Unreasonable searches of property.

Q.  Okay.  And the Fourth Amendment also protects the right to privacy; correct?

MS. JONES:  Objection.

A.  Correct.

Q.  And an intrusion into the curtilage is considered an invasion of the right to privacy; correct?

MS. JONES:  Objection.

A.  No.  If there's exigency, and again, not the target of the investigation, the safety of the officer and the safety of the public is the priority.

Q.  Okay.  So in all the extensive training that you've received, did you ever learn that a search



CHIEF FABIAN RIVERA - BY MR. SHIELDS

for the purposes of the Fourth Amendment occurs when the police intrude on a person's "reasonable expectation of privacy"?

A. Yes.

Q. Okay. And did you also learn that a core premise underlying the Fourth Amendment is that unwarranted searches of a home are presumptively unreasonable?

A. Yes.

Q. Okay. And did you also learn that the curtilage, that is the "area adjacent to the home into which the activity of home life extends," is considered part of a person's home and enjoys the same protection against unreasonable searches as the home itself?

A. Yes.

Q. Okay. So, in other words, the same rules apply and protect the curtilage that would apply to entry of the home itself; correct?

MS. JONES: Objection.

A. Yes.

Q. Okay. So if the only way for Nellist and Kelly to get to their final operating position was to go through the front door to Ms. Gursslin's home and



CHIEF FABIAN RIVERA - BY MR. SHIELDS

out her back door, would they have been permitted to do that?

A.    No.

MS. JONES:  Objection.

Q.    Okay.  So if they weren't allowed to go through the front door to her home and out the back door, why were they allowed to cut through the curtilage to her property?

A.    The exigency of the SWAT operation that occurred two doors down.

Q.    Okay.  So I thought we just agreed that the same rules applied for entering her home as entering the curtilage to her property, did we not?

MS. JONES:  Objection.

A.    Yes, but there are exceptions to that; right?

Q.    Okay.  So if all the same exceptions applied and those exceptions wouldn't permit the officers to go through her front door and out the back door, then how would they apply differently to permit them to go through her yard?

MS. JONES:  Objection.

A.    Again, they were not the target of the investigation.  They're not a target of a search.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

They were a target of a -- again, a criminal investigation. Moving through and moving out of their backyard is not a violation of their Fourth Amendment rights.

Q. Okay. So based on all your training and experience and accepting as true and your testimony that you understood that the Fourth Amendment applies equally to entering someone's home as it does to entering the curtilage to their property, that's still your testimony?

A. Yes.

Q. Okay. So Springer testified that after this incident, he believes that the RPD policy was updated in some way. Are you aware of any policy changes that were made after this incident?

MS. JONES: Objection.

A. I am not.

Q. Okay. And Springer also testified that after this incident, he realized that after looking into the allegations in this case, that officers are not allowed to simply walk through someone's backyard. Do you disagree with --

MS. JONES: Objection.

Q. -- Chief Springer?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

MS. JONES:  Objection.

A.  I think it best practice after this incident and the reason why I'm here getting deposed, I would have to say I can't disagree with him.  Again, unfortunately, the loss of a family pet occurred.  I can't be -- I can't take that not into account that it does have to change or my opinion has to change.  But at that time, it wasn't unfortunately.

Again, I can't be ignorant to the fact that was I wrong at the time?  Did I believe I was wrong at the time?  No.  And in hindsight, why I'm here doing a deposition for five, six hours, I would say I can't disagree.  You got to take a look at it.  It's a lesson learned.  And I can't be oblivious to it.

Q.  So it's your testimony that you agree with Springer.  At the time of the incident, you did not realize that it was unlawful for the SWAT snipers to walk through the curtilage to the property to get to their final operating position.  But now as we sit here today, you realize that the Fourth Amendment, in fact, does prohibit officers from traversing the curtilage to a property simply to get to their final operating position on a neighboring property?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

173

CHIEF FABIAN RIVERA - BY MR. SHIELDS

MS. JONES:  Objection.

A.   You know, one of the things that, you know, I probably will do is go back to Op Tac and ask, you know, what's the case law?  What's going on nationally?  Because again, are these practices still being used?  Well, I'm out of the game, you know.  But as a police leader, I have to educate myself and I have to say yeah, yeah, we have to take a good look at it.

Q.   Okay.  And so if, in fact, the case law that I read to you is correct and the same rules apply to entering the curtilage to a property as entering the front door to the home, would you agree that Nellist and Kelly did not have the right under the Fourth Amendment to cross through my client's fenced-in backyard on the night of the incident?

MS. JONES:  Objection.

A.   Today, yes.  Not back in 2018.

Q.   And to take it a step further -- so let's -- well, let me withdraw that.

If you can observe let's say from a lawful vantage point contraband on the curtilage to a property, does that give you a reasonable cause to enter the property to seize the contraband?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

174

CHIEF FABIAN RIVERA - BY MR. SHIELDS

MS. JONES:  Objection.

A.  Is that the plain view exception?

Q.  Correct.

A.  Yes.

MS. JONES:  Objection.

Q.  Okay.  So, for example, if you can see contraband in someone's yard by peering over a fence, does that automatically give you a legal basis to enter the yard and seize the contraband?

MS. JONES:  Objection.

A.  And seize the contraband?  Can you look at criminal charges is a different story.

Q.  Is it -- so I guess my question is, is there a difference legally between being able to observe the contraband from a lawful vantage point and being able to lawfully enter the property to seize the contraband?

MS. JONES:  Objection.

A.  I think one of the questions on the upcoming chief's test is always get a search warrant. So I'd have to say get a search warrant.

Q.  So the answer would be no, even if you can see it, you're not lawfully allowed to enter the property and seize the contraband; correct?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

MS. JONES:  Objection.

A.  No.

Q.  Now, coming back to the incident at issue in this case, you would agree now today that the exigent circumstances exception to the Fourth Amendment warrant requirement did not apply to permit Officers Nellist and Kelly to enter my client's yard on the night of the incident; correct?

MS. JONES:  Objection.

A.  Unfortunately, hindsight is not 20/20.  I would say you're correct.

Q.  But at the time of the incident, you did believe that they were permitted to traverse my client's property; correct?

A.  Correct.

MS. JONES:  Objection.

Q.  And that was based on your, I guess at the time, 18 years working as a police officer in Rochester?

MS. JONES:  Objection.

A.  Correct.  And best practices that were used in the sniper community, you know, nationally.

Q.  And that was based on the training that you had received from the RPD?



Confidential

176

CHIEF FABIAN RIVERA - BY MR. SHIELDS

A.   No.   Training I received from Op Tac to the FBI field office in New York City to other sniper courses, but not RPD.

Q.   Okay.   Did any of those other trainings that you went to deal with the specific issue of entering the curtilage to a neighboring property that was not the target location to traverse that property to get to a final operating position?

MS. JONES:   Objection.

A.   No.

Q.   When you would go to these outside trainings, either with private companies or the FBI, would you be given -- would you be given some kind of materials, like a packet of materials related to what you learned at that training?

A.   Yes.

Q.   Okay.   What would you do with that packet of materials?

A.   An example, I'd bring a bag, disseminate it with the team, snipers.  I haven't kept any of the manuals from Op Tac.  I think I have, you know, the books.  He wrote a book.  Of course, that's part of the course.  Mainly, I archive it and eventually throw it out.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

Q.  Okay.  So when you say you archived it, what do you mean?

A.  Kept it in my office.  After certain years, after retirement, I left the RPD with a bunch of boxes.  Boxes went into the garage, so boxes went into the dumpster.

Q.  Okay.  So is there any requirement, for example, when you go to an outside training to provide copies of any training materials to the training section within the RPD?

A.  No.

Q.  Okay.  Was there any practice amongst the sniper team to keep some kind of library of training materials gathered at these outside trainings?

A.  Yes.

Q.  Okay.  So could some of these training materials from the trainings that you attended still be present in this library that's maintained by the SWAT sniper team?

MS. JONES:  Objection.

A.  I took -- I had, you know, main publications, not of the just training, but, you know, sniper -- law enforcement sniping kind of materials, but more non-instructor -- instruction materials but



Confidential

178

CHIEF FABIAN RIVERA - BY MR. SHIELDS

books itself.

As far as stuff that they've gathered, I couldn't say for sure.  But, you know, good snipers will usually keep their materials that they've gotten and archive them.  I'm not sure what the team is doing at this point.

Q.  So if I wanted to get copies of any of the materials from these FBI trainings or private company trainings that you went to, do you think you would be able to provide any of those materials?

MS. JONES:  Objection.

A.  No.

Q.  Okay.  Do you think that the RPD or the sniper team within the RPD would be able to provide any of those materials?

MS. JONES:  Objection.

A.  Can't say.

Q.  Okay.

A.  You could reach out to Op Tac, the FBI.  I mean, those are possibilities.

MR. SHIELDS:  Okay.  All right.  Well, and Ms. Jones, to the extent that RPD or the sniper team is in possession of any of these relevant training materials that were previously demanded, we'd again



CHIEF FABIAN RIVERA - BY MR. SHIELDS

demand production of any relevant SWAT sniper training materials.

MS. JONES:  Please follow up in writing.

(Document request - SWAT sniper training materials)

Q.  When is the last time that you received any training from the RPD regarding entering the curtilage to a residential property?

A.  I don't recall.

Q.  Do you think since the academy you ever received any training about entering the curtilage to a residential property from the RPD?

A.  I'm trying to think if there's been any like legal updates that were rolled out, but I can't recall.

Q.  Okay.  If there was a legal update that was rolled out while you were at the RPD, how would that legal update be provided to you?

A.  Usually a training was disseminated through an info update.  They do keep a record of legal updates.  I think they call it something different.  But they do go out and they are maintained by training and R&E from Narcan, administration of Narcan to raise the age.  Depends on the topic.  But



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

CHIEF FABIAN RIVERA - BY MR. SHIELDS

they are posted at the RPD web and disseminated through roll call training and through the info update.  It's just like the daily message from the chief's office.

Q.  Okay.  The daily message from the chief's office, is that an email?

A.  Info update.  Yeah, it's through email.  It goes out daily.

Q.  All right.  If there's like a training bulletin or training update, is there any requirement to acknowledge receipt of those things?

A.  Yes.

Q.  All right.  How is that done?

A.  By signature at the patrol level.  Command level there is not really a checks and balance.

Q.  Okay.  So a patrol officer would have to provide a signature of some sort acknowledging I've read this, I reviewed it, I understand it.  And that would be provided back to PDS or something like that?

MS. JONES:  Objection.

A.  I believe it goes back to training or PDS, yes.

Q.  Okay.  Okay.  During all your time as a SWAT sniper leader, did you ever do anything to ensure



CHIEF FABIAN RIVERA - BY MR. SHIELDS

that other members of the SWAT sniper team did not trespass on the curtilage to residential properties?

A.   I did not.

Q.   Okay.  In all your time as the SWAT assistant commander, did you do anything to ensure that SWAT sniper members did not trespass on the curtilage to residential properties?

A.   I did not.

Q.   Okay.  In all your time as an SOD commander or any other commander position, did you do anything to ensure that SWAT sniper members did not trespass on the curtilage to residential properties?

MS. JONES:  Objection.

A.   I did not.

Q.   And would it also be true that you, in those various positions, never did anything to ensure that members of the SWAT Team were aware that a search for the purposes of the Fourth Amendment occurs when the police intrude on somebody's "reasonable expectation of privacy"?

MS. JONES:  Objection.

A.   No, I did not.

Q.   And in all of those positions, did you ever do anything to ensure that members of the SWAT



CHIEF FABIAN RIVERA - BY MR. SHIELDS

Team were aware that people have a reasonable expectation of privacy -- I'll start that question over.

In all your time in any of those various positions as SWAT sniper leader, SWAT assistant commander or SOD commander, did you ever do anything to ensure that members of the SWAT Team were aware that people have a reasonable expectation of privacy in the curtilage to their property?

MS. JONES:  Objection.

A.  I did not.

Q.  And in all of those positions as a SWAT sniper leader, SWAT assistant commander or SOD commander, did you ever do anything to ensure that members of the SWAT Team were aware that the curtilage of a property enjoys the same Fourth Amendment protections against unreasonable searches and seizures as the home itself?

MS. JONES:  Objection.

A.  I did not.

Q.  And did you ever provide any training to the SWAT Team about the legal requirements to enter the curtilage to a residential property?

A.  I did not.



CHIEF FABIAN RIVERA - BY MR. SHIELDS

Q.   And did you ever implement any types of rules whatsoever to ensure that the SWAT Team didn't trespass on the curtilage to residential property?

MS. JONES:   Objection.

A.   I did not.

Q.   Okay.   And earlier we talked about not obtaining consent prior to entering the curtilage to a residential property.   In your time with the RPD within the SWAT Team, did you ever seek a separate warrant when executing a high-risk search warrant requesting permission to enter through the curtilage to any of the neighboring properties?

A.   I did not.

MS. JONES:   Objection.

Q.   Okay.   So it's the policy of the RPD to never obtain a separate warrant to get permission to enter through the curtilage to a neighboring property?

MS. JONES:   Objection.

A.   We never did, at least during my operations or my tenure on the team as an operator, as a team leader, as an assistant team commander, and as a commanding officer of SOD, no.

Q.   Okay.   So from 2003 through 2019, it was the practice of the RPD to not obtain consent and to



ALLIANCE
COURT REPORTING, INC.

Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

184

CHIEF FABIAN RIVERA - BY MR. SHIELDS

not obtain a warrant prior to entering the curtilage to any neighboring properties; correct?

MS. JONES:  Objection.

A.  Sorry.  Can you repeat the question?

Q.  Sure.  So you said during your entire time working on the SWAT Team through your tenure as the SOD commander -- so that time period would have been 2003 to 2019; correct?

A.  Correct.

MS. JONES:  Objection.

Q.  And so during that time period 2003 to 2019, it was the practice of the RPD to never obtain consent from the residents at the neighboring property or to obtain a warrant from a judge in order to get the lawful right to enter through the curtilage to any neighboring properties when you were executing a high-risk search warrant --

MS. JONES:  Objection.

Q.  -- is that correct?

MS. JONES:  Objection.

A.  That is correct.

Q.  Okay.  In your various other leadership roles with the RPD, were you ever in charge of any other incidents where a dog was shot?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920