CONFIDENTIAL

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ERIN GURSSLIN,

          Plaintiff,

                              Civil Action No. 20-cv-6508

v.

THE CITY OF ROCHESTER, a municipal entity, POLICE OFFICER JEREMY NELLIST, POLICE OFFICER JOSHUA KELLY, COMMANDER FABIAN RIVERA, LIEUTENANT AARON SPRINGER,

          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Video-recorded Deposition Upon Oral Examination of:

                Officer Jeremy Nellist

Location:        Alliance Court Reporting, Inc.
                 109 South Union Street, Suite 400
                 Rochester, New York  14607

Date:            February 24, 2023

Time:            10:00 a.m.

Reported By:     KIMBERLY A. BONSIGNORE

                 Alliance Court Reporting, Inc.

                 109 South Union Street, Suite 400

                 Rochester, New York  14607



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

**Confidential**

2

A P P E A R A N C E S

Appearing Remotely on Behalf of Plaintiff:

Elliot D. Shields, Esq.
    Roth & Roth LLP
    192 Lexington Avenue, Suite 802
    New York, New York  10016
    eshields@rothandrothlaw.com


Appearing on Behalf of Defendant:

Peachie L. Jones, Esq.
    City of Rochester Law Department
    City Hall, Room 400A
    30 Church Street
    Rochester, New York  14614
    peachie.jones@cityofrochester.gov


Also Present:

Peter H. Colucci, Videographer
    Alliance Court Reporting, Inc.
    109 South Union Street, Suite 400
    Rochester, New York  14607


                    *       *       *



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

**19**

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q. Okay. Can you give me an overview of your roles and assignments with the SWAT team?

A. During my probationary period, I was assigned to an entry team. And then after my one-year probation, I was assigned to the sniper team, and I have been there ever since.

Q. Okay. So you've been a sniper since about 2013; is that right?

MS. JONES: Objection.

A. Yes.

Q. Prior to being assigned to the sniper team, did you have to do additional training to join the sniper team?

A. Yes.

Q. Can you tell me about that training?

A. Yeah. It was a one-week -- actually -- I'm sorry. It was a two-week basic sniper school.

Q. Okay. Where was that?

A. It was held at Rush Range.

Q. Okay. And what types of things did you learn in basic sniper school?

A. I learned stalking techniques, extended distance shooting, how to make adjustments in high winds, and how to measure targets without actually



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

OFFICER JEREMY NELLIST - BY MR. SHIELDS

measuring them.

Q.  When you say "measuring targets," do you mean, like, the distance that you are from a target or something else?

MS. JONES:  Objection.

A.  Correct, the distance from a target that I am.

Q.  Did you learn about scouting?

A.  Yes.

Q.  Okay.  And what is scouting?

A.  Scouting is identifying a location and then doing a drive-by, or actually researching the location, and looking for specific things.

Q.  Okay.  What are the RPD's SWAT team rules about scouting?

MS. JONES:  Objection.

Q.  Let me withdraw that question.

Does the RPD require that before a high-risk search warrant is executed that scouting is conducted?

A.  Yes.

Q.  Okay.  Tell me what types of things you're required to do, when you conduct scouting, prior to the execution of a high-risk search warrant.



OFFICER JEREMY NELLIST - BY MR. SHIELDS

A.   I believe so, yes.

Q.   Okay.  And Lieutenant Springer was the SWAT commander on September 6, 2018?

A.   Yes.

Q.   And Michael Magri was the SWAT -- was the sniper team leader on September 6, 2018?

MS. JONES:  Objection.

A.   Yes.

Q.   And do you know who the assistant sniper team leader was on September 6, 2018?

A.   I think it might have been Josh Kelly.

Q.   Is that something that would be documented in the SWAT operation order?

A.   If he was the assistant team leader of the sniper team?

Q.   Correct.

A.   I don't think that would be in the op order, no.

Q.   Okay.  Is that something that would be documented anywhere to your knowledge?

A.   Yes.  It would be -- it would be documented somewhere.

Q.   Okay.  Do you know where it would be documented?



Confidential

28

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A.   No.

Q.   Okay.  And prior to September 6, 2018, you and Kelly developed a plan for the SWAT operation; is that correct?  A deployment plan.

MS. JONES:  Objection.

A.   Yes.

Q.   Okay.  And when did you develop the development plan?

A.   A few days prior to the execution date.

Q.   Okay.  Do you remember how many days prior?

A.   No.

Q.   And part of the planning included choosing your final operating position; is that correct?

MS. JONES:  Objection.

A.   Yes.

Q.   How did you choose your final operating position?

A.   After conducting a scout of the target location, I found that the only viable option for a predeployment was behind a garage.

Q.   Okay.  Tell me everything that you did to scout for September 6, 2018.

MS. JONES:  Objection.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

29

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A. We drove past the location. We took photos. We used Google overhead maps. We cut through an apartment complex to the -- it would be the west of the location, to get some pictures of side 3 of the target location.

And then I also did some scouts -- well, one scout of the area that we were going to walk through to get to our final operating position.

Q. When you say you did a walk through the area -- or a scout of the area that you were going to walk through to get to the location, are you referring to my client's yard at 1747 St. Paul Street?

A. Yes.

MS. JONES: Objection.

Q. And did you ask for her consent prior to entering her backyard --

MS. JONES: Objection.

Q. -- during the scout?

MS. JONES: Objection.

A. No.

Q. Okay. So you just decided to trespass on her property as part of your scout?

MS. JONES: Objection.

A. There was no trespassing signs, no.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

30

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q.  Okay.  So if there's not a no trespassing sign, you're allowed to walk into someone's fenced-in backyard?

MS. JONES:  Objection.

A.  Well, I was conducting a lawful police activity, and I was not searching anything on her property.  So I walked through the back of it to make sure that we could actually get into a position to provide cover and observations for our SWAT team.

Q.  Okay.  So you didn't have a warrant to enter her property; correct?

MS. JONES:  Objection.

A.  Correct.

Q.  And you didn't have her consent to enter her property; correct?

MS. JONES:  Objection.

A.  Correct.

Q.  And you didn't have probable cause to believe that a crime was being committed on her property; correct?

MS. JONES:  Objection.

A.  Correct.

Q.  And there was no emergency requiring that you enter her property; correct?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

31

OFFICER JEREMY NELLIST - BY MR. SHIELDS

MS. JONES:  Objection.

A.  On the day of the warrant, yes, there was some exigency for us to go through her property to get to where we needed to go.

Q.  Okay.  During the scout, there was no emergency requiring you to enter her property at that time; correct?

MS. JONES:  Objection.

A.  Correct.

Q.  And on the night of the incident, there was no probable cause to believe that a crime was being committed on her property; correct?

MS. JONES:  Objection.

A.  Correct.

Q.  And as part of the SWAT operation on September 6, 2018, your plan was, that you developed beforehand, to walk down her back -- or walk down her driveway and go through her backyard; is that correct?

MS. JONES:  Objection.

A.  Yes.

Q.  And what else did you do to choose that route?

A.  I don't believe I did anything else to choose that route, other than actually walking through



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

OFFICER JEREMY NELLIST - BY MR. SHIELDS

it to make sure that we could actually do it.

Q.  Okay.  And Sergeant Magri approved that route?

A.  Yes.

Q.  Okay.  And the assistant commander, which I think you believed was Sergeant Kelly, approved that route?

MS. JONES:  Objection.

A.  Assistant team leader, yes.

Q.  Assistant Team Leader Kelly approved that route?

A.  Yes.

Q.  And Lieutenant Springer approved that route?

MS. JONES:  Objection.

A.  Yes.

Q.  And Fabian Rivera approved that route?

MS. JONES:  Objection.

A.  Yes.

Q.  And the choice of that route through Ms. Gursslin's backyard, that was consistent with RPD's policy?

MS. JONES:  Objection.

A.  Yes.



Confidential

33

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q. And the choice of that route through Ms. Gursslin's backyard, that was consistent with your SWAT sniper training?

A. Yes.

Q. And there was nothing out of the ordinary in choosing a route that cut through my client's backyard; correct?

MS. JONES: Objection.

A. I'm sorry. Can you rephrase the question?

Q. There was nothing out of the ordinary in choosing to cut through Ms. Gursslin's backyard; correct?

MS. JONES: Objection.

A. No, nothing out of the ordinary. Like I said, most of the time we're secluded somewhere in -- either in a structure or a vehicle. Only on the rare occasions are we outside of a vehicle.

So in those type of observations, yes, that was normally what we do.

Q. Okay. And do you guys refer to those operations as, like, a rural operation or something like that?

MS. JONES: Objection.

A. Well, rural would be, like, in a wooded



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

34

OFFICER JEREMY NELLIST - BY MR. SHIELDS

area.  So it was more like an urban -- an urban hide.

Q.  Okay.  I just was looking for a phrase that we could refer to -- "the hide," as something other than inside of a structure or inside of a vehicle, do you have a general term for that?

MS. JONES:  Objection.

A.  No.

Q.  Okay.  So when you're doing an outdoor hide, and you're planning an outdoor hide for a high-risk search warrant, it's common for the sniper team to cut through neighboring properties to reach your final operating position?

MS. JONES:  Objection.

A.  Yes.

Q.  Okay.  And you never got a separate warrant to go through Ms. Gursslin's property at 1747 St. Paul; right?

MS. JONES:  Objection.

A.  Correct.

Q.  And you never got the consent from Ms. Gursslin, or any other resident of 1747 St. Paul, to enter the property; correct?

MS. JONES:  Objection.

A.  Correct.



ALLIANCE
COURT REPORTING, INC.

*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

35

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q.   And not getting a warrant or consent was consistent with RPD policy; is that correct?

MS. JONES:  Objection.

A.   Yes.

Q.   And not getting a warrant or consent was consistent with your RPD SWAT training; correct?

MS. JONES:  Objection.

A.   Yes.

Q.   And the SWAT team never gets a warrant or consent to cross through the yards of neighboring properties to get to your final operating position; correct?

MS. JONES:  Objection.

A.   Correct.

Q.   And that's something, just to be clear, that you've never done since you joined the sniper team in 2013; correct?

MS. JONES:  Objection.

A.   Correct.

Q.   And I think I might have asked this earlier, but you never suspected that there was a crime being committed on Ms. Gursslin's property; correct?

MS. JONES:  Objection.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

36

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A. Correct.

Q. And you never suspected that -- or you never had facts that would have indicated that there was an emergency occurring on Ms. Gursslin's property; correct?

MS. JONES: Objection.

A. Correct.

Q. And can you tell us why you chose that route through Ms. Gursslin's yard?

MS. JONES: Objection.

A. Yes. Because the door of the apartment on the house that we were executing the search warrant for was recessed at the 3-4 corner, and also down, like, a small, graded hill -- that was only visible for us to provide the type of observations and security for the entry team, and also provide us some type of concealment -- was in back of that garage to the north of her property.

And the only way to get to that garage, without being compromised or compromise the execution and safety of the search -- the entry team, was to go through that yard.

Q. Kelly testified that you knew you didn't have a lawful basis to enter Ms. Gursslin's property,



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

OFFICER JEREMY NELLIST - BY MR. SHIELDS

but you chose to trespass on her property anyways because it was the, quote, easiest and best route to get to the final operating position; is that right?

MS. JONES:  Objection.

A.  No.  I believe we did have a lawful -- a lawful means to be there.  Because we were providing observations and security for the entry team, and in order for us to do that safely, we had to get through -- we had to go through her yard.

Q.  If the only way to get to your final operating position was to go through the front door of Ms. Gursslin's home and out her back door, would you be permitted to do that?

MS. JONES:  Objection.

A.  I'm sorry.  Can you rephrase the question?

Q.  If the only way to get to your final operating position was to go through the front door of Ms. Gursslin's home and out her back door, would you be permitted to do that?

MS. JONES:  Objection.

A.  No.

Q.  Okay.  If you don't have a warrant or consent, would you be permitted to go through her home?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

38

OFFICER JEREMY NELLIST - BY MR. SHIELDS

MS. JONES:  Objection.

A.  No.

Q.  Okay.  And under the circumstances on the night of the incident, without a warrant or her consent, would you have been permitted to go through her home?

MS. JONES:  Objection.

A.  No.

Q.  Okay.  And were you taught in your training that the curtilage of the home is considered part of the person's home?

A.  It's an extension.

Q.  Okay.  Were you taught that it's part of the person's home and enjoys the same protection under the Fourth Amendment as the home itself?

MS. JONES:  Objection.

A.  Yes.

Q.  Okay.  So the same rules apply to entering and going through a curtilage as applied to entering and going through the home itself; right?

MS. JONES:  Objection.

A.  Correct.

Q.  So if you didn't have a lawful basis to go through her home on the night of the incident, how



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

OFFICER JEREMY NELLIST - BY MR. SHIELDS

could you have a lawful basis to go through her backyard?

MS. JONES:  Objection.

A.  I don't believe that in a yard you enjoy -- or have the same privileges as being inside your house.  I mean, I can drive down the road and look into her backyard and see vehicles and structures.  It's not the same as the inside of her home.

Q.  Okay.  So previously you testified that the curtilage to the property, you were trained, enjoys the same Fourth Amendment protections, but now you're saying something different.  Can you explain the discrepancy?

MS. JONES:  Objection.

A.  Explain -- yes.  So inside of someone's house is secluded.  There's doors.  There's walls.  You generally can't see into a house.  In someone's yard, you can look into that yard and see things that are in there.  So it's not necessarily the same as someone's actual home.

Q.  Okay.  So like, for example, one of the Fourth Amendment warrant exceptions would be the plain view exception; correct?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

40

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A.   Yes.

     MS. JONES:   Objection.

Q.   Can you explain the plain view exception?

A.   Yes.  So if I can see something that would be considered illegal, aka narcotics or something like that, I'm able to seize them if they're in plain view.

Q.   Okay.  So is your testimony that if you can see narcotics or a gun in someone's backyard that you're permitted to just go onto their backyard and seize it?

     MS. JONES:   Objection.

A.   If it's just laying there, due to safety of citizens and children and other people around, yes, I would.

Q.   Okay.  So you were never taught that, in order to seize evidence, that a plain view seizure cannot be justified if it's effectuated by an unlawful trespass?

     MS. JONES:   Objection.

A.   If I am there lawfully, serving a police purpose, and I see in plain view elements of a crime, yes, you can seize them.

Q.   And that is -- your answer there is consistent with your understanding of RPD policy?



**Confidential**

41

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A.   Yes.

Q.   And your answer there is consistent with your understanding of the Fourth Amendment?

A.   Yes.

Q.   As interpreted by the courts, like the United States Supreme Court?

MS. JONES:  Objection.

A.   Yes.

Q.   Okay.  And you were taught that individuals have a Fourth Amendment interest in the curtilage to their home?

A.   Yes.

Q.   Okay.  And so what makes the curtilage to the home different than the inside of someone's home?

A.   Well, usually people don't live inside of their curtilage, aka a garage or a fenced yard.

Q.   Okay.  So is there -- are there different rules for entering someone's closed garage than there are for entering the front door to their house?

A.   No.

Q.   Okay.  Are there different rules for entering someone's fenced-in backyard than there are for entering the front door to their house?

MS. JONES:  Objection.



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

42

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A.   I guess not.

Q.   At the time of the incident on September 6, 2018, you knew that the legal requirements to enter someone's fenced-in backyard were the same as the legal requirements to enter someone's house; correct?

MS. JONES:  Objection.

A.   Yes.

Q.   And you learned in your training that a warrantless entry is presumptively unlawful under the Fourth Amendment, unless a lawful exemption applies?

MS. JONES:  Objection.

A.   Yes.

Q.   Kelly testified in his training that you learned that a Fourth Amendment search occurs when the police intrude on a person's reasonable expectation of privacy.  You learned that as well?

MS. JONES:  Objection.

A.   I'm sorry.  Can you rephrase the question?

Q.   Sure.  If somebody has a reasonable expectation of privacy, a Fourth Amendment search occurs if the police intrude on that area where they have a reasonable expectation of privacy; correct?

MS. JONES:  Objection.

A.   Yes.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

43

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q.   Does the RPD train you that you don't have to obtain a warrant before entering the curtilage to a home?

A.   Yes.

Q.   And have you ever obtained a warrant before entering the curtilage to a home?

A.   I'm sorry.  Can you repeat the question?

Q.   Since you began working with the RPD until today, have you ever obtained a warrant before entering the curtilage to a property?

A.   I have not, no.

Q.   And the RPD trains you that you don't have to obtain the homeowner's consent if you're simply cutting across the curtilage to their property?

MS. JONES:  Objection.

A.   Correct.

Q.   And the RPD trains you that, in the absence of a warrant or consent, you can enter someone's fenced-in backyard even if you don't believe a crime is being committed there, in that backyard, if you're simply cutting across the yard?

MS. JONES:  Objection.

A.   Correct.

Q.   After the plan was put together for the



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

44

OFFICER JEREMY NELLIST - BY MR. SHIELDS

warrant execution at 1771 St. Paul, there was a prewarrant briefing; is that right?

A.   Yes.

Q.   Who was present at that briefing?

A.   I don't recall all the people.  Lieutenant Springer was there.  Mike -- Sergeant Mike Diehl was there.  A bunch of the guys on the entry team.  I don't remember exactly who all was there.

Q.   Okay.  On that day, was it just you and Kelly on the sniper team, or were there additional sniper team members?

MS. JONES:  Objection.

A.   It was just me and Kelly.

Q.   Okay.  And was Fabian Rivera there?

MS. JONES:  Objection.

A.   I don't remember if he was at the briefing or not.

Q.   Okay.  Was the uniform support there?

MS. JONES:  Objection.

A.   Yes.

Q.   Okay.  Do you remember who from uniform support were there?

A.   No, I don't.

Q.   Okay.  And how many members of the uniform



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

45

OFFICER JEREMY NELLIST - BY MR. SHIELDS

support team that were going to be there at the execution were at the meeting?

MS. JONES:  Objection.

A.  I don't remember.

Q.  Okay.  Was it more than two?

MS. JONES:  Objection.

A.  I don't know.

Q.  Okay.  How long was that briefing?

A.  I don't know how long the briefing actually took.

Q.  In general, when you do one of these prewarrant briefings, how long do they last?

MS. JONES:  In -- objection.

A.  They usually last anywhere from 15 to 25 minutes.

Q.  Okay.  And what do you discuss at the briefings?

A.  The entire operational plan.

Q.  Including the sniper team's plan?

A.  Correct.

Q.  Okay.  Including your final operating position?

A.  Yes.

Q.  Including how you infiltrate to and



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

46

OFFICER JEREMY NELLIST - BY MR. SHIELDS

exfiltrate from your final operating position?

A.  Yes.

Q.  Okay.  So that's something that everyone that was present at the meeting would have been -- would have known based on the meeting?

MS. JONES:  Objection.

A.  Correct.

Q.  At the meeting, was there any plan developed for what to do if anyone encountered a dog during the operation?

A.  That I don't remember.  Usually if -- usually if we have intelligence that there's dogs present at the location, we usually carry up a catch pole.  That's usually -- they're in all our vehicles and we have access to them.

Q.  Okay.  Does the SWAT sniper team also carry a catch pole, or just the entry team?

A.  Just the entry team.

Q.  So there was no nonlethal plan developed for what to do if members of the sniper team encountered a dog in Ms. Gursslin's backyard; correct?

A.  Correct.

MS. JONES:  Objection.

Q.  Was there a nonlethal plan developed for



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

67

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A.   No.

Q.   Did you peer through any windows of the house to see if there were dogs inside?

A.   No.

Q.   Did you peer through the house to see if there were -- anything, like a leash, hanging by the front door?

A.   No.

Q.   Okay.  Did you look inside any of the cars in the backyard for a sign of a dog?

A.   No.

Q.   Okay.  How much poop was on the ground in the backyard?

MS. JONES:  Objection.

A.   I didn't notice any.

Q.   Okay.  Did you look?

A.   As I was walking through, yes.

Q.   Okay.  Is it something that you were specifically looking for when you entered the backyard?

MS. JONES:  Objection.

A.   I didn't scan the entire yard.  I looked in the area that I walked through, and I didn't notice any.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

68

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q.   Okay.   Is it something that, before you entered the backyard, you were consciously thinking about, looking for poop on the ground?

MS. JONES:   Objection.

A.   Yes.

Q.   Okay.   And you didn't see any?

A.   Correct.

MS. JONES:   Objection.

(The following exhibit was marked for identification:   Number EXH 1.)

Q.   Okay.   All right.   I'm going to put up, I guess, what will be marked as Exhibit 1 for the purposes of this deposition, and it's a picture Bates-numbered City of Rochester 35.

I'm just going to ask you some questions about this, Officer.   Okay?

A.   Yes.

Q.   Okay.   And can you see a picture displayed on your screen right now, Officer?

A.   Yes.

Q.   Okay.   And do you recognize this picture?

A.   Yes.

Q.   Have you seen this picture before?

A.   Yes.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

**Confidential**

69

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q.   Okay.  Is it something that you reviewed in preparation for the deposition today?

A.   Yes.

Q.   Okay.  And can you describe what you see in this picture that we've marked as Exhibit 1 for this deposition?

A.   It looks like the backyard that we walked through, and I can see the outline of the garage that we were behind.

Q.   Okay.  What else can you see in the picture?

A.   I see a tarp.

Q.   Okay.  And what else can you see in the picture?

A.   I see the wheel of a car.

Q.   Okay.  Anything else?

MS. JONES:  Objection.

A.   No.

Q.   Can you see anything on the ground in the picture?

A.   I see leaves and grass.

Q.   Okay.  Anything else?

MS. JONES:  Objection.

A.   No.



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q.   Okay.  Now, I'll just zoom in, and maybe it will help you see a little better.

What does that look like, to you, on the ground?

A.   It looks like a piece of dog poop.

MR. SHIELDS:  Okay.  And I'm just going to circle, for the record -- not showing up too bright in the highlighter there on Adobe -- okay.  It's orange.

Q.   Did I just place a circle around the object that you've identified as dog poop?

A.   Yes.

Q.   Okay.  So at least on the date of the incident, there was dog poop in the backyard?

A.   Yes.

Q.   And is the area where you -- I'm going to take this down for now, and then I'll ask you some more questions in a minute.  Okay?

When you conducted the scouting, did you wait outside of Ms. Gursslin's house to see if anybody exited with a dog, to take it on a walk?

A.   No.

Q.   Okay.  Is that something that you ever do?

A.   No.

Q.   Okay.  And I think you testified earlier



Confidential

71

OFFICER JEREMY NELLIST - BY MR. SHIELDS

that you never checked any city records to see if there was a registered dog living at that address; correct?

A.    Correct.

MS. JONES:    Objection.

Q.    I'm sorry.    That was correct?

MS. JONES:    Objection.

A.    Yes.

Q.    Did you conduct any surveillance of the house at all to see if people entered and exited the house?

A.    No.

Q.    And can you tell me everything else you did, during the planning phase, to prepare for the execution of the warrant?

A.    I think I've already told you everything that I've done.

Q.    Okay.    During the planning phase, what contingencies did you plan for?

A.    As far as the sniper portion of it?

Q.    Correct.

A.    We had a safety car assigned to us in case there was an emergency, but we did not have, like, an exact contingency plan for us.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

72

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q.   Okay.   What was the safety car?

A.   It was just a car, a marked car, a couple blocks away in case there was an emergency, that we needed them.

Q.   Okay.   Was that marked car parked in front of Ms. Gursslin's house?

MS. JONES:   Objection.

A.   No.

Q.   Okay.   Are you aware that there was a marked police car parked in the vicinity of Whittier Park and St. Paul Street?

A.   Yes.

Q.   Okay.   That was a different car than the safety car you just referenced?

A.   Yes.

Q.   Okay.   Does the safety car have, like, emergency equipment or something?

MS. JONES:   Objection.

A.   Yes.   Usually -- I believe on that particular operation, it was actually a couple SWAT operators that were in a marked car.

Q.   Okay.   So they had a different role than the patrol officers that were in the marked car in the vicinity of Whittier Park and St. Paul Street?



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

73

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A.   Yes.

Q.   Okay.  What was the role of the officers who were -- Kent and McClellan, what was their role on the night of the incident?

A.   I believe they were just blocking traffic.

Q.   Okay.  And they were present at the prewarrant briefing?

A.   Yes.

Q.   Okay.  So they would have known about your plan to cut through my client's property?

MS. JONES:  Objection.

A.   I'm not a hundred percent sure that in the plan, if our actual route into the FOP, which was our position, was designated.  So I'm not aware if they knew or not.

Q.   I think you testified earlier that at the briefing that was discussed; correct?

MS. JONES:  Objection.

A.   Yes.

Q.   Okay.  And so if they were at the briefing, they would have been aware of that?

A.   Correct.

MS. JONES:  Objection.

Q.   And you never planned for the contingency


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

74

OFFICER JEREMY NELLIST - BY MR. SHIELDS

of possibly encountering a dog on Ms. Gursslin's property; correct?

MS. JONES:  Objection.

A.  Correct.

Q.  Okay.  Did you plan for the contingency of encountering a dog on any other properties that day -- or that morning?

A.  No.

Q.  What were you wearing on the night of the SWAT operation on September 6, 2018?

A.  I believe it was a black hoodie and black pants.

Q.  Okay.  And what gear did you have with you?

A.  I had a backpack and a rifle bag, and I believe a tripod.

Q.  You had a backpack and a rifle bag?  Are those separate bags?

A.  Correct.

Q.  So you had two bags with you?

A.  Correct.

Q.  Did the rifle go in the rifle bag?

A.  Correct.

Q.  And what would go in the backpack?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

**75**

OFFICER JEREMY NELLIST - BY MR. SHIELDS

11:30:38    A.   Gear.   Like ammunition, veils, binoculars, night vision.

11:30:46    Q.   Okay.   Did you have all that stuff with you on the night of September 6, 2018?

11:30:52        MS. JONES:   Objection.

11:30:52    A.   I believe so.

11:30:55    Q.   Okay.   Were you wearing a bulletproof vest?

11:31:01    A.   I don't remember.

11:31:02    Q.   Is a bulletproof vest something that you normally wear during a SWAT operation when you're operating as a sniper?

11:31:13    A.   Sometimes, yes.

11:31:14    Q.   Okay.   What would determine whether or not you wear a bulletproof vest?

11:31:20    A.   Sometimes we don't if we're in a position that the vest would hinder us in being able to sustain for long periods of time.

11:31:32    Q.   Okay.   So sometimes, in your role as a sniper, you have to be in position for long periods of time?

11:31:38    A.   Correct.

11:31:39    Q.   Okay.   Is that something that you planned to do on the night of this incident?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

76

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A. No.

Q. Okay. Is there anything that would refresh your recollection as to whether you wore a vest on that night?

MS. JONES: Objection.

A. I don't believe so, no.

Q. Okay. Were you wearing gloves?

A. I don't recall.

Q. Okay. On the morning of the incident, you and Kelly staged on Whittier Park; is that correct?

A. Yes.

Q. Okay. And that's the street that's perpendicular to St. Paul Street, across from Ms. Gursslin's home?

A. Yes.

Q. Okay. And what time did you arrive at Whittier Park?

A. I don't remember the exact time.

Q. Okay. Was it dark outside?

A. Yes.

Q. Okay. Did you guys arrive before the rest of the SWAT team?

A. Yes.

Q. And that's typical because you guys go out


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

77

OFFICER JEREMY NELLIST - BY MR. SHIELDS

into your final operating position and set up prior to the rest of the SWAT team getting there?

A.   Yes.

Q.   Between when you arrived at Whittier Park and when you left to go to your final operating position, had any other members of the SWAT team or any uniform support arrived in the vicinity?

MS. JONES:   Objection.

A.   No.

Q.   And how long were you in your car at Whittier Park before you left to go to your final operating position?

A.   I don't remember.

Q.   Are there things that you always do when you arrive at the staging area before you leave to go to your final operating position?

MS. JONES:   Objection.

A.   Yes.

Q.   Okay.  And tell me what those are.

A.   We radio that we are departing, and then we usually drive the route that the entry team is going to take to the location and make sure that is clear.

Q.   Okay.  Anything else?



Confidential

**78**

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A.  We prep whatever gear that we have.  So it's, you know, a quick transition to, you know -- a quick setup to our FOP.

Q.  And you drive a normal, like, undercover car?

MS. JONES:  Objection.

A.  Yes.

Q.  And are those the things that you did, after you arrived at Whittier Park, before you left to go to your operating position?

A.  No.  We did some of that prior to getting to Whittier Park.

Q.  Okay.  Tell me everything that you did, after you arrived at Whittier Park, before you left to go to your final operating position.

MS. JONES:  Objection.

A.  We parked the car.  We looked at the house that we were going to go through.  The house was dark. And then we exited our vehicle and went to our FOP.

Q.  Okay. So did you observe any cars in Ms. Gursslin's driveway?

A.  Yes.

Q.  Okay.  How many?

A.  I don't know.



OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q.   Okay.   More than one?

MS. JONES:   Objection.

A.   I don't remember.

Q.   Okay.   And the marked patrol car wasn't on the street in the vicinity of St. Paul and Whittier Park yet?

A.   Correct.

Q.   So eventually you and Kelly left from Whittier Park and began to walk down Ms. Gursslin's driveway; correct?

A.   Yes.

Q.   Okay.   And she's got a chain-linked gate that goes across her driveway; correct?

A.   Yes.

MS. JONES:   Objection.

Q.   Okay.   Do you remember what position that gate was in?

A.   No, I don't.

Q.   So you might have had to open it?

MS. JONES:   Objection.

A.   I don't remember if we opened it or not.

Q.   If it was closed, you would have had to open it to get into her backyard?

A.   Yes.



**Confidential**

80

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q.   Okay.  And when you went down the driveway, the motion sensor floodlight turned on on the side of the house?

MS. JONES:  Objection.

A.   I don't remember if there was a light that turned on or not.

MR. SHIELDS:  Okay.  I'm just going to mark another picture.  So this will be Exhibit 2. Just give me one second.

(The following exhibit was marked for identification:  Number EXH 2.)

Q.   Okay.  And, Officer, do you see the picture displayed on the screen?

A.   Yes.

Q.   Okay.  And does this look like the side door to the property at 1747 St. Paul Street?

A.   That does not look familiar to me, no.

Q.   Okay.  That's not something that you took note of prior to executing your duties on September 6, 2018?

A.   I didn't --

MS. JONES:  Objection.

A.   I did not notice that.

Q.   Okay.  When you're scouting, do you look



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

81

OFFICER JEREMY NELLIST - BY MR. SHIELDS

for things like cameras?

A.   Yes.

Q.   When you're scouting, do you look for things like motion sensor lights?

A.   Yes.

Q.   But you didn't notice this motion sensor light on when you were scouting for the operation at 1747 St. Paul?

MS. JONES:  Objection.

A.   I don't recall it, no.

Q.   Okay.  But you did walk down the driveway and into the backyard?

MS. JONES:  Objection.

A.   Yes.

Q.   What time of day was it when you scouted and walked into the backyard at 1747 St. Paul?

A.   It was roughly around the same time that we were going to be executing the search warrant.

Q.   Okay.  So it was dark outside?

A.   Yes.

Q.   Okay.  Do you remember the motion sensor light coming on when you scouted?

A.   I don't remember, no.

Q.   Okay.  And if it was dark outside, it



Confidential

82

OFFICER JEREMY NELLIST - BY MR. SHIELDS

would have been hard to see that dog poop on the ground; right?

MS. JONES:  Objection.

A.  Correct.

Q.  Okay.  What would you have done if the motion sensor light did in fact turn on when you were walking down the driveway?

A.  During the scout?

Q.  During the actual operation.

A.  Walk past it.

Q.  Did you make any plan beforehand for what to do if a motion sensor light came on in Ms. Gursslin's property as you were walking down the driveway or through her backyard?

MS. JONES:  Objection.

A.  No.

Q.  So as you walked down the driveway and entered the backyard, what did you observe at that time?

A.  On the day of the operation?

Q.  Correct.

A.  There were some cars in the driveway.

Q.  Okay.  Do you remember there being more than one car?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

83

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A.  No.

Q.  What did you do when you entered the backyard?

A.  We walked to the far -- it would be the northwest corner and jumped over the fence.

Q.  Okay.  I'm going to put back up the picture that we marked as Exhibit 1.

Okay.  Do you see depicted in the picture that we've marked as Exhibit 1, which is -- here.

MR. SHIELDS:  Let me just make a note for myself.

Exhibit 1, 35.

Exhibit 2, motion sensor.

Q.  Okay.  Do you see in Exhibit 1 the area where you jumped the fence?

A.  Yes.

Q.  Okay.  And would that be the white lattice fence in the corner, behind the tarp?

A.  Yes.

MR. SHIELDS:  All right.  I'm going to take that down for now.

Okay.  I'm going to put up another exhibit, but I've got to pull it up.  One second.

I'm going to put another picture that



OFFICER JEREMY NELLIST - BY MR. SHIELDS

we'll mark as Exhibit 3 for this deposition.

          (The following exhibit was marked for

          identification:  Number EXH 3.)

          Q.   And, Officer Nellist, do you see the

picture depicted on your screen?

          A.   Yes.

          Q.   Okay.  And aside from the snow, does this

picture depict generally the route that you would have

taken after you jumped the fence in the picture that

we marked as Exhibit 1?

          A.   Yes.

          Q.   I'm sorry.  Was that "yes"?

          A.   Yes.

          MS. JONES:  Objection.

          Q.   And in this picture, can you see where you

set up your final operating position?

          A.   Yes.

          Q.   Okay.  And in this picture that we've

marked as Exhibit 3, where was your final operating

position?

          A.   Right at the north corner of that cinder

block building.

          Q.   Okay.  Kind of behind the tires that you

can see on the ground?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

85

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A.   Yes.

Q.   So the building provided cover?

A.   Yes.

MR. SHIELDS:   Okay.   I'm going to pull it down.

Q.   Okay.   And Kelly was with you throughout this whole time?

A.   Yes.

Q.   Okay.   And after you jumped the fence, what did you do?

A.   We set up in our position and started relaying observations.

Q.   Okay.   And what did you do to set up?

A.   I believe we set up a tripod, set up a veil over our rifle, and just kind of made it as comfortable as we could make it.

Q.   Did you both have your own separate rifles or, between the two of you, was there only one rifle?

A.   I can't remember if we both brought ours, or if we had separate ones, or we only took --

Q.   Would it be common that two snipers would go on a mission but only one would bring a rifle?

MS. JONES:   Objection.

A.   Yes.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

86

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q.  And do you remember specifically bringing a tripod?

A.  I always usually carry one on me.  So it's not uncommon -- it's more uncommon for me not to have one than to have one.

Q.  Okay.  Was the final operating position that you ended up in different from the final operating position that you had planned in advance?

A.  No.

MR. SHIELDS:  Okay.  Just so we're clear for the record, I'm going to put up another exhibit.

Okay.  So this was marked as Exhibit 2 at Kelly's deposition but, for this one, we'll mark it as Exhibit 4, and it's a document Bates-numbered City of Rochester 16.

(The following exhibit was marked for identification:  Number EXH 4.)

Q.  And, Officer Nellist, do you see the document displayed on the screen?  It's entitled "Execution Sniper Deployment."

A.  Yes.

Q.  Okay.  And do you know why it marks S2, it looks like, in the parking lot at Seth Green Park?

A.  No.



Confidential

87

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q.  Okay.  Did you have any part in putting this document together?

MS. JONES:  Objection.

A.  I don't recall that I did or not.  I don't know who did that one.

Q.  Okay.  When the sniper team is putting together the deployment plan, would you do that in consultation with, like, the sniper leader?

A.  No.

Q.  Okay.  Who would usually put it together?

A.  Usually the person who did the scout.

Q.  Okay.  You and Kelly did the scout here?

A.  I did the scout.

Q.  Okay.  Was Kelly with you when you did the scout?

A.  No.

Q.  Oh, okay.  So you did the scout by yourself?

A.  Yes.

MS. JONES:  Objection.

Q.  Okay.  Do you have any idea if Kelly also did a scout?

MS. JONES:  Objection.

A.  I don't know if he did or not.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

88

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q.   Okay.  So you did the scout, but you don't remember putting together the Execution Sniper Deployment document here?

MS. JONES:  Objection.

A.   Correct.

Q.   Okay.  But your final operating position was not where this document shows it as -- the S2 being marked?

MS. JONES:  Objection.

A.   Correct.

Q.   And just so we're clear, the S2, to your understanding, that's supposed to indicate where the final operating position is; is that right?

MS. JONES:  Objection.

A.   Correct.

MR. SHIELDS:  I'm going to take that down.

Q.   Okay.  Tell me everything that happened between the time you reached your final operating position and when you exfiltrated from that position.

A.   Once we were in position, we started making observations of the target.  We observed multiple people coming and going, buying narcotics. This was a very active location, open 24 hours a day. So there was people constantly coming and going.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

89

OFFICER JEREMY NELLIST - BY MR. SHIELDS

So we made observations of that.  And we actually observed the suspect leaving the location, getting into a vehicle and leaving, we radioed that, and we were able to get uniformed, marked cars to perform a traffic stop on that person over on the west side, and he was able to be taken into custody.

And then after he was taken into custody, the entry team arrives, executed the breach of the door, and safely secured the location.

After the location was secured, we were given the order to exfil, and we exfilled the same way that we infilled.

Q.  And did you observe the entry team go into the location?

MS. JONES:  Objection.

A.  Yes.

Q.  Okay.  And how did the entry team make entry into the location?

MS. JONES:  Objection.

A.  They breached the door, I believe they deployed a flash-bang, and they made entry.

Q.  Okay.  How did they breach the door?

A.  I don't remember.

Q.  Okay.  I think Kelly testified that two of



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

102

OFFICER JEREMY NELLIST - BY MR. SHIELDS

your gun and put it in the bag and all that stuff; right?

A.   Yes.

Q.   Okay.   So that takes a few minutes?

MS. JONES:   Objection.

A.   Yes.

Q.   Okay.   And I'm just going to -- when you exfiltrated, you went back down the path that we looked at previously as Exhibit 3; is that right?

MS. JONES:   Objection.

A.   Yes.

Q.   And you jumped back over that fence?

A.   Yes.

Q.   Okay.   Before you jumped the fence, were there any lights on in Ms. Gursslin's property when you reentered the yard?

A.   I don't recall.

Q.   Okay.   Is that something that you would have looked for before you jumped the fence?

A.   Yes.

Q.   Any indoor or outdoor lights?

MS. JONES:   Objection.

A.   Yes.

Q.   After you reentered Ms. Gursslin's



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

103

OFFICER JEREMY NELLIST - BY MR. SHIELDS

backyard, did you notice that there was an additional car parked in the driveway?

A.  No.

Q.  Okay.  After you reentered Ms. Gursslin's yard, did you notice the motion sensor light on the side of the house come on?

MS. JONES:  Objection.

A.  No.

Q.  After you reentered Ms. Gursslin's backyard, did you notice any light come on?

MS. JONES:  Objection.

A.  No.

Q.  Okay.  Kelly testified that after you reentered the yard, he noticed some outdoor light come on.

Does that refresh your recollection?

MS. JONES:  Objection.

A.  I don't recall seeing a light on.

Q.  Okay.  Well, just to be clear, what I was saying is that Kelly testified that after you came into the yard he noticed a light turn on after you entered the yard at some point --

MS. JONES:  Objection.

Q.  -- from the house.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

104

OFFICER JEREMY NELLIST - BY MR. SHIELDS

MS. JONES:  Objection.

A.  I can't testify to what he testified to. I did not notice a light, no.

Q.  Okay.  So at no point you noticed a light come on?

A.  Correct.

Q.  After you reentered the backyard, what did you hear Ms. Gursslin saying to Nina?

MS. JONES:  Objection.

A.  I didn't hear anything.

Q.  Okay.  What happened after you entered the backyard?

A.  We got charged by a dog.

Q.  Okay.  When's the first time that you noticed the dog?

A.  As it was about 5 or 6 feet from us.

Q.  Okay.  Did you also notice Ms. Gursslin right behind the dog?

A.  No.

Q.  Okay.  If Ms. Gursslin was right behind the dog and talking to it, is that something that you think you would have noticed?

MS. JONES:  Objection.

A.  I did not notice her anywhere in the yard.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

105

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q.   Okay.   When's the first time that you noticed Ms. Gursslin?

A.   After we shot the dog.

Q.   Okay.   If Ms. Gursslin testified that she was following the dog and talking to it right up to the time when you shot the dog, and that she was standing about 3 feet behind the dog when you shot it, do you think she was mistaken?

MS. JONES:   Objection.

A.   Yes.

Q.   Okay.   If she was 3 feet behind the dog, do you think you would have noticed her?

MS. JONES:   Objection.

A.   Yes.

Q.   Okay.   And you testified that it was dark outside?

A.   It was dark, yes.

Q.   And you testified that you didn't see any light come on?

MS. JONES:   Objection.

A.   Correct.

Q.   And you testified that you didn't see any poop on the ground because it was dark outside?

MS. JONES:   Objection.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A.   Correct.

Q.   And you testified -- well, let me withdraw that.

So you jump the fence, and you see the dog running at you, and then you shoot the dog.  Is that what happened?

A.   No.

MS. JONES:  Objection.

Q.   Okay.  So what happened?

A.   So Josh jumped over the fence first.  He was in the yard, I passed him all the gear, and then I jumped over the fence.  And then we picked up our gear and began to walk out.

And as we got to the point of the yard, that's when the dog charged at us.  So we were in the yard briefly before the dog ever came at us.

Q.   Okay.  So how long were you in the yard before you noticed the dog?

A.   About 30 seconds.

Q.   Okay.  And in that 30 seconds, you never noticed the light come on?

A.   No.

Q.   And in that 30 seconds, you never heard Ms. Gursslin talking to Nina?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

107

OFFICER JEREMY NELLIST - BY MR. SHIELDS

MS. JONES:  Objection.

A.  No.

Q.  Okay.  Where was Nina located in the yard when you first noticed her?

A.  She was about 4 to 5 feet from us, running directly at us.

Q.  Okay.  So in that 4 to 5 feet, you were able to pull out your gun and shoot?

A.  No.

Q.  Okay.  So what happened?

A.  So initially the dog charged at Josh, who was in front of me because we were in a single-file line.  Josh used his rifle bag and put it in front of him as a barrier between him and the dog.

The dog could not get through the rifle bag.  Josh actually used it, from what I could see, as a shield, moving it around to -- as a barrier between him and the dog.

The dog then went around to our right and came in through some shrubbery that we were up against that was between us and the dog.

Q.  I mean, what were you doing when Josh had the bag and was using it as a shield?

A.  I was actually just -- I don't remember



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

108

OFFICER JEREMY NELLIST - BY MR. SHIELDS

exactly what I did because it happened so fast.  I think I kind of grabbed my bag too.  I had gear in my hand.

Q.  Okay.  And what did you -- what did you do?

MS. JONES:  Objection.

A.  I just kind of stood there.

Q.  Okay.  Did you see Ms. Gursslin while you were standing there?

A.  No.

Q.  Okay.  Did you hear Ms. Gursslin while you were standing there?

MS. JONES:  Objection.

A.  No.

Q.  Then what happened next?

A.  The dog left where Josh was, came in at a different location.  I saw Josh draw his handgun, and I drew mine at the same time.  And he shot first, and then I shot roughly a quarter of a second behind him, as the dog was coming at us through the shrubbery.  And then I started identifying ourselves as police officers.

Q.  Okay.  Why did you start identifying yourselves as police officers?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A.   So that if there was anyone else in the yard, they knew police was back there.

Q.   Okay.  So did you start identifying yourself after you saw Ms. Gursslin?

MS. JONES:   Objection.

A.   I started identifying ourselves after the shots were fired.

Q.   Okay.  And you saw Ms. Gursslin immediately after the shots were fired?

A.   Yes.

Q.   Okay.  Where was Ms. Gursslin?

A.   Coming through the yard.

Q.   Okay.  She was close to you?

MS. JONES:   Objection.

A.   She was approaching us, yes.

Q.   She was behind that little white picket fence that divided the backyard?

MS. JONES:   Objection.

A.   I don't remember exactly where she was.

Q.   Okay.  She wasn't, like, by the side door; right?

MS. JONES:   Objection.

A.   I don't recall exactly where she was, no.

Q.   Okay.  Did you have any idea where the dog



Confidential

110

OFFICER JEREMY NELLIST - BY MR. SHIELDS

came from?

A.   From the area that it was running from, it looked like it came from the area of the house.

Q.   Josh testified that he thought the dog came from a back door because he noticed the light come on.  Was that your thought?

MS. JONES:  Objection.

A.   All I know is that it came from the yard, running in the direction from the house.  I have no idea where the dog came from.

Q.   Okay.  How far away from you is the dog when you drew your weapon?

MS. JONES:  Objection.

A.   3 feet.

Q.   Okay.  So in that 3 feet, you were able to draw your weapon and shoot before the dog made contact with you?

MS. JONES:  Objection.

A.   Yes.

Q.   Okay.  Before you shot, did you think that there might be a person in the yard also?

A.   No.

Q.   Okay.  You thought the dog just came out by itself?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

111

OFFICER JEREMY NELLIST - BY MR. SHIELDS

MS. JONES:  Objection.

A.   I don't know where the dog came from.

Q.   Okay.  And what did Ms. Gursslin do after you shot the dog?

A.   She started yelling.

Q.   Was she upset?

MS. JONES:  Objection.

A.   Yes.

Q.   Was she crying?

MS. JONES:  Objection.

A.   Yes.

Q.   And did you see her get down on the ground and hold Nina as she bled to death?

MS. JONES:  Objection.

A.   I don't recall.

Q.   When you shot Nina, were you afraid?

A.   Yes.

MS. JONES:  Objection.

Q.   When you shot Nina, were you reacting based on your fear?

A.   Yes.

Q.   And everything that happened was consistent with your training?

A.   Yes.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

112

OFFICER JEREMY NELLIST - BY MR. SHIELDS

Q.  Had you ever done any training with live dogs?

A.  Not in training, no.

Q.  Had you ever done any simulation-based training involving dogs?

A.  What do you mean by "simulation"?

Q.  My understanding is that the RPD has a PRISM simulator at the training facility; is that correct?

MS. JONES:  Objection.

A.  Yes.

Q.  Have you ever done a simulation-based training on that PRISM simulator involving dogs?

A.  I don't recall.  It's been many, many years since I've used that PRISM machine.

Q.  Okay.  So have you ever done any simulation-based training on any other similar simulator involving dogs?

A.  No.

Q.  Okay.  Have you ever done any shoot/don't shoot scenarios involving dogs?

A.  I mean, we'll -- yes.

Q.  Okay.  Tell me about that.

A.  So we have targets of dogs, and sometimes



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

113

OFFICER JEREMY NELLIST - BY MR. SHIELDS

we'll put them up -- it hasn't been for a very long time -- as we run simulated entries.

Q.   Okay.  So that would be part of the SWAT team?

A.   Yes.

Q.   Okay.  Part of your SWAT team training, that is?

A.   Yes.

Q.   Have you ever done shoot/don't shoot scenarios involving dogs during your RPD training, aside from your training with the SWAT team?

A.   Other than -- are you talking, like, live dogs or -- I guess can you rephrase your question?

Q.   Sure.  Have you done any similar target shoot/don't shoot scenarios that you've just described you did with the SWAT team during, for example, your regular firearms training that all RPD officers get?

A.   I don't recall.

Q.   Were you ever trained that, if you were subjectively fearful, you can shoot a dog?

MS. JONES:  Objection.

A.   Yes.

Q.   And were you ever taught to question whether that subjective fear was objectively



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

OFFICER JEREMY NELLIST - BY MR. SHIELDS

reasonable?

MS. JONES:  Objection.

A.  Can you rephrase the question?

Q.  Were you ever taught to question whether your subjective fear of the dog was objectively reasonable?

A.  No.

Q.  And you were never disciplined in connection with this incident; correct?

A.  Correct.

Q.  And you were never required to undergo any additional training as a result of this incident; correct?

A.  Correct.

Q.  And you were never required to undergo any additional testing as a result of the incident; correct?

A.  Correct.

Q.  And you were never required to attend any psychological assessments by the SWAT commander, or anyone else, as a result of the incident?

MS. JONES:  Objection.

A.  Correct.

Q.  I'm sorry.  I didn't hear your answer.



Confidential

115

OFFICER JEREMY NELLIST - BY MR. SHIELDS

A.  Correct.

Q.  And you were never placed on an administrative assignment after the shooting; correct?

A.  Correct.

Q.  And you were never placed on a probationary status after the shooting; correct?

A.  Correct.

Q.  Have you ever shot any other dogs?

A.  Yes.

Q.  When was that?

A.  I don't remember the exact year.  It was a couple years after I had got onto the job I was working, Clinton midnights.

Q.  So that would have been sometime shortly after 2008, then?

A.  Yes.

Q.  Okay.  Would it be fair to say sometime between 2008 and 2013?

MS. JONES:  Objection.

A.  Yes.

Q.  Okay.  Tell me about that time.

A.  Myself and a sergeant and a couple additional officers were, in an apartment complex at Portland and Norton Street, investigating a stabbing



Confidential

116

OFFICER JEREMY NELLIST - BY MR. SHIELDS

that occurred inside one of the apartments.

I was familiar with the apartment because I had been in there a week prior for a domestic between the woman and the male. There was a dog -- a large black pit bull inside the location at the time, but inside of a cage which was located near the apartment door.

On the day of the stabbing, we made contact with the female, and she was allowing us to investigate the stabbing. Before we opened the door, I could hear the dog barking right next to the door. And I asked her if the dog was in its cage, and she said, yes, it was.

And I knew that the dog's cage was right by the door, and that's where the area of the barking was coming from, so I assumed that she wasn't lying to us that the dog was in the cage.

And when she opened the door, the dog immediately charged out at us. She bent down to stop -- to try and prevent the dog as -- myself, my supervisor, and a couple additional officers ran back towards the stairwell. And as we got back to the stairwell, she couldn't hold the dog anymore and she released it.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

117

OFFICER JEREMY NELLIST - BY MR. SHIELDS

And he charged at us.  As I was on top of the stairwell, I turned around, saw that the dog was about 2 feet away from me, I drew my gun and I fired one round, and then I fell backwards down the stairs, injuring my back.

Q.  Did you bring a catch pole when you went to the apartment?

A.  No.

Q.  Okay.  Did you contact Animal Services to go to the apartment with you?

A.  No.

Q.  Okay.  Did you make any other plan before going to the apartment for dealing with the dog that you knew was there?

A.  No.  Because prior to the incident of the stabbing, I was inside of that apartment, dealing with a domestic, and the dog was restrained inside the cage and we had no issues with the dog at that time.

And at the time of the stabbing incident, she assured me that the dog was inside the cage.  So I assumed that we would not have any issues again.  The issue was was the dog was not inside the cage or had busted out.

Q.  And what was the dog's demeanor on the



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

OFFICER JEREMY NELLIST - BY MR. SHIELDS

prior occasion that you were at the property when it was inside the cage?

A.   He was barking, aggressive.

Q.   Okay.  So there's a barking, aggressive pit bull that you described as large at the apartment, and you made no plan for what to maybe do if it got out of the cage when you went back to the apartment for the domestic incident?

MS. JONES:  Objection.

A.   Correct.

Q.   Is that consistent with your RPD training?

A.   Yes.

Q.   And that's consistent with RPD policy?

A.   Yes.

Q.   And the SWAT team is required to undergo a large amount of additional training above and beyond what's required of ordinary RPD officers; correct?

A.   Correct.

MS. JONES:  Elliot -- sorry -- I keep waiting for you to transition to a new topic, and then I don't jump in quick enough.  So after we finish these questions about SWAT, do you mind if we take a break for a few minutes?

MR. SHIELDS:  We can take a break now.



OFFICER JEREMY NELLIST - BY MR. SHIELDS

That's fine.

MS. JONES:  Okay.

MR. SHIELDS:  Do you want to say ten minutes?  Maybe 12 -- go ahead.

MS. JONES:  Yeah, that should be fine.

MR. SHIELDS:  Let's do -- come back at 12:35?

MS. JONES:  Yep.

MR. SHIELDS:  Okay.

THE VIDEOGRAPHER:  The time is 12:23. We're off the record.

(The proceedings recessed at 12:23 p.m.)

(The proceedings reconvened at 12:37 p.m.; appearances as before noted.)

THE VIDEOGRAPHER:  The time is 12:37. We're back on the record.

Go ahead.

OFFICER JEREMY NELLIST, resumes;

CONTINUING EXAMINATION BY MR. SHIELDS:

Q.  Officer Nellist, we just had a break for a little over ten minutes.  Did you have an opportunity to speak with your attorney during the break?

A.  Yes.

Q.  And are there any answers to any questions



Confidential

120

OFFICER JEREMY NELLIST - BY MR. SHIELDS

that you want to change after having the opportunity to speak with your attorney?

A.   No.

Q.   Okay.  Were there any answers that you want to clarify after speaking with your attorney?

A.   No.

MR. SHIELDS:  So I'm just going to take a step back.  There's a couple pictures I want to show you and just ask you some quick questions about.

So the first one we will mark as Exhibit 6 for this deposition.  Let me put it up.

(The following exhibit was marked for

identification:  Number EXH 6.)

Q.   Okay.  And, Officer Nellist, do you see the picture that's depicted on the screen right now?

A.   Yes.

Q.   Okay.  Would this be a picture from where you set up the final operating position on the night of the incident?

A.   I don't know if it exactly looked like that, but that's in the area that we were.

Q.   Okay.  So aside from the snow on the ground and maybe some objects in the area, that's generally where you had set up on the night of the



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

OFFICER JEREMY NELLIST - BY MR. SHIELDS

incident; is that right?

MS. JONES:  Objection.

A.  Yes.

MR. SHIELDS:  Okay.  And I'm just going to go right to another picture that we'll mark as Exhibit 7.

Hold on.  I'm just going to -- okay.

So Exhibit 7 is looking from the other way towards that back corner.

(The following exhibit was marked for identification:  Number EXH 7.)

Q.  Does this generally depict the area where your final operating position was set up also?

A.  Yes.

MS. JONES:  Objection.

Q.  And that would have been -- I don't know. Can you see -- it looks like a trash barrel at the corner.  Would you have been around on the opposite side?  Between the back of the structure and the fence, is that where you were located?

A.  Yes.

Q.  All right.

MS. JONES:  Elliot, if we're going to have more questions on this picture, can you zoom in a



Confidential

122

OFFICER JEREMY NELLIST - BY MR. SHIELDS

little more.  Thank you.

MR. SHIELDS:  That was going to be the end of my questions about it.

Q.  But, I guess, you guys were just kind of around the corner in this picture, maybe behind where the tires were; is that right?

MS. JONES:  Objection.

A.  Yes.

MR. SHIELDS:  Okay.  I'm going to pull those down for now.

Okay.  And then I have a couple questions about your interrogatory responses.  So I want to mark the interrogatory responses as Exhibit 8, and I'll put those up.

(The following exhibit was marked for identification:  Number EXH 8.)

Q.  Okay.  And, Officer Nellist, do you see on your screen what we've marked as Exhibit 8, a document entitled "Defendant Jeremy Nellist's Responses to Plaintiff's First Set of Interrogatories"?

A.  Yes.

Q.  I want to fast-forward down here to number 6, which says "Describe every instance where you have discharged a firearm during the line of duty,



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920