CONFIDENTIAL

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

ERIN GURSSLIN,

Plaintiff,

Civil Action No. 20-cv-6508

v.

THE CITY OF ROCHESTER, a municipal entity, POLICE OFFICER JEREMY NELLIST, POLICE OFFICER JOSHUA KELLY, COMMANDER FABIAN RIVERA, LIEUTENANT AARON SPRINGER,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

Remote Deposition Upon Oral Examination:

Sergeant Joshua Paul Kelly

Date:          February 22, 2023

Time:          10:00 a.m.

Reported By:   Jayme C. Wintish

               Alliance Court Reporting, Inc.

               109 South Union Street, Suite 400

               Rochester, New York 14607



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

A P P E A R A N C E S

Appearing Remotely on Behalf of Plaintiff:

Elliot D. Shields, Esq.

   Roth & Roth LLP

   192 Lexington Avenue, Suite 802

   New York, New York  10016

   eshields@rothandrothlaw.com


Appearing Remotely on Behalf of Defendants:

Peachie L. Jones, Esq.

   City of Rochester Law Department

   City Hall, Room 400A

   30 Church Street

   Rochester, New York  14614

   peachie.jones@cityofrochester.gov


Also Present Remotely:

Dave Parrotta, Videographer

   Alliance Court Reporting, Inc.

   109 South Union Street, Suite 400

   Rochester, New York 14607


          *      *      *



ALLIANCE COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

16

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

team leader.

Q.   Okay.   And is that person chosen by the commander?

MS. JONES:   Objection.

But go ahead.

A.   Yes, sir.   The commander and, I believe, the assistant commander has some say in it as well.

Q.   And how many members of the sniper team are there?

A.   Currently, counting myself there are six.

Q.   How many were there at the time of the incident?

MR. JONES:   Objection.

But go ahead.

A.   That, I can't recall.   The numbers change significantly based upon people retiring from the SWAT team.

Q.   Were there more than two?

MS. JONES:   Objection.

But go ahead.

A.   Yes.

Q.   On the morning of September 6th, 2018, you were working in your capacity as a member of the SWAT team in your role as a sniper; is that correct?


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

A.   Could you repeat the date?

Q.   September 6th, 2018.

A.   Yes, sir.  I was.

Q.   The date of the incident in this lawsuit?

A.   Yes, sir.

Q.   And who was the SWAT commander on September 6th, 2018?

MS. JONES:  Objection.

But go ahead.

A.   Former Lieutenant Aaron Springer.

Q.   And who was the sniper team leader on September 6th 2018?

A.   From what I can recall, I believe it was Sergeant Michael Magri, M-A-G-R-I.

Q.   And who is the assistant sniper team leader?

A.   That, I can't recall.

Q.   Would there be a document that would contain that information?

A.   I'm assuming that the commander has some type of documentation.

Q.   Would the SWAT operation order state that?

A.   Not for that day, it would not.

Q.   Prior to September 6th, 2018, did you



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

18

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

develop a deployment plan for the SWAT operation at 1771 St. Paul Street?

MS. JONES:  Objection.

But go ahead.

A.  Yes, sir.  I did.

Q.  Okay.  And part of that planning included choosing your final operating position?

A.  That is correct, sir.

Q.  And the final operating position was so that you could provide protective overwatch to --

MS. JONES:  Objection.

But go ahead.

Q.  Part of -- or the final operating position was so that you could provide protective overwatch for the entry team?

A.  It was to provide observation and protection for the entry team.

Q.  Part of the planning included choosing the route to infiltrate and exfiltrate from your final operating position; is that correct?

MS. JONES:  Objection.

But go ahead.

A.  That is correct, sir.

Q.  As part of the SWAT operation on September



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

**19**

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

6th, 2018, you planned to infiltrate or get to your final operating position by going down Ms. Gursslin's driveway --

MS. JONES:  Objection.

Q.   -- at 1747 St. Paul Boulevard and through her backyard; is that correct?

MS. JONES:  Objection.

But go ahead.

A.   Yes, sir.

Q.   And after the plan was put together, was there a pre-warrant execution meeting?

A.   Yes.  There was a brief of the operation plan.

Q.   And is that what that meeting is referred to, a brief of the operation plan?

A.   Yes.

Q.   At that briefing, was it discussed that you and Nellist planned to infiltrate to your final operating position by walking down Ms. Gursslin's driveway and through her backyard?

MS. JONES:  Objection.

But go ahead.

A.   I don't recall if that was discussed in detail.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

22

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

A.   I don't recall us filling one out, so it wouldn't have been in existence.

Q.   Okay.  Prior to the scout checklist, how would you communicate in writing about your plans regarding getting to and exiting from your final operating position to the commander?

A.   Generally, it's told to the team leader and a potential pre-deployment slide is made on a PowerPoint.

Q.   Okay.  Would you ever email with any -- with the team leader or the commander about your plans?

MS. JONES:  Objection.

But go ahead.

A.   Not that I can ever recall doing.

Q.   Would that pre-deployment plan put together by the team leader be included in the SWAT operation order for the incident?

A.   Can you -- I guess can you clarify, sir?

Q.   So you said that the pre-deployment plan would be put together by the team leader; correct?

A.   The team leader and, generally, whoever conducts the scout since they have the hands-on information.



SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

Q.   And would that be a separate document or would that be a single slide or a series of slides included in the SWAT operation order for the incident?

MS. JONES:   Objection.

But go ahead.

A.   It could be a series of slides, possibly one or two, with a brief understanding for the rest of the team.

Q.   So would that be included in a SWAT operation order?

A.   Yes, sir.

(Document request - SWAT operation order)

MR. SHIELDS:   And to the extent that that was redacted in the SWAT operation order that was produced in this case, I call for those redactions to be removed.

MS. JONES:   Follow up in writing, please.

Q.   So at the pre-brief -- at the briefing prior to the execution of the SWAT operation, are all members of the SWAT team present at that briefing?

A.   Yes, sir.

Q.   And who else is present at that briefing?

A.   Any other police personnel that will be taking part in the operation.



SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

And then would that scouting checklist be provided to somebody else after that?

A.   Yes.

MS. JONES:  Objection.

But go ahead.

A.   I apologize.  I should have clarified when I said "team leader."  So when the scout is conducted by snipers, anything that they gather, myself or my assistant team leader will generally review all the documents to make sure the scout is what we consider complete.  And then we will notify the team leader of the operation.

Q.   Is scouting ordinarily done by members of the SWAT team -- I mean -- I withdraw that.

Is scouting ordinarily done by members of the sniper team?

A.   Yes, sir.

Q.   And why did you plan to walk down Ms. Gursslin's driveway and cut through her backyard at 1747 St. Paul Street to get to your final operating position?

A.   From what I can recall, that was the easiest and best route that we could find to be able to make it to our position.



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

Q.   Okay.  Any other reasons you recall?

A.   Not offhand.

Q.   Okay.  The September 6th, 2018, SWAT operation involved execution of a high-risk search warrant that had been issued for the property located at 1771 St. Paul Street; correct?

MS. JONES:  Objection.

Go ahead.

A.   Yes, sir.  That is correct.

Q.   And a judge issued that warrant authorizing the police to enter 1771 St. Paul Street because presumably there was probable cause to believe that there were drugs and guns in that location?

MS. JONES:  Objection.

But go ahead.

A.   Yes, sir.

Q.   And the warrant did not authorize the SWAT team to enter Ms. Gursslin's property at 1747 St. Paul Street; correct?

MS. JONES:  Objection.

But go ahead.

A.   That's correct.

Q.   And the warrant did not authorize the SWAT team to enter the curtilage to Ms. Gursslin's property



Confidential

31

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS
at 1747 St. Paul Street; correct?

MS. JONES:  Objection.

But go ahead.

A.  That's correct.

Q.  And the warrant did not authorize you to cut through Ms. Gursslin's backyard; correct?

MS. JONES:  Objection.

But go ahead.

A.  That is correct.

Q.  And there was never any reason to believe that a crime was being committed on Ms. Gursslin's property at 1747 St. Paul Street; correct?

MS. JONES:  Objection.

But go ahead.

A.  That is correct.

Q.  And you never obtained a separate warrant authorizing you and Jeremy Nellist to enter Ms. Gursslin's backyard at 1747 St. Paul Street; correct?

MS. JONES:  Objection.

But go ahead.

A.  That is correct.

Q.  And why not?

A.  If we obtained a warrant for her property,



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

32

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

we would have to serve that warrant to her, which would jeopardize our mission.

Q. Okay. Any other reasons you did not try to obtain a warrant for entering Ms. Gursslin's property?

A. Not that I can recall.

Q. And you had never obtained the consent of Ms. Gursslin or any other residents who lived at 1747 St. Paul Street prior to entering the driveway in the backyard; correct?

MS. JONES: Objection.

But go ahead.

A. That is correct.

Q. And why not?

A. Possibility of jeopardizing the mission.

Q. And is it typical that in your role as a SWAT sniper you cut through the curtilage to residential properties?

MS. JONES: Objection.

But go ahead.

A. I'd say sometimes.

Q. Okay. How often is "sometimes"?

MS. JONES: Objection.

But go ahead.



SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

A.   Asking for a generalization, I guess it's dependent upon maybe 15 percent of our operations, and that's a rough guess.

Q.   And when is the last time that you remember a SWAT operation where the sniper team cut through the curtilage to someone's residential property?

MS. JONES:  Objection.

But go ahead.

A.   Asking -- you're asking for a specific operation?

Q.   When is the last operation that you remember?  When did that occur?

A.   I can't remember an operation in general, but it happens more often on a call out for a barricaded gunman.

Q.   Okay.  How often does it occur when the SWAT sniper team is providing overwatch or observation for a high-risk search warrant?

MS. JONES:  Objection.

But go ahead.

A.   Again, just a rough guess, maybe 10 percent and that's just guessing.

Q.   Okay.  So -- and would that be like this



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

34

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

case to get to an exit from the final operating position?

A.   I'm sorry.  You're asking are they very similar?

Q.   Why would -- why would the SWAT sniper team cross over the curtilage to residential properties as part of SWAT high-risk search warrant execution?

MS. JONES:  Objection.

But go ahead.

A.   So you get in position to provide the observation and coverage of the entry team.

Q.   Is it common that the final operating position is located on a residential property that is not the target location?

A.   I'd say more often than not.

Q.   And how would you get to and exit from that final operating position?

A.   Again, it depends, you know, what type of operation it is and what type of setup that we have planned.

Q.   Okay.  So earlier when you said that only 10 percent of the time, in your estimation, would you cut through the curtilage to a residential property to



SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

get to your final operating position, that did not include incidents where you simply walk onto the property where the final operating position would be located; is that correct?

MS. JONES:  Objection.

But go ahead.

A.   There's a lot of times where we're not on anybody's personal property at all.  We're on city-owned property, streets.

Q.   Okay.  So in response to my question where I asked if it was common that the sniper's final operating position is located on a residential property that's not the target location, your answer was "more often than not."

Is that still your answer?

A.   No, sir.  I believe you said anytime we're not on the property of the target location is -- from what I understood.

Q.   Okay.  So how often are you on private property that is not the target location for the final operating position?

A.   When you say "private property," are we considering public property as well such as parking lots where anybody is free to go through?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

36

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

Q.   Okay.   No private property, either residential or commercial?

A.   I'd say roughly 10 to 15 percent of the time.

Q.   Okay.   And when is the last time that you obtained a separate warrant that authorized you to set up your final operating position on a property that was not the target location?

MS. JONES:   Objection.

But go ahead.

A.   I've never done that, sir.

Q.   And when is the last time that you obtained consent to set up your final operating position on a property that was not the target location?

MS. JONES:   Objection.

But go ahead.

A.   It happens at times where a barricaded gunman will talk to people.   They'll realize we're out there.   And city residents are great at times and they allow us to come into their house to get warm and use their property.   But I can't remember the last operation where that happened.

Q.   Okay.   Has that ever happened when the



Confidential

37

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

operation involved a high-risk search warrant?

A. I can't recall.

Q. Okay. It would be less often than situations involving a barricaded gunman?

MS. JONES: Objection.

But go ahead.

A. Yes, sir.

Q. And when is the last time that you obtained a separate warrant that authorized you to cut through a neighboring property to infiltrate to or exfiltrate from the final operating position?

MS. JONES: Objection.

But go ahead.

A. Again, I've never done that.

Q. And when is the last time that you obtained consent to cut through a neighboring property to infiltrate to or exfiltrate from the final operating position?

MS. JONES: Objection.

But go ahead.

A. I don't recall.

Q. You don't recall ever having done that?

A. I don't recall the last time I did that.

Q. Okay. So have you done that previously?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

38

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

MS. JONES:  Objection.

But go ahead.

A.  From what I can remember I have spoken to residents in the past.

Q.  Okay.  And was -- have you spoken to residents about crossing through their property in advance of or during the planning stages of a high-risk search warrant?

A.  Not that I can recall.

Q.  So the plan that you made for the SWAT operation on September 6th, 2018, to cut through Ms. Gursslin's backyard without a warrant or consent, that was typical for your duties as a SWAT sniper?

MS. JONES:  Objection.

But go ahead.

A.  It was not atypical.

Q.  So if it was not atypical, then yes, it was typical?

MS. JONES:  Objection.

But go ahead.

A.  Again, it was a practice that was used.

Q.  Okay.  A practice that was commonly used on the SWAT team for the City of Rochester?

MS. JONES:  Objection.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

39

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

But go ahead.

A.   Again, it was a tactic that was used.  I wouldn't say it was commonly used, but it was used.

Q.   It was used when you deemed that it was necessary?

A.   Yes, sir.

Q.   And so SWAT snipers never obtain a separate warrant or consent to set up the final operating position on a neighboring property during a high-risk search warrant; is that right?

MS. JONES:  Objection.

But go ahead.

A.   Again, I would say that would be false. There are times where business properties have been contacted and given us access.

Q.   Okay.  So that would be consent.  But other than consent, you never obtain a separate warrant to set up the final operating position on a neighboring property; is that correct?

A.   That's correct.

MS. JONES:  Objection.

Q.   And is another reason why you don't obtain a warrant from a judge to cut through neighboring properties because the judge wouldn't authorize that



Confidential

61

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

11:12:56    circumstances?

11:12:57        MS. JONES:  Objection.

11:12:58        Go ahead.

11:12:59    A.  Yes, sir.

11:13:00    Q.  And assuming a police officer does something they know is wrong, would it be fair to refer to that conduct as willful misconduct?

11:13:12        MS. JONES:  Objection.

11:13:13    A.  I don't know, sir.

11:13:14    Q.  And do you accept responsibility for entering Ms. Gursslin's backyard without a warrant?

11:13:21        MS. JONES:  Objection.

11:13:23        Go ahead.

11:13:24    A.  I'm sorry.  You're asking me -- again, can you repeat that, please?

11:13:30    Q.  Do you accept responsibility for entering Ms. Gursslin's backyard without a warrant?

11:13:37    A.  Yes, sir.

11:13:38    Q.  Do you accept responsibility for entering Ms. Gursslin's backyard without her permission?

11:13:46        MS. JONES:  Objection.

11:13:47    A.  Yes, sir.

11:13:47    Q.  And do you accept responsibility for entering Ms. Gursslin's backyard without exigent



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

62

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

circumstances?

MS. JONES:  Objection.

A.  Yes, sir.

Q.  All right.  Earlier you testified that the snipers do all the scouting for high-risk search warrants; correct?

MS. JONES:  Objection.

A.  Yes, sir.  If a sniper -- if two snipers are not available, they have the ability to check with other team members to assist.

MS. JONES:  Sorry.  We moved away from SWAT and sniper questionings for a little bit.  But if we're going back to that, this section should also be marked as confidential.

MR. SHIELDS:  Listen.  So you don't have to keep saying it, you know, earlier I said anything talking about SWAT team operations, other than anything specifically discussing a document that has not been marked confidential, we agree should be marked confidential.

MS. JONES:  So for the balance of the deposition.  Well, either way, I just would like it to be clear.

MR. SHIELDS:  No problem.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

63

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

Q.  I'm sorry, Sergeant.  So you said if there's two snipers available, they'll conduct the scouting, but if there's not two snipers available, then they might pull in a different team member; is that correct?

MS. JONES:  Objection.

A.  Yes, sir.

Q.  Okay.  And are you required to do reconnaissance before being deployed to the location?

A.  I guess it depends upon what type of operation.

Q.  Okay.  And generally -- that was a good question.  When I ask a confusing question -- what I mean is, during a high-risk search warrant.  So before executing a high-risk search warrant, are you required to do reconnaissance prior to being deployed to that location?

A.  The commander will send me information as far as the location.  And then I will ask my snipers to go out and do the scout.  If the commander deems for some reason that one is not needed, that's going to be a decision he makes.

Q.  Okay.  So it's the discretion of the commander; is that correct?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

64

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

A. I'd say that --

MS. JONES: Objection.

But go ahead.

A. I'd say that it would be his discretion.

Q. So for example, there's not a SWAT rule that requires prior to every high-risk search warrant execution that some sort of scouting or reconnaissance be conducted.

Is that fair to say?

MS. JONES: Objection.

A. You're asking for something absolute as far as understanding the commander's job and everything. I don't want to say anything is 100 percent, but I'd said that generally, a scout is conducted on all high-risk search warrants.

Q. Okay. And so my follow-up question to that is, is there a rule that requires scouting or reconnaissance be conducted prior to execution of a high-risk search warrant?

A. I don't know if there's any rule per se.

Q. And that scouting is obviously conducted during the planning phase prior to the execution of the warrant; correct?

MS. JONES: Objection.



Confidential

65

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

A.   Yes, sir.  That is correct.

Q.   Okay.  And how far in advance of the warrant execution is that scouting conducted?

A.   It all depends.

Q.   Okay.  So in a general -- generally -- I don't know -- how far in advance is scouting or reconnaissance conducted?

MS. JONES:  Objection.

Go ahead.

A.   We don't sign the warrants.  So when we're given the information, I try to get my guys out there to conduct the scouting as soon as possible just because timelines change.  But I've seen anywhere from one day in advance to probably a couple months.

Q.   Okay.  So the scout is conducted after the warrant is issued; is that correct?

MS. JONES:  Objection.

Go ahead.

A.   I believe it's after a high-risk search -- a high risk search warrant check sheet is completed and then sent up the chain of command.  And I believe -- I'm not sure if -- because I'm not one of the investigators that's signing these warrants, whether they have the warrant in hand already or if


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

they're in the process of obtaining it. I just don't know that information.

Q. Okay. So you don't know if the high-risk search warrant check sheet is conducted or completed before or after the warrant is issued?

MS. JONES: Objection.

A. The check sheet is usually done first. I'm assuming they apply for the warrant after, but I could be wrong.

Q. Okay. So to your knowledge, the scouting is conducted after the high-risk search warrant check sheet is completed; correct?

MS. JONES: Objection.

Go ahead.

A. Generally, from my understanding -- and again, I'm not the commander of the team, so I don't know the integral part of that -- but he is notified that it appears that it's going to be a SWAT warrant. And then we are notified.

Q. Okay. So the commander gets notified that SWAT warrant is going to be executed. And then the commander contacts you as the sniper team leader and asks you to have your guys go out and do scouting; is that correct?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

MS. JONES:  Objection.

Go ahead.

A.   Yes, sir.  That's generally how it works.

Q.   And before the September 6th, 2018, incident where Nina was shot and killed -- Nina is the dog -- did you scout the target location at 1771 St. Paul Street?

A.   Yes, sir.  I believe I was one of the scouting officers on that.

Q.   Okay.  Was the other scouting officer Jeremy Nellist?

A.   I believe so.

Q.   Because you testified earlier that typically it's the two snipers that are assigned to that operation that conduct the scouting because they're most familiar; is that correct?

MS. JONES:  Objection.

Go ahead.

A.   Typically that's how it happens.

Q.   Okay.  Do you have an independent recollection of conducting scouting for this operation?

A.   Yes, sir.  I can remember some details.

Q.   Okay.  Tell me everything you did to scout



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

68

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

for this incident on September 6th, 2018?

A.  I generally start with reviewing any aerial maps of the location to get a general familiarization with the area.  I believe there is an apartment complex behind the target house and the other location.  We went over to check to see if that would be a viable option.  And there was a lot of activity going on, to the point where it wouldn't have been a viable option.  Plus there was a large fence in the way.

The target location, based upon how it was set up, it was a rear apartment.  So it was important for us to get eyes on that door.  As we were out there, we recognized that the landscape drops significantly from the road towards the back of the property.  So no matter what angle from the street, we were unable to see the door of the target location.

Q.  When you say "the street," you mean St. Paul Street?

A.  I'm sorry.  Yes, sir.

Q.  Okay.  What else did you do to scout?

A.  We saw an open gate at your client's property.  And we looked around for any signs of anybody being outside or any animals and did not see



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

69

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

anything.

Q.   Okay.   So before the September 6th, 2018, incident where you shot and killed Nina, what did you do specifically in terms of scouting at Ms. Gursslin's property at 1747 St. Paul?

MS. JONES:  Objection.

Go ahead.

A.   Well, we walked up to the property.  We saw that -- I believe it was two larger gates at the driveway -- were open.  We didn't see any residents, and we didn't see any signs of any dogs.

Q.   When did they -- when did you conduct that scouting?

A.   I don't know the exact date.

Q.   Was it the morning of the incident?

MS. JONES:  Objection.

Go ahead.

A.   No, sir.

Q.   Was it the day before?

MS. JONES:  Objection.

Go ahead.

A.   I don't think it was the day before.

Q.   Was it within a week prior to the incident?



70

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

MS. JONES:  Objection.

A.  If I had to take an educated guess, I'd say it was within a week timeframe.

Q.  Okay.  And did you scout that location one time or more than one time?

A.  For the actual scout we were out there one time.

Q.  Okay.  So you never went back to see if maybe the gate was closed on a different time when you went back?

MS. JONES:  Objection.

Go ahead.

A.  The only other time was the morning that we were out there for the warrant.

Q.  So was the gate being open an invitation for you to enter the backyard?

A.  I'd say no.

Q.  What did you do to determine whether or not any dogs resided at that property?

A.  We're visually checking to see if we see a dog or listening to see if we hear any type of commotion in the backyard.  We're looking for any signs as far as dog bowls, water bowls, food bowls, stuff along that nature.  We're looking for any



SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

chains, dog houses, lead lines that might run from a porch or something like that.  We're looking for any dog feces in the yard, any wear patterns in the grass that might show where a dog is constantly going back and forth.  Those are some of the things I can think of offhand.

MR. SHIELDS:  Okay.  So I'm going to move to strike that answer as nonresponsive to my question.

Q.  I didn't ask what you do generally.  I asked, what did you do when you scouted my client's property at 1747 St. Paul Street to determine whether or not any dogs resided at that specific property?

A.  Those are all the things I did that morning looking for -- observation-wise to see if there was any type of animal.

Q.  Okay.  Did you enter the backyard to see if there was poop on the ground?

A.  Yes.  I entered the backyard.

Q.  Okay.  So when you scouted, you walked into the backyard of the property?

MS. JONES:  Objection.  Go ahead.

A.  Yes.  When I walked up the driveway, I saw the open gate.  I'm listening and looking for signs from -- before I enter the gate.  And without any of



72

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

those signs that I just spoke of, I further entered the property.

Q. Okay. And so when you entered the property when you were scouting, you did that without a warrant, consent, or exigent circumstances; correct?

MS. JONES: Objection.

A. That's correct.

Q. Did you document anything that you observed when you did the scouting on my client's property on a form or any piece of paper?

A. Not that I can recall.

Q. And how long did the scouting operation last?

MS. JONES: Objection.

But go ahead.

A. I don't recall a time frame.

Q. And is a fenced-in residential property an indication that a dog might reside at that property?

A. It could be an indication.

Q. So the answer is yes?

MS. JONES: Objection.

Go ahead.

A. I'd answered that it would be a potential sign.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

135

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

you?

MS. JONES:  Objection.

A.  No, sir.

Q.  Okay.  What did Nellist do?

A.  So I would be closer to the cinder block. And so again, this is tougher to explain than to show you.  I guess if my left shoulder was close to the cinder block with my back up against that corner of the two fences facing towards the house, Nellist would have been to my right.

Q.  Okay.  So Nellist would have been closer to the white van?

A.  I wouldn't say he was close to the white van, but he was closer than I was.

Q.  Okay.  So he was to your right if you're facing towards the house.

And so that would have been the direction where the white van is in this picture marked as City of Rochester 34; correct?

MS. JONES:  Objection.

A.  Correct.  We were shoulder to shoulder in that back corner.

Q.  Okay.  All right.  What happened next?

A.  Like I said, the dog made what I -- what



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

136

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

appeared to me as a charging motion. I threw my bag down in order to create a barrier. The dog stopped and from what I can recall, it seemed to circle around, I guess, towards the van, to use a reference point. At that point, the dog appeared to charge again towards our location. And that's when I fired two rounds.

Q. Okay. You fired two rounds.

And did Nellist also fire his gun?

A. Yes.

Q. Okay. And do you know how many rounds Nellist fired?

A. One, I believe.

Q. Okay. Did all of the rounds strike the dog?

A. I can't say for sure.

Q. Okay. What happened next?

A. Once the dog was hit, it appeared to back up and fall to the ground. We radioed to the team, I believe, our location. And I'm trying to think if there was anything else. We were met by team members out back.

Q. Okay. What happened before the team members got there?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

A.  Maybe -- if I had to guess, maybe 2017 or 2019 or...

Q.  Okay.  You don't remember if it was before or after this incident?

A.  No, sir.  I don't.

Q.  Tell me everything that you remember about that training.

MS. JONES:  Objection.

Go ahead.

A.  I remember them going over some of the visual cues about a dog.

Q.  Okay.  Did you watch any videos at that training?

A.  I don't remember any video in particular, but I'm sure there was.

Q.  Okay.  What did you learn at that training?

A.  Indicators for dog behavior.

Q.  Okay.  Anything else?

A.  That's specifically what I remember.

Q.  Okay.  And was that training geared towards dealing with aggressive dogs?

A.  I don't remember if it was geared towards an aggressive dog or a docile dog.  I just -- I



Confidential

162

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS
remember them going over different characteristics
that a dog might exhibit visually to give you
indicators as far as what their possible state of mind
might be.

Q.   Okay.  And indicators as to whether or not
they might be attacking or about to attack?

A.   Yeah.

MS. JONES:  Objection.

A.   Indicators for possible aggressiveness or
playfulness.

Q.   Okay.  Do you remember anything about how
to tell whether a dog is approaching you in an
aggressive manner versus approaching you just to greet
you like a normal dog would do, you know, if you
entered its yard that you learned at the training?

MS. JONES:  Objection.

Go ahead.

A.   I can try to give you an idea.  It's hard
to differentiate between life experience and what I
remember from that training and if they're crossing
paths or if one was from life experience.

Q.   Okay.  So what I'm try to figure out is,
is there anything you took away from that training
about how to differentiate between a dog that might be



Confidential

163

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

a threat versus one that you might misperceive as a threat, but really is not a threat?

A.   Okay.   I think, from what I can remember, they talked about hair standing up on the back of a dog's neck, the stance it takes, the showing of teeth, the audible sounds it may make, as far as whether it's growling or barking.  Just the overall posture.

Q.   Was there any discussion of how to avoid using a firearm against a dog that you perceive as a threat?

A.   I can't recall if they went over less lethal options or not in that.

Q.   Other than less lethal options, do you remember if they went over any other ways to avoid shooting a dog that you perceived as a threat?

MS. JONES:  Objection.

A.   Not that I can recall.

Q.   Okay.  Does the annual firearms training involve dog-shooting scenarios?

A.   Are you talking about like the qualification?

Q.   Correct.

A.   No, sir.

Q.   Are there any other incidents where you



Confidential

197

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

MS. JONES:  Objection.

A.   Yes, sir.

Q.   Okay.  So you chose to trespass in my client's yard because it was the easiest way to get to your final operating position; correct?

MS. JONES:  Objection.

A.   Like I said earlier, it was the easier and fastest approach.

Q.   Okay.  And you chose to exfiltrate through her yard again because it was the easiest way to exfiltrate; correct?

MS. JONES:  Objection.

A.   Again, it was the easiest and fastest way. And we come out where we went in unless we encounter something.

Q.   Okay.  So you knew that you were going to -- you knew that you didn't have a lawful basis to enter her yard, but you chose to do it anyways because it was the easiest thing to do?

MS. JONES:  Objection.

A.   I'd say that under emergency circumstances for this warrant I felt like we had a right to be there.

Q.   Okay.  And earlier you agreed with me and



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

198

SERGEANT JOSHUA PAUL KELLY - BY MR. SHIELDS

you testified that there were no exigent circumstances justifying your entry into her property; correct?

MS. JONES:  Objection.

A.   There was no exigent circumstances at that time.

Q.   There were no exigent circumstances at the time that you first entered her property to infiltrate to your final operating position and there were no exigent circumstances when you entered her yard the second time when you were exfiltrating from your final operating position; correct?

MS. JONES:  Objection.

A.   Correct.

MR. SHIELDS:  No further questions.

MS. JONES:  I think we're good.

THE VIDEOGRAPHER:  It's 3:03 p.m. and the deposition is now completed.

(TIME:  3:03 p.m.)

*     *     *

