CONFIDENTIAL

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ERIN GURSSLIN,

        Plaintiff,

                Civil Action No. 20-cv-6508

v.

THE CITY OF ROCHESTER, a municipal entity, POLICE
OFFICER JEREMY NELLIST, POLICE OFFICER JOSHUA
KELLY, COMMANDER FABIAN RIVERA, LIEUTENANT AARON
SPRINGER,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Video-Recorded Deposition in the Above-Titled Matter:

           Deputy Chief Aaron Springer

Location:     Alliance Court Reporting, Inc.
             109 South Union Street, Suite 400
             Rochester, New York 14607

Date:         February 28, 2023

Time:         10:00 a.m.

Reported By:  CHRISTINE VIGNA

             Alliance Court Reporting, Inc.

             109 South Union Street, Suite 400

             Rochester, New York 14607



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

A P P E A R A N C E S

Appearing Remotely on Behalf of Plaintiff:

Elliot D. Shields, Esq.

   Roth & Roth LLP

   192 Lexington Avenue, Suite 802

   New York, New York 10016

   eshields@rothandrothlaw.com

Appearing on Behalf of Defendants:

Peachie L. Jones, Esq.

   City of Rochester Law Department

   City Hall, Room 400A

   30 Church Street

   Rochester, New York 14614

   peachie.jones@cityofrochester.gov

Also Present:

Kenneth Williamson, Videographer

   Alliance Court Reporting, Inc.

   109 South Union Street, Suite 400

   Rochester, New York  14607

            *       *       *



DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

training coordinator, assistant commander and the commander.

Q.   Okay.   Can you give me the dates for all of those different positions?

A.   I -- I think it -- it would be difficult for me to recall as I transferred different positions. I was -- I know for certain that I was moved to the assistant commander position and had some ancillary responsibilities as the training coordinator when I was promoted to lieutenant in and around 2009.   But I -- I know with certainty that I was appointed as the commander of the team in December of 2012.

Q.   So you were commander of the team from December of 2012 until your retirement in January of 2020?

A.   That's correct.

Q.   Okay.   And I just want to back up and make sure I got all the different positions that you held before that.

So first you said entry and then breach. And then what was after breach?

A.   Assistant team leader.

Q.   And for which team was that?

A.   That would have been an entry team.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

**21**

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

Q.   Okay.  And then after that?

A.   Team leader, entry team.

Q.   Okay.  And then after that?

A.   I served as the training coordinator. That -- that position sometimes overlapped team leader and assistant commander.  So that was an -- an ancillary -- ancillary duty.

In and around 2009 shortly after I was promoted lieutenant, I was moved into the position of assistant commander and then in December of 2012 the commander.

Q.   Okay.  So you said the training coordinator is the position that overlapped with the other ones?

A.   That's correct.

Q.   Okay.  And today you have several different jobs; is that right?

MS. JONES:  Objection.

A.   I -- I only have one job today.

Q.   Okay.  So your current -- currently you work as the Deputy Chief of the Greece Police Department; is that right?

A.   That's correct.

MS. JONES:  Objection.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

consultation with the -- the rest of the team when we were putting this -- this procedure together.

And again, there's also the historical context of what had been done prior to sort of the implementation of this SOP that was never really codified or written down with -- with the exception of some reference that would have been in a general order predating the 2015 draft that you had there.

Q. Okay. So I'm just scrolling to get to the next thing. But as you said that, I have a question. Which is, prior to this SOP, was there a pre-existing SOP for the SWAT team?

A. There was not. We relied specifically on just the general order that would have predated the 2015 draft.

Q. Okay. So you drafted the first draft of the SOP that came into existence for the RPD SWAT team?

A. Right. You know, again, like nitpicking, but to provide context or detail, in consultation with other members of the team, yup.

Q. Okay. So I went down to page 40 of the 160-page document that we marked as Exhibit 1. And this is still under SWAT organization, order number



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

52

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

300, page 4. And down here under J and K, I highlighted them. And it says that -- well, I'm sorry. Let me go up.

It says duties and responsibilities under subsection C and then 1, SWAT commander. And it says "The SWAT commander is responsible for the following, administrative duties." And it says "A, command of RPD SWAT." And then I just wanted to fast-forward down here to J and K. And it says "Develop, coordinate, approve and administer SWAT training through the SWAT training coordinator." And then K, "Continually evaluate and make improvements to SWAT weapons, equipment and techniques, tactics and procedures."

So I guess my question is, Chief, basically it was your duty, according to the SOP, to -- what it says in J -- develop, coordinate, approve and administer the SWAT training through the SWAT training coordinator; is that right?

A. That's correct.

MS. JONES: Objection.

Q. And I mean, what does that mean in, you know, everyday English to you?

A. So what that means to me in everyday



Confidential

53

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

English is to -- is to work with the SWAT training coordinator and the team leaders to develop an annual training plan toward the end of the preceding year of that training cycle or calendar.

The training coordinator would have been responsible for reviewing training and operational after action reviews to identify training needs, to build out an annual training calendar that met all of our mission essential task list items based on our -- our -- our core mission, you know, hostage, rescue, barricaded armed subjects, high-risk warrant service. And then ensure that all components of training needs were met to include our biannual SWAT qualification testing. And then from -- from a large level.

And then on a monthly basis to, you know, approve, oversee and participating in monthly SWAT training. And then it would be finally, to review the training after action report and ensure that it was recorded for -- you know, in accordance with our -- our ability to record that document as a -- as a -- as a reference for future need.

Q. And since this is listed under your administrative duties, again, you were the final person to have the final say, overall SWAT training;



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

54

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

is that fair to say?

MS. JONES:  Objection.

A.   That would be -- that would be fair to say that I had the final say, yes.

Q.   Okay.  So you would have been the final policy maker for the SWAT training for the RPD SWAT team?

MS. JONES:  Objection.

A.   So I -- I don't think it would be fair to say that I would be responsible for -- for the policy. I -- I think that -- that there's implications there that are -- that are outside of my scope a little bit.

So MPTC provides policy requirements, the chief of police, the research and evaluation section. New York State MPTC and DCJS, they -- they -- they outline policy requirements.

It was my job to sort of ensure that the team was -- was meeting those -- those needs or -- or what was outlined in the policy that was prescribed to us.

Q.   Okay.  So if not -- so you didn't per se develop the policies that were developed by MPTC, but you made sure to implement those policies that were prescribed by MPTC?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

**Confidential**

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

checks and balances.  And as much as the experience I did have, I -- I appreciated other people having an opportunity to look at that too.

So as outlined in the -- in the policies, you know, where -- where I reported to the SOD commander or reported to the deputy chief of operations, typically given the -- the ability of time in a deliberate planning process when I reviewed a plan, I would forward it to the SOD commander for review and then he would forward it to the deputy chief of operations for review.

And then I would, you know, get any feedback and -- and make any changes that were identified.  And then we would move forward with -- once we had approval for the operation.

Q.  Okay.  So, for example, for a high-risk search warrant, your team would put together a SWAT operation order and then it would go to you for review --

A.  Generally --

Q.  -- first?

A.  Yup.  Generally.  Again, if we weren't doing it under a time exigency.

Q.  Okay.  So -- yes.



ALLIANCE
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

So in this -- all these next questions will be without a time exigency.

Then after you reviewed it, would it have to be approved by a supervisor above you?

A.  Yes.  That's correct.  Generally, I would -- with -- with a deliberate planning process with time, as you stipulated, I would forward that to the SOD commander for his or her review and approval.

Q.  And on September 6, 2018, that was Fabian Rivera?

A.  That's correct.

Q.  Okay.  Do you have any idea what time period Commander Rivera served as SOD commander?

A.  I don't.  I had a lot of SOD commanders as the commander of the -- of the SWAT team.  And I know that there was a point where he transitioned from the SOD commander to the patrol commander.  And he was replaced by, I believe it was, Commander Henry Favor. But I -- I don't recall the specific -- the specific time frames and dates of that.

Q.  Okay.  But on the date of the incident of this lawsuit, September 6, 2018, you remember that he was the commander of SOD at that point?

A.  That's correct.



DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

describe that if they're there.  But if they pre-deployed, then those specific things wouldn't be discussed during the pre-warrant briefing, which is -- which is -- like you described a conversation with Officer Nellist and I, we typically wouldn't have those conversations.

The -- the issuance of the operation order is very, very formal where the -- the -- the commander or the assistant commander typically introduces the operation.  And then the individual team leaders, they brief their specific parts of their plan.

So it's not -- it's not really a -- a communal communicative process where -- where there's a lot of, you know, discussing the plan or the merits of the plan.  Generally, that's already done.

Q.  Okay.  So what Nellist testified to was that prior to execution of the plan, he made you aware, Sergeant Magri aware and Commander Rivera aware of the planned route to get to and exit from their final operating position and that you all approved of that plan.  Does that sound accurate to you?

MS. JONES:  Objection.

A.  I -- I respect Officer Nellist's recollection and -- and, you know, certainly concede



Confidential

131

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

that -- that that's his perspective and recollection. And I would not dispute that.  I would just like to add that I don't have an independent recollection of that specific conversation.

Q.  Okay.

A.  And I'm not saying that it didn't happen. I just don't remember it happening.

Q.  And is the route that the snipers plan to get to and exit from their final operating position something that you're generally aware of prior to the execution of a high-risk search warrant?

A.  Yeah.  I think that's fair.  In general terms, I'm -- I'm generally aware.

Q.  Okay.  Okay.  And so prior to the execution of this warrant, you would have been aware that Nellist and Kelly planned to cross through my client's fenced-in backyard to get to and exit from their final operating position?

MS. JONES:  Objection.

A.  I -- I feel like I -- I have to sort of answer the same way I did a few minutes ago, that -- that I concede to Officer Nellist's recollection.  I don't have any -- I don't remember exactly how they explained they were going to get in



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

132

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

and out of -- of where they needed to go for their FOP.

Yeah.  So in terms of remembering independently without being able to review any documentation that outlines their route, I can't say with any level of certainty that I recall that conversation.  Just to be completely candid, it wasn't -- it's not germane to the operation.

Q.  The -- the route that they took to get to and to exit from their final operating position, that's not germane to the execution of the search warrant at 1771; that's what you mean?

MS. JONES:  Objection.

A.  Yes.  That's what I mean.  Because then -- and what's germane was specific, what's most important is that they're going to be at their spot to perform their task when they're supposed to be there. That's -- that's the most important thing that -- you know, that I typically would pay the most attention to in that part of the plan.

Q.  Okay.  Okay.  If you thought that there was some kind of problem with the route that they had chosen, is that something that you would address with them prior to the execution?



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

133

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

MS. JONES:  Objection.

A.  I'm trying to think of what -- what problems I may want to address with them prior to the commencement of an operation that I observed or identified at that particular time.  Again, my -- my focus of understanding their plan was -- was the -- the primary objective, where their FOP was in relation to what their task was.

But again, in general terms, if I -- just like every part of the plan, if I saw a problem, then I would either ask for clarification to better understand, to -- to see if my assumption of the problem was accurate or offer an alternate solution or -- or -- or edit to the plan to address the issue or problem that I saw if we're able to verify it through -- through additional conversation.  In -- in general terms.

In this particular case, I don't recall identifying a problem or requesting that they make any changes to what their plan was at the time.

(The following exhibit was marked for identification:  Number EXH 6.)

Q.  I want to put up the next exhibit which is going to be the after action report and that will be



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

143

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

A.   Generally, the -- the process was -- was I reviewed, signed, dated and submitted to -- to the SOD commander and then deferred, you know, their signatures and -- and their record to them.  I -- I don't understand or know how it was recorded after their review and signature.

But to ensure that it -- that it was and that it didn't get lost and that there was access to it, I saved this document as a PDF as a permanent record in our SWAT files.

Q.   Okay.  So you have no way of knowing whether the SOD commander or the deputy chief of operations ever reviewed and signed off on this document then; is that right?

MS. JONES:  Objection.

A.   I -- I would say that there's not a confirmatory process in place whereby I receive acknowledgment by the SOD commander or the deputy chief of operations that they've signed and reviewed the document.  I -- I pass it along to them electronically and then -- you know, because they're the boss of me, I defer to them on -- on how they do that process.

Q.   When you say you pass it along



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

144

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

electronically, do you mean that you email it to them or something else?

A.   Yes.

MS. JONES:  Objection.

A.   I generally emailed.  Or would -- would print and forward through the inner departmental mail. It was one of those two process.  I preferred electronically, but, you know, I -- I would generally take advantage of both options.

(Document request - Emails related to incident)

MR. SHIELDS:  Okay.  We call for production of the email which, you know, we had called for production in our RFPs of any emails related to this incident.

And so to the extent that this email that the Chief just referenced regarding forwarding this document to the SOD commander and the deputy chief of operations, we call for production of that email.

Q.   Okay.  Do you remember whether this after action report was completed by you or if you had somebody else complete it?

MS. JONES:  Objection.

A.   I did not complete that after action report.  It was delegated to a subordinate supervisor



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

145

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

on the team.

Q.   Okay.  Do you know what supervisor on the team completed the after action report?

A.   I believe on the end, it was submitted by Sergeant Osipovitch.

Q.   Okay.  But as we already discussed, you signed off on it.  So you reviewed it and all of its contents?

A.   That's correct.

Q.   Okay.  So you had personal knowledge of the information contained in the after action report at the time that you signed it?

A.   Please, I don't -- I don't necessarily understand exactly what that means.  Personal knowledge.  I -- I -- I read the document.  But if -- if the document was describing components of the operation that I did not directly observe, I don't know if -- maybe I'm confused.  But it wouldn't be fair for me to stay that I had direct knowledge of what was being described.  I only had direct knowledge of the words.

Q.   After the incident before the drafting of the after action report, there's a meeting, correct?

MS. JONES:  Objection.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

146

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

A.   Correct.

Q.   That meeting is called a debriefing; is that right?

MS. JONES:  Objection.

A.   It's typically referred to as an after action review, a debrief, a hot wash.  We all -- all the members of the team get together in one room and they discuss -- and we discuss the operation.

Q.   Okay.  Do you remember doing that after this operation?

A.   I don't have a specific recollection other than to say with a high degree of certainty that it was done because that's what we do on every single operation.

Q.   Okay.  Do you remember speaking with Nellist and Kelly about the dog being shot during the operation?

A.   During the operation, I -- I responded briefly to the area where the dog was shot. We -- we -- I believe that when the incident took place, that we had found ourselves proximate to a criminal assault or a shooting.

The information with regards to the -- the dog being shot was not immediately relayed on the


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

147

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

radio.  And -- and I -- I believed at the time when the gunshots were heard and there was a woman screaming, that we had somehow found ourselves in the middle of a -- of a -- of a criminal assault which prompted available team members who weren't specifically focused on a task in the operation to respond to the area in an effort to, you know, identify if there was a victim, identify and apprehend a -- a suspect, especially because of the gunshots.

Again, my immediate -- my immediate thoughts were that this was a -- this was -- that -- that we had somehow found ourselves in the middle of a criminal act.

Q.  So that -- that sounds pretty chaotic?  No?

MS. JONES:  Objection.

A.  I mean, when -- when -- when you're -- you're trying to ascertain critical information in a short period of time, there can be some communication or some information friction.

But to be completely candid, relative to other incidents that I've been involved with, you know, very, very quickly after getting proximate to the incident location, it was very clear what



Confidential

148

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

happened.  And so then all the communication friction very quickly subsided and we understood exactly -- you know, had a good understanding of what took place.

Specifically, that it was not -- that it was not a criminal assault shooting and that the officers were involved with a -- with a dog.

Q.  Okay.  And so you knew that the officers were involved with the dog before you reviewed and signed off on this after action report?

MS. JONES:  Objection.

A.  Yes.

Q.  Okay.  I want to go to -- let's see.  Hold on.

Okay.  So just to confirm, if we go back to page 1, it says that the incident was preplanned, correct?

A.  Yes.  Correct.

Q.  Okay.  And then where it says arrival of the team, 05:00, does that refer to the arrival of the team at the briefing location or the staging location or something else?

MS. JONES:  Objection.

A.  That generally refers to the time the team is expected to be at, you know, the location of the



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

149

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

briefing.

Q.   Okay.   So here that would mean that at 5 a.m. the team would have arrived at the location for the briefing where the document that we had marked as Exhibit 5, the SWAT operation order, would have been reviewed with the team?

A.   That's correct.

Q.   Okay.   And then time of deployment, does that refer to the time that they arrived at the staging location or the time that they make entry into the target location or something else?

MS. JONES:   Objection.

A.   That's -- that's generally indicative of the time that the team deploys to the -- and commences the SWAT operation at the location.

Q.   Okay.   So can you tell me what the process would be?   They would go from the briefing location to the target location in some sort of vehicle; is that the first step?

A.   Yeah.   Generally.   So when -- when we have time, the general process is that the -- the operation order is issued to the team.   The team leaders organize their individual teams into the vehicles. The vehicles are staged.   We drop some cones out in a



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

150

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

parking lot to signify the location, that we do some rehearsals.  Rehearsals typically consist of the teams deploying from their vehicles to their specific areas of responsibility.  We walk through that several times.

Once the team leaders are confident that any issues that weren't identified in the issuance of the operation order have been buttoned up and little things like, you know, the order of movement inside the vehicles, how people or personnel are staged and then exiting the vehicles and approaching their areas of responsibility, whether that be a containment point or -- or a member of the entry team or an alternate entry point or a break and rake.

Once those things are all walked through a couple of times and we feel confident, we get in the trucks.  And depending on time, may go to a staging area to await, you know, command to commence the operation if there is any particular trigger involved or move directly to what we call an LCC which is last cover and concealment.

And officers will -- will exit inside the cars and they'll get on the outside of the -- the -- you know, the rails and the steps of the



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

151

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

cars a block or two away from -- from the location. So when they pull up, everybody understands what their -- what their roles are, deploys immediately to their -- their assigned area.

Q.   Got it.

And then time location clear, that says 6:05.  So does that mean the team made entry and searched the location and cleared it of any potential people inside the location or -- is that what it means or something else?

MS. JONES:  Objection.

A.   The time location clear is that -- is that the -- the location and the occupants are secure and that we have begun, you know, post-operation administrative tasks in anticipation of turning the location over to whomever the host unit was.

But I -- I mean, I just want to differentiate between, you know -- you know, occupants are secure and search.  Search has more of a connotation of evidence or contraband and -- and unless there are some exigency, our general rule is that we do not participate in -- in evidence or contraband searches.  That's the responsibility of the host or the investigative unit.


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

152

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

Q.  Got it.

Because the purpose of SWAT being deployed is because it's presumably high-risk, right, dangerous?

MS. JONES:  Objection.

A.  That's -- that's correct, yes.

Q.  Okay.

A.  And -- and -- and more importantly, because, you know, our -- our training and our focus of effort is -- is -- is the safety of the occupants of the location and the team itself.  So that's -- that's really all that we're focused on and the investigators who -- who -- that -- that is -- you know, they have the training and the experience and the expertise and the investigative background. They're the ones that are then responsible for the investigation.

Q.  Got it.

And what does time secured mean?

A.  The time that we left the location.  All personnel and equipment are accounted for and we're back on the trucks and we're -- we're going back to the designated office to conduct the -- the after action review.



ALLIANCE
COURT REPORTING, INC.

*Videography · Remote · Deposition Suites*

www.alliancecourtreporting.net · 585.546.4920

Confidential

153

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

Q.   Got it.

Okay.   So if we go down to the page that's Bates-numbered City of Rochester 110, do you see at the bottom of the page, it says "Sniper Deployment Sierra Team 2"?

So in general, is this bottom portion of the page what would consist of the after action review for the sniper team specifically?

A.   That's -- that's generally representative of -- of the information that comes from the sniper team on an after action review -- or after action report, yes.

Q.   Okay.   And under the section "Effectiveness of Deployment, Pre-Deployment," it says "Very effective.   Sierra team was able to get into position without incident.   They were able to relay info for when one of the suspects left the location." And then the rest of that portion is redacted.

Do you know what that redacted portion says?

A.   No.   I -- I don't recall.

(Document request - entire document unredacted)

MR. SHIELDS:   Okay.   And we'll just call



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

154

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

for this page, and most likely -- well, let me withdraw that.

We'll call for this entire document to be produced in the unredacted format since it was produced as confidential anyways.  And we'll follow up in writing.

Q.   And, Chief, under recommendations, it says "While exfilling, the team encountered an aggressive dog 2 yards south of the target location.  Due to the aggressive actions of the loose dog and no egress from the fenced-in yard, they had to put the dog down which caused the owner to become irate.  During future ops, ensure members have their police badges and coms readily available and accessible."

If we go down to the next page, which is COR 111, the top of the next page is redacted.  Would this top portion of this page connect to the recommendations for the sniper deployment or something else --

MS. JONES:  Objection.

Q.   -- if you know?

MS. JONES:  Objection.

A.   I -- I don't recall.  It could be another heading.  It could be additional information


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

155

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

from -- I -- I -- without seeing the unredacted version, I can't say with any certainty --

Q.  Okay.

A.  -- it could be -- it could be a whole -- a whole other paragraph.  For example, the, you know, less -- less lethal deployment if there was one.  So I can't say with any level of certainty.

Q.  Okay.  So from what we can see on this portion of the unredacted portion of the document, the only recommendations or lessons learned that's documented in this after action report are that during future ops ensure that members have their police badges and coms readily available and accessible --

MS. JONES:  Objection.

Q.  -- is that accurate?

MS. JONES:  Objection.

A.  Based on the -- the unredacted text, that's correct, yes.

Q.  Okay.  Do you remember specifically making any additional recommendations as a result of this incident?

A.  I do not.

Q.  Okay.  And Nellist and Kelly both testified that you found all of their actions to have



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

members will have their police badges and coms readily available and accessible.  So that would have been the extent of the -- the -- the training, not specific to Officer Nellist and Officer Kelly, but for the whole entire team for future operations.

Q.   Okay.  By signing the after action report, you approved the basis for the actions of Kelly and Nellist on September 6, 2018?

MS. JONES:   Objection.

A.   I -- I wouldn't say that.  This -- this is the documentation in an attempt to accurately reflect what took place.  There was another report that was issued that -- that outlined specifically the -- the incident for -- for shooting the dog.  That was -- that was documented on an incident report separate to this particular document.

Q.   And Nellist and Kelly both testified that in no way by you or anyone else were they ever disciplined as a result of this incident.  Does that sound accurate to you?

MS. JONES:   Objection.

A.   Yes.

Q.   Okay.  And that they were never required to undergo any additional training.  That's what they



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

160

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

both testified to as well.  Does that sound accurate to you?

MS. JONES:  Objection.

A.  Yes.  That's accurate.

MR. SHIELDS:  Okay.  I want to just take a quick two-minute bathroom break if that's okay?

MS. JONES:  Sure.

THE WITNESS:  Good with me.

THE VIDEOGRAPHER:  Okay.  The time is 1:46 p.m.  We are off the record.

(The proceedings recessed at 1:46 p.m.)

(The proceedings reconvened at 1:55 p.m.; appearances as before noted.)

THE VIDEOGRAPHER:  We are on the record. The time is 1:55 p.m. on February 28, 2023.  This is a hybrid deposition.  We are located at Alliance Court Reporting, 109 South Union Street, Rochester, New York.  Our deponent is Deputy Chief Aaron Springer.

Please continue.

DEPUTY CHIEF AARON SPRINGER, resumes;

CONTINUING EXAMINATION BY MR. SHIELDS:

Q.  All right.  Chief, welcome back.  Same questions as before.  We just took a break for about ten minutes.  And during that ten-minute break, did



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

161

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

you have an opportunity to speak with your attorney?

A.  No, I did not.

Q.  Okay.  Are there answers to any questions after the break that you'd like to change your answer to?

A.  No.

Q.  Okay.  All right.  I want to go back to Exhibit 1, the SWAT SOP that you drafted and ask a couple of questions on that.

So we are on page 62 of 160 in the SWAT operations order manual.  We're in order number 300, SWAT organization on page number 26 under section D1, SWAT member position requirements, 1, SWAT commander. And I just want to go down to Q.

So Q says "Knowledge of laws, case law and standards relating to the use of SWAT and associated legal requirements and prohibitions," correct?  That's what that says there?

A.  Yes.  That's correct.

Q.  Okay.  So how would you go about keeping yourself informed of the knowledge of the laws and case law that was related to the SWAT team?

A.  So I -- I tried to ensure that I was, you know, consistently made aware of those particular



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

things by seeking outside training as I described earlier, so the operational tactics course, the NOTA, the leadership forums.

Generally, one of the speakers there was an attorney and a retired police chief and SWAT member who -- who now works for Lexipol, Mike Ranalli.  And that was one of the typical topics, updated case law or, you know, legal liabilities and risk.

You know, interestingly enough, like I found a -- a bunch of outlets now where, you know, where, you know, there's -- you know, there's automated email lists where you get case law updates and court decision reviews.  And it's -- and it's really done well in documented terms and easy for someone like me to understand.  But at the time I was a SWAT commander, I wasn't really aware of those types of things and didn't know that that -- those were opportunities I could have taken advantage of.

So in terms of how -- how did I satisfy that particular requirement, it was -- it was seeking and attending and participating in -- in outside training.

Q.  What are some of the, you know, legal updates or case -- cases that were discussed at some



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

163

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

of those outside trainings?

A.  I -- I -- I can't recall specifically.
And I don't think it would be fair for me to say.  I
feel like, you know, in general terms, there
were -- there were, you know, constitutional-related
conversations.

There's -- there's always conversations
with regards to graham and force training, like
canton-related issues with training.

You know, one of -- okay.  So one of the
ones that -- that I -- one of my big takeaways at some
of these trainings is -- is the liability incurred
when dealing with emotionally disturbed persons and
that the traditional SWAT response in dealing with
emotionally disturbed persons was as a barricaded
armed subject and -- and my exposure to some case law
and then recommendations or industry-best practice for
dealing with emotionally disturbed persons that are
non-criminal barricades to not involve the use of
tactical teams because of the liability and potential
risk.

So, you know, my -- my takeaway from that
was to really take a hard look at how we were
responding to those.  And especially, if -- if a SWAT



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

team by virtue of its deployment and the more traditional response to a barricade treated a non-criminal barricade the same way, that there was a tremendous amount of liability that we would incur especially in the context of using force.

So quite simply put, my position after being exposed to these concepts, ideas and case law was that I was adamantly opposed to using tactical teams, SWAT team resources in dealing with non-criminal barricades because of the potential negative outcome that could result especially if force was used up to and including deadly physical force.

Q. Okay. Did you ever learn that the supreme court has held that a search for the purposes of the Fourth Amendment occurs when the police intrude on a person's reasonable expectation of privacy?

A. I'm not -- I'm not sure I -- I completely understand. So I'm -- I'm trying to paraphrase or understand the question.

The supreme court has decided that a search takes place when there's an unreasonable intrusion on an individual's right to privacy? Did I summarize that correctly?

Q. Correct.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

A.   No.   I would say no, that -- that my understanding of -- of case law -- although, I don't know if I could point to a specific one -- is that -- is that a search can be done based on a -- on a reasonable intrusion of -- of the government as well.

So -- so, you know, while -- while the Fourth Amendment specifically states that individuals are protected from unreasonable governmental intrusion, then there -- there are times when it may be reasonable for the government to conduct a search and that -- that not necessarily be a -- a Fourth Amendment violation.

Q.   Okay.   So maybe I didn't state my question very clearly.

Did you ever learn that the supreme court has defined a search as constituting whenever -- under the Fourth Amendment -- so the supreme court has defined under the Fourth Amendment that a search occurs whenever the police intrude upon a person's "reasonable expectation of privacy"?

A.   Thank you.   I -- I understand your question now.

I would say no, that -- that -- that



Confidential

166

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

I -- the -- the -- the interpretation of the Fourth Amendment that I can recall that I was exposed to didn't define it in -- in the terms that you've defined it insomuch as a search automatically associates with an intrusion on someone's property.

Q.   Okay.  Now that you know that, is that something you might take to your job as a Deputy Chief for the Town of Greece?

A.   What it would --

MS. JONES:  Objection.

A.   -- what it would prompt me to do is, is do some thorough research both in case law and in current policy and procedure to see if that concept needed to be emphasized in -- in -- in our policy and procedure. Yeah.

Q.   And did you ever learn that the core premise underlying the Fourth Amendment is that a warrantless search of a home is presumptively unreasonable?

A.   No.  No.  I don't -- I don't think I ever learned it defined in those terms.  I feel like a -- a search or an intrusion, a governmental intrusion was predicated on -- on -- on a warrant or an exception to the warrant and that -- that not all searches were



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

unreasonable, you know, without a warrant.  That's the way, I guess, I would sort of define my understanding of it.

Q.  Okay.  And did you ever learn that the curtilage or the area adjacent to the home into which the activity of home life extends is considered a part of a person's home and enjoys the same protection against unreasonable searches as the home itself?

A.  Yeah.  I'm -- I'm definitely aware of that.  And I -- I understand curtilage to include specific spaces on the property of -- of a resident that -- that may not serve as the primary area of residence, for example, a garage, a shed -- a detached garage, a shed, an abandoned car, or vehicle or boat where personal property or effects are stored in.

So, you know, for example, if I was responsible for a search warrant at a location, I would want to make sure if there was curtilage identified during the scouting that -- and that -- and that curtilage was identified as potentially containing people, that that was included in the search warrant so that we could ensure that that area was safe and secure for the occupants and the follow-on investigators as well.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

Q.   So you mentioned several structures and a vehicle.  Is there anything else to your understanding that's included within the definition of the curtilage to a property?

A.   No.

Q.   Okay.  Is the fenced-in backyard to somebody's home considered the curtilage to their property?

A.   Well, that's an interesting point.  That's an interesting question.  Because prior to this incident, I would not have defined that area as curtilage.

Dependent on the -- the type of fence or if there was a yard that lacked a fence, I would -- I would not have considered that area curtilage and would -- would not have thought that if -- if someone passed through that space that it was potentially in violation of the Fourth Amendment.

I can say since this particular case has evolved and I've learned a little bit more, that -- that that area can be considered curtilage and that it can be thus protected under the Fourth Amendment.  But I have to say that prior to this incident, I did not understand that that was sort of



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS
protected space under the Fourth Amendment given especially or specifically if there was no specific governmental interest in that area.

So, for example, if I was walking through a backyard to get from point A to point B and I crossed over a chain-linked fence and I had no specific interest in that property insomuch as looking to search for and/or seize property, I didn't believe that that was being done in -- in violation of any Fourth Amendment considerations.

Q.   And that's because the RPD had never provided you with any specific training that taught you that you're not permitted to simply walk through someone's backyard; is that right?

MS. JONES:   Objection.

A.   Yeah.   I would say in fairness to RPD, I don't recall any specific training, policy, procedure or reference prior to this particular point that indicated that I didn't have that ability.   So yeah. That I -- that -- that that was a Fourth Amendment consideration.

Q.   After this incident, did the RPD make any changes to their policies or practices with regards to permitting officers to walk through someone's



DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

fenced-in backyard?

A.  I -- I believe that in the -- and I can't remember specifically, but I believe that -- that the, you know, search and seizure policy -- and I don't recall the number -- was updated to reflect that.

And I know now that RPD SWAT takes those things into consideration based on a conversation that I had, you know, somewhat recently with Sergeant Rudolph in planning an operation, but I -- and -- and I think it's important to note that I didn't make any substantive changes because I continued to lack awareness of this particular issue until I was made aware of this particular lawsuit.

Prior to that and prior to any conversation I had with my -- with my counsel, I -- I would have said that walking through someone's backyard was not -- was not a governmental intrusion.

Q.  And now after this lawsuit has been filed, you understand that simply walking through someone's backyard is a governmental intrusion and a violation of the Fourth Amendment?

MS. JONES:  Objection.

A.  I -- I understand now that there should be more consideration given to traversing someone's



**Confidential**

171

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

property because there may be Fourth Amendment implications.

So, for example, you know, in the normal course of police work, we -- we potentially intrude on people's property all the time.  You know, a hypothetical would be if -- if police officers need to do a neighborhood canvas following a -- a -- a criminal incident, they would -- they would traverse people's property to -- to knock on the door.  And I don't think that that particular case would be unreasonable.

So -- so in -- in my opinion now, that there has to be much more consideration given when there is any planning or -- or any lack of -- of exigency with regards to traversing people's property to ensure that their Fourth Amendment protections are -- are protected and supported by law enforcement.

Q.  Okay.  So you understand now that a search of the curtilage that occurs without a warrant based on probable cause or an exception to the warrant requirement violates the Fourth Amendment?

MS. JONES:  Objection.

A.  So -- so therein lies, I guess, a little question.  So if -- if I -- if I -- if someone were to



**ALLIANCE**
COURT REPORTING, INC.
*Videography · Remote · Deposition Suites*
www.alliancecourtreporting.net · 585.546.4920

Confidential

172

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

say do you need a warrant to search curtilage, I would respond affirmatively barring an exception.

If -- if -- if I would say you need a search warrant every time for curtilage with regards to property, you know, if I have a legal authority to be in a particular place and I can see something in plain view that may be within curtilage area, I -- I mean, I don't think it's unreasonable to say that I could, you know, seize that property without a warrant based on other factors and exigencies.

I -- I -- I don't believe that, in -- in my superficial understanding of case law and Fourth Amendment protections that -- to say it exclusively would be fair in my opinion.

Q. You understand that people have a reasonable expectation of privacy in the curtilage to their property?

A. Yes.

Q. And so based on the definition of a search from the United States Supreme Court that I read to you earlier that a Fourth Amendment violation occurs or a search for the purposes of the Fourth Amendment occurs when police intrude on a person's reasonable expectation of privacy, you understand that that means



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS
if you simply enter into somebody's fenced-in backyard without a warrant, consent or exigent circumstances, that would be a violation of the Fourth Amendment, right?

MS. JONES:  Objection.

A.  Yeah.  I guess my opinion would be because of the complexity of the law and the -- the importance of applying a fact -- a specific fact pattern, that I may argue that.  You know, I mean, I wouldn't say, you know, being made aware of the circumstance of this incident and having an opportunity to -- to learn more about Fourth Amendment implications specific to curtilage, that I wouldn't say without -- without exception that I wouldn't walk through someone's property again.  I don't -- I don't think that would be a -- a fair statement.

I think it would be fair to say that anytime I was planning to traverse property in conjunction with a -- a law enforcement operation, that consideration would be given to find an alternate means to protect that property owner's Fourth Amendment rights.  So I can give you a for example.

Recently I had a conversation with Sergeant Rudolph about a -- a SWAT operation.  And



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

they believed that there were going to be suspects that were going to be suspects that would exit the rear of the location and flee through the yards to a neighboring property.  And we were discussing the validity of deploying officers into the backyards to prevent the escape of the suspects from that house.

And it was my opinion -- again, from -- from having an opportunity to learn a little bit more over the last year or so since this -- since this incident has unfolded more -- that you -- you can't presume an exigency, the exigency being the suspects fleeing.  Therefore, it wouldn't be appropriate to put people in someone's backyard on the chance that occupants of the target location fled.

So, therefore, having an opportunity to learn and plan and -- and better now after having been exposed to that educational processes helping us with preventing this from happening again.

Q.  Okay.  So in this instance, there was no warrant to enter onto Ms. Gursslin's property, correct?

MS. JONES:  Objection.

A.  Correct.

Q.  Okay.  And in this instance, no one got



DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

consent to enter onto Ms. Gursslin's property, correct?

MS. JONES: Objection.

A.   Correct.

Q.   Okay.  So the only other warrant exception that could potentially apply would be exigent circumstances, correct?

MS. JONES:  Objection.

A.   Well, I mean, you know, hypothetically, if we observed someone to -- you know, if we established probable cause that a -- that a crime was occurring, we could enter the property.  If there was a public safety issue, like we observed, you know, an unattended, you know, hazardous device like a handgun, you know, in the backyard.  Given -- given the fact pattern that we know, barring an exigency, it wouldn't necessarily be appropriate to traverse the property of that particular residence.

And again, I -- I -- you know, for -- for, I guess, because I -- I understand the -- the result and implications of what took place.  I think it's important to understand that -- that it was -- it was not my opinion that traversing someone's backyard was -- required a warrant or an exception to the



DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

warrant requirement.

Q.   And now after this lawsuit's been filed and you've had an opportunity to educate yourself, now you understand that in order to traverse somebody's yard, you do need a warrant or a valid exception to the warrant requirement?

MS. JONES:   Objection.

A.   Yeah.   I -- I think that's fair.   Yeah. For sure.

Q.   And I just want to go through the exigent circumstances exception with you.   Is it your understanding that exigent circumstances require that a police officer has both emergency and probable cause in order to enter onto a property in the absence of consent or a warrant?

MS. JONES:   Objection.

A.   Yeah.   I think -- I think that there's -- there's, you know -- I think -- I think the way you phrased the question I got confused a little bit because you said maybe an exception and probable cause.   I think they can stand independently.

You know, again -- again, removing or stipulating that we're not talking about consent, probable cause would allow me to -- to enter and/or


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

199

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

made aware of -- of circumstance that -- that prohibit that behavior.

Q.  Okay.  So after this incident, the department was made aware that what happened in this case was unlawful?

MS. JONES:  Objection.

A.  It -- it was -- I would have to look at the specific policy language to see the wording.  I don't know if it says it's unlawful.  I just think that it advises against barring, you know, probable cause or exigency or if it can be articulated as being reasonable.

Q.  Both Nellist and Kelly testified that in their entire time working as SWAT snipers they've never obtained a warrant or consent to cut through the curtilage to someone's property to get to their final operating position.

Does that sound accurate to you?

MS. JONES:  Objection.

A.  That -- I would absolutely believe that that's accurate.  Again, because it was -- whether it be specific to me or the SWAT team, that we believed that a search warrant was required to pass through property where there was no, you know, governmental


ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

interest in that specific property other than using it to -- to traverse from point A to point P.

And I think it's important to note though that again I believe semantics are important when we talk about curtilage as a whole.  Because I don't want -- I don't want to -- to convey the opinion that we believed that we could go on or in people's property wantonly, recklessly without regard for the Fourth Amendment.

So I -- I did not define passing through a yard even if someone had to climb over a chain-link fence as -- as entering curtilage as opposed to the -- the SWAT team believing that in order to get from point A to point B we had to pass through someone's detached garage or -- or we had the ability to go through a -- a shed or whatever, anything like that, that this was specific to, you know, yards that we would just kind of walk through, point A to point B.

Q.  So it would have been the practice of the RPD SWAT sniper team to pass through someone's fenced-in backyard to get from point A to point B, point B being their final operating position?

MS. JONES:  Objection.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

201

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

A.   I -- I don't know if "practice" is the right word.  And -- and we talk about convenience. Right?  If it's -- if it's an 8-foot stockade fence, it -- it may not be convenient for the snipers who are oftentimes making a surreptitious or covert deployment or withdraw to -- to, you know, traverse an 8-foot fence.

But an open yard was -- was commonly used to pass through.  A -- a small chain-link fence to hop over, it wasn't necessarily practice.  But if the circumstance required that based on what their task and assignment and mission was and based on the route that they believed was most effective to get to that position to be able to do their mission and task, there -- there were no prohibitions against that.

Q.   So as the SWAT team commander, because of your misunderstanding of what constituted curtilage at the time, you never implemented any rules prohibiting the SWAT sniper team from crossing through the curtilage to somebody's property --

MS. JONES:  Objection.

Q.   -- correct?

MS. JONES:  Objection.

A.   Correct.



ALLIANCE
COURT REPORTING, INC.
Videography · Remote · Deposition Suites
www.alliancecourtreporting.net · 585.546.4920

Confidential

254

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

chain of command.  And -- and -- and I don't recall any officer bringing that to my attention.

Q.  In order to maintain membership on the SWAT team, isn't it true that the members had to maintain a clean disciplinary history?

MS. JONES:  Objection.

A.  Yeah.  Per the policy that we reviewed earlier, yes.

Q.  Okay.  So if any of your SWAT members had ever been disciplined in any way, that would be brought to your attention somehow, correct?

MS. JONES:  Objection.

A.  I would like to think that that would have been brought to my attention, yes.

Q.  Okay.  Because that would be a grounds for potentially dismissing that member from the SWAT team?

MS. JONES:  Objection.

A.  Correct.

Q.  What has the department done to try and reduce the number of dogs that are shot?

MS. JONES:  Objection.

A.  I -- I can't say with any certainty because of the period of separation.

Q.  Okay.  In the time that you were with the



Confidential

255

DEPUTY CHIEF AARON SPRINGER - BY MR. SHIELDS

RPD from 1996 to 20 -- to January of 2020, what did the department do to try and reduce the number of dogs that were shot?

MS. JONES:  Objection.

A.  I don't recall any specific effort on the part of the department based on an identification of an -- of an issue to reduce the number of dogs being shot with the exception of a training bulletin or a presentation that was conducted or that was provided to officers that -- that -- that maybe had some pictures of what dogs looked like to show when a dog was or was not, you know, in an aggressive posture. Aside from that, I don't recall really anything else.

Q.  Did you receive that training?

A.  I don't have the -- what I can remember is I remember the -- the pictures of the dogs, the -- the diagrams of the dogs in different postures, but I -- I don't remember specifically attending the training, reviewing any training material, when or where the training was.  I just remember that there was pictures of -- of dogs in different poses.

Q.  So you don't have an independent recollection of attending any in-service training?

MS. JONES:  Objection.

