UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ERIN GURSSLIN,

                    Plaintiff,

          v.

CITY OF ROCHESTER, *A municipal
entity*, JEREMY NELLIST, *Police Officer*,
JOSHUA P. KELLY, *Police Officer*,
FABIAN RIVERA, *Commander*, and
AARON SPRINGER, *Lieutenant*,

                    Defendants.
_____

**DECISION AND ORDER**

6:20-CV-06508 EAW

## INTRODUCTION

On September 6, 2018, Rochester Police Department ("RPD") officers Jeremy Nellist ("Nellist") and Joshua P. Kelly ("Kelly") traversed through the backyard of plaintiff Erin Gursslin's ("Plaintiff") property on St. Paul Street, in the City of Rochester (the "City"), during the course of executing a search warrant at a location three properties north of Plaintiff's home.  On their return trip, Nellist and Kelly encountered Plaintiff's foster dog, Nina, whom they shot and killed.  Plaintiff thereafter sued the City, Nellist, Kelly, RPD Commander Fabian Rivera ("Rivera"), and RPD Lieutenant Aaron Springer ("Springer") (collectively "Defendants") pursuant to 42 U.S.C. § 1983 for having unreasonably searched the curtilage of Plaintiff's property, for having unlawfully seized Nina, and for having unlawfully seized Plaintiff, all in violation of the Fourth Amendment. (Dkt. 1).

- 1 -

The Court previously granted summary judgment to Defendants on Plaintiff's claim for unreasonable search of her curtilage.  (Dkt. 120) (the "First Summary Judgment D&O").  Familiarity with the First Summary Judgment D&O and the procedural background of this case are assumed for purposes of the instant Decision and Order.

Presently before the Court are: (1) Defendants' motion to preclude Plaintiff from using James Crosby ("Crosby") as an expert in this matter (Dkt. 113); and (2) Defendants' motion for summary judgment on Plaintiff's remaining claims (Dkt. 114).  For the reasons below, the Court grants in part and denies in part Defendants' motion to preclude and grants in part and denies in part Defendants' motion for partial summary judgment.

## BACKGROUND

### I.    Factual Background

The Court incorporates by reference the factual background set forth in the First Summary Judgment D&O.  To briefly summarize, on September 6, 2018, Nellist and Kelly, who were members of the RPD's Special Weapons and Tactics ("SWAT") team, assigned to the Sniper Team, were involved in the execution of a High-Risk Search Warrant ("HRSW") at 1771 St. Paul Street, which was located approximately three properties north of Plaintiff's home.  (Dkt. 120 at 2-3).  While planning for the execution of the HRSW, Nellist and Kelly determined that they would "infiltrate to and exfiltrate from their final operating position" by walking down Plaintiff's driveway, through her backyard, and jumping the fence in the northwest corner of her backyard.  (*Id*. at 3).

After the HRSW was executed, at approximately 6:00 a.m. on September 6, 2018, Nellist and Kelly exfiltrated from their final operation position by traversing through

Plaintiff's yard without a warrant or consent.  (*Id*. at 3-4).  While they were in Plaintiff's yard, Nellist and Kelly encountered Nina, whom they shot and killed.  (*Id*. at 4).

The following additional facts were not previously before the Court, but are relevant to the pending motion for summary judgment.  Plaintiff fostered Nina through the organization Greece Residents Assisting Stray Pets ("GRASP").  (Dkt. 114-7).  In opposition to Defendants' motion for summary judgment, Plaintiff has submitted a sworn declaration from Donna Beyea, a member of GRASP's Board of Directors, who represents that she is "fully familiar with the facts and circumstances surrounding the foster care arrangement between GRASP and [Plaintiff] regarding the dog known as Nina[.]"  (*Id*. at ¶ 3).  Plaintiff assumed possession of and responsibility for Nina on August 19, 2016, more than two years before the incident at issue in this matter.  (*Id*. at ¶ 4).  "During this time, [Plaintiff] was responsible for Nina's daily care, including feeding, grooming, and providing a safe environment[.]"  (*Id*.).

GRASP's practice when a foster care arrangement lasts for this long and no interest has been expressed by any other party in adopting the dog, is that—assuming mutual agreement by GRASP and the foster—"the foster will remain in the possession and assume the responsibility for the care and well-being of the dog for the remainder of the dog's life." (*Id*. at ¶ 5).  GRASP will cease posting the dog for adoption and the foster arrangement will become permanent.  (*Id*.).  GRASP's only ongoing involvement at that point is to pay for certain expenses, such as veterinary care, if requested.  (*Id*.).  GRASP stopped posting Nina for adoption in April 2018.  (*Id*. at ¶ 6).  Plaintiff was Nina's primary caregiver and

had the right of first refusal if any person expressed an interest in adopting Nina.  (*Id*. at ¶ 8).

## II.    **Procedural Background**

Discovery in this matter closed in May 2024.  (Dkt. 103).  Defendants filed their motion to preclude on July 10, 2024 (Dkt. 113), and their pending motion for summary judgment on July 12, 2024 (Dkt. 114).  Plaintiff filed opposition papers with respect to both motions (Dkt. 116; Dkt. 117), and Defendants filed replies (Dkt. 118; Dkt. 119).  The Court issued the First Summary Judgment D&O on September 16, 2024.  (Dkt. 120).

## DISCUSSION

## I.    **Motion to Preclude Crosby**

### A.    **Legal Standard**

Pursuant to Federal Rule of Evidence 702, a proposed expert witness must possess "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  In accordance with this rule, a court considering the admissibility of expert testimony must consider whether (1) "the testimony is based upon sufficient facts or data"; (2) "the testimony is the product of reliable principles and methods"; and (3) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702(b), (c), (d).

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court explained that a trial court has a "gatekeeping" duty under Rule 702, and must ensure that proposed expert testimony "both rests on a reliable foundation and is

relevant to the task at hand." *Id.* at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) ("In *Daubert*, this Court held that Federal Rule of Evidence 702 imposes a special obligation upon a trial judge to ensure that any and all scientific testimony is not only relevant, but reliable.") (quotation and alteration omitted).

"Per *Daubert* and its progeny, a court's Rule 702 inquiry involves the assessment of three issues: (1) the qualifications of the expert, (2) the reliability of the methodology and underlying data employed by the expert, and (3) the relevance of that about which the expert intends to testify." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015). Rule 702 was amended in December 2023 "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Civ. P. 702, Advisory Committee Notes, 2023 Amendments.

## B.  Crosby's Qualifications and Opinions

Crosby holds "a Ph.D. in Veterinary Medical Science from the College of Veterinary Medicine, University of Florida, with specialization in Veterinary Forensics; [and] a Master of Science degree from the College of Veterinary Medicine, University of Florida, with specialization in Veterinary Forensics." (Dkt. 113-3 at 1). He is also "a Certified Behavior Consultant—Canine-Knowledge Assessed." (*Id.*). Crosby served as a police officer with the Jacksonville Sheriff's Office from 1977 to 1999, "performing twenty-two years of active service." (*Id.* at 3). During his career Crosby served as "a Patrolman, a Sergeant, and a Lieutenant." (*Id.*). He is a Certified Animal Control Officer in the state of Florida and "served as the Animal Control Division Manager for Bay County,

Florida, from February 2008 to September 2010." (*Id*. at 2). He also served as "the acting Chief of Animal Care and Protective Services for the City of Jacksonville, Florida from March through December of 2016." (*Id*.). Crosby has "trained police departments in the proper and effective use of less- and non-lethal force; recognition of canine body language, behavior, and dog bite risk analysis; and methods for safe engagement with domestic dogs across the United States." (*Id*.).

In his expert report, Crosby offers 23 opinions (*id*. at 18-24), which Defendants have separated into five categories: (1) the Fourth Amendment (opinions 1, 3, and 7); (2) SWAT tactics and operations (opinions 2, 4, 5, 6, 8, and 9); (3) "dogs, dog behaviors, and law enforcement encounters with dogs" (opinions 10, 11, and 13); (4) firearms (opinion 12); and (5) training and municipal liability (opinions 14-23) (Dkt. 113-1 at 5). Defendants argue that Crosby "should be precluded from testifying as an expert in all five of the proposed areas, mainly because he lacks expertise in the majority of them. His opinions also lack factual support, are not reliable, and seek to tell the jury what to conclude." (Dkt. 113-1 at 7). The Court considers these arguments below.

### C.    Admissibility of Crosby's Opinions

#### 1.    Fourth Amendment Opinions (Opinions 1, 3, and 7)

Defendants first argue that Crosby should be precluded from offering opinions 1, 3, and 7, regarding the Fourth Amendment and Nellist and Kelly's entry into Plaintiff's yard. The Court need not reach this argument, because opinions 1, 3, and 7 are all related to Plaintiff's claim for an unreasonable search of her curtilage, on which the Court has already

granted summary judgment to Defendants.  This portion of Defendants' motion is accordingly denied as moot.

### 2.    SWAT-Related Opinions (Opinions 2, 4, 5, 6, 8, and 9)

Defendants next argue that Crosby has "no SWAT experience or training" and that his opinions on SWAT-related issues are not based on "sufficient facts on which to make a reliable opinion."  (Dkt. 113-1 at 11).  Plaintiff does not dispute that Crosby has no expertise in SWAT-related issues, but argues that this argument is a "red herring" because Crosby "is not offering an opinion on specialized SWAT tactics or procedures," but instead is focusing on "the straightforward issue" of "why Officers Nellist and Kelly chose to trespass through Ms. Gursslin's yard after the conclusion of the SWAT operation when they could have simply exited through the vacant lot."  (Dkt. 116 at 20).

Opinion 2 reads in relevant part: "Any reasonable officer in 2018 would have known that because exigent circumstances did not exist to justify entry into the yard, they were required to request permission prior to entering the yard, or at least provide a warning to the home's occupants of their presence."  (Dkt. 113-3 at 18).  "In deciding whether expert testimony will be helpful to the fact-finder, the Court must determine whether the testimony 'usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'"  *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 48 (S.D.N.Y. 2016) (alteration omitted and quoting *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)).  Opinion 2 not only runs afoul of this prohibition, it offers a legal opinion on issues that have already been considered by this Court in the First Summary Judgment D&O.  It is not admissible under Rule 702.

Opinion 4 reads: "Even as overwatch sniper units, Nellist and Kelly should have been equipped with and prepared to use less-lethal tools should they have encountered any person or animals not posing a threat of death or serious injury during their passage to and from their position, especially considering that an uninvolved person or homeowner could reasonably be expected to have confronted them, not recognizing they were police officers." (Dkt. 113-3 at 19). The Court agrees with Defendants that this opinion falls outside the scope of Crosby's expertise. Crosby has never been a member of a SWAT team nor has he ever supervised a SWAT team. (Dkt. 113-5 at 6). Plaintiff has not demonstrated by a preponderance of the evidence that Crosby has any basis of knowledge regarding the proper equipment and training for a SWAT team's overwatch sniper units. Opinion 4 is not admissible under Rule 702.

Opinion 5 relates to Nellist and Kelly's prior "scout" of Plaintiff's back yard, and reads in relevant part: "In short, they did nothing in the planning phase to learn whether Nina or any other dog resided at the property, despite having the time and opportunity to do so. Nellist and Kelly's failure to conduct a proper scout or do anything whatsoever to learn whether a dog resided at the property was unreasonable under the circumstances and constituted a violation of good and accepted police practices and professional standards of care." (Dkt. 113-3 at 19). The Court does not find that this opinion is specifically related to SWAT tactics or organization, as opposed to planning for the possible presence of a dog in connection with the execution of a search warrant, which is a topic in which Crosby does have expertise. Further, while Defendants argue that it is "demonstrably false" that Nellist and Kelly took no steps to investigate whether a dog resided on the property, that argument

is based solely on the fact that they conducted a scout (Dkt. 113-1 at 13), which Crosby

acknowledges in his expert report (Dkt. 113-3 at 19).  This is a factual dispute, not a reason

to exclude expert testimony.   Opinion 5 is admissible.

Opinion 6 reads:

> Nellist and Kelly demonstrated a lack of situational awareness when they
> reentered Ms. Gursslin's back yard while exfiltrating from their Final
> Operating Position.  Prior to entering Ms. Gursslin's back yard, they should
> have recognized that there was an additional car parked in her driveway that
> was not there when they arrived; that there were lights on inside of the house
> that were not on when they arrived; and that the motion sensor light on the
> side of the house was on.  At this point, good and accepted police practices
> and professional standards of care required that they radio to their supervisors
> to learn whether anyone was home and whether it was safe to enter the yard.
> At the least, they should have recognized the heightened possibility that they
> might encounter a person or a dog in the yard, and paused and developed a
> plan for what to do if they encountered a person or a dog in the yard.  Their
> failure to do so was unreasonable under the circumstances and contrary to
> the actions of any reasonably and properly trained police officer and
> constituted a violation of good and accepted police practices and professional
> standards of care.

(Dkt. 113-3 at 19).  Like opinion 5, opinion 6 is not SWAT-specific, but relates generally

to procedures after execution of a search warrant.  Further, while Defendants attack the

factual basis for this opinion (Dkt. 113-1 at 12-13), their citations do not support their

argument.  Defendants argue that Crosby did not "know whether Plaintiff's vehicle in the

driveway was visible to the SWAT officers, because he did not know what kind of vehicle

Plaintiff drove or where (in relation to the other vehicle) Plaintiff parked in the driveway,"

citing "Crosby DC Depo. Tr. 46:15-49:21." (*Id*.).  "Crosby DC Depo. Tr." refers to Exhibit

C to Defendants' motion to preclude (*see id*. at 7), which is filed at Dkt. 113-5.  But the

cited portions of Dkt. 113-5 have nothing to do with Plaintiff or where her car was parked

on the night in question.  (*See* Dkt. 113-5 at 20-3).  Instead, they concern the use of tasers and pepper spray during dog encounters.  (*Id*.).  Defendants have failed to properly support their argument.  The Court will not preclude opinion 6 on this basis.

Opinion 8 relates to Springer and Rivera's supervision of the execution of the HRSW.  Specifically, opinion 8 concludes that Springer and Rivera did not properly supervise and oversee the SWAT operation because "the uniformed police officers stationed in front of Ms. Gursslin's property—Herbert McClellan and Jonathan Kent—failed to appreciate that Nellist and Kelly were exfiltrating from their final operating position by walking through Ms. Gursslin's back yard" and "[i]f Springer and Rivera had properly informed McClellan and Kent, then they could have warned Ms. Gursslin on her arrival at the home that police officers were using her backyard as part of the SWAT operation and prevented her from going into her back yard on the morning of the incident." (Dkt. 113-3 at 20).  The Court agrees with Plaintiff that this opinion is not specifically related to SWAT tactics, as opposed to general law enforcement practices when accessing citizens' properties during the execution of a search warrant.

The Court further rejects Defendants' contention that opinion 8 lacks a sufficient factual basis.  Defendants argue that "neither Officer McClellan nor Officer Kent saw Plaintiff or anyone the morning prior to the dog being shot."  (Dkt. 113-1 at 13).  But Plaintiff testified that she and her boyfriend went up to a police officer in a car and asked him what was going on.  (Dkt. 116-12 at 47).  And McClellan only testified that he did not remember anyone coming to his car and speaking to him.  (Dkt. 113-9 at 5).  Again, this is

a factual dispute, not a basis to preclude expert testimony. The Court will not exclude opinion 8.

Finally, opinion 9 is that "Nellist and Kelly had no plan for the use of less-lethal or non-lethal force regarding encountering Nina, or indeed any dog, in this incident. . . . In 2018, no reasonable and well-trained officer would fail to make and implement such a plan—especially considering that they had at least one week prior to the incident to conduct such an investigation—and the lack of planning directly led to the needless shooting of Nina. Failure to recognize the availability of, or to attempt to use less- or non-lethal methods in their encounter with Nina constituted objectively unreasonable action by Nellist and Kelly." (Dkt. 113-3 at 20). This opinion has nothing to do with the specifics of SWAT-related operations, and is within the scope of Crosby's expertise. The Court will not preclude opinion 9.

Defendants also make a general argument that Crosby's opinions regarding "good and accepted police practices" and "professional standards of care" are unreliable. (Dkt. 113-1 at 13-14). The Court is unpersuaded by this argument, which cites no case law. Crosby's opinions are based on his experience and training. The Second Circuit has upheld the admission of a law enforcement expert's testimony on "what minimally accepted police practices required" and how a defendant's "conduct departed from accepted police practices." *Restivo v. Hessemann*, 846 F.3d 547, 580 (2d Cir. 2017).

The Court is also unpersuaded by Defendants' argument that opinions 5 and 9 contradict one another, such that Crosby is not a reliable witness. (*See* Dkt. 113-1 at 14). Defendants argue that it is inherently contradictory to acknowledge that Kelly and Nellist

scouted Plaintiff's property but to also opine that they took no steps to ascertain whether a dog resided at the property. (*Id.*). But in reviewing Crosby's expert report, it is clear that his view is that during the scout, Kelly and Nellist took no steps to ascertain whether a dog resided at the property. There is no inherent contradiction.

### 3.    Opinions on Dog Behavior and Dog Encounters (Opinions 10, 11, and 13)

Defendants next seek to preclude Crosby's opinions on dog behavior and dog encounters, arguing that: (1) expert testimony on this topic is not needed; (2) Crosby seeks to replace the jury and not to aid it; (3) Crosby has not adequately defined "good and accepted police practices"; and (4) Crosby has not reliably applied his principles to the facts of this case. (Dkt. 113-1 at 14-17). The Court is unpersuaded by these arguments.

As to the first argument, while lay people may be generally familiar with dogs, the Court finds that the jury would benefit from expert opinion on police tactics for dealing with pet dogs. Most jurors have no law enforcement experience, and are unlikely to be familiar with the circumstances in which law enforcement are likely to encounter pet dogs, or what options they have available to them in such circumstances.

Defendants' second argument fails as a matter of law. Defendants argue that Crosby "should also be precluded, because he impermissibly decides a jury question." (Dkt. 113-1 at 15). But Federal Rule of Evidence 704(a) expressly provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." This is not a basis to preclude Crosby's testimony.

The Court has already rejected Defendants' third argument regarding "good and accepted police practices," and that analysis applies with equal force here. Finally, Defendants' fourth argument is nothing more than a disagreement with Crosby's conclusions regarding Kelly's placement of his rifle bag between himself and Nina. Specifically, Crosby has criticized Kelly for throwing the bag down in front of Nina instead of holding it between himself and the dog. (*See* Dkt. 113-1 at 17). Defendants contend that this is an improper conclusion by Crosby regarding the use of a barrier versus a shield (*see id.*), but this is merely their interpretation of Crosby's testimony. Defendants are free to cross-examine Crosby on this topic at trial. The Court will not preclude Crosby from testifying regarding dog behavior and dog encounters.

### 4. <u>Firearms Opinion (Opinion 12)</u>

Defendants contend that Crosby's opinion 12 relates to firearms and that he is not an expert in this topic. (Dkt. 113-1 at 17). Defendants further argue that this opinion is unsupported by facts. (*Id*. at 17-18).

Opinion 12 states:

Nellist and Kelly were, by their own admission, firing without regard for any potential collateral risk to person(s) that might have been behind Nina in the yard or in Ms. Gursslin's home. Nellist and Kelly never checked for other occupants in the yard or in the home, nor did they contact Plaintiff to ascertain whether there were other animals or persons within the home lawfully. Nellist and Kelly fired their sidearms at Nina as Ms. Gursslin was in the backyard just several feet behind Nina. They also fired while facing towards the back of Ms. Gursslin's home, where Ms. Gursslin's downstairs neighbors were present in their apartment, and her boyfriend was present in the upstairs apartment. Nellist and Kelly should have recognized that a distinct possibility existed that a human or other animal subject could have been within the yard and the home and thereby needlessly and recklessly exposed to injury or death from one or more of the bullets fired.

(Dkt. 113-3 at 21). The Court disagrees that this is an opinion about firearms, as opposed to an opinion about when it is appropriate for a police officer to use his firearm and what he should take into consideration before doing so. Crosby's law enforcement experience and training qualifies him to opine on a police officer's use of his firearm.

Defendants' factual attacks on this opinion lack merit. Defendants claim that it is "possible" that Nellist and Kelly were not facing Plaintiff's house when they shot Nina (Dkt. 113-1 at 18), but it is equally possible that they were. Defendants also claim that it is "misleading to state that the officers Nellist and Kelly fired their sidearms at Nina as Ms. Gursslin was in the backyard just several feet behind Nina when neither Sgt. Kelly nor Officer Nellist saw Plaintiff prior to shooting the dog or knew anyone was in the yard." (*Id.* (quotation and citations omitted)). But this argument actually reinforces Crosby's conclusions. Kelly and Nellist did not ascertain whether there were human beings present in the yard before opening fire, causing them to shoot bullets only feet from Plaintiff, who was doing nothing more than standing in her own yard. The Court will not preclude opinion 12.

### 5.  Training and Municipal Liability Opinions (Opinions 14-23)

Finally, the Court considers Defendants' argument that Crosby should not be permitted to opine on issues related to municipal liability. Defendants contend that Crosby is not an expert on municipal liability and that he improperly attempts to take the role of the jury. (Dkt. 113-1 at 14-15). The Court has carefully reviewed opinions 14 through 23 and finds that only opinion 14 can fairly be said to be about municipal liability as a legal concept, as opposed to the adequacy of the RPD's training regarding use of force in dog

encounters.  The Court does agree with Defendants that opinion 14, which states, "In my professional opinion, the City of Rochester exhibited deliberate indifference by failing to provide any of the free and effective trainings that were widely available and easily accessible regarding how to safely and lawfully interact with dogs" (Dkt. 113-3 at 21), goes beyond the scope of Crosby's expertise.  "Deliberate indifference" is—as discussed further below—a legal concept that has a specific meaning in this context, and Crosby has no particular expertise in whether or not that definition has been satisfied.  The Court will preclude opinion 14 on this basis.  But opinions 15 through 23 do not suffer from similar infirmities.

Defendants have also made specific factual arguments about opinions 19 and 21. (Dkt. 113-1 at 20).  As to opinion 19, in which Crosby "states that the City should have taken notice of the demonstrably effective trainings on dog encounters and provided those effective trainings to RPD officers," Defendants argue that Crosby "does not know how many dogs [sic] shootings occurred in each year or if the annual numbers decreased after the City gave" a training in 2014.  (*Id.*).  But Defendants have not provided the Court with the portions of Crosby's deposition transcript that they claim support this argument. Defendants cite "Crosby DC Depo. Tr. 107:2-16."  (Dkt. 113-1 at 20).  As noted above, this is Exhibit C to Defendants' motion to preclude, filed at Dkt. 113-5.  But Dkt. 113-5 does not contain a page numbered 107.  It goes directly from a page numbered 91 to a page numbered 123.  (Dkt. 113-5 at 34-35).  The Court lacks any basis, on the record before it, to conclude that opinion 19 is not based on sufficient facts.

Opinion 21 is about the training provided by the RPD to its officers, and includes the opinion that "best practices require at least a four-hour training." (Dkt. 113-3 at 23). Defendants argue that this opinion is outside Crosby's expertise, because he "does not have advanced education or training in teaching, course development, pedagogy, etc." (Dkt. 113-1 at 20). But an expert may be qualified based on any of "knowledge, skill, experience, training, or education." Fed. R. Civ. P. 702. Crosby has significant experience in training law enforcement officers how to interact with dogs, and his lack of formal training in teaching and course development does not prevent him from being an expert in this field.

For all these reasons, the Court grants Defendants' motion to preclude (Dkt. 113) as to opinions 2, 4, and 14. Defendants' motion to preclude is otherwise denied.

## II.     **Defendants' Motion for Partial Summary Judgment**

### A.     **Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). "The moving party bears the burden of showing the absence of a genuine dispute as to any material fact[.]" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "Where the non-moving party will bear the burden of proof at trial, the party moving for summary

judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial." *Johnson v. Xerox Corp.*, 838 F. Supp. 2d 99, 103 (W.D.N.Y. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011)). Specifically, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown*, 654 F.3d at 358. Indeed, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## B.    Unreasonable Seizure of a Person Claim

Defendants seek summary judgment on Plaintiff's claim that she was unreasonably seized by Nellist and/or Kelly, arguing that: (1) Plaintiff did not plead the elements of a seizure of her person; and (2) no facts support the conclusion that Plaintiff was seized by Nellist or Kelly. (Dkt. 114-1 at 9-11). The first of these arguments fails as a procedural matter. As the Second Circuit recently explained, "[t]he different standards generally applicable to motions to dismiss and for summary judgment serve distinct purposes, each tailored to addressing the unique considerations that arise at successive stages of the

litigation." *Lugo v. City of Troy*, 114 F.4th 80, 89 (2d Cir. 2024). As such, it is a reversible procedural error for the Court to "resolve[] a summary-judgment motion as a pleadings motion[.]" *Id*. At this stage of the proceedings, the adequacy of Plaintiffs' pleadings is not the relevant inquiry, and the Court will not grant summary judgment on this basis.

But the Court agrees with Defendants that there is no evidence in the record from which a reasonable jury could conclude that Plaintiff was seized. "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quotation and citation omitted). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). The Second Circuit has explained:

> Pertinent factors identifying a police seizure can include the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 340 (2d Cir. 2000) (citations and quotations omitted).

Plaintiff does not claim that Nellist or Kelly ever gave her any commands or pointed their weapons at her. Instead, Plaintiff argues that she was seized "under a theory of transferred intent" because Nina was shot while Plaintiff was standing just three feet behind

her. (Dkt. 117 at 8-9). This argument is foreclosed by the Second Circuit's decision in *Medeiros v. O'Connell*, 150 F.3d 164 (2d Cir. 1998). In *Medeiros*, the police accidentally shot a teenager while firing at the armed robber who was holding him hostage. *Id*. at 166. The Second Circuit held as a matter of law that the teenager had not been seized, "because the police did not intend to restrain" the teenager. *Id*. at 169. The Second Circuit explained that these sorts of "unintended consequences" cannot form the basis for a Fourth Amendment seizure claim. (*Id*.). Plaintiff's theory that a person is seized via transferred intent whenever the police discharge a firearm in that person's vicinity cannot be reconciled with *Medeiros*. Defendants are entitled to summary judgment on Plaintiff's claim for seizure of her person.

### C.    Unreasonable Seizure of Property (Nina) Claim

Defendants seek summary judgment on Plaintiff's claim for an unreasonable seizure of Nina, arguing that: (1) Plaintiff lacks standing to assert this claim, because Nina was her foster dog; and (2) the seizure of Nina was reasonable. (Dkt. 114-1 at 12-20). The Court is not persuaded by these arguments, for the reasons below.

#### 1.    Status as Foster Dog

"A seizure of property occurs where there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 63 (1992) (quotation and citation omitted). "To claim an unconstitutional seizure, 'a party must first assert a possessory interest in an item seized.'" *Newsome v. Bogan*, 617 F. Supp. 3d 133, 146 (W.D.N.Y. 2022) (quoting *United States v. Fields*, 113 F.3d 313, 320 (2d Cir. 1997)).

"Property interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 55 (1979). Under New York law regarding the licensing, identification, and control of dogs, "owner" is defined to mean "any person who harbors or keeps any dog." N.Y. Agric. & Mkts. Law § 108(15). "Harbor" is defined as "to provide food or shelter to any dog." *Id*. § 108(10). Plaintiff was indisputably harboring and keeping Nina, who had lived with and been cared for by her for more than two years. Plaintiff thus met the New York definition of "ownership" of Nina. *Cf. Chappell v. Horsham Twp. Police Dep't*, No. 2:16-CV-02650, 2018 WL 6075096, at *5 (E.D. Pa. Nov. 20, 2018) (finding that individual who was keeping foster dog "on his premises and in his care" had a possessory interest because "[u]nder Pennsylvania's Dog Law, a dog's owner 'includes every person having a right of property in such dog, and every person who keeps or harbors such dog or has it in his care, and every person who permits such dog to remain on or about any premises occupied by him'" (citing 3 Pa. Stat. Ann. § 459-102)).

Defendants argue in reply that New York law "distinguishes between 'owners' and 'owners of record'" and that "only 'owners of record' possess the ability to redeem a dog confiscated by animal control officers." (Dkt. 119 at 4-5). But New York law also states that "[i]f it cannot be determined in whose name any dog was last licensed . . ., the owner shall be deemed to be the owner of record of such dog[.]" N.Y. Agric. & Mkts. Law § 108(16). Defendants' counsel has submitted a sworn declaration stating that "[t]he City of Rochester Clerk's Office, which licenses all dogs in the City of Rochester, did not find a license for the dog Nina in its business records." (Dkt. 114-2 at ¶ 24). On the record before this Court, Plaintiff appears to have been both the owner and the owner of record of

- 20 -

Nina under New York law.  Defendants have not demonstrated that summary judgment should be granted based on lack of standing.

Nor does the Court agree with Defendants that it should abstain from resolving this issue pursuant to *Railroad Commission of Texas. v. Pullman Co.*, 312 U.S. 496 (1941). (*See* Dkt. 114-1 at 14-15).  "Three criteria must be established in order to justify abstention on *Pullman* grounds: (1) an unclear state statute or uncertain state law issue; (2) determination of the federal issue turns upon resolution of the unclear state law provision; and (3) the state law provision is susceptible to an interpretation that would avoid or modify the federal constitutional question presented."  *Planned Parenthood of Dutchess-Ulster, Inc. v. Steinhaus*, 60 F.3d 122, 126 (2d Cir. 1995).  The first of these criteria is not met in this case—New York's statute defining dog ownership is not unclear.  It provides a simple, easily applied definition that clearly applies to Plaintiff.  The fact that no state court has opined on the operative issue does not render this straightforward state statute unclear.  *Id*. ("The regulations at issue are neither ambiguous nor unintelligible, nor are they rendered 'unclear' merely because no state court has yet construed them.").  It would be error for the Court to abstain under *Pullman* in this case, where New York law is "neither unclear nor tangled[.]"  *Id*. at 27 (quotation omitted).

### 2.    Reasonableness of the Seizure

Having determined that Plaintiff has standing, the Court turns to the reasonableness of the seizure.  "[T]he unreasonable killing of a companion animal constitutes an unconstitutional 'seizure' of personal property under the Fourth Amendment."  *Carroll v. Cnty. of Monroe*, 712 F.3d 649, 651 (2d Cir. 2013).  In assessing reasonableness, a court

"must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion and determine whether the totality of the circumstances justified the particular sort of seizure." *Id*. (quotation and alterations omitted).

Killing a person's pet dog is "a severe intrusion given the emotional attachment between a dog and an owner." *Id*.; *see also Ray v. Roane*, 948 F.3d 222, 227 (4th Cir. 2020) ("private interests in dogs—and family pets especially—are highly significant since dogs have aptly been labeled Man's Best Friend, and certainly the bond between a dog owner and his pet can be strong and enduring" (quotations omitted)). As such, "when a dog is seized—and especially, as here, where it is killed, not merely injured or detained—the intrusion on the owner weighs heavily in favor of finding the seizure unreasonable[.]" *Matteson v. Hall*, No. 18-CV-6772, 2019 WL 2192502, at *7 (W.D.N.Y. May 21, 2019) (quotation omitted and collecting cases).

But on the other hand, ensuring officer safety is a significant governmental interest. *Carroll*, 712 F.3d at 651. Accordingly, "in some circumstances, it is reasonable for an officer to shoot a dog that he believes poses a threat to his safety or the safety of the community." *Id*. "Though an officer need not wait to be mauled or attacked before employing force in self-defense, the officer may not utilize deadly force against a dog unless there is an actual basis to believe that the dog posed an imminent threat." *Azurdia v. City of New York*, No. 18-CV-04189-ARR-PK, 2019 WL 1406647, at *8 (E.D.N.Y. Mar. 28, 2019) (quotation omitted). Relevant factors in ascertaining reasonableness include the context in which the officer encountered the dog, the dog's behavior and temperament, the

dog's breed, whether the owner was available and willing to assert control over the dog, whether non-lethal means were available to control the dog, and whether there was time to find an alternative solution to control the dog. *See Matteson*, 2019 WL 2192502, at *8; *see also Strong v. Perrone*, No. 17-CV-6183-FPG, 2020 WL 1445877, at *3 (W.D.N.Y. Mar. 25, 2020).

Defendants claim that the shooting of Nina was justified as a matter of law because she was a pit bull mix, because they did not know that Plaintiff was available to restrain the dog, because they had not seen evidence of a dog when they previously scouted Plaintiff's yard, because Nina approached them "quickly and aggressively," because Kelly first tried to control Nina by placing a rifle bag between himself and Nina, and because they had limited escape options. (Dkt. 114-1 at 17-19). Defendants' argument assumes that a reasonable jury would have to accept Nellist's and Kelly's account of the incident. This is incorrect. A reasonable jury could disagree with many of the "facts" offered by Defendants in support of their argument.

Beginning with Nina's breed, while it is undisputed that she was a pit bull mix, there is also evidence in the record that she had a deformity in her legs. Plaintiff testified at her deposition that the joints in Nina's back legs "bent funny" and that this made her hind legs look different from a normal dog's. (Dkt. 117-4 at 157-58). While Defendants contend that Kelly and Nellist could not see this deformity because it was dark outside (*see* Dkt. 119 at 5), that is a question of fact for a jury to decide. Plaintiff testified at her deposition that a motion sensor light in her backyard was on at the time of the incident. (*See* Dkt. 117-4 at 156-57).

There is also an issue of fact as to whether Nina unexpectedly approached Nellist and Kelly in an aggressive manner. Plaintiff, who was within feet of Nina, will testify that she never heard Nina growl or bark. Plaintiff will also testify that she was calling Nina's name in the yard prior to the shooting. A reasonable jury could infer that Nellist and Kelly were or should have been aware of both Plaintiff's and Nina's presence.

A reasonable jury could also conclude that Nellist and Kelly had ample opportunity to develop a plan that did not involve entering Plaintiff's yard without her knowledge or consent, and thus running the risk of encountering an unsuspecting pet. The reasonableness of a Fourth Amendment seizure is a fact-intensive inquiry, and the record before the Court does not support the conclusion that Nellist's and Kelly's actions were reasonable as a matter of law.

Nor does the Court find that Nellist or Kelly is entitled to qualified immunity.[1] It was clearly established at the time of Nina's death that the killing of a pet without justification violates the Fourth Amendment. *See Strong*, 2020 WL 1445877, at *6 ("It is further clearly established that killing a pet without justification constitutes a Fourth Amendment violation." (quotation omitted)); *Matteson*, 2019 WL 2192502, at *8 ("At the time of [the dog's] death, the law clearly established that the fatal seizure of a pet dog without justification constituted a Fourth Amendment violation."). Defendants argue that Nina—who, again, had a leg deformity—was "charging" Nellist and Kelly (Dkt. 114-1 at

---

[1]    Defendants' qualified immunity argument is limited to Nellist and Kelly; they do not make a qualified immunity argument as to Rivera and Springer. (*See* Dkt. 114-1 at 20-21).

20-21), but that argument characterizes the facts in the light most favorable to Defendants. There are genuine issues of material fact regarding whether Nina was acting in a way that would have caused a reasonable officer to believe that the shooting was justified. Summary judgment on the basis of qualified immunity is not warranted.

The Court also rejects Defendants' arguments that the City is entitled to summary judgment on the claim for unlawful seizure of Nina.[2] This Court recently issued a Decision in Order in *Dempsey v. City of Rochester*, a matter in which the plaintiff—who is represented by the same counsel as the plaintiff in this case—sued the City for the shooting death of his dog in October 2018, one month after Nina was shot. *Dempsey v. City of Rochester*, No. 6:19-CV-06780 EAW, Dkt. 104 (W.D.N.Y. Jan. 2, 2025). In *Dempsey*, the Court detailed the evidence—including an expert report by Crosby—establishing a genuine issue of material fact on municipal liability. (*Id*. at 23-25). In particular, the Court explained that there was a genuine issue of material fact as to whether there had been "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." (*Id*. at 23 (quoting *Brandon v. City of New York*, 705 F. Supp. 2d 261, 277 (S.D.N.Y. 2010)). The same evidence that precluded summary judgment in favor of the City in *Dempsey* is available to Plaintiff and precludes summary judgment here.

---

[2]    While Plaintiff has asserted "municipal liability" as a separate cause of action, municipal liability is "an extension of liability, not an independent cause of action[.]" *Soto v. City of New York*, 132 F. Supp. 3d 424, 459 (E.D.N.Y. 2015). The Court accordingly has assessed the viability of the unlawful seizure of Nina claim as asserted again the City.

The Court further finds that Springer and Rivera are not entitled to summary judgment on the claim for seizure of Nina. Defendants argue that Springer and Rivera had no personal involvement in the seizure. (Dkt. 114-1 at 21-22). To be held liable under § 1983, a defendant must have violated the plaintiff's constitutional rights "through the official's own individual actions[.]" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020).

In this case, Rivera and Springer oversaw the SWAT operation that resulted in Nina's death. Rivera was listed as the incident commander on the After Action Report. (Dkt. 123-2 at 129). He testified at his deposition that it was his responsibility to review and approve all SWAT operation plans, including the one for the incident involved in this lawsuit. (*Id*. at 142-43). Rivera approved the plan to infiltrate and exfiltrate through Plaintiff's yard. (*Id*. at 159). There is also evidence that Springer was aware of and approved the planned route. (*See, e.g.,* Dkt. 123-4 at 130-33). A reasonable juror could conclude that Rivera and Springer were directly involved in the plan to use Plaintiff's yard without her knowledge or consent, and without confirming that no pets lived in the home or were likely to be encountered in the yard, and that this constituted personal involvement in Nina's death. *See generally Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014) ("[P]lanners may be liable under section 1983 to the extent that a plan for a search or seizure, as formulated and approved by those defendants, provides for and results in an unconstitutionally excessive use of force."). Rivera and Springer are not entitled to summary judgment on the claim for unlawful seizure of Nina on the record before the Court.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to preclude Plaintiff's expert witness (Dkt. 113) and grants in part and denies in part Defendants' motion for partial summary judgment on Plaintiff's seizure claims (Dkt. 114). In particular, the Court grants the motion to preclude as to opinions 2, 4, and 14, and otherwise denies the motion to preclude. The Court grants the motion for partial summary judgment as to the claim for seizure of Plaintiff against all Defendants, but denies the motion for partial summary judgment as to the claim for seizure of Nina against all Defendants.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: January 3, 2025
       Rochester, New York